# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,        Case No. 22-CR-223 (NEB/DTS)

           Plaintiff,

v.                            ORDER

AIMEE MARIE BOCK ET AL.,

           Defendants.

In 2022, fourteen individuals were indicted for their roles in an alleged scheme to defraud the Federal Child Nutrition Program. (ECF No. 1.) Before trial, defendants filed various dispositive and non-dispositive motions. On November 1, 2024, United States Magistrate Judge David T. Schultz issued two Report and Recommendations ("R&Rs") and three Orders. (ECF Nos. 353, 354, 355, 356, 357.)

The first R&R—ECF No. 354—recommended denying defendants' various motions to suppress. The second R&R—ECF No. 355—recommended denying defendants' various motions to dismiss. The first order—ECF No. 353—denied defendants' motions for a *Franks* hearing. The second order—ECF No. 356—denied defendants' various motions for a bill of particulars. And the third order—ECF No. 357— denied defendants' remaining miscellaneous motions, like motions to change venue. There has been no appeal to the second and third orders (ECF Nos. 356 and 357).

Four defendants bring challenges as follows:

- In her objection, (ECF No. 368), Aimee Marie Bock objects to the R&R recommending denial of her motion to dismiss, (ECF No. 355).[1]

- In his objections, (ECF Nos. 366, 367), Abdulkadir Nur Salah objects to the R&R recommending denial of his motion to suppress, (ECF No. 354), and denial of his motion to dismiss, (ECF No. 355). He also appeals the order denying his motion for a *Franks* hearing, (ECF No. 353).

- In his objection, (ECF No. 369), Abdihakim Ali Ahmed objects to the R&R recommending denial of his motion to suppress, (ECF No. 354). He also appeals the order denying his motion for a *Franks* hearing, (ECF No. 353).

- In his objections, (ECF Nos. 364, 365), Ahmed Abdullahi Ghedi objects to the R&R recommending denial of his motion to suppress, (ECF No. 354), and denial of his motion to dismiss, (ECF No. 355).

## BACKGROUND

Judge Schultz's R&Rs set forth an appropriate overview of the factual and procedural history. The Court will assume the parties are familiar with the background facts.

---

[1] The Government's consolidated response states that "Bock objects to the Magistrate Judge's *Franks* order." (ECF No. 373 at 11.) However, Bock never filed for a motion for a *Franks* hearing, and her objection does not reference *Franks* at all. Because Bock never moved for a *Franks* hearing, the Court does not address it.

## ANALYSIS

### I.    Aimee Marie Bock (1)

Aimee Bock was the executive director of Feeding Our Future. (ECF No. 1 ¶ 10.) The indictment alleges that she "oversaw" the alleged fraud scheme. (*Id.* ¶ 24.) She is charged with conspiracy to commit wire fraud (Count 1), wire fraud (Counts 2, 4, 5, and 12), conspiracy to commit federal programs bribery (Count 15), and federal programs bribery (Count 40).

#### A.    *Motion to Suppress*

Bock purports to object to Judge Schultz's recommended denial of defendants' various motions to suppress. (*See* ECF No. 368 at 1 (citing ECF No. 354).) Bock, however, did not file a motion to suppress; she only filed a motion to dismiss and a motion for a bill of particulars. (ECF No. 194). Judge Schultz addressed those two motions, respectively, in ECF No. 355 and ECF No. 356. Beyond a citation to ECF No. 354, Bock's objection makes no argument or reference to a suppression motion.

#### B.    *Motion to Dismiss*

Judge Schultz recommended denying Bock's motion to dismiss the indictment. (ECF No. 355 at 24.) Bock objects to that recommendation. (ECF No. 368.) A motion to dismiss is dispositive, so the Court reviews the recommendation *de novo*. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(1), (3).

An indictment survives a motion to dismiss if it (1) "contains all of the essential elements of the offense charged," (2) "fairly informs the defendant of the charges against which he must defend," and (3) "alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." *United States v. Fleming*, 8 F.3d 1264, 1265 (8th Cir. 1993). "An indictment is normally sufficient if its language tracks the statutory language." *United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008).

1.    *Wire Fraud*

The essential elements of wire fraud are that (1) the defendant "joined a scheme to defraud," (2) she "intended to defraud," (3) "it was reasonably foreseeable that interstate wire communications would be used," and (4) "the wires were, in fact, used." *United States v. Louper-Morris*, 672 F.3d 539, 556 (8th Cir. 2012).

In her objection, Bock's main argument is that the indictment does not sufficiently allege the second element: intent to defraud.[2] (ECF No. 368 at 4.) The indictment, however, directly alleges that Bock knew the claims submitted to MDE were fraudulent: "Despite knowing the claims were fraudulent, BOCK and Feeding Our Future submitted

---

[2] Although Bock does not make an argument about the first, third, and fourth elements, the Court concludes that the indictment sufficiently alleges them. Not only did Bock allegedly join the scheme, she is alleged to have overseen the scheme and recruited others to join. (ECF No. 1 ¶ 24.) And the indictment alleges that millions of dollars flowed from the Minnesota Department of Education ("MDE") to Feeding Our Future and then to food distribution sites. (*Id.* ¶ 29.) Thus the indictment sufficiently alleges the interstate-wire elements.

her co-conspirators' fraudulent claims to MDE." (ECF No. 1 ¶ 28.) Two additional allegations support the sufficiency of the indictment as to the intent-to-defraud element. First, the indictment alleges that some distribution sites served nominal amounts of food before submitting "fraudulent invoices for inflated quantities of food." (ECF No. 1 ¶ 26.) Second, the indictment alleges that, after MDE became suspicious of Feeding Our Future's meal counts, Bock sued MDE, accusing it of racial animus in violation of the Minnesota Human Rights Act.[3] (*Id.* ¶ 34.)

Bock also argues that the R&R does not acknowledge (1) that nutrition programs may charge administrative fees and (2) that Bock did not receive any administrative fees personally. (ECF No. 368 at 4–5.) These arguments are irrelevant to the sufficiency of the indictment. The validity or invalidity of administrative fees is not an essential element of wire fraud.

Although she focuses on wire fraud, Bock's objection is labeled as "Conspiracy to Commit Wire Fraud." (*See id.* at 4–6.) Assuming Bock also challenges the recommended denial of her motion to dismiss the conspiracy count, the Court finds that the indictment is sufficient on this count as well.

---

[3] "A slightly greater level of detail is required" for a wire fraud indictment. *United States v. Hansmeier*, 988 F.3d 428, 436 (8th Cir. 2021) (citation omitted). The Court finds that even under this higher standard, the indictment includes sufficient allegations to survive a motion to dismiss.

"To prove conspiracy to commit wire fraud, the government must show (1) that there was a conspiracy, an agreement to commit wire fraud, (2) that [Bock] knew of the agreement, and (3) that [she] intentionally joined in the conspiracy." *United States v. Johnson*, 450 F.3d 366, 374 (8th Cir. 2006).

The indictment alleges that Bock "conspired with" other defendants "to devise a scheme and artifice to defraud and to obtain money by materially false and fraudulent pretenses." (ECF No. 1 ¶ 21.) Bock is alleged to have known of the agreement—she "recruited individuals" to join the scheme. (*Id.* ¶ 24.) She is also alleged to have taken actions that demonstrate she intentionally joined in the conspiracy: (1) she "created and submitted false documentation to cover up" the fraud; (2) she submitted fraudulent claims to MDE; (3) she "sought to divert attention away from" the scheme; and (4) she gave false assurances to MDE. (*Id.* ¶¶ 26, 28, 33.) The Court concludes that these allegations contain the essential elements of conspiracy to commit wire fraud.

2.    *Federal Programs Bribery*

To prove federal programs bribery, the Government must show that Bock: (1) was an agent of a government-affiliated entity; (2) corruptly accepted a thing of value in connection with Federal Child Nutrition Program ("FCNP") transactions; (3) that the transaction involved something of value of $5,000 or more; and (4) that the government-affiliated entity received benefits in excess of $10,000 from the federal government. *United*

*States v. Baumann*, 684 F. Supp. 2d 1146, 1149 (D.S.D. 2010) (listing elements of 18 U.S.C. § 66(a)(1)(B)); *see also* Model Crim. Jury Instr. 8th Cir. 6.18.666C (2020).[4]

Bock's main argument on the bribery count is that the "indictment fails to allege the requisite intent to influence or reward an official act, as it simply refers to the [$310,000] check's issuance in connection with a business transaction, which is not inherently a bribe." (ECF No. 368 at 5.) She cites *Snyder v. United States*, 603 U.S. 1 (2024), in support of her argument. Co-defendant Abdulkadir Nur Salah also objects to the recommendation to deny his motion to dismiss based on *Snyder*. The Court disagrees with both defendants' positions under *Snyder*, as analyzed below in the section addressing Salah.

Finally, Bock claims that "the indictment improperly treats the $310,000 check as the sole basis for the bribery charge." (ECF No. 368 at 5–6.) That the indictment alleges one instance of bribery is no reason to dismiss the indictment. Nothing in the statute requires multiple alleged bribes to sustain a federal program bribery charge.

---

[4] There are also four elements for conspiracy to commit federal programs bribery. The Government must show that: (1) Bock agreed with at least one other person to commit the crime of federal programs bribery; (2) she voluntarily and intentionally joined in the agreement; (3) at the time she joined in the agreement, she knew the purpose of the agreement; and (4) she knowingly did one or more acts for carrying out or carrying forward the agreement. *See United States v. Woodard*, 315 F.3d 1000, 1004 (8th Cir. 2003). The Court concludes the indictment sufficiently alleges conspiracy to commit federal programs bribery.

## II.    Abdulkadir Nur Salah

Abdulkadir Nur Salah is alleged to have been affiliated with at least four entities involved in the alleged fraud scheme.[5] He is charged with conspiracy to commit wire fraud (Count 1), wire fraud (Counts 5, 8, 13, and 14), conspiracy to commit federal programs bribery (Count 15), federal programs bribery (Counts 20, 22, 24, and 40), conspiracy to commit money laundering (Count 41), and money laundering (Counts 52, 57, and 58). Judge Schultz recommended denying Salah's motion to suppress and motion to dismiss the indictment. (ECF No. 354 at 34–37; ECF No. 355 at 21–23.) He also denied Salah's request for a *Franks* hearing. (ECF No. 353 at 43–44.) The Court reviews motions to suppress and to dismiss *de novo*. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(1), (3). A denial of a request for a *Franks* hearing is reviewed for clear error. Fed. R. Crim. P. 59 (non-dispositive matters referred to magistrate judges are reviewed for clear error); *see United States v. Lewis*, 386 F. Supp. 3d 963, 979 (E.D. Wis. 2019) ("Rule 59(a) governs the referral of non-dispositive matters—in this case, the motion for a Franks hearing—to magistrate judges.").

---

[5] The indictment alleges that Salah (1) was an owner of an LLC that ran Safari Restaurant, (ECF No. 1 ¶ 12); (2) operated Total Financial Solutions, "a company that provided payroll and bookkeeping services to many of the companies involved in the scheme," (*id.* ¶ 15); (3) was affiliated with Stigma-Free International, a non-profit that operated five FCNP sites in Minnesota, (*id.* ¶ 16); and (4) created a nonprofit called Bet on Better Future that opened FCNP sites in four Minnesota cities, (*id.* ¶ 20).

### A.   Motion to Suppress

Law enforcement obtained search warrants for Salah's email account and home. (ECF Nos. 188-1, 188-3.) Salah moved to suppress evidence gathered from both warrants. (ECF No. 189.) "Though establishing probable cause is not a high bar, it still requires a showing of facts that create a fair probability that evidence of a crime will be found in the place to be searched." *United States v. James*, 3 F.4th 1102, 1104–05 (8th Cir. 2021) (cleaned up). Because "the issuing judge relied solely upon the supporting affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (cleaned up). The Court looks "to the totality of the circumstances to determine whether an affidavit is sufficient to demonstrate probable cause." *United States v. Keele*, 589 F.3d 940, 943 (8th Cir. 2009).

### 1.   Email Warrant

In support of the email search warrant, FBI Special Agent Wilmer attached an affidavit that referenced three emails sent by Salah.

- Email 1 - Salah emailed receipts to Bock that, as described by the affidavit, "purport[ed]" to show food purchases. (ECF No. 188-3 ¶ 136.)

- Email 2 - Salah emailed Bock with the subject line "SAFARI ADDITIONAL RECEIPTS" and attached receipts (*Id.* ¶ 137.)

- Email 3 - Salah emailed Bock invoices that, as described by the affidavit, "purport[ed] to document Safari Restaurant's purchase of food from various food distribution companies." (*Id.* ¶ 138.)

- Along with the emails, Agent Wilmer attested that Salah created a limited liability company—3017 LLC—with the Minnesota Secretary of State's office and listed his email as part of that registration. (*Id.* ¶ 135.)

Salah argues that there was no probable cause because the emails indicate no fraudulent purpose. (ECF No. 354 at 4–5.) The emails only show that he "participated in some minor way" with food distribution and innocuously sent receipts to Bock. (*Id.*)

Read in isolation, the emails might not support probable cause. But three additional sets of facts in the affidavit establish a fair probability that evidence of a crime would be found in Salah's email account.

First, Agent Wilmer explained the overall structure of the alleged fraud scheme. He avers that individuals "purportedly in the business of providing federally funded free meals" claimed to serve thousands of children, but "almost none" of the funding was used for that purpose. (ECF No. 188-3 ¶ 7.) Instead, he sets forth, individuals misappropriated the funds for personal gain, in part by submitting false invoices and meal counts to Feeding Our Future. (*See id.* ¶¶ 47–50.)

Second, the affidavit included bank records showing that Salah's limited liability company (3017 LLC) received over two million dollars through the alleged scheme.[6]

Third, Salah was involved with the $2.8 million purchase of a commercial building in Minneapolis, which was allegedly bought with proceeds from the scheme. (*Id.* ¶ 89.) 3017 LLC transferred $840,000 into a bank account to buy the building. (*Id.* ¶¶ 92–93.) The entity that purchased the building (Cosmopolitan Business Properties, LLC) included Salah's email as contact information. (*Id.* ¶ 96.)

Read "with common sense," *Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir.1998), the affidavit establishes probable cause to search Salah's email account. The affidavit need not include direct evidence that Salah used his email account to commit fraud. *See United States v. Diallo*, No. 20-CR-2339 (JRT/DTS), 2023 WL 3815695, at *3–4 (D. Minn. June 5, 2023) (investigators' knowledge of broader scheme established probable cause even when individual emails could be characterized as "potentially innocuous"). It was enough to show that (1) Salah's limited liability company earned millions from the alleged scheme, (2) Salah used his email, on at least some occasions, consistent with the

---

[6] For example, between October 2020 and July 2021, $6.9 million in FCNP funds was deposited into the bank account of Safari Restaurant—a food distribution site. (ECF No. 188-3 ¶ 54.) $1.9 million of that $6.9 million was transferred to 3017 LLC. (*Id.* ¶ 55.) Similarly, between July 15, 2021, and November 30, 2021, $6.2 million in FCNP funds were deposited into Safari Restaurant's bank account. (*Id.* ¶ 56.) Of that $6.2 million, Salah and 3017 LLC were transferred $138,000. (*Id.* ¶ 57.) And then of $2.6 million in FCNP funds deposited into Safari Restaurant's bank account between May and October 2020, $562,000 went to 3017 LLC. (*Id.* ¶¶ 69-70.) Agent Wilmer also attested that Salah was a signatory on at least one of Safari Restaurant's bank accounts. (*Id.* ¶ 56.)

scheme (*i.e.*, sharing receipts with Feeding Our Future), and (3) Salah listed his email in connection with a real estate purchase allegedly bought with fraudulent proceeds. The affidavit establishes a fair probability that evidence of a crime would be found in his emails. *See United States v. Adjani*, 452 F.3d 1140, 1145 (9th Cir. 2006) (affirming search warrant for computer where "extensive 24-page supporting affidavit described the extortion scheme in detail" including "the need to search computers, in particular, for evidence of the extortion scheme").

2.    *Residence Warrant*

Salah also challenges the warrant to search his residence. In support of that warrant, Agent Wilmer's affidavit described his experience investigating fraud, including that individuals "receiving income from fraud schemes [] often maintain within their residence records of assets and financial transactions." (ECF No. 188-1 ¶¶ 3, 4b.)

In addition, Agent Wilmer attested to examples of Salah's residence connected to the alleged fraud scheme.

- The registered office address of 3017 LLC was Salah's residence. (*Id.* ¶ 39.)

- A bank account for 3017 LLC listed Salah's residence as an address. (*Id.* ¶ 40.)

- 3017 LLC received "large" checks "from other entities involved in the fraud scheme" and those checks listed Salah's residence as the address for 3017 LLC. (*Id.* ¶ 41.)

- The company that owned Safari Restaurant listed Salah's residence as its address with the Minnesota Secretary of State. (*Id.* ¶ 42.)

- The company created to buy the Minneapolis commercial building listed Salah's residence as its address. (*Id.* ¶ 43.)

A law enforcement officer's experienced opinion can provide the basis for a probable cause finding. *Keele*, 589 F.3d at 943–44. Based on his experience, Agent Wilmer concluded that there was a fair probability that evidence of financial fraud could be found at Salah's residence. Salah's home address was connected to three entities (3017 LLC, Cosmopolitan Business Solutions, and Cosmopolitan Business Properties LLC) that are alleged to have been central to the scheme.

### B.    *Motion to Dismiss*

Five defendants moved to dismiss the federal programs bribery charges based on the Supreme Court's 2024 decision in *Snyder v. United States*.[7] Judge Schultz recommended denying their motions. Two defendants—Bock and Salah—object to that recommendation. They argue that *Snyder* clarified an essential element of federal programs bribery: the quid pro quo agreement must occur *before* the official act. Bock and Salah contend that the timing element is missing from the indictment and therefore their bribery counts should be dismissed.

---

[7] The main motion came from Abdulkadir Nur Salah. (ECF No. 348.) Three additional defendants—Abdihakim Ali Ahmed, Abdinasir Mahamed Abshir, Salim Ahmed Said—joined that motion. (ECF Nos. 337, 338, 341). Bock also moved to dismiss the indictment based on *Snyder*. (ECF No. 327.)

To resolve this issue, the Court first summarizes how *Snyder* changed the essential elements of federal programs bribery, and then examines the indictment to see if any essential element is missing.

1.    *Snyder*

"Section 666 of Title 18 makes it a crime for state and local officials to 'corruptly' solicit, accept, or agree to accept 'anything of value from any person, intending to be influenced or rewarded' for an official act." *Snyder*, 603 U.S. at 5. In *Snyder*, Portage, Indiana mayor James Snyder received a $13,000 check from a local truck company after the city had awarded the company two contracts. *Id.* at 9. A federal jury convicted him for accepting the $13,000 check in violation of Section 666(a)(1)(B). *Id.* at 9–10.

Key to *Snyder* was the difference between a bribe and a gratuity. "[B]ribes are payments made or agreed to before an official act in order to influence the official with respect to that future official act." *Id.* at 5. By contrast, "[g]ratuities are typically payments made to an official after an official act as a token of appreciation." *Id.* at 6. *Snyder* held that Section 666 proscribes bribes, not gratuities. *Id.* at 10, 19–20.

In reaching that holding, *Snyder* rejected the argument that the word "rewarded" in Section 666 covered post-act gratuities.[8] *Id.* at 18–19. "By including the term 'rewarded,'

---

[8] It is illegal when a state or local official "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or *rewarded* in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B) (emphasis added).

Congress made clear that the timing of the agreement is the key, not the timing of the payment." *Id.* at 19. In other words, to be a bribe under Section 666, only the agreement must occur before the official act. Whether the payment arrives before or after the act is immaterial. *United States v. Macrina*, 109 F.4th 1341, 1351 (11th Cir. 2024) ("If there were an agreement before the official act was complete to make a payment for that act, the payment received after the act could still be considered a bribe.").

The Court concludes that *Snyder* established a new essential element of federal programs bribery. This is especially true in the Eighth Circuit, which was on the losing side of the circuit split. *See United States v. Zimmermann*, 509 F.3d 920, 927 (8th Cir. 2007), *abrogated by Snyder v. United States*, 603 U.S. 1 (2024). To charge federal programs bribery post-*Snyder*, the bribe-giver and the bribe-taker must have come to their quid pro quo agreement *before* the official act. *Snyder*, 603 U.S. at 6.

2.     *Sufficiency of the Indictment*

That said, the Court keeps in mind the bar an indictment must clear to survive a motion to dismiss: "An indictment is normally sufficient if its language tracks the statutory language." *Sewell*, 513 F.3d at 821. The Court cannot "insist that a particular word or phrase appear in the indictment when the element is alleged in a form which substantially states the element." *United States v. Wyatt*, 853 F.3d 454, 457 (8th Cir. 2017) (cleaned up). And "the allegations of the indictment must be taken as true." *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952). That said, if the indictment lacks

essential elements of a charge, that "omission is not cured by the bare citation of the charging statute."[9] *United States v. Zangger*, 848 F.2d 923, 925 (8th Cir. 1988).

For three reasons the Court finds that the indictment's federal programs bribery charges survive a motion to dismiss.

First, the indictment tracks the statutory language of Section 666.[10] Subsection (a)(2) proscribes bribe-giving. It states it is a crime when an individual

> corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more.

Salah is an alleged bribe-giver. The indictment alleges that he "corruptly gave, offered, and agreed to give" three checks to Abdikerm Eidleh, an employee of Feeding

---

[9] *See also United States v. Camp*, 541 F.2d 737, 739 (8th Cir. 1976) ("The word 'forcibly' was omitted from the indictment, and we conclude that the omission requires a reversal of the conviction."); *United States v. Olson*, 262 F.3d 795, 799 (8th Cir. 2001) ("As there was no fact allegation in Count 1 that can be reasonably construed as charging the force-or-intimidation element of a § 2113(a) offense, we conclude that Count 1 failed to allege a violation of that statute.").

[10] Section 666 criminalizes both bribe giving (18 U.S.C. § 666(a)(2)) and bribe accepting (18 U.S.C. § 666(a)(1)(B)). The Court notes that the indictment does not explicitly delineate which defendants are charged under what subsection. Bock is presumably charged with violating Section 666(a)(1)(B) for allegedly accepting a bribe in exchange for Feeding Our Future's sponsorship. Salah is presumably charged with violating Section 666(a)(2) for allegedly paying a bribe to secure Feeding Our Future's sponsorship. (*See also* ECF No. 355 at 7 n.2 (Judge Schultz reaching same conclusions about which defendants were charged under § 666(a)(2) versus (a)(1)(B)).)

Our Future, "in exchange for sponsoring [Salah's] fraudulent participation" in the FCNP.[11] (ECF No. 1 ¶¶ 31, 147, 180.)

Section 666 (a)(1)(B) proscribes accepting a bribe. It is a crime when a local official:

> corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more.

Bock is an alleged bribe-taker. As an employee of Feeding Our Future, she is alleged to have "solicited and accepted bribes and kickbacks from individuals who opened [FCNP] sites under the sponsorship of Feeding Our Future."[12] (*Id.* ¶ 149a.) On August 13, 2021, the indictment alleges that Salah, acting through Cosmopolitan Business Solutions, sent Bock a check for $310,000 to buy a food distribution site in Burnsville,

---

[11] The first check was for $5,000 in November 2020, the second for $7,000 in January 2021, and the third for $7,000 also in January 2021. (ECF No. 1 ¶ 180.) Of the three food distribution sites Salah was connected to, one opened in April 2020, another sometime in the fall of 2020, and the third in "late 2021." (*Id.* ¶¶ 35, 49, 65–66.)

[12] The Court notes that the indictment and the Government's briefing often couples the word "kickbacks" with "bribes." (*See, e.g.*, ECF No. 1 ¶ 148 ("The object and purpose of the conspiracy was for individuals and entities participating in the fraudulent scheme to obtain [FCNP] funds to pay bribes and kickbacks to Feeding Our Future employes . . . .").) Section 666 does not contain the word "kickback." In fact, a separate statute penalizes and defines kickbacks—the Anti-Kickback Act, 41 U.S.C. §§ 52 *et seq.*—which defendants are not charged under. To the extent that the Government is using the term "kickback" in a colloquial sense, it is more precise under Section 666 to use the word "bribe."

Minnesota. (*Id.* ¶¶ 140–41, 180.) That $310,000 check is alleged to be a bribe. (*See id.* ¶¶ 148, 178.)

At trial, the Government will need to prove beyond a reasonable doubt that defendants formed a quid pro quo agreement *before* obtaining Feeding Our Future's sponsorship. But *Snyder* did not change the statutory language of Section 666. The indictment, almost word for word, follows the text of Section 666(a)(2) and (a)(1)(B). (*See* ECF No. 1 ¶¶ 147, 180.) Because the indictment tracks the statutory language, the indictment survives a motion to dismiss.

Second, the allegations support a reasonable construction that the quid pro quo agreements took place before the official act. "An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by *any* reasonable construction, to charge the offense for which the defendant was convicted." *United States v. Fleming*, 8 F.3d 1264, 1265 (8th Cir. 1993) (emphasis added).

To become a food distribution site, defendants relied on Feeding Our Future's sponsorship. (*See* ECF No. 1 at ¶ 10.) "As a sponsor, Feeding Our Future was responsible for submitting site applications to MDE for approval." (*Id.*) "[I]n exchange for Feeding Our Future's sponsorship," defendants allegedly paid Feeding Our Future employees various bribes. (*Id.* ¶ 148.) Between July 2020 and August 2021, the indictment alleges defendants paid almost $800,000 in bribes to Feeding Our Future employees. (*Id.* ¶ 180.) Bribes ranged from $1,500 to $310,00. (*Id.*) Given Feeding Our Future's gatekeeping role

between the food distribution sites and federal funding, it is a reasonable construction of the indictment that defendants entered in an agreement before the official act (Feeding Our Future's sponsorship or approval of applications or invoices), and then paid the alleged bribes after the act.

Defendants suggest their own reasonable construction of the indictment. They contend that the indictment more naturally suggests a "non-criminal gratuity," not a bribe. (*See* ECF No. 367 at 3; ECF No. 368 at 5.) That may be a fair construction, and an argument to the jury. But the indictment is not "so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted." *Fleming*, 8 F.3d at 1265.

Third, the only other district court so far to consider a similar *Snyder* argument denied the defendant's motion to dismiss. *United States v. Starks*, No. 1:24-CR-00126 (JLR), 2024 WL 4528169, at *4 (S.D.N.Y. Oct. 18, 2024). Charles Starks, a superintendent at a public housing facility, was charged with violating 18 U.S.C. Section 666(a)(1)(B). The indictment alleged that Starks "solicited and accepted" around "$18,500 in bribes in exchange for arranging for certain contractors to receive no-bid contracts from [the public housing authority] worth a total of at least approximately $130,245." *Id.* at *4. Starks moved to dismiss the indictment. He argued that in his case, "as in *Snyder*, the Government is in effect asserting a gratuities theory, premised on [him] 'awarding a no-

bid contract to a contractor and *then* asking that contractor for a gift.'" *Id.* at *3 (citation omitted).

The court found that the indictment "easily" met the "low threshold" for sufficiency. *Id.* First, the indictment "explicitly characterize[d] the payments exchanged as 'bribes,' not gratuities." *Id.* Given that allegations in an indictment are taken as true, that characterization was sufficient. *Id.* Second, the indictment used the phrase "in exchange for." The court found that language "entirely consistent with a quid pro quo agreement, which implies a bribe and not a gratuity." *Id.* at *3 (citation omitted).

Although *Starks* is not binding, the Court agrees with its reasoning. Here, the Government's theory of the case is based on defendants offering and accepting illegal bribes, not gratuities. "[I]n arguing otherwise," Bock and Salah "seek[] to introduce an ambiguity on the face of the Indictment where none exists." *Id.*

The Court concludes that, even post-*Snyder*, the indictment survives a motion to dismiss.

## C.    *Franks Hearing*

To obtain a *Franks* hearing, "a defendant must make 'a substantial preliminary showing' that an affidavit contains an intentional or reckless false statement or omission necessary to the probable cause finding." *United States v. Bradley*, 924 F.3d 476, 481 (8th Cir. 2019) (citation omitted). Salah's attack on the warrant applications "must be more than conclusory"; he must allege a "deliberate falsehood or [] reckless disregard for the

truth, and those allegations must be accompanied by an offer of proof." *United States v. Williams*, 669 F.3d 903, 905 (8th Cir. 2012) (citing, among others, *Franks*, 438 U.S. at 171).

Salah argued that he was entitled to a *Franks* hearing based on three sets of "omissions and misstatements": (1) certain COVID-19 pandemic FCNP waivers not cited by the affidavit; (2) omitted bank records; and (3) video surveillance not referenced in the affidavit. (ECF No. 188.)

1.    *Pandemic Waivers*

Because of the COVID-19 pandemic, the Department of Agriculture relaxed certain pre-pandemic requirements related to the FCNP. (*See* ECF No. 1 ¶ 9.) Salah argued that the search warrant affidavits referenced only waivers that supported the Government's case and omitted waivers "that cut against the thrust of the government's narrative."[13] (ECF No. 188 at 5.) These omissions, he contends, entitled him to a *Franks* hearing.

Judge Schultz rejected that argument, and the Court agrees. Even if other "somewhat relevant" waivers were not cited in the affidavit, and even if abiding by those waivers might have made the number of children served "slightly more plausible," Salah did not make a substantial preliminary showing that the omissions were made with a reckless disregard for the truth. (ECF No. 353 at 22.) And had those waivers been included

---

[13] He cites waivers that (1) loosened the requirements for where food could be distributed from, (2) loosened eligibility verification, (3) allowed adults to pick up meals on behalf of children, and (4) allowed multiple meals to be packaged together.

in the affidavit, there still would have been probable cause to issue the warrant. "A law enforcement official is not required to include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not." *Tech. Ordnance, Inc. v. United States*, 244 F.3d 641, 649 (8th Cir. 2001). And even if the affidavit had cited every single pandemic waiver, the affidavit would still have been enough to establish probable cause.[14] *See Cronin v. Peterson*, 982 F.3d 1187, 1196 (8th Cir. 2020) ("The inclusion of Cronin's additional details would not have negated the existence of probable cause.").

2.    *Bank Records*

Salah argued that Agent Wilmer's affidavit misrepresented Safari Restaurant's bank records. Had Agent Wilmer included certain missing financial information, the bank records would have told "a different story." (ECF No. 188 at 19.)

---

[14] In *United States v. Dingle*, the defendant made a similar argument. No. 19-00215-01-CR-W-RK, 2021 WL 1015854, at *3 (W.D. Mo. Jan. 22, 2021), *report & recommendation adopted*, 2021 WL 982327 (W.D. Mo. Mar. 16, 2021). Patrick Dingle was accused "of using the status of others to compete for federal contracts reserved for disadvantaged groups." *Id.* at *1. He argued that the affidavits failed to cite the relevant governing regulations and statutes. *Id.* at *3. Given that the regulatory framework was "complicated," he contended that the magistrate judge who issued the search warrant needed to understand "the complex interplay between the relevant statutes and regulations." *Id.* The court rejected that argument:

> This is not a regulatory case. Citation to the Code of Federal Regulations thus was not necessary to the probable cause findings. Even so, the affidavits set forth the substance of the relevant regulations, including provisions on control, compensation and impermissible affiliation between two businesses. The Court, therefore, finds that Special Agent Tauai did not omit such regulations in reckless disregard for the truth.

*Id.* (citations omitted).

Judge Schultz rejected that argument, and the Court agrees. Even if the omitted bank records demonstrated that Safari Restaurant was engaged in other legitimate business practices, there was no valid basis to infer a reckless disregard for the truth. (ECF No. 353 at 25.) And had those records been included, there was still sufficient information to establish probable cause. "A mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing" to receive a *Franks* hearing. *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998).

3.      *Video Footage*

Law enforcement installed a surveillance camera outside the Safari Restaurant.[15] (ECF No. 188 at 24.) Salah argued that the video footage from the camera showed that Safari Restaurant was receiving and distributing "large amounts of food." (*Id.*) He contended that the affidavit's failure to mention the video at all was an omission that requires a *Franks* hearing.

Judge Schultz rejected that argument, and the Court agrees. On the one hand, the footage depicted instances of food delivery and distribution. On the other hand, there was no depiction of thousands of children a day being served meals. That the footage

---

[15] Salah included twelve screenshots of the video surveillance in his original motion for a *Franks* hearing. (ECF No. 188 at 26–34.) Although the video itself is not before the Court, the Government does not dispute its validity and addresses the substance of the screenshots in its consolidated response. (ECF No. 257 at 39–40.)

might support either side defeats any argument that its omission was deliberate or reckless. *See United States v. Melendez*, 527 F. Supp. 3d 89, 93 (D. Mass. 2021) (denying *Franks* hearing where video's depiction of events was open to two interpretations), *aff'd sub nom. United States v. Rodriguez*, 115 F.4th 24 (1st Cir. 2024).

To be sure, the other waivers, other bank records, and video surveillance may tell "a different story." (ECF No. 188 at 19.) But Salah provides no evidence that those omissions were made intentionally or recklessly. An affidavit in support of a search warrant need not include a factual narrative told in a light most favorable to the defendant. "When no proof is offered that an affiant deliberately lied or recklessly disregarded the truth, a *Franks* hearing is not required." *United States v. Moore*, 129 F.3d 989, 992 (8th Cir. 1997).

### III.    Abdihakim Ali Ahmed

The indictment alleges that Abdihakim Ali Ahmed opened a food site in St. Paul that claimed to serve 1.6 million meals between September 2020 and September 2021. (ECF No. 1 ¶ 40.) That site was opened under the management of ASA Limited. (*Id.*) Ahmed is charged with conspiracy to commit wire fraud (Count 1), wire fraud (Counts 2, 5, and 12), conspiracy to commit federal programs bribery (Count 15), federal programs bribery (Counts 21 and 26), conspiracy to commit money laundering (Count 41), and money laundering (Count 50 and 58). Judge Schultz recommended denying Ahmed's motion to suppress. (ECF No. 354 at 40.) He also denied Ahmed's request for a *Franks*

hearing. (ECF No. 353 at 48.) The Court reviews motions to suppress *de novo*. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(1), (3). A denial of a request for a *Franks* hearing is reviewed for clear error. Fed. R. Crim. P. 59; *Lewis*, 386 F. Supp. 3d at 979.

### A.    Motion to Suppress

Ahmed moved to suppress evidence gathered from a search of his email account. The Court looks to the four corners of the supporting affidavit to determine whether there was probable cause. *Solomon*, 432 F.3d at 827.

### 1.    Email Warrant

Agent Wilmer's affidavit referenced several 2021 emails sent by Ahmed that demonstrate involvement with the alleged fraud scheme.

- February 8 – Ahmed emailed a different sponsoring agency—Partners in Quality Care—when his application with Feeding Our Future had yet to be approved after two months. (ECF No. 188-3 ¶ 145.)

- August 9 – Ahmed emailed Bock and asked for a catering contract. (*Id.* ¶ 147.)

- September 2 – Ahmed emailed Bock an invoice from Safari Restaurant claiming to have served 2,000 children a day in August; the attached invoice sought $440,820 in reimbursement. (*Id.* ¶ 148.)

- October 8 – Ahmed emailed Bock meal count sheets showing that ASA Limited served meals to 2,000 children a day in September. (*Id.* ¶ 150.)

- October 12 – Ahmed emailed Bock an invoice seeking $236,000 in reimbursement. (*Id.* ¶ 151.)

- November 4 – Via email, Ahmed sought $316,000 in reimbursement for meals served in October. (*Id.* ¶ 152.)

In addition, Agent Wilmer attested that the invoices Ahmed emailed listed identical quantities of meals served each day. For example, one invoice claimed that exactly 2,000 children per day were served in August 2021 at two sites. (*Id.* ¶¶ 148–49.) Another claimed that 1,990 children per day were served in September 2021. (*Id.* ¶ 151.)

Given Ahmed's central role in the alleged fraud scheme, there was "a fair probability that evidence of a crime" would be found in his email account. *James*, 3 F.4th at 1104–05. On the same day that Ahmed created ASA Limited, he applied to enroll in the FCNP under Feeding Our Future's sponsorship. (ECF No. 188-3 ¶ 36.) In its first month, the food site operated by ASA Limited claimed $700,00 in FCNP reimbursement. (*Id.* at 37) Agent Wilmer attested that hundreds of thousands of dollars of FCNP funding was fraudulently transferred from Safari Restaurant's bank account to ASA Limited. (*Id.* ¶¶ 57, 62). Ahmed and ASA Limited partook in the purchase of the Minneapolis commercial building that was allegedly bought with proceeds from the scheme. (*Id.* ¶ 90.) And Ahmed is alleged to have purchased a new car with funds that originated from the scheme. (*Id.* ¶ 97.)

Ahmed argues the affidavit did not establish probable cause because (1) it does not indicate how much ASA Limited spent on food, (2) the $40,000 car purchase is "not outlandish" compared to some of the other defendants, and (3) given the population density around the food site, serving 2,000 a day was feasible. Those arguments may be appropriate for trial, but they are not relevant for establishing probable cause. The

affidavit only needs to show that there is a "fair probability that evidence of a crime will be found in the place to be searched." *James*, 3 F.4th at 1104–05. It was enough here to show that (1) Ahmed and his affiliated entity ASA Limited benefited greatly (over $1 million) from the alleged scheme and (2) Ahmed used his email, on at least some occasions, consistent with the scheme (*i.e.*, sharing receipts and meal counts with Feeding Our Future). Read "with common sense," *Walden*, 156 F.3d at 870, there was probable cause to search Ahmed's email account. *See Adjani*, 452 F.3d at 1145; *Diallo*, 2023 WL 3815695, at *3–4.

### 2.    *Overbreadth and Lack of Particularity*

In his objection, Ahmed also argues that the email search warrant was overbroad and lacked particularity. The warrant first required Google to disclose:

> The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail.

(ECF No. 188-3 at 65.)

Next, the warrant enumerated thirteen specific categories of information to be seized, such as "All emails which evidence the planning and execution of the scheme to defraud," "Any records related to the use or distribution of federal funds received from the United States Department of Agriculture or the Minnesota Department of Education," and "Any records related to payments from sites under sponsorship of Feeding Our Future." (*Id.* at 68.)

27

Ahmed relies on *United States v. Moulder* to contend that the initial seizure of the contents of his email account failed to satisfy the Fourth Amendment's particularity and breadth requirements. No. 20-CR-232(7) (JRT/BRT), 2022 WL 3644893, at *4 (D. Minn. Aug. 24, 2022). *Moulder* is of course not binding on this Court; in addition, the Court disagrees with *Moulder*'s reasoning and thus finds it inapplicable to this search warrant.

*Moulder* interpreted Federal Rule of Criminal Procedure 41(e)(2)(b):

> **Warrant Seeking Electronically Stored Information.** A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.

Fed. R. Crim. P. 41.

In other words, Rule 41(e)(2)(b) "explicitly permits the seizure or copying of electronically stored information for later off-site review." *United States v. Schesso*, 730 F.3d 1040, 1046 n.3 (9th Cir. 2013). Because electronic devices "commonly contain such large amounts of information that it is often impractical for law enforcement to review all of the information during execution of the warrant at the search location," Rule 41(e)(2)(b) "acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant." Fed. R. Crim. P. 41, advisory committee's note to 2009 amendments. That makes sense. If law enforcement obtains a valid warrant to search

an individual's home computer for evidence of financial fraud, an agent need not sit in that individual's home office for days to conduct the search.

*Moulder*, however, held that the initial seizure of the electronic information must meet the Fourth Amendment's requirements for search warrants (*i.e.*, sufficiently particular and not overbroad). 2022 WL 3644893, at *4. The Court disagrees with *Moulder*'s analysis for three reasons.

First, *Moulder* assumed that the "first step" of Rule 41(e)(2)(b)—the "seizure or copying of electronically stored information"—was a standalone search that required its own particularity and overbreadth analysis. But seizures and searches are distinct concepts. *United States v. Clutter*, 674 F.3d 980, 984 (8th Cir. 2012). And the particularity and breadth inquiries apply only to search warrants.[16] *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 856–57 (9th Cir. 1991) ("Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based.") (citation omitted).

---

[16] In other seizure contexts—for example, when a police officer conducts a traffic stop—it would be unnatural to argue that the stop—i.e., the seizure—was overbroad and lacked particularity. Similarly, if the officer searched the car subject to one of the Fourth Amendment's exceptions to the warrant requirement—e.g., the automobile exception—it would also be unnatural to argue that the search was overbroad and lacked particularity.

Second, *Moulder* ignored that Rule 41(e)(2)(b) already incorporates the safeguards of a search warrant. Once the electronic information is seized, Rule 41(e)(2)(b) authorizes "later review" of the information so long as that review is "consistent with the warrant." In other words, just because Google discloses the entire contents of an email account does not mean that law enforcement can search for anything in that disclosure. The search is constrained by the preexisting warrant, which, of course, must satisfy particularity and breadth requirements.

Third, the Courts of Appeal consistently understand Rule 41(e)(2)(b) to be a provision that authorizes off-site storage and later review of electronic information,[17] not,

---

[17] *See, e.g.*, *United States v. Schesso*, 730 F.3d 1040, 1046 (9th Cir. 2013) ("[T]he detailed explanation of the need for off-site analysis and recovery [] justif[ied] the seizure and subsequent off-premises search of Schesso's entire computer system and associated digital storage devices."); *id.* at 1046 n.3 ("This process is not out of the ordinary. Federal Rule of Criminal Procedure 41(e)(2)(B) explicitly permits the seizure or copying of electronically stored information for later off-site review."); *United States v. Ganias*, 824 F.3d 199, 201 n.4 (2d Cir. 2016) (approving search warrant where it was "necessary for the agents to take entire hard drives off-site for subsequent search rather than search the hard drives on-site"); *United States v. Aboshady*, 951 F.3d 1, 5 (1st Cir. 2020) (approving search warrant that first sought "all data" associated with an email account, then authorized law enforcement to apply "search terms to filter out potentially privileged communications" under Rule 41(e)(2)(B)); *United States v. Zelaya-Veliz*, 94 F.4th 321, 338 (4th Cir. 2024) ("The validity of this two-step process is acknowledged by Federal Rule of Criminal Procedure 41(e)(2)(B) and its commentary, which permit officers, in searching electronically stored information pursuant to a warrant, to 'seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant.'"), *cert. denied*, No. 24-5092, 2024 WL 4805917 (U.S. Nov. 18, 2024).

as *Moulder* conceived it, a provision that mandates a threshold particularity and overbreadth inquiry for the initial seizure.

"The particularity requirement is 'one of practical accuracy rather than of hypertechnicality.'" *United States v. Shrum*, 59 F.4th 968, 973 (8th Cir. 2023) (citation omitted). Here, the email search warrant delineated thirteen specific categories of information to be searched. Those categories were linked directly to the alleged scheme. For example: "Any records related to the use or distribution of federal funds received from the United States Department of Agriculture or the Minnesota Department of Education." (ECF No. 188-3 at 65.) The warrant was sufficiently particular and not overbroad.

### B.    *Franks Hearing*

Ahmed moved for a *Franks* hearing. (ECF No. 193.) That motion, however, was silent on whether the requirements for a *Franks* hearing (*i.e.,* a deliberate falsehood that was vital to the determination of probable cause) were satisfied. Judge Schultz therefore denied the motion, finding that Ahmed "failed to identify specific falsehoods or omissions, let alone provide supporting affidavits or other reliable statements to substantiate his allegations." (ECF No. 353 at 32.) The Court agrees with this conclusion, and Ahmed has presented nothing to add to the analysis.

IV.    **Ahmed Abdullahi Ghedi**

Ghedi is alleged to have been a one-third partner of ASA Limited, which operated a food site in St. Paul. (ECF No. 1 ¶¶ 13, 40.) He is charged with conspiracy to commit wire fraud (Count 1), wire fraud (Counts 2, 5, and 12), federal programs bribery (Count 23), conspiracy to commit money laundering (Count 41), and money laundering (Counts 43, 46, 53, 56). Judge Schultz recommended denying Ghedi's motion to suppress and motion to dismiss. (ECF No. 354 at 41–42; ECF No. 355 at 17–20.) Both are reviewed *de novo*. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(1), (3).

A.    *Motion to Suppress*

1.    *Email*

The affidavit cited several emails sent by Ghedi that demonstrate involvement with the alleged fraud scheme. For example:

- November 2, 2020 – Ghedi received an email with the subject line "Checks." (ECF No. 258-2 ¶ 72.) Attached to the email were copies of checks from ASA Limited to Ghedi. (*Id.*)

- December 2, 2020 – Ghedi received a forwarded email from Bridgewater Bank notifying Ghedi that he could not be added as a signatory on the ASA Limited bank account because "he had a closure on file from another institution." (*Id.* ¶ 73.)

- December 14, 2020 – Ghedi received an email with an attachment that included incorporation documents from the Minnesota Secretary of State related to ASA Limited. (*Id.* ¶ 74.)

- February 19, 2021 – Ghedi received an email with a PDF document that contained paystubs from ASA Limited. (*Id.* ¶ 76.)

- July 1, 2021 – Ghedi received an email with the subject line "FWD: Your First American title report is ready for 2722 and 2742 Park Avenue South." (*Id.* ¶ 77.) This referred to the Minneapolis commercial property purchased by other defendants allegedly using FCNP funds. (*Id.*)

- January 29, 2022 – Ghedi emailed Abdulkadir Nur Salah bank statements for Cosmopolitan Business Solutions, an entity that ran Safari Restaurant and which allegedly received millions of dollars in FCNP funds. (*Id.* ¶ 78.)

Ghedi argues that his ownership interest in ASA Limited, by itself, is not enough to establish probable cause. But the affidavit includes much more than just his ownership interest. Ghedi's email received checks, bank statements, incorporation documents, and paystubs related to ASA Limited. And ASA limited is alleged to be central to the fraud scheme (*Id.* ¶¶ 35–44.) The types of financial documents sent to Ghedi's email account strike at the heart of the allegations of wire fraud and money laundering. Thus, viewing the affidavit as a whole, it establishes "a fair probability that evidence of a crime will be found in the place to be searched." *James*, 3 F.4th at 1104–05.

2.    2722 Park Avenue

2722 Park Avenue is a commercial building in Minneapolis. (ECF No. 188-1 ¶ 126.) It was allegedly purchased by three defendants using $2.8 million in misappropriated FCNP funds. (*Id.*) In January 2022, United States Magistrate Judge Tony N. Leung signed a search warrant for the building. Though Ghedi was not one of defendants alleged to have purchased the building, Attachment B to the search warrant authorized law enforcement to seize "[a]ll personal financial documents, records and information" of twelve individuals—including Ghedi—found in any of the physical locations to be

searched. (*Id.* at 65.) Ghedi moved to suppress evidence seized from 2722 Park Avenue even though it was "unclear whether the government seized any records belonging to [him] during the search." (ECF No. 205 at 1.) Judge Schultz recommended denying that motion based on Ghedi's lack of standing. Ghedi now objects and argues that his "ownership interest in the building" establishes standing. (ECF No. 364 at 4.)

Suppression of evidence that results from a Fourth Amendment violation "can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States*, 394 U.S. 165, 171–72 (1969). In other words, Ghedi must first establish that he has standing to challenge the gathered evidence; to do so he carries the burden to prove a reasonable expectation of privacy in 2722 Park Avenue. *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994). To meet that burden, he must identify specific evidence to establish standing. *United States v. Maxwell*, 778 F.3d 719, 732 (8th Cir. 2015).

The Ninth Circuit's decision in *United States v. Galecki*, 89 F.4th 713 (9th Cir. 2023), provides helpful guidance. There, law enforcement searched a commercial warehouse connected to defendants' business. *Id.* at 720. To analyze "whether a particular individual has a reasonable expectation of privacy in a specific company space," *Galecki* considered several factors that can be posed as the following questions. *Id.* at 724. First, was the individual a small business owner that had "complete 'day-to-day' personal control over" the commercial space? *Id.* Second, did the individual have exclusive use of the

space? *Id.* at 724-25. Third, did the individual have a personal connection to the place searched, like personal property or control of the items seized? *Id.* at 725.

The Court assumes as true that Ghedi had an ownership interest in 2722 Park Avenue. "An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 700 (1987). Being a part owner of the building, by itself, does not create a reasonable expectation of privacy in the building. Ghedi points to no evidence that he worked from 2772 Park Avenue, that he has ever been to the building, that he stored personal property at the building, or anything else to show that he "manifested a subjective expectation of privacy in the [building] that society is willing to recognize as reasonable." *Galecki*, 89 F.4th at 724; *see also United States v. Lewis*, 864 F.3d 937, 943 (8th Cir. 2017) (concluding that tattoo artist did not have reasonable expectation of privacy in workspace within tattoo parlor). Without standing, Ghedi cannot challenge the search of 2772 Park Avenue. And even assuming that Ghedi did have standing, the affidavit established probable cause to search the building: Agent Wilmer attested that Ghedi fraudulently received $859,000 through ASA Limited, $694,000 through another shell company, and contributed $560,000 to the purchase of the commercial building. (ECF No. 188-1 ¶¶ 93–94, 129.) Those attestations, plus the affidavit's overall description of the alleged fraud scheme, establish a fair probability that evidence of a crime could be found in 2772 Park Avenue.

**B.    Motion to Dismiss**

Ghedi moved to dismiss the conspiracy count, the three wire fraud counts, the conspiracy to commit money laundering count, and the three money laundering counts.

*1.    Wire Fraud and Conspiracy*

As to wire fraud: To prove this count, the Government must show that (1) Ghedi "joined a scheme to defraud," (2) he "intended to defraud," (3) "it was reasonably foreseeable that interstate wire communications would be used," and (4) "the wires were, in fact, used." *Louper-Morris*, 672 F.3d at 556. The indictment alleges that Ghedi "knowingly" participated in a "scheme and artifice to defraud" (ECF No. 1 ¶ 144.) It also alleges that "for the purpose of executing the scheme" Ghedi knowingly transmitted various wire communications in interstate commerce. (*Id.* ¶ 145.) Although it is not alleged that Ghedi himself sent the emails that support the wire fraud counts, a fair reading of the indictment includes that it was reasonably foreseeable that emails between Feeding Our Future and MDE would be sent on ASA Limited's behalf. *United States v. Wrehe*, 628 F.2d 1079, 1085 (8th Cir. 1980) ("We also recognize that a defendant will be deemed to have 'caused' the use of the mails or of the interstate wires if the use was the reasonably foreseeable result of his actions.")

As to conspiracy: To prove this count, the Government must show "(1) that there was a conspiracy, an agreement to commit wire fraud, (2) that [Ghedi] knew of the

agreement, and (3) that he intentionally joined in the conspiracy." *Johnson*, 450 F.3d at 374.

The indictment alleged that Ghedi "conspired with" his co-defendants "to devise a scheme" "to obtain money by materially false and fraudulent pretenses." (ECF No. 1 ¶ 21.) Ghedi opened a food site that claimed to serve 2,000 to 3,000 meals a day from a small strip mall location in St. Paul, just three weeks after opening. (*Id.* ¶¶ 40, 75.) In at least two instances, the indictment alleges that a co-defendant transferred millions of dollars of fraudulent funds to Ghedi and other co-defendants through "entities set up and used to disguise the source and use of the proceeds." (*Id.* ¶¶ 53, 59.) Taken together, the indictment sufficiently alleges that Ghedi knew of the agreement and intentionally participated in the conspiracy. Read in conjunction with the overall alleged fraud scheme, the wire fraud counts survive a motion to dismiss.[18]

2.    *Money Laundering and Conspiracy*

As to money laundering: This count requires a showing "(1) that the defendant knowingly engaged in a monetary transaction, (2) that the defendant knew the property involved derived from specified unlawful activity, and (3) that the property was of a value greater than $10,000." *Johnson*, 450 F.3d at 375.

---

[18] "A slightly greater level of detail is required" for a wire fraud indictment. *Hansmeier*, 988 F.3d 436. Under this higher standard, the Court finds that the indictment includes sufficient allegations to survive a motion to dismiss.

The indictment alleges that Ghedi bought or leased a Cadillac Escalade, Dodge Charger, Dodge Ram, and Mercedes in whole or in part with proceeds from the alleged fraud scheme. (ECF No. 1 ¶ 199.) Those purchases total over $200,000. (*Id.*) The indictment also alleges that he "knowingly engaged" in "monetary transactions" involving "criminally derived property." (*Id.*) Together with the overall structure of the alleged fraud scheme, and the millions of dollars of FCNP funds that flowed to entities affiliated with Ghedi, the indictment survives a motion to dismiss.

As to conspiracy: This count requires the Government to prove (1) an agreement to launder money, (2) Ghedi's voluntary joinder of the agreement, and (3) Gehdi's knowing joinder of the agreement. *United States v. Jarrett*, 684 F.3d 800, 802 (8th Cir. 2012).

The indictment alleges that Ghedi "conspired with" others to conduct financial transactions "knowing that the property involved in such transactions represented the proceeds of some sort of unlawful activity." (ECF No. 1 ¶ 182.) Ghedi is alleged to have created ASA Limited "as a shell company to obtain and launder fraud proceeds." (*Id.* ¶184e.) He is also alleged to have created a second shell company (AG Limited LLC) through which he laundered millions of dollars. (*Id.* ¶ 190.) Those allegations survive a motion to dismiss the indictment.

Moreover, all of the counts challenged by Ghedi track the statutory language, providing an additional reason to find the indictment sufficient. *Sewell*, 513 F.3d at 821.

**CONCLUSION**

Based on the foregoing and on all the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.    Defendants' Objections to the Reports and Recommendations of United States

      Magistrate Judge David T. Schultz (ECF Nos. 364, 365, 366, 367, 368, and 369)

      are OVERRULED;

2.    The Report and Recommendations of United States Magistrate Judge David T.

      Schultz (ECF Nos. 354 and 355) are ACCEPTED;

3.    Defendants' Appeals of the Order of United States Magistrate Judge David T.

      Schultz denying Defendants' Motions for a *Franks* Hearing (ECF Nos. 366 and

      369) are DENIED; and

4.    The Order of United States Magistrate Judge David T. Schultz denying

      Defendants' Motions for a *Franks* Hearing (ECF Nos. 353) is AFFIRMED;

Dated: January 2, 2025                    BY THE COURT:

                                          s/Nancy E. Brasel
                                          Nancy E. Brasel
                                          United States District Judge