1
2

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

3                                    )
         United States of America,   )   File No. 22-cr-223
4                                    )          (NEB/DTS)
                  Plaintiff,         )
5                                    )
         v.                          )
6                                    )   Courtroom 13W
         Aimee Marie Bock(1),        )   Minneapolis, Minnesota
7        Salim Ahmed Said(3),        )   Tuesday, February 11, 2025
                                     )   9:02 a.m.
8                 Defendants.        )
                                     )
9        ------------------------------------------------------------

10              BEFORE THE HONORABLE NANCY E. BRASEL
            UNITED STATES DISTRICT COURT DISTRICT JUDGE
11
              **VOLUME III - JURY TRIAL PROCEEDINGS**
12

13

14

15

16

17

18

19
         Court Reporter:        RENEE A. ROGGE, RMR-CRR
20                              United States Courthouse
                                300 South Fourth Street, Box 1005
21                              Minneapolis, Minnesota 55415

22                                  *   *   *

23          Proceedings recorded by mechanical stenography;
         Transcript produced by computer.
24
                                    *   *   *
25

```
 1     APPEARANCES:

 2       For Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
                                 BY:  JOSEPH H. THOMPSON
 3                                    HARRY JACOBS
                                      MATTHEW S. EBERT
 4                                    DANIEL W. BOBIER
                                 600 United States Courthouse
 5                               300 South Fourth Street
                                 Minneapolis, Minnesota 55415
 6
         For Defendant           KENNETH UBONG UDOIBOK P.A.
 7       Aimee Marie Bock(1):    BY:  KENNETH U. UDOIBOK
                                 310 Fourth Avenue South, #5010
 8                               Minneapolis, Minnesota 55415

 9       For Defendant           COLICH & ASSOCIATES
         Salim Ahmed Said(3):    BY:  MICHAEL J. COLICH
10                                    ADRIAN SCOTT LAFAVOR-MONTEZ
                                      RAGHEN LUCY
11                               10 South Fifth Street, #420
                                 Minneapolis, Minnesota 55402
12

13

14                                   *   *   *

15

16

17

18

19

20

21

22

23

24

25
```

1                           **I N D E X**

                                                           <u>PAGE</u>
2

      **EMILY HONER**
3        Cross-Examination By Mr. Udoibok              441
         Cross-Examination By Mr. Colich              515
4        Redirect Examination By Mr. Thompson         524
         Recross-Examination By Mr. Udoibok           536
5        Redirect Examination By Mr. Thompson         545
         Recross-Examination By Mr. Udoibok           547
6
      **BENJAMIN STAYBERG**
7        Direct Examination By Mr. Thompson           550
         Cross-Examination By Mr. Udoibok             572
8
      **LUL ALI**
9        Direct Examination By Mr. Thompson           580
         Cross-Examination By Mr. Udoibok             625
10
      **KEVIN ERDMAN**
11       Direct Examination By Mr. Jacobs             650
         Cross-Examination By Mr. Udoibok             668
12       Cross-Examination By Mr. Montez              669

13

14

15   <u>GOVERNMENT'S EXHIBITS</u>                       <u>REC'D</u>
         W3                                           658
16       Y2                                           598
         Q40                                          604
17       Q41                                          606
         Q42                                          611
18       Q43                                          613
         Q44                                          614
19       Q45                                          619
         Q46                                          619
20       W13                                          662
         W23                                          660
21

22                         *   *   *

23

24

25

```
 1                          IN OPEN COURT

 2                          (JURY PRESENT)

 3      9:02 a.m.

 4                          IN OPEN COURT

 5                          (JURY PRESENT)

 6              THE COURT:  You may all be seated.

 7              And good morning.

 8              Ms. Honer, you are still under oath, and we are

 9      prepared for cross-examination.

10              Mr. Udoibok.

11              MR. UDOIBOK:  Thank you, Your Honor.

12                          EMILY HONER,

13      called on behalf of the government, was duly sworn, was

14      examined and testified as follows:

15                        CROSS-EXAMINATION

16      BY MR. UDOIBOK:

17      Q.  Good morning, Ms. Honer.

18      A.  Good morning.

19      Q.  My name is Kenneth Udoibok.  I believe we haven't met.

20      A.  I believe we met virtually.

21      Q.  Oh, okay.  I'm sorry.

22              I have a few questions for you, though, based on

23      your last testimony?  Just for starters, I believe you

24      testified yesterday about when you started your employment

25      with the Minnesota Department of Education, correct?
```

442

```
1    A.  That's correct.

2    Q.  When did you start?

3    A.  So I started in May of 2019 with the Minnesota

4    Department of Education.

5    Q.  And you, you were a supervisor or director of the

6    nutrition program?

7    A.  Yes.  When I started, I was the supervisor of Business

8    Operations and Support Services.

9    Q.  Okay.  And then you've been promoted since, right?

10   A.  Yes, I have.

11   Q.  And what's your current position?

12   A.  My current position is the director of Nutrition Program

13   Services.

14   Q.  And when were you promoted?

15   A.  I received that position in August of 2023.

16   Q.  You did a good job.

17   A.  Thank you.

18   Q.  I want to talk about your knowledge of C.F.R. 226.6.

19   Are you familiar with that?

20   A.  I'm familiar with those regulations.  I do not know them

21   by heart.

22   Q.  But you work with those regulations?

23   A.  Yes, that is correct.

24   Q.  You know, one thing I tend to talk real slowly, so I

25   think you anticipate what I'm going to ask, but let me
```

```
 1    finish.

 2    A.  Sure.

 3    Q.  So you testified earlier about for-profit businesses not

 4    being able to participate in the food program, correct?

 5    A.  I testified about for-profit not being able to

 6    participate in certain child nutrition programs.

 7    Q.  What specifically were those that for-profit were not

 8    authorized to participate?

 9    A.  The CACFP at-risk program and then --

10    Q.  The CS -- for the benefit of the jury, we don't know

11    those acronyms.

12    A.  Oh, I'm sorry.  The Child and Adult Care Food Program

13    at-risk.

14    Q.  Child and adult food program at-risk.  And that's

15    usually in the summer?

16    A.  No, it's not.

17    Q.  All year round?

18    A.  No.  It only operates during the school year.

19    Q.  And for-profits may not participate or may participate?

20    A.  May not in the CACFP at-risk.

21    Q.  And what any other program for-profit, profits could

22    participate?

23    A.  I disagree with that.  The regulations do spell out

24    which organizations are eligible, and that would typically

25    be a nonprofit with an IRS exempt status.
```

```
1    Q.  Okay.  A nonprofit could participate.  A nonprofit like
2    Feeding Our Future could participate, right?
3    A.  With the correct exemption, yes.
4    Q.  What exemption would that be, 501c3 exemption?
5    A.  Yes.  And I believe the regulations refer to it as an
6    IRS tax code.  I believe it is in the definitions of those
7    regulations.
8    Q.  All right.  Are you familiar at all with for-profits
9    organizations that, in Minnesota, participate in the food
10   program?
11   A.  I am familiar with other for-profit organizations that
12   participate in programs outside of the CACFP at-risk
13   program.
14   Q.  All right.  And would it be far to say there's quite a
15   bit of them?
16   A.  I do believe that's fair to say.
17   Q.  Okay.  Now, was it your practice if you don't
18   understand, if you have questions about the food program,
19   you would contact USDA?
20   A.  Yes.  When I would have questions about the food program
21   that my colleagues could not answer, I would ask the USDA.
22   Q.  And did you -- how did you contact USDA?
23   A.  It depends.  Typically I would either email them, but
24   the USDA also holds regular phone calls, and so many times
25   we would ask questions in those phone calls.
```

```
1    Q.  Did you send emails to USDA?

2    A.  Yes, I have.

3    Q.  And, and you would get response by email back?

4    A.  Not all the time, but, yes, we would get responses by

5    email sometimes.

6    Q.  And did you have a practice, did you have a practice of

7    sending emails to USDA, and they would respond, USDA would

8    respond with their notes on your email?

9    A.  Oh, that has happened, yes.

10   Q.  And you, you prefer that because your colleagues would

11   also review those correspondence between you and USDA,

12   correct?

13   A.  I would say that I, I like emailed answers so that it's

14   documented, yes.

15   Q.  Yes.  Now, I want to, I want to direct you to Defendant

16   Exhibit 763.

17            Why don't you pull up 764.

18            Now, can you see 764?

19   A.  Yes, I can.

20   Q.  And that is an email from you to USDA, correct?

21   A.  Yes, that is correct.

22   Q.  All right.  And what date did you send that email?

23   A.  Actually, I'm sorry.  I need to correct.  This is an

24   email from the USDA to myself.

25   Q.  All right.  Did you receive the email?
```

446

1     A.  Yes, I did.

2     Q.  Now, go down further to the beginning of the email.  Do

3     you see your email to USDA?

4     A.  Yes, I do.

5     Q.  When did you send that email?

6     A.  I sent this email on November 6th, 2020.

7     Q.  And is it regarding SFSP for-profit starter sites?

8            MR. THOMPSON:  Your Honor, objection.  This isn't

9     in evidence.

10           THE COURT:  Mr. Udoibok, it is not in evidence

11    yet.

12           MR. UDOIBOK:  Thank you, Your Honor.

13    BY MR. UDOIBOK:

14    Q.  Nonetheless, it is your email to USDA regarding

15    for-profit, correct?

16           MR. THOMPSON:  Objection, Your Honor.

17           THE COURT:  So don't describe it before its in

18    evidence.  The jury can't see it yet.

19           MR. UDOIBOK:  All right.

20    BY MR. UDOIBOK:

21    Q.  You sent this email, correct?

22           THE COURT:  You may answer.

23           THE WITNESS:  Yes, I sent this email.

24    BY MR. UDOIBOK:

25    Q.  You sent it to whom?

```
1    A.  I sent this email to two individuals at the USDA, and I

2    copied my supervisor at the time.

3              MR. UDOIBOK:  Your Honor, permission to publish

4    Exhibit 764.

5              MR. THOMPSON:  Objection.  Hearsay.  Your Honor,

6    there's a series of emails here.  It's a whole chain.

7              THE COURT:  So a portion of this is hearsay and a

8    portion isn't?

9              MR. THOMPSON:  Your Honor, I believe the entire

10   email is hearsay, the entire chain.

11             THE COURT:  I would have to look at the whole

12   thing.  Anyway, sustained.

13             MR. UDOIBOK:  All right.

14   BY MR. UDOIBOK:

15   Q.  All right.  Ms. Honer, this email is part of your

16   business record, isn't it?

17   A.  So I sent this email with my state email address, so I

18   would categorize that as business.

19   Q.  And you sent it to someone at USDA, correct?

20   A.  That is correct.

21   Q.  And you sent it because you had questions about the food

22   program, correct?

23   A.  That's what it appears to be.

24   Q.  And you sent this email relating to Feeding Our Future,

25   correct?
```

```
1    A.  I would have to go back and read it.  I don't know that
2    for sure.
3    Q.  Why don't you?
4    A.  I would say to that, my email does not indicate Feeding
5    Our Future, and there were a couple of sponsors that I had
6    concerns over, so I don't know that for sure.
7    Q.  And if you look at the corner with, do you see anything
8    about MDE documenting it, the numbers?
9    A.  What is on the screen, I'm not sure what that is.
10   Q.  Okay.  All right.  Let's continue to -- what is subject
11   of --
12              MR. THOMPSON:  Objection, Your Honor.
13              THE COURT:  Sustained.
14   BY MR. UDOIBOK:
15   Q.  Is it true that USDA corrected you regarding for-profit
16   participation in the food program?
17   A.  I would disagree.
18   Q.  All right.
19   A.  I categorize that USDA clarified for us.
20   Q.  All right.  Well, why don't you go to the first page so
21   I will ask you.
22              MR. THOMPSON:  Your Honor, I'm going to object to
23   this continued discussion of this email.  It's not in
24   evidence.
25              THE COURT:  It's not in evidence.  She can't
```

1    testify from it.

2              MR. UDOIBOK:  Yes, I'm not -- she's not offering

3    the evidence --

4              Okay.  May I approach?

5              THE COURT:  You may have a sidebar, yes.

6                        **(Sidebar discussion)**

7              THE COURT:  Mr. Udoibok.

8              MR. UDOIBOK:  Yes, Your Honor.  Exhibit, the

9    exhibit is not offered for the truth of the -- the exhibit

10   is not offered for the truth of the matter, but rather what

11   she learned, the effect on her, and what she derived from

12   communicating with USDA regarding the food program.

13             THE COURT:  Mr. Thompson.

14             MR. THOMPSON:  Your Honor, what she derived from

15   it is the truth of the matter asserted.  Mr. Udoibok is

16   entitled to ask her about, sorry, Mr. Udoibok is certainly,

17   certainly permissible for him to talk to Ms. Honer about the

18   rules as she understood them and the clarification that she

19   just testified to.

20             But this is an out-of-court statement from a USDA

21   employee who is not testifying here.  It's offered for the

22   truth of the matter asserted, specifically the substance of

23   the clarification USDA provided to her.  So this is classic

24   hearsay.

25             THE COURT:  The email can't come in.  It's

1    hearsay, and it appears to be offered for the truth, which

2    is the exceptions.  But the testimony, I mean, you can, she

3    can testify as she did on direct as to what she did after

4    speaking with the USDA.

5                          **(In open court)**

6                THE COURT:  All right.  You may continue.  Thank

7    you.

8    BY MR. UDOIBOK:

9    Q.  So, Ms. Honer, I'm going to direct you to when you

10   received D1-764, which is your email correspondence with

11   USDA.  You received clarification, correct?

12   A.  That is correct.

13   Q.  And you testified earlier about clarification.  What was

14   that clarification that you received from USDA?

15   A.  So in regards to the clarification from this email and

16   what I testified before, the first clarification from the

17   USDA was regarding distribution for-profit sites with the

18   CACFP at-risk and summer food.

19              And then we received additional clarification on

20   the summer food program.

21   Q.  Okay.  Let's discuss the first clarification.  What was

22   that clarification?

23   A.  So to my recollection, the clarification was regarding

24   the regulations of the Child and Adult Care Food Program not

25   allowing for-profit to operate the CACFP at-risk.

```
1    Q.  That was a clarification?

2    A.  I believe so.

3    Q.  Now state what USDA clarified to you what you were

4    supposed to do.

5    A.  I guess I don't recall exactly.  I'd have to go back to

6    the email.

7    Q.  Why didn't you look at the email to refresh your

8    recollection as to what the clarification was?  If you need

9    help scrolling down, please, let us know.

10   A.  Yes, if you can scroll down.  You can go to the second

11   page to scroll.  Thank you.

12              THE COURT:  And just can you repeat your question?

13              MR. UDOIBOK:  I just want to know what the

14   clarification was.

15              THE WITNESS:  So I think you had asked about

16   clarification to the first piece of CACFP?

17   BY MR. UDOIBOK:

18   Q.  Yes.

19   A.  This email is the second piece of clarification.

20   Q.  What was the first one?

21   A.  I believe that first clarification came in September.

22   Q.  Right.  What was the clarification, though?

23   A.  The clarification was the Child and Adult Care Food

24   Program at-risk and the inability to operate as a

25   for-profit.
```

1    Q.  What was your position, MDE's position, regarding the

2    first clarification?

3    A.  I guess our position was to follow the regulation.

4    Q.  All right.  But you needed a clarification, right?

5    A.  The clarification was on the distribution sites --

6    Q.  Okay.

7    A.  -- which were a flexibility that USDA provided in June.

8    Q.  Yes.  What was that flexibility?

9    A.  The flexibility was to partner with the waivers in that

10   parents could pick up meals from the vended meal operators

11   versus those meals going out to their sites.

12   Q.  Is that what you call waivers, right?

13   A.  Well, the waivers were in place, but, no, this was a

14   separate flexibility, not a waiver.

15   Q.  So regarding clarification, you needed clarification

16   because some of the sponsors disagreed with you, correct?

17   A.  We needed clarification because the number of brand-new

18   site applications coming in did not appear to be in line

19   with the program integrity of those flexibilities and

20   waivers.

21   Q.  So you needed USDA to clarify things for you, correct?

22   A.  I would agree with that.

23   Q.  All right.  And then what does MWRO stand for?

24   A.  Yes, this stands for the Midwest Regional Office, and

25   this is the regional office from the USDA assigned to the

1    Midwest region.

2    Q.  Now, then, we talked about, you talked about the first

3    clarification, then the second clarification.  What was the

4    second clarification?

5    A.  So the second clarification is specific to the Summer

6    Food Service Program.

7    Q.  All right.  What was that about?

8    A.  That was sites of for-profit operating the summer food

9    program and what those sites could essentially look like.

10   Q.  What do you mean by "look like"?

11   A.  So there is a policy memo for summer food which explains

12   how for-profit sites could operate in the program.  There's

13   many limitations to that.  And so the clarification

14   requested was to explain what we saw and if that was in line

15   with the memo.

16   Q.  All right.  Was the clarification, in a nut shell,

17   allowed -- waived some of the regulations, correct?

18   A.  No, I disagree with that.  The clarification did not

19   waive the regulations.

20   Q.  I didn't say waive the regulation, but loosened the

21   requirements a bit?

22   A.  I would also disagree.  I do not believe the

23   clarification loosened them.

24   Q.  What was the -- what was specifically the clarification,

25   then, if everything was clear?

1    A.  To my recollection, the clarification was that a

2    nonprofit organization must be operating the site.

3    Q.  All right.  Now, the nonprofit must operate the site,

4    correct?  You testified to that.

5    A.  That's correct.

6    Q.  Now, did the regulation give any time, any timeline

7    where a nonprofit can take over a site that was a

8    for-profit, and a nonprofit takes over.  Is there any

9    regulation that that should not be done?

10   A.  Well, the regulation doesn't exist because the

11   for-profit shouldn't have operated in the first place.

12   Q.  Please answer my question.  My question is, does a

13   vendor who is a for-profit, do you agree?  That's possible?

14   A.  I would agree that a vendor is typically for-profit.

15   Q.  All right.  If a nonprofit takes over a vendor, is there

16   anything in the regulation that makes that improper?

17   A.  I stand with my answer before.  That situation shouldn't

18   occur.

19   Q.  All right.  Because the regulation says not?

20   A.  I don't believe the regulation specifically says a

21   nonprofit can take over a vendor.

22   Q.  No.  I'm saying, is there anything improper for a

23   nonprofit to take over the functioning of a for-profit

24   vendor?

25   A.  If a nonprofit organization wants to take over a vendor

1    as part of their business, that would be outside of the

2    child nutrition programs.

3    Q.  Are you saying that the regulation does not allow a

4    nonprofit to take over the functioning of food delivery?  Is

5    that what you are saying?

6            MR. THOMPSON:  Objection.  Asked and answered.

7    Speculation and calls for a legal conclusion.

8            THE COURT:  Overruled.

9            You may answer.

10           THE WITNESS:  So to that, again, there is no

11   regulation to my knowledge.  Yeah, I think I'll just leave

12   that there.

13   BY MR. UDOIBOK:

14   Q.  There's no regulation stopping a nonprofit from taking

15   over the, the functioning of a nonprofit?

16   A.  I agree.  I don't think there is a regulation with that.

17   Q.  I don't think I understand your answer.  Is there a

18   regulation that prevented?  Maybe I should use the word

19   "prevented."

20   A.  Not to my knowledge.

21   Q.  Thank you.

22           I want to talk to you about, you testified

23   yesterday about site identification.  Do you recall that?

24   A.  Yes.

25   Q.  All right.  And you also testified about site

1    application, correct?

2    A.  Yes.

3    Q.  All right.  Let's take site identification first.

4    A.  Sure.

5    Q.  All right.  What is a site identification?

6    A.  So as I explained yesterday, a site identification

7    number in the CLiCS system --

8    Q.  No, I didn't ask you about a number.  I asked you about

9    what is a site identification.

10   A.  So then, to go back even further, the site

11   identification I believe you are referring to is the

12   latitude and longitude.

13   Q.  All right.  What is that?

14   A.  So it's the coordinates on a map.  So basically the

15   location of where a site is.

16   Q.  The location about a site.  That's where it is, a

17   particular place on the map in a city, correct?

18   A.  Correct.

19   Q.  All right.  Now, site identification application, what

20   is that?

21   A.  So again, referring to site identification as the place

22   on the ground then, the application would be when a sponsor

23   applies to operate this program at a particular site.

24   Q.  Isn't that site, isn't that site application?  Do you

25   remember you testified earlier to two different ones.  One

1    is site ID application and is site, all right, application.

2    There's two different ones, right?

3    A.  Well, the site ID --

4    Q.  Yes.

5    A.  -- again is part of CLiCS.  So that is to get access to

6    the CLiCS system.

7    Q.  I know.  I know.  My question, though, is, There is an

8    application process for site identification, right?

9    A.  There is a form.

10   Q.  All right.  And then that form, the sponsor fills out

11   that form?

12   A.  Yes.

13   Q.  All right.  And what is contained in that form?

14   A.  I don't remember all of the pieces of the form, but

15   generally we want to know the location.  We want to know

16   what type of site, so if it is a school or a nonprofit

17   organization, child care.

18          I think that would be the general information we

19   look for.

20   Q.  And you verify that site ID application, correct?

21   A.  We take a look at where that site is located and plot it

22   on a map.

23   Q.  You plot it on a map, and you see that that place

24   actually exists, correct?

25   A.  I would disagree.  We don't see that that place actually

1    exists.

2    Q.  And if you can't find that the place exist, then you

3    deny the site identification application, correct?

4    A.  I disagree, because we don't do that first part.

5    Q.  You just approve it.

6    A.  No.  We take a look at the location, if it's in an

7    eligible location, and we plot it on a map.

8    Q.  All right.  And then what happens to that application?

9    You approve or deny it?

10   A.  Well, the site ID portion of that application, if it's

11   approved and plotted on that map, then the sponsor receives

12   the site ID number.

13   Q.  Hold on.  Hold on.  Hold on.  I want to, I want you to

14   be a little clearer.

15         When you receive the application, do you have the

16   authority to deny or approve, one of two things?

17   A.  And can you clarify?  You are talking about the site ID?

18   Q.  Yes, site ID application.

19   A.  Yes, I would say we have the authority to deny or not

20   approve the site ID.

21   Q.  Before the identification number comes about, there has

22   to be an approval, correct?

23   A.  I suppose it can be looked at that way.  The creation of

24   the site ID is essentially the approval of that site.

25   Q.  All right.  I don't want you to guess, please.  Is it

```
 1    your testimony that the site ID number comes after the
 2    application for the site identification is approved by MDE?
 3    A.  I would generally say yes.
 4    Q.  Otherwise how would they get the number?  The number is
 5    generated by MDE, correct?
 6    A.  The number is generated by the CLiCS system of MDE, yes.
 7    Q.  Thank you.  Well, I want to direct you to a document
 8    that you testified to yesterday, B4, B like in boy.
 9            You are looking at what has been marked as
10    Exhibit B4.
11    A.  Yes.
12    Q.  Do you recall this exhibit?
13    A.  Yes, I do.
14    Q.  And this is an email, correct?
15    A.  Yes, it is.
16    Q.  And it's from, who sent you this email?
17    A.  Aimee Bock sent this email.
18    Q.  And what does this, what does B4 entail, Exhibit B4
19    entail?
20    A.  So this is an email sent by Aimee Bock for a site
21    application for Safari.
22    Q.  All right.  Is a site application a site ID application?
23    A.  I would need to look at the attachment again.
24    Q.  Why don't you?
25            Scroll down a bit.  Stop.
```

```
 1                  Is that helpful?
 2    A.  Yes.  So this is neither the site ID request, nor is it
 3    the meal plan application.  This is an additional
 4    documentation that Feeding Our Future had for their sites.
 5    Q.  What was the application for?
 6    A.  Based on this first page, it --
 7    Q.  Go back to page 1.
 8                  Do you recall what it was for?
 9    A.  No.  Page 1 does not appear to indicate which program.
10    Q.  Why don't you, let's go to page 2.  We'll scroll down as
11    much as you want.
12    A.  So on the second page here, it appears that there is
13    writing next to for-profit eligibility and the letters ARAS,
14    which to me means at-risk after school.
15    Q.  This is -- go down farther.  What is that?  What is
16    page 3 of that?
17    A.  Page 3 is the site identification number request form.
18    Q.  All right.  And there's an approval process for the site
19    number application, correct?
20    A.  Again, in general, we process these, yes.
21    Q.  What do you mean by in general you process it?
22    A.  I do not feel that we provide a formal approve/deny
23    necessarily.  We process these applications and create a
24    number.
25    Q.  So you just approve them?
```

1    A.  Not always.

2    Q.  All right.  You can deny some that you can't find

3    locations, correct?

4    A.  Yes.

5    Q.  Let's go farther.  Go down to the next page.  Stop.

6    Could you go up a little?  Go up to the next page.  The page

7    before, please.  No.  Go -- next page.  Down.  I'm a bad

8    driver.  Stop.

9          Do you see the question is this a school site and

10   there's a no, do you see that?

11   A.  Yes, I do.

12   Q.  What does that, what does that mean?

13   A.  Sure.  So to MDE we work with a lot of schools, and when

14   we have a school site, we work our technology systems to

15   connect each other.  So it's important for us to know when

16   there is a school site so we can do that.

17   Q.  All right.  Please go to the next page.  Stop.

18          What is this?

19   A.  This is, and I believe I testified to this yesterday

20   too.  It is the agreement between Feeding Our Future and

21   Safari Restaurant.  We refer to this as a sponsor site

22   agreement.

23   Q.  Now, Exhibit B4 you testified earlier was documents that

24   Feeding Our Future submitted.

25   A.  I believe so.

1    Q.  All right.  And I assume that you checked the location

2    of Safari and found that it existed before you approved the

3    site identification, correct?

4    A.  Again, we don't go out and take a look at the building.

5    We plot these on a map.  It is the sponsor's responsibility

6    to make sure that a site exists.

7    Q.  I want to know what you did before you approved the site

8    identification.  Did you look at the location?

9    A.  Well, I don't recall exactly this process, but in

10   general we pull it up on our map.

11   Q.  Let's go to the next page.  Stop.

12             What is this?

13   A.  This appears to be the second page of the sponsor site

14   agreement.

15   Q.  And does this state the responsibility between the site

16   and the sponsor?

17   A.  Although that's what the agreement is for, this

18   particular page appears to be the sponsoring organization

19   rights and responsibilities.

20   Q.  All right.  And look at general administration.  Do you

21   see that?

22   A.  Yes, I do.

23   Q.  Would you call out that paragraph?

24   A.  Yes.  So again, this would be under the sponsor Feeding

25   Our Future's rights and responsibilities.

```
 1              One is to "Develop and provide Safari with written
 2       information, procedures and recordkeeping forms for CACFP
 3       operations.
 4              "2.  Establish and use generally accepted
 5       accounting practices for recording income and expenditures
 6       to foster Safari's internal control systems and maintain
 7       effective recordkeeping.
 8              "3.  Retain program records for each fiscal year
 9       of Safari's CACFP operations for three years after
10       submission to MDE of the final claim for the fiscal year.
11              "4.  Reserve the right to revise the agreement,
12       subject to change in CACFP regulations and program
13       directives.
14              "5.  Reserve the right to terminate Safari from
15       CACFP sponsorship for cause or convenience."
16       Q.  All right.  Those are the obligations of the sponsor to
17       Safari Restaurant, correct?
18       A.  Under the general administration topic.
19       Q.  Was there any obligation of MDE as it relates to Feeding
20       Our Future or Safari Restaurant?
21       A.  So MDE has agreements with the sponsors, not the sites,
22       and those are laid out in the program agreement that we
23       have.
24       Q.  My question, though, Is there any responsibility of MDE
25       to Safari?
```

1    A.  Not to my recollection right now.

2    Q.  So it is your testimony here that MDE cannot do a site

3    inspection of Safari?

4    A.  So we can go out at any time to a sponsored site.  We

5    typically do this on administrative reviews.

6    Q.  My question was as a director, supervisor at MDE in the

7    food program, does MDE have any authority, responsibility to

8    do a site inspection of vendors or sites?

9              MR. THOMPSON:  Objection.  Compound.

10             THE COURT:  Overruled.

11             You may answer if you can.

12             THE WITNESS:  So I would say that MDE does have

13   authority to go out and visit sites.

14   BY MR. UDOIBOK:

15   Q.  Stop there.  You have the authority.  Do you have the

16   responsibility?

17   A.  The responsibility would be laid out as part of the

18   monitoring that is within regulations.

19   Q.  Do you have the responsibility or not?

20   A.  I would say no, we are not responsible for going to do

21   site visits on an application.

22   Q.  All right.  Let me use the word "obligation."  Do you

23   have any obligation to do site inspection, if you are not

24   responsible?

25   A.  I do not believe so.

1    Q.  I want to understand what you are telling this court,

2    that MDE is not responsible at all to what any site does?

3              MR. THOMPSON:  Objection.  Misstates her

4    testimony.

5              THE COURT:  Sustained.

6    BY MR. UDOIBOK:

7    Q.  All right.  If you have information that a particular

8    site is engaged in fraud, do you have any obligation to do a

9    site inspection?

10   A.  If we are concerned about fraud, I believe the

11   regulations lay out that we need to make a referral to the

12   OIG.

13   Q.  All right.  Has there been any time between, between

14   2019 when you started your employment with MDE until 2022,

15   that any site anywhere, other than Feeding Our Future, told

16   you that they suspect fraud?

17   A.  Yes, I have suspected fraud at other sites.

18   Q.  All right.  Have you ever taken the position that MDE

19   cannot take a position on fraud?

20   A.  MDE does not, to my knowledge, does not have the legal

21   authority to investigate or designate fraud.

22   Q.  Do you have any authority to do a site inspection of a

23   site that is, you have information that may have been

24   engaged in fraud?

25   A.  I believe I answered this before.  Again, I don't

```
 1    believe that there is an obligation.  We refer to the OIG if
 2    we suspect fraud.
 3    Q.  All right.  I want to direct you to Exhibit D1-606.  See
 4    if that refresh your recollection.
 5          You are looking at what has been marked as
 6    Exhibit D1-606.  Do you see that?
 7    A.  Yes, I do.
 8    Q.  This is your email to Ms. Bock at Feeding Our Future,
 9    correct?
10    A.  Yes, that is correct.
11    Q.  And you copied other members or employees of MDE,
12    correct?
13    A.  That is correct.
14    Q.  And let me see what the first, why don't you read, just
15    to yourself, the highlighted portion.
16    A.  I'm sorry.  You said just to read to myself?
17    Q.  Recall that portion.  I want you to focus on
18    paragraph 2.
19          You done?
20    A.  Yep, I reviewed it.
21    Q.  Did you tell Ms. Bock --
22          MR. THOMPSON:  Objection.  Not in evidence.
23          THE COURT:  Sustained.
24          MR. UDOIBOK:  I haven't formulated -- Your Honor,
25    the defense will offer into evidence 606.
```

```
 1                MR. THOMPSON:  Objection.  Hearsay.

 2                THE COURT:  Sustained.

 3      BY MR. UDOIBOK:

 4      Q.  All right.  Was there any time that you took no position

 5      regarding fraud?

 6      A.  So it appears, yes.

 7      Q.  All right.  And --

 8                MR. THOMPSON:  Your Honor, can I ask for a

 9      sidebar?

10                THE COURT:  You may.

11                      (Sidebar discussion)

12                THE COURT:  Mr. Thompson.

13                MR. THOMPSON:  Your Honor, obviously this is, the

14      objection to hearsay was sustained.  It appears first that

15      Mr. Udoibok is trying to elicit the substance of this

16      hearsay communication through testimony by leaving it up on

17      the screen and asking the witness about it.

18                So we would ask that it be taken down if it's not

19      going to be admitted into evidence.

20                Second, I want to caution defense counsel that

21      this communication could open the door, continued

22      cross-examination as to this, could open the door to

23      redirect testimony from Ms. Honer that's quite damaging to

24      the defense, specifically House of Refuge and Sharon Ross,

25      who I know Your Honor is familiar with from the sentencing
```

 1    last week, was essentially kicked out of, her and her

 2    coconspirator Hanna Marekegn were booted from the program,

 3    for lack of a better term, by Ms. Bock after refusing to pay

 4    kickbacks to Ms. Bock and Feeding Our Future.

 5            After this dispute, which rose to MDE, complaints

 6    were filed by not only Ms. Bock and Feeding Our Future, but

 7    also Ms. Ross and Ms. Marekegn.  And in their complaints to

 8    MDE, they said that they, Ms. Bock refused to process their

 9    Federal Child Nutrition Program claims or submit their

10    claims because they refused, because and when they refused

11    to pay kickbacks to Ms. Bock and Feeding Our Future.

12            So if he wants to -- and Ms. Honer I believe if

13    asked on redirect would say this was an entire mess and a

14    dispute between a sponsor and a site, and they told MDE --

15    or Feeding Our Future to deal with it.

16            They weren't going to take a position between this

17    battle between the two entities.

18            THE COURT:  Mr. Udoibok.

19            MR. UDOIBOK:  I was just taking the position,

20    finding out her position regarding fraud, that MDE didn't

21    take a position.  That's not, that's not eliciting any

22    additional information.

23            THE COURT:  Well, we'll see, but let me just ask

24    you while I have you that whether the D1-606 falls within

25    hearsay exception.

```
 1                    MR. UDOIBOK:  Yeah.

 2                    THE COURT:  What is it?

 3                    MR. UDOIBOK:  It's her communication after

 4        Ms. Bock was a party opponent.  It could be admitted, you

 5        know.  It's a, a statement of a party opponent.

 6                    MR. THOMPSON:  Your Honor, Ms. Honer is not a

 7        party opponent.  She's not a party to this criminal

 8        prosecution, and therefore that's not a proper hearsay

 9        objection.

10                    MR. UDOIBOK:  Besides, it's business records.

11        It's government records.  There are multiple exceptions.

12                    THE COURT:  Either of those don't work.  Business

13        record exception doesn't allow you to get around hearsay

14        when it's otherwise hearsay, and Ms. Honer isn't a party to

15        this proceeding, and so the party opponent doesn't apply

16        here.

17                    MR. THOMPSON:  Your Honor --

18                    MR. UDOIBOK:  I know what to do.

19                    THE COURT:  Did you say, "I know what to do"?

20                    MR. UDOIBOK:  Yes, Your Honor.

21                    MR. THOMPSON:  Your Honor, before we continue I

22        just want to say and caution Mr. Udoibok when he says that

23        he's trying to elicit her -- oh, my goodness -- not taking a

24        position on fraud, that's misleading.  She's not saying that

25        there's no fraud in the program.  She's saying we're not
```

1    getting involved in this dispute between Feeding Our Future,

2    House of Refuge in light of the dueling allegations, and

3    that's misleading, and he has opened the doors to redirect

4    that he's not going to like.

5           THE COURT:  I understand your warning.  I'm not

6    going to pre-rule, but I'm concerned about that as well.

7    You've given your warning.  You may go forward.

8                      **(In open court)**

9    BY MR. UDOIBOK:

10   Q.  Let's go back to B4, Exhibit B4.

11          THE COURT:  Let me just interrupt and say does

12   anyone have a paper copy of Exhibit B4?

13          MR. THOMPSON:  I do, Your Honor.

14          THE COURT:  Could you provide it to the witness?

15   I think that's easier than the scrolling.

16          MR. THOMPSON:  Yes.

17          THE COURT:  Thank you.

18          Is that all right with you, Mr. Udoibok?  I just

19   think that's easier on everybody.

20          MR. UDOIBOK:  Sure.

21          MR. THOMPSON:  Yes, Your Honor.  Permission to

22   approach.

23          THE COURT:  Yes.  Thank you.

24          THE WITNESS:  Thank you.

25          MR. THOMPSON:  Sure.

```
 1                THE COURT:  Sorry.  It was my ruling from the
 2      beginning that they should only have electronic, so that's
 3      my fault.
 4      BY MR. UDOIBOK:
 5      Q.  Let's just move slowly because I don't have a paper copy
 6      with you.  Let's go to the second page.
 7      A.  Okay.
 8      Q.  We talked about the second page.  Go to the third page,
 9      Third one.
10                So is it normal practice that a sponsor in
11      requesting a site identification would include supplemental
12      information?  Is that normal practice, or this was an
13      exception with Feeding Our Future?
14      A.  It is not normal practice.
15      Q.  So this was, Feeding Our Future provided you additional
16      information about the site?
17      A.  It's my understanding that MDE required Feeding Our
18      Future to provide this.
19      Q.  And she did?  And Feeding Our Future did?
20      A.  Correct.
21      Q.  Let's go to the next page.  Next one.  We talked about
22      this.  Let's go to the next page.
23                Now, Feeding Our Future was explicit to MDE
24      regarding administrative fees in the site application,
25      correct?
```

1    A.  I would disagree on the site application.  It's in the

2    sponsor site agreement, not the application.

3    Q.  Yes.  Okay.  But this, this attachment was included in

4    the site application, correct?  You testified to that

5    earlier.

6    A.  Correct.

7    Q.  All right.  And what is the administrative fee?

8    A.  I'm not seeing an administrative fee spelled out

9    specifically on this page.  I'm on page 6.

10   Q.  But you aware that Feeding Our Future would charge

11   administrative fees to sites Feeding Our Future sponsor,

12   correct?

13   A.  Oh, absolutely.  The regulations allow up to 15 percent.

14   Q.  All right.  Do you know what percentage Feeding Our

15   Future charged?

16   A.  Not specifically for every site, although I believe it

17   was then percent.

18   Q.  Did you wonder why Feeding Our Future was charging less

19   than the allowable fee?

20   A.  Not particularly.

21   Q.  It's a good thing, right?

22   A.  I wouldn't necessarily say that.

23   Q.  Let's go to the next page.  What page are you looking

24   at?

25   A.  I'm on page 7, same as the screen.

1    Q.  Now, go to the next page.

2          Do you see Number 7?

3    A.  I see Number 7 at the top, yes.

4    Q.  Do you see C.F.R. 226.20?

5    A.  I do see that in the sentence, yes.

6    Q.  And that's, that's a statute or a regulation, sorry,

7    that you work regularly in the food program, correct?

8    A.  I personally do not work in this regulation.  This

9    appears to be around the meal pattern and portion size.

10   Q.  Yeah, but the regulation, you agree, 7 C.F.R. 226

11   controls a lot of the food program, correct?

12   A.  Yes, 7 C.F.R. 226 are the CACFP regs.

13   Q.  Let's go to the next page.

14          Now, this application, all right, was submitted to

15   MDE, correct?

16   A.  This is supplemental documentation, along with the

17   application.

18   Q.  Let's go to the next page.

19          What is your understanding of this page?

20   A.  My understanding, this is the Feeding Our Future

21   preoperational visit to the Safari site for the CACFP.

22   Q.  What does that mean?  Preoperational site?

23   Preoperational visit?

24   A.  So sponsors are required to ensure that the site that

25   will be operating the meal program is eligible and doing so.

1    This monitoring visit documents that Feeding Our Future did

2    that.

3    Q.  Next page.

4            And what is this about?

5    A.  These appear to be the requirements that Feeding Our

6    Future needed to check on the site.

7    Q.  Next page.

8            What's CP?

9    A.  I'm not sure.

10   Q.  Do you see the check mark?

11   A.  I see many check marks on this page.

12   Q.  Do you see the check mark on food production records?

13   A.  Yes, I do.

14   Q.  What is that?

15   A.  So food production records are the records that are

16   required to be kept from the site to indicate how much of a

17   food, the portion size, basically the recordkeeping

18   requirements to produce that food.

19   Q.  Feeding Our Future in fact kept those records, correct?

20   A.  I'm not sure what Feeding Our Future kept.

21   Q.  But at least on this exhibit in the application, Feeding

22   Our Future represented they kept those food production

23   records, correct?

24   A.  That's what it appears to look like.

25   Q.  Remember, this is a supplemental record that is not

```
 1   normal for site identification application, correct?
 2   A.  I would agree with that.
 3   Q.  But Feeding Our Future was required to put more or
 4   voluntarily, you know, give more records, correct?
 5   A.  It's my understanding they were required to.
 6   Q.  Go to the next page.  Do you see where it says
 7   "for-profit eligibility"?
 8   A.  Yes, I do.
 9   Q.  What does it say?  The check mark says what?
10   A.  The check mark appears to be under the column Not
11   Applicable, and the comments are, "Area eligible."
12   Q.  Do you know who made the comment?
13   A.  I do not.
14   Q.  But the comment, what does the comment mean to you?
15   A.  The comment means to me that this site is located in an
16   eligible area to operate the program.
17   Q.  What does that mean, "eligible area"?
18   A.  So I testified to this yesterday.  Again, eligible areas
19   are based on school and census data.  I believe this is the
20   CACFP program, so it would be school data.
21   Q.  CACFP program, for the benefit of the jury, what does
22   that mean?
23   A.  The Child and Adult Care Food Program.
24   Q.  Okay.  Then let's go to the next page.
25              Do you see the area "Civil Rights"?
```

1    A.  Yes, I do.

2    Q.  What is, what is that supposed to mean?

3    A.  So in these programs, the USDA requires certain civil

4    right protections that must be adhered to for the sites.  So

5    these appear to be those requirements.

6    Q.  Call out the "Civil Right" column.

7            Is it fair to say that this site application rule

8    required Feeding Our Future not to discriminate on the basis

9    of race, color, national origin, sex and all the conditions

10   that is under law?

11   A.  Well, although I would agree that Feeding Our Future is

12   not allowed to discriminate on those bases, this particular

13   section is that the program or site is not allowed to do

14   those.

15   Q.  The program or the sites, correct?

16   A.  I would say no one in this program should be

17   discriminating.

18   Q.  All right.  Thank you.

19           Let's go to the next page.

20           So you look, let's look at the column "Public

21   Release."  What does that mean?

22   A.  So these programs are meant for children in the areas to

23   come and receive food, and so when a site is for all

24   children in that community, there should be some sort of

25   public statement identifying that site as providing food.

1    Q.  And why is that necessary?

2    A.  Because these programs are meant to feed healthy,

3    nutritious meals, and in order to do that, the kids need to

4    know where to go.

5    Q.  Okay.  Take the call-out out.  Go to the next column,

6    the National Disqualified List?

7    A.  Yes.

8    Q.  What is that?

9    A.  The national disqualified list is specific to the Child

10   and Adult Care Food Program.  It is when an organization or

11   an individual does not operate this program correctly, has

12   been given opportunity to correct, and still does not

13   correct.

14          They go to a national disqualified list and are

15   banned this program for seven years.

16   Q.  And what does that checklist says?

17   A.  This checklist states -- so this is a requirement.  The

18   sponsor is required to check the site operators against that

19   national disqualified list.

20   Q.  And the site operators were not disqualified, were they?

21   A.  That's what it appears from this form.

22   Q.  Take it out.  Let's see the next page.

23          This is a license exempt verification, correct?

24   A.  That is what it appears to be, yes.

25   Q.  What is that?

```
 1    A.  So I don't know the specific state statute, but there is

 2    a DHS state statute for DHS licensing.  This would be

 3    daycares, child cares.  And there is specific exceptions in

 4    which a license is not needed.

 5          And so this form appears to document that this

 6    site did not need a DHS license per those state statutes.

 7    Q.  Let's go to the next page.

 8          Is that what you testified earlier about a

 9    location on the map?

10    A.  It appears to be very similar.

11    Q.  Call it out.

12          Is that what you were testifying to earlier?

13    A.  Yes, this would be a map that is plotted for that site

14    ID.

15    Q.  Call out the latitude and longitude towards the right

16    there.

17          Is that what you were referring to about the

18    longitude and latitude, those numbers?

19    A.  That is an example of the latitude and longitude that we

20    would use for a site, yes.

21    Q.  Now, call out CLiCS.  No.  The next box.  Up.

22          Do you see the CLiCS written on it?

23    A.  I do see CLiCS written at the top right, yes.

24    Q.  Call it out please, so I make sure.  Go to the box to

25    your right, please, Darlene.  Call out that box.
```

 1                    Do you see the CLiCS here?

 2       A.  Yes, I do.

 3       Q.  All right.  Thank you.

 4              So when you testified earlier this information is

 5       inputted in CLiCS and CLiCS is the device that the sponsor

 6       sends information to MDE?

 7       A.  I would generally agree with that.

 8       Q.  All right.  Let's go to the next page.

 9              So let's go to the next page.

10       A.  Yes.

11       Q.  It's for immediate release.  What is that?

12       A.  I believe this is the notice that Feeding Our Future

13       would send to do that public announcement that I had

14       mentioned.

15       Q.  And do you have any recollection about the April 13,

16       2020, date there?

17       A.  I do not.

18       Q.  It says mailed.

19              Let's go to the next page.  Next page.

20              So this is the site identification application

21       that you received from Feeding Our Future regarding Safari,

22       correct?

23       A.  Well, again, it was supplemental documentation, along

24       with a site ID request.

25       Q.  All right.  So when a sponsor like Feeding Our Future

1    sent, sent MDE the site ID application, the address, all

2    right, of the site is entered into the system by MDE,

3    correct?

4    A.   That's correct.

5    Q.   All right.  Now, does MDE have a policy as to what name

6    must be given to that site?

7    A.   We do not.

8    Q.   All right.  So is it possible for more than one site to

9    have the same location?

10   A.   It is possible.

11   Q.   All right.  Is it also possible for a site with a site

12   ID number and a vendor with the same address?

13   A.   I don't believe we saw that until the summer of 2020.

14   Q.   I was just asking whether it was possible or not.

15   A.   I suppose it could be possible.

16   Q.   Okay.  And that is because a vendor is different from a

17   site, correct?

18   A.   They should be.

19   Q.   Okay.  Now, is it possible for a vendor and a site to be

20   owned by the same organization?

21   A.   No, I don't believe it is.

22   Q.   It isn't possible.  Okay.

23            Is it possible for a site that is a business and a

24   vendor that's also a business, but owned by the same

25   peoples?

```
1    A.  I believe that is more possible.

2    Q.  And have the same address?

3    A.  Sure.

4    Q.  Like a shopping mall?

5    A.  Sure.

6    Q.  I want to direct you to, I want to shift gear a little

7    bit to V, victor 3.  You testified to that earlier.

8              This is a CLiCS data, correct?

9    A.  This is the CLiCS claim submission form.

10   Q.  Ms. Mallet, why don't you call out the first box?  No.

11   The entire series.  There you go.

12             I should learn this thing like Mr. Thompson.

13             Now, what is V, Exhibit V3?

14   A.  So again, that's the CLiCS claim submission form.

15   Q.  All right.  And the sponsor on top is Feeding Our

16   Future, correct?

17   A.  That is correct.

18   Q.  And the site now has a number, and it's called what?

19   A.  The title is Distribution Site Safari Restaurant.

20   Q.  All right.  The calendar year is 2020, correct?

21   A.  That is correct.

22   Q.  And April 2020, correct?

23   A.  That is correct.

24   Q.  And it's approved, correct?

25   A.  That is correct.
```

```
1    Q.  And the approval is done by MDE, correct?

2    A.  The approval happens within the MDE CLiCS system.

3    Q.  Someone approves it, right?

4    A.  No, we do not have an actual person approving each

5    claim.

6    Q.  All right.  So that's critical.  So a computer approves

7    it?

8    A.  It's based on the information submitted on the

9    application.  There's edit checks built into the product.

10   Q.  But, nonetheless, MDE can approve or deny whatever

11   system you use, correct?

12   A.  I would agree that we have the access to do that.

13   Q.  All right.  And Exhibit V3, MDE approved it, correct?

14   A.  Again, the MDE CLiCS system approved this claim.

15   Q.  I don't think I can examine CLiCS as a person, but

16   someone is responsible for making sure that CLiCS is not

17   approving all applications, correct?

18   A.  So in terms of applications, we do have staff that

19   approve them.

20   Q.  All right.

21   A.  We do not have staff that approve the claims, each

22   individual one.

23   Q.  So is it your testimony that the approval of Exhibit V3

24   was not done by a human being?

25   A.  That is correct.
```

```
 1   Q.  Okay.  Take out the call-out.

 2             Now let's go to attendance.  Call out that column.

 3             And the CLiCS system says the average daily

 4   attendance is 1179, correct?

 5   A.  That was what was submitted by the sponsor, yes.

 6   Q.  All right.  And I'll use your phrase.  The CLiCS system

 7   approved it, correct?

 8   A.  For that claim, yes.

 9   Q.  All right.  Let's go to the next page.  Take out the

10   call-out.

11             Circle for-profit, call out for-profit section.

12   No.  The first paragraph, please.

13             Do you see for-profit child care sponsors?

14   A.  Yes, I do.

15   Q.  Can for-profit child care sponsors participate?

16   A.  Not in the CACFP at-risk program, no.

17   Q.  But on this, what does this document say?

18   A.  Well, this is a standard certification that is on the

19   claim that the sponsor agrees to when they submit a claim.

20   Q.  What does it say?

21   A.  It says, "For-Profit child care sponsors:  Each

22   for-profit center must demonstrate that during the claiming

23   month no less than 25 percent of enrolled participants or

24   licensed capacity, whichever is less, were Title XX

25   beneficiaries, or were approved for free or reduced-price
```

1    meals."

2    Q.  All right.  It's for-profit, correct?

3    A.  That particular statement is meant for for-profit child

4    care sponsors, yes.

5    Q.  Thank you.  Take out the call-out.

6            Is there a second page?

7            I want to direct you to the next page.

8            Is there a second page?  There, stop there.

9            Now, go to the first, the first group there.

10   There you go.

11           What month is this exhibit referring to?

12   A.  This refers to May 2020.

13   Q.  All right.  And is relating to Safari, correct?

14   A.  The site title is Distribution Site Safari Restaurant.

15   Q.  And it's also approved, correct?

16   A.  That is correct.

17   Q.  Take out the call-out.  Now go to the at-risk section

18   and call that out.

19           What is the average attendance?

20   A.  The average attendance submitted was 2,928.

21   Q.  If I recall you testified earlier, yesterday, that you

22   were concerned by the increase in numbers, correct?

23   A.  That's correct.

24   Q.  And you also testified that school districts saw a

25   decrease in numbers, correct?

```
1    A.  Initially school districts saw a decrease, yes.

2    Q.  Was it possible that the kids did not go to the school

3    district but came to the sites to receive food?

4    A.  I do not believe so.

5    Q.  What basis do you have to disagree?

6    A.  So schools saw their decrease in the beginning of COVID,

7    that was my testimony yesterday, which would have been

8    March, April, May.

9              Safari Restaurant didn't pick up with their

10   concerning numbers until soon after that, when school

11   started to see increases.

12   Q.  And I just want to know.  By May 2020 it was COVID,

13   correct?

14   A.  Yes.

15   Q.  All right.  And school districts numbers decreased,

16   correct?

17   A.  In the beginning of COVID, yes.

18   Q.  Yes.  When did COVID begin?

19   A.  Again, March, April, some of May.

20   Q.  What year?

21   A.  2020.

22   Q.  Okay.  And as school district decrease, and is it

23   possible that children went to the sites instead of the

24   school district?  Is it possible?

25   A.  I do not believe so.
```

```
1    Q.  No, I know what you believe.  I'm saying is it possible

2    or not?

3    A.  I do not find it possible.

4    Q.  So where did the kids that did not pick up food, did not

5    eat at school, where did they eat?

6    A.  I don't know.

7    Q.  Okay.  You don't.

8            All right.  Take out the call-out.  Go to the next

9    page.  Is there another page to V3?  Yes.  Let's go to --

10   call out the first column.

11           This is regarding which month?

12   A.  This is June 2020.

13   Q.  And, again, I'll say the CLiCS system approved it,

14   right?

15   A.  That is correct.

16   Q.  All right.  Go to the bottom to, not -- the last column

17   to address.  Call that out.

18           What is the daily attendance of this?

19   A.  The average daily attendance submitted was 3,589.

20   Q.  It's smaller, correct?

21   A.  Small?  No.

22   Q.  Smaller compared to --

23   A.  I believe the previous month's was in the 2,000s.  I

24   would have to look back again.

25   Q.  This is 3,500.  Now, the CLiCS system approved it,
```

```
 1    correct?

 2    A.   That is correct.

 3    Q.   There is an application, correct?

 4    A.   Incorrect.  This is a claim.

 5    Q.   A claim.  But, yeah, it was approved?

 6    A.   The claim was approved by the CLiCS system, yes.

 7    Q.   Let's go to the next column -- let's go to the next

 8    page.  Next page?

 9              MS. MALLET:  That's it.

10              MR. UDOIBOK:  Go to the first page.

11    BY MR. UDOIBOK:

12    Q.   So just to get the gist of your testimony, is the site

13    application, CLiCS is responsible for approving or denying,

14    correct?

15    A.   I don't agree.  The CLiCS system is the product we use

16    for applications.  We have staff that process those

17    applications.

18    Q.   Okay.  So the site ID application, CLiCS approves or

19    deny.  It's CLiCS' responsibility?

20    A.   Not for the site ID application.

21    Q.   Approves or denies?

22    A.   A human being processes that site ID.

23    Q.   And approves and gives a number?

24    A.   Once the information is put into CLiCS, CLiCS

25    automatically processes a number and sends to the sponsor.
```

1    Q.  And CLiCS also approves it or a human being does?

2    A.  A human being has to input that information.

3    Q.  The approval?

4    A.  Sure.

5    Q.  All right.  And then the claims that we just looked at

6    in V3, in this particular case it was approved, right?

7    A.  And again, this is different from the application.  This

8    is a claim, but, yes, it was approved.

9    Q.  It was approved.  By a human being and not CLiCS?

10   A.  Not by a human being.

11   Q.  By CLiCS?

12   A.  Correct.

13   Q.  I want to direct you to V, Government Exhibit V2.  What

14   is this?

15   A.  This is the site application for the Child and Adult

16   Care Food Program submitted by Feeding Our Future for the

17   distribution site Safari Restaurant.

18   Q.  All right.  And when was this application made?

19   A.  I don't know exactly.

20   Q.  I'm directing you to the column "Site Status."

21          Call out site status.  Site application status.

22          The approval date range, is it April '20 through

23   September '20?

24   A.  That is correct.

25   Q.  And the site is Safari Restaurant, correct?

1    A.  Yes, that's -- Safari Restaurant is titled under the

2    program name.

3    Q.  Okay.  Is there a difference between program name and

4    the site name?

5    A.  There can be.

6    Q.  For instance?

7    A.  So, for example, let's say you have the summer food

8    program that's going to be located at a park, the site name

9    could be XYZ Park and the program name could be YMCA.

10   Q.  So it is possible that the site ID has 310 Fourth Avenue

11   South.  The delivery site could be at a park at a different

12   address?

13   A.  No.

14   Q.  Oh.  Okay.  So I believe you testified that the program

15   ID is different from a delivery site.  Is that --

16   A.  I don't believe that I testified that.  So food, where

17   food is being served to children, that needs to be the

18   address of the application.

19   Q.  All right.  Why is that important?

20   A.  Because we look at the eligibility of that location.

21   Q.  So it is possible then for -- remember we testified

22   about in a large area one address, like a shopping mall.  Is

23   it possible then that there could be two addresses, I mean

24   two sites with the same address?

25   A.  So in that instance there would be, say, a building I

```
1    believe you are referring to, there would be different suite
2    numbers.  There would be some sort of distinction in the
3    address to tell them apart.
4    Q.  So call out just for clarity "Serious Deficiency
5    Information."  There you go.
6              In this, is this a claim, or was it an
7    application?
8    A.  So this is a site application.
9    Q.  All right.  And the site application says, is what?  Is
10   a nonprofit?
11   A.  Yes, Feeding Our Future submitted this as a nonprofit.
12   Q.  All right.  And the classification site was at-risk
13   center, correct?
14   A.  They also submitted it as an at-risk center, yes.
15   Q.  Take out the call-out.  Now go back and circle the
16   approval, call out the approval.
17             And this site application was also approved,
18   correct?
19   A.  That is correct.
20   Q.  Okay.  Take out the call-out.  Let's go to the next
21   page.
22             There's a check mark in the first column there.
23   This is legally separate from -- all right.
24             What does that mean?  This site is legally
25   separate from the sponsoring authority?
```

```
1    A.  So as I mentioned earlier, when there is a site that

2    does not have a legal connection, they are not the same

3    entity, as the sponsor and site, that's what this call-out

4    means.  They are two separate entities.

5    Q.  So, for example, Feeding Our Future is separate legally

6    from Safari Restaurant, correct?

7    A.  Correct.  They do not share tax ID numbers.

8    Q.  There you go.  And there's a check mark for exempt from

9    DHS.  What does that mean?

10   A.  So again, I don't remember the DHS statute, but there is

11   requirements for DHS licensing and there is exemptions under

12   that as well.

13   Q.  And there's a notation that Safari Restaurant was

14   legally exempt, correct?

15   A.  That is what Feeding Our Future submitted.

16   Q.  And it was approved.

17   A.  That is correct.

18   Q.  All right.  Take out the call-out.

19        Now circle the compliance statement in the middle,

20   call out the compliant statement.

21        What is that?

22   A.  So these are requirements for all of the applications.

23   Q.  All right.  The legal requirements for the applications.

24   A.  I would agree with that.

25   Q.  And also it was approved, correct?
```

1    A.  That is correct.

2    Q.  Take the call-out out.  Go to Section 9.  Call out

3    Section 9.

4              What was the method of meal preparation as to this

5    application?

6    A.  So Feeding Our Future submitted that the method of meal

7    preparation was that meals were prepared on site.

8    Q.  Who would prepare the meals?

9    A.  I'm not sure.  Site staff.

10   Q.  And, I mean, based on this application?

11   A.  That's for the sponsor to have an understanding of.

12   Q.  All right.  But again, it was approved, correct?

13   A.  That's correct.

14   Q.  Now go to participation, site participation status.

15             What is that about?

16   A.  So as I've talked about the Child and Adult Care Food

17   Program, there is the at-risk portion of that program.  This

18   calls out that this site is applying to participate in

19   at-risk.

20   Q.  Take out the call-out.  And let's go to the next page,

21   if there is one.

22             All right.  So, nonetheless, Feeding Our Future

23   provided you --

24             Oh, by the way, why don't you look at, call out

25   Section 5 and 6.

```
 1                    It says licensed/approved capacity.  What does
 2       that mean?
 3       A.  Yes.  The sponsor is responsible to understand what that
 4       site is able to have as far as their max capacity.  This can
 5       be depending on, as far as licensing, fire licensing or fire
 6       capacity.  It could be a license capacity with DHS.
 7                    And then Number 6 is the estimated daily
 8       enrollment, so this is the number of children that the site
 9       expected to see each day.
10       Q.  All right.  Take that out.  Take the call-out out.
11                    Let's go to the first page of Exhibit V2.
12                    I just want to make sure that 300 meals were
13       requested and was approved by MDE, correct?
14       A.  That is correct.
15       Q.  Okay.  I want to direct you to Exhibit V1 that you
16       testified to earlier.
17                    THE COURT:  Mr. Udoibok, before you do that, we
18       need to take our morning break.
19                    MR. UDOIBOK:  Thank you.
20                    THE COURT:  All right.  So we'll come back at,
21       let's come back at 11:00.  So we'll see you all at 11:00.
22       Thank you.
23                    All rise for the jury.
24       10:39 a.m.
25
```

0:22-cr-00223-NEB-DTS   MR. Doc. 589K

1                    **IN OPEN COURT**

2                  **(JURY NOT PRESENT)**

3              THE COURT:  Counsel, my understanding was that you

4       had a small, something to put on the record at the break?

5       Am I right?  I am wrong?  I am right.

6              MR. EBERT:  Yes, Your Honor.  Just very briefly.

7              At the pretrial conference, there was some

8       discussion about the fact that the government may have

9       instances where there's a case agent who would be recalled

10      on a separate date to testify about other separate matters.

11      I just wanted to address that fact.

12             We've been in communication with counsel for both

13      defendants about that.  We anticipate that that first

14      instance of this, Your Honor, would come through testimony

15      of Special Agent Jared Kary, who would take the stand

16      perhaps later today or tomorrow, and then he would be

17      recalled to testify at a later point at trial.

18             I just wanted to mention that for the record.

19      It's something we've flagged for the court previously and

20      discussed it again with the defense, who indicated they have

21      no opposition to that formulation.

22             THE COURT:  So you are saying you are going to

23      call him.  He's going to testify about particular items, and

24      rather than going outside the scope of that cross, the

25      defense is reserving the right to recall him?  Is that what

```
 1     you are saying?

 2              MR. EBERT:  No, Your Honor.

 3              THE COURT:  No.

 4              MR. EBERT:  The government would recall him to

 5     testify about new and separate matters at a later point.

 6              THE COURT:  All right.  Regardless of what happens

 7     on cross?

 8              MR. EBERT:  Yes, Your Honor.

 9              THE COURT:  Understood.

10              Any objection?

11              MR. COLICH:  No, Your Honor.

12              MR. UDOIBOK:  No.

13              THE COURT:  All right.

14              MR. UDOIBOK:  But reserve the right in case, in

15     event that, depending what the testimony is, it goes

16     outside.

17              THE COURT:  Fair.  You are reserving all

18     objections to his specific testimony.  That I think is in

19     order.  That makes sense.  All right.

20              MR. UDOIBOK:  Thank you.

21              MR. EBERT:  Thank you, Your Honor.

22              THE COURT:  11:00.  We're in recess.  Thank you,

23     everyone.

24              (Recess taken at 10:41 a.m. till 11:01 a.m.)

25     11:01 a.m.
```

```
 1                        IN OPEN COURT

 2                       (JURY PRESENT)

 3              THE COURT:  You may all be seated.

 4              Mr. Udoibok, you may continue.

 5              MR. UDOIBOK:  Thank you, Your Honor.

 6   BY MR. UDOIBOK:

 7   Q.  Ms. Honer, I apologize.  I'm learning this system as

 8   this case is going on, so I might seem a little scatter

 9   brain.

10              But I want to direct you to Exhibit, we were

11   talking about, Exhibit V3.  All right.  And we will go to

12   the first page.  I have my computer now, so I can follow

13   easier.

14              You testified earlier that Exhibit V3 is claims,

15   right?

16   A.  That is correct.

17   Q.  All right.  And before, in this case, Safari Restaurant

18   would have filed a claim, they have gone through at least

19   two processes, one being site ID application, correct?

20   A.  I would disagree that it would be Safari.  It's the

21   sponsor that submits those documents, but, yes, for that

22   site.

23   Q.  Okay.  For -- let's make sure we understand each other.

24   The site itself, the sponsor would have applied for the site

25   identification, correct?
```

```
 1    A.  Yes.

 2    Q.  All right.  Why don't you pull up Exhibit V3, first

 3    page, and call out "Sponsor."

 4            All right.  Do you see that?  The sponsor in this

 5    case is Feeding Our Future, correct?

 6    A.  That is correct.

 7    Q.  And the site is Safari Restaurant, correct?

 8    A.  That is correct.

 9    Q.  They have two different numbers, correct?

10    A.  That is correct.

11    Q.  Now, before this stage of claims, Safari would have had

12    a site identification number, correct?

13    A.  That is correct.

14    Q.  All right.  And then Feeding Our Future would have made

15    the application for the site identification, correct?

16    A.  That is correct.

17    Q.  And, and the site ID would have been approved, correct?

18    A.  That is correct.

19    Q.  All right.  Now, then, by this -- then we get to this

20    claim, correct?

21    A.  Sure.

22    Q.  Now, in the application, site application and also --

23    strike that.

24            The site application would give you the number of

25    meals that that site would want to serve, correct?
```

1    A.  In general, yes.

2    Q.  All right.  And that application would have been

3    approved by MDE before we get to this V3, correct?

4    A.  That's correct.

5    Q.  Okay.  I just want to remember this.  I just figured

6    that out today.

7           So call out "Other," the reason for adjustment.

8    What is that?

9    A.  So when there is an adjustment to a meal claim, this is

10   where that adjustment would be made.

11   Q.  All right.  Who is the reviewer in this case?

12   A.  Well, so reviewer refers to "Other," which you see is a

13   description under that drop-down.

14   Q.  There's a drop-down menu, correct?

15   A.  Correct.

16   Q.  In that drop-down menu, would there be names of people

17   at MDE?

18   A.  No.

19   Q.  No?  Okay.  So what's the drop-down menu for?

20   A.  So the drop-down menu, as it states above, is the reason

21   for adjustment.  So this could be a decrease, an increase.

22   I don't remember all of the options under there.

23   Q.  Now, is it also a computer that reviews Exhibit V3, or

24   is a human being?

25   A.  So V3 is a claim, and the claim is processed by the

```
 1    computer system.

 2    Q.  Not a human being?

 3    A.  No.

 4    Q.  So is it your testimony that when a claim is made for

 5    money at MDE, a human being does not evaluate it for

 6    approval or denial?

 7    A.  That is correct.

 8    Q.  Let's go to V2.  I'm just curious.  Is it, in claims

 9    processing approval or denial, is that standard practice at

10    MDE now?

11              MR. THOMPSON:  Objection, Your Honor.

12              MR. UDOIBOK:  For a computer to review and deny or

13    approve, is that still the practice?

14              MR. THOMPSON:  Objection.  Relevance.

15              THE COURT:  Sustained.

16    BY MR. UDOIBOK:

17    Q.  Let's go to V2.  Now, what is V2?  It's an application,

18    correct?

19    A.  That is correct.

20    Q.  And an application for what?

21    A.  This is an application for the Child and Adult Care Food

22    Program for the distribution site Safari Restaurant.

23    Q.  All right.  So this application must be approved or

24    denied before you can submit claims, correct?

25    A.  That is correct.
```

1   Q.  All right.  And is it your testimony too that this is

2   also reviewed by a computer or human being?

3   A.  No.  Again, the applications are reviewed by a human

4   being.

5   Q.  All right.  I'm directing you to page 3.  Call out

6   page 3, the internal application notes.

7           Who is KP?

8   A.  KP is Kendra Pace.

9   Q.  And Kendra Pace, you supervised Kendra Pace, did you?

10  A.  I did.

11  Q.  All right.  And in this application what is the internal

12  communication here?

13  A.  Do you want me to read it?

14  Q.  Please.

15  A.  So the internal application notes read, "In order to

16  bypass claim edits for the COVID-19 waivers of noncongregate

17  and child care, site listed as nonprofit until June 30th,

18  2020," with the initials KP, 5/6/2020.

19          Then it states, "New site COVID waiver," with the

20  initials KP, 5/5/2020.

21  Q.  What did they waive?  What did KP waive?

22  A.  So this relates to the COVID-19 waivers as provided by

23  the USDA.  And our CLiCS system is set up for normal

24  operations, and the waivers were not set up in our computer

25  system, so we had to make certain arrangements in the

1    computer system to account for those waivers.

2    Q.  And the arrangement in this case is for Kendra Pace to

3    put notes in the CLiCS system for MDE to know that Kendra

4    Pace had waived certain conditions based on the COVID

5    waiver, correct?

6    A.  Yes.  Any time we're outside of normal practice, we like

7    to document that.

8    Q.  And this internal application notes was included in the

9    approval of the application, correct?

10   A.  I guess you could say that.  It's included in this

11   printout of the application.

12   Q.  Well, why don't you go to the first page under approval.

13   Was it approved or not?

14   A.  It was approved.

15   Q.  Okay.  Now, because it was reviewed by a human being,

16   the human being had the authority to approve or deny,

17   correct?

18   A.  I would say so.

19   Q.  Now, in the application, did Feeding Our Future tell you

20   or MDE about the number of meals that Safari was, would be,

21   you know, preparing?

22   A.  Yes, as it states above 300.

23   Q.  Let's specifically make sure.  So go to column 5 and

24   call out 5, 6.

25               MDE approved 300 as the estimated daily

1    enrollment, correct?

2    A.   That is correct.

3    Q.   You testified earlier you were concerned --

4    A.   Yes.

5    Q.   -- about these numbers, correct?

6    A.   Well, the numbers that were coming in on claims were far

7    above these numbers.

8    Q.   Right.  But this particular numbers, was it alarming to

9    you?

10   A.   The particular numbers on the application of 300, no,

11   not specifically.

12   Q.   Because it was approved?

13   A.   Sure.

14   Q.   Let's go to your exhibit you testified to earlier, V

15   like in victor, 1.

16            This is another application, isn't it?

17   A.   That is correct.

18   Q.   What type of application is it?

19   A.   This application is the Summer Food Service Program site

20   application for Safari Restaurant.

21   Q.   And what time period was the approval for?

22   A.   The approval for this application was June 2020 to

23   July 2020.

24   Q.   So there's no confusion, the approval was performed or

25   issued by human being, correct?

```
 1    A.  On the site application, yes.

 2    Q.  And go, call out the "Contact Section."

 3              And who is the contact?

 4    A.  The contact for this site application is Aimee Bock, the

 5    founder/executive director, with her phone number and email

 6    address.

 7    Q.  Now, if MDE has, had any questions about the

 8    application, it would be Aimee Bock that they would write or

 9    communicate with, correct?

10    A.  That's correct.

11    Q.  Now, do you know whether MDE -- whether Feeding Our

12    Future used any other address in communicating with MDE?

13    A.  To clarify, are you talking email address?

14    Q.  Yes.

15    A.  I remember Aimee also had a hot mail address every once

16    in a while.  It was rare.

17    Q.  Yeah.

18    A.  And then there was her compliance manager that would

19    also correspond with us.

20    Q.  Who was the compliance manager?

21    A.  Rhyddid Watkins.

22    Q.  Isn't Rhyddid an attorney for Feeding Our Future?

23    A.  It's my understanding he served as both.

24    Q.  Okay.  So it is your testimony that Feeding Our Future

25    had a compliance manager?
```

```
1     A.  Yes.

2     Q.  All right.  And did Feeding Our Future also have a

3     financial manager, an accountant?

4     A.  No, I do not believe they did.

5     Q.  All right.  So I want to walk you through this

6     application a little bit.

7               Let's go to, call out "Serious Deficiency."

8               In the program year 2020-2021 for Exhibit V2 -- I

9     mean V1, sorry -- is there any notation about serious

10    deficiency?

11    A.  No, there is not, on this application.

12    Q.  All right.  And a human being reviewed it, correct?

13    A.  That is correct.

14    Q.  A human being approved it, correct?

15    A.  That is correct.

16    Q.  I want to direct you to Section 7, "Operational

17    Schedule."  Do you see that?

18    A.  Yes, I do.

19    Q.  What does that mean?

20    A.  So underneath that title, the sentence is, "Check the

21    box for all days on which meals may be served."

22              So those checked boxes indicate the days meals are

23    served.

24    Q.  But there are also additional comments below.  What are

25    those comments?
```

1    A.  Sure.  The additional sentence below the check boxes

2    state, "If site will not serve meals on all days reported

3    above in Number 4, opening and closing dates and in

4    Number 7, operational schedule, record details below (i.e.

5    closed July 4th or only operating June 13th-19th, July 10th

6    through)," and then it cuts off.

7    Q.  All right.  So I'm directing you to page 3, "Catering

8    Contracts and Renewal Documents."

9         Do you see that part?

10   A.  Yes, I do.

11   Q.  Call out the file name section, Ms. Mallet.

12   A.  So -- oh, I'm sorry.

13   Q.  All right.  Go ahead.

14   A.  So under the file names, the first file is titled

15   6.8.21.

16   Q.  What does that represent?

17   A.  The date.

18   Q.  All right.  And then it's a catering contract with

19   Safari, correct?

20   A.  That is correct.

21   Q.  And it's -- there's a drop-down menu for upload date,

22   correct?

23   A.  No, that is not a drop-down.  That arrow is the ability

24   to download the file.

25   Q.  All right.  And what does "action" mean, "actions"?

1    A.  So "actions" is the circle icon that you were referring

2    to that allows the document to be uploaded.

3    Q.  Is it fair to say that MDE received the catering

4    contract and the revised one with Safari that was sent to it

5    by Feeding Our Future, correct?

6    A.  I would agree with that.

7    Q.  Was there anything improper about Exhibit V1?

8    A.  Not that I can recall.

9    Q.  Let's go to Section 10, "Meal Type Information."  Call

10   out the entire section.

11            What is the request here in the application

12   regarding breakfast, morning snack?  How many people?

13   A.  The number entered under morning snack, I'm sorry,

14   morning snack for total estimated children served is 5,000.

15   Q.  All right.  And then what about lunch?

16   A.  It is also 5,000.

17   Q.  It was approved, wasn't it?

18   A.  Yes, it was.

19   Q.  By a human being, correct?

20   A.  Yes.

21   Q.  Now go to file name Section 11, Ms. Mallet, and call out

22   the section "SFSP."

23            What does SFSP application mean?

24   A.  Do you mean in terms of the file name?

25   Q.  Yeah.

1    A.  So the file name refers to a supplement, and I don't

2    know exactly what that document is.  I would assume it to be

3    similar to the supplement we saw before.

4    Q.  Additional information beyond what would normally be

5    requested, correct?

6    A.  That's incorrect.

7    Q.  All right.  Correct me.  But nonetheless is a

8    supplementation?

9    A.  This is a supplement.

10   Q.  That was reviewed before approval, correct?

11   A.  That is correct.

12   Q.  Now, I want you to take a look at page 4 and call out

13   the section that starts with "Per EH" and ends with "Per."

14   A.  Would you like me to read it?

15   Q.  Please, if --

16   A.  Yes.  So it states, "Per EH removed stop pay 4/29/21."

17   Initials JF.

18   Q.  Let's just take it piece by piece because it seems a

19   lot.  Who is EH?

20   A.  That is me.

21   Q.  And you are removing the stop pay, correct?

22   A.  That is correct.

23   Q.  When did you remove the stop pay?

24   A.  Bated on these notes, it appears to be April 29, 2021.

25   Q.  Who is JF?

1    A.  I believe it is a staff person, Jennifer Forester.

2    Q.  What was the stop pay that you removed?

3    A.  As I mentioned yesterday, stop pay is a function in

4    CLiCS.  So stop pay had been put on this application, and

5    then we were removing that from CLiCS.

6    Q.  Because you were satisfied with whatever information was

7    given to you?

8    A.  Absolutely not.

9    Q.  Okay.  What would be the reason that you stop pay?

10   A.  Because it is my understanding from a court hearing and

11   from USDA, we did not have the authority to stop pay.

12   Q.  All right.  And based on a decision by a court and USDA,

13   you removed the stop pay?

14   A.  I would disagree.  I don't believe there was a decision.

15   Q.  Something happened in court, and you removed the stop

16   pay; is that fair?

17   A.  That is fair.

18   Q.  And you talked to USDA, and you removed the stop pay?

19   A.  That is fair, yes.

20   Q.  Okay.  Do you consider the USDA, the conversation you

21   had with USDA, that USDA was wrong?

22   A.  I wouldn't categorize it as that.

23   Q.  Okay.  So look at the next sentence.  It says, "Per EH

24   site on stop pay due SD claim verification 4/22/21."

25             What is that?

1    A.  So again EH is myself.  And as you can see these notes

2    go in order, newest to oldest.  So this is the note from

3    April 22nd, 2021, where a staff person with the initials CA

4    put the stop pay on this site application per my direction.

5    Q.  But it was ultimately removed?

6    A.  That is correct.

7    Q.  Now, look at reapproved and that line of comments.

8         Could you explain that to us?

9    A.  So the note is, "Reapproved, closing date from 12/31 to

10   4/30," with the initials KP, dated February 10th, 2021.

11        And what this means is that this site application

12   submitted, resubmitted within the program year to extend

13   their dates of operation.

14   Q.  Okay.  And then what does CAP 5500 to 6,000 mean?

15   A.  I believe that note refers to the capacity going from

16   5500 to 6,000.

17   Q.  Of what?

18   A.  Children.

19   Q.  Meals, right?

20   A.  Meals served to children per day.

21   Q.  And that was approved?

22   A.  It appears so.

23   Q.  It appears so.

24   A.  From the notes, it says, "Reapproved."

25        It appears so.

RENEE A. ROGGE, RMR-CRR
612-664-5107

1    Q.  Thank you.

2              Now take out the call-out.

3              You testified earlier that you didn't know whether

4    or not Safari Restaurant had the capacity to produce the

5    number of meals that it purportedly sought payment for.  Do

6    you remember your testimony?

7    A.  I believe I testified that I questioned their ability to

8    serve that many meals.

9    Q.  All right.  And how many meals were those that you

10   questioned?

11   A.  I was questioning all of the meals.

12   Q.  But nonetheless you approved it.

13   A.  That is correct.

14   Q.  All right.  And in the catering contract, do you recall

15   whether or not Feeding Our Future included a bond document?

16   A.  I do not believe that they did.

17   Q.  Are you sure?

18   A.  If you have documents to show me otherwise, I will look

19   at that.

20   Q.  But as you sit here today, do you have information that

21   Feeding Our Future did not have a bond, a bonding contract?

22   A.  I do not have any information on that.

23   Q.  Okay.  I want to direct you to Exhibit V7.  No.

24   Let's -- I don't want to do that right now.

25              When you testified earlier yesterday, you talked

 1   about that Ms. Bock specifically pushed back.  Do you recall

 2   that?

 3   A.  Yes, I do.

 4   Q.  I want to understand what you meant by "pushing back."

 5   Is it because she went to the court?

 6   A.  Oh, no, not specifically.

 7   Q.  She communicated with you for clarification?  Is that

 8   it?

 9   A.  I would say that that was a huge part of it.

10   Q.  And she disagreed with you regarding your opinion as to

11   USDA guidance, correct?

12   A.  That was one of the many pieces she did not agree with,

13   to my understanding.

14   Q.  And some of those guidance you sought, you talked to

15   USDA for some clarifications, correct?

16   A.  That is correct.

17   Q.  Is it your expectation that sponsors must not question

18   your opinions?

19   A.  That's not correct.

20   Q.  Okay.  They could question your opinions?

21   A.  Absolutely.

22   Q.  In fact, they can disagree with you, correct?

23   A.  Absolutely.

24   Q.  Is it your position that sponsors cannot seek clarity in

25   court regarding MDE's conduct?

```
 1    A.  I do not believe that is a limitation.

 2    Q.  Oh, yeah, because everyone is authorized to go to court

 3    to get redress, otherwise we will be fighting, right?

 4    A.  Sure.

 5    Q.  I just want to understand, because your testimony -- I

 6    want to understand whether or not you believe -- now I'm

 7    going to C.F.R. 226.  All right.

 8            Do you think that MDE has any obligation at all,

 9    any responsibility at all, to conduct site inspection, less

10    used site inspection of the sponsors?  Let's take sponsors

11    first.

12            Do you believe the law allows you to conduct any

13    inspection of the site?

14            MR. THOMPSON:  Objection.  Asked and answered.

15    Calls for a legal conclusion.

16            THE COURT:  Overruled.

17            You may answer.

18            THE WITNESS:  I believe we have the authority to

19    monitor sponsors.

20    BY MR. UDOIBOK:

21    Q.  Do you have the authority to monitor sites?

22    A.  I believe we have the ability to monitor sites as it

23    relates to the sponsor's monitoring.

24    Q.  All right.  Did you -- how many times a year does the

25    regulation require you to monitor sites?
```

```
1    A.  So if we're looking just at 226, and I don't recall

2    these exactly, but there is certain percentages of sites

3    that we visit when we conduct a sponsor monitoring review.

4    Q.  All right.  You are talking about sites.  All right.

5    I'm talking about sponsors.

6               Do you do any oversight of sponsors?

7    A.  Yes.

8    Q.  Yes?

9    A.  In the --

10   Q.  Go ahead.  Sorry.

11   A.  In the regulations it spells out what the state agency

12   is required to do as far as monitoring with sponsors.

13   Q.  And as it relate to sites, you have, also have

14   obligation, responsibility, to do conduct site inspection.

15   A.  Again, I disagree.  We inspect sites or choose sites as

16   it relates to a sponsor's monitoring review.

17   Q.  All right.  Let's take Feeding Our Future.  You

18   conducted oversight of Feeding Our Future, correct?

19   A.  I conducted parts of oversight.  My colleagues conducted

20   the others.

21   Q.  All right.  And then did you, regarding Safari, did you

22   perform any site inspection with Safari?

23   A.  I personally did not, but my colleagues did.

24   Q.  All right.  And in what years did you conduct site

25   inspection of Safari?
```

```
1    A.  I believe our office conducted a pre-approval site visit

2    of Safari in June or July of 2020.

3    Q.  And then you approved the site.

4    A.  I believe the approval came after.

5    Q.  All right.  Was there any time during the existence of

6    Safari, did you communicate to Feeding Our Future that

7    Safari was engaged in any improper conduct?

8    A.  Well, I didn't know for sure that they were engaging in

9    improper conduct.

10   Q.  Okay.

11   A.  I absolutely voiced my concerns.

12   Q.  You voiced your concerns to whom, to --

13   A.  Aimee Bock.

14   Q.  Was that in writing?

15   A.  Yes.  Emails.

16   Q.  And then she clarified to you, correct?

17   A.  I don't feel I got great clarification.

18   Q.  But yet you approved the Safari site, correct?

19   A.  I conducted our approvals and work within the

20   regulations in my authority.

21   Q.  Do you have the authority to deny, though?

22   A.  If I have reasons to deny, which are spelled out in

23   regulations, yes.

24   Q.  But you never did that?

25   A.  I didn't feel I had the evidence --
```

```
 1    Q.  Okay.

 2    A.  -- of the concerns.

 3              MR. UDOIBOK:  Just a moment, Your Honor.

 4              I have no further questions, Your Honor.

 5              THE COURT:  Mr. Montez or Mr. Colich.

 6                     CROSS-EXAMINATION

 7    BY MR. COLICH:

 8    Q.  Good morning.

 9    A.  Good morning or afternoon.  It's almost there.

10    Q.  It's nice to speak to someone.

11              Last night I thought I'd dig into these

12    regulations and rules and waivers and all these other

13    documents we've heard about in this courtroom.  Within ten

14    minutes I was sound asleep, but I was thinking of you on the

15    way in this morning.

16              You are required to read all these regulations

17    from the Department of Agriculture and from your own

18    department and all the waivers; is that correct?

19    A.  To read through them?

20    Q.  Yes.

21    A.  Yes.

22    Q.  And to try your best to understand and make some clarity

23    out of those.  Would that be fair to say?

24    A.  I think that is fair to say.

25    Q.  Would it also be fair to say, though, those are
```

```
1   voluminous?

2   A.  Yes.

3   Q.  Yeah.  And do you think it's expected of a sponsor or

4   even the site to read all those documents?

5   A.  I do believe it's expected.

6   Q.  And is it your expectations and belief that people who

7   aren't necessarily trained in those areas or deal regularly

8   in governmental regulations, they are going to necessarily

9   understand all of those?

10  A.  I would agree.  If they are not trained, they are not

11  probably going to understand.

12  Q.  So that's when we get to this conversation about whose

13  responsibility is it to educate, inform these individuals,

14  correct?

15  A.  If that's the question.

16  Q.  Would you agree with that, that someone needs to give

17  direction to perhaps sponsors or sites when you start

18  getting into the details on regulations, et cetera?

19  A.  I could agree to a point, yes.

20  Q.  Okay.  And pre-COVID, the requirements for feeding

21  children, giving them healthy food, was quite different than

22  it was once COVID-19 hit us.  Would that be fair to say?

23  A.  I don't think that is fair to say.  The waivers waived

24  flexibilities to provide children meals, but much of those

25  program regulations and operations remained the same.
```

 1    Q.  There were hundreds of thousands, millions of kids

 2    throughout this country that needed these meals, these

 3    snacks, who were told you can't go to school anymore; is

 4    that correct?

 5    A.  I think it varied by state, but yes.

 6    Q.  Yes, that's right, varied by state.

 7            So we've been talking about our state --

 8    A.  Yes.

 9    Q.  -- right?  Do you have any data, any statistics, on the

10    number of meals served in other states to children who all

11    of a sudden are facing COVID-19 and nowhere to go to get

12    food?

13    A.  I do not have that data.

14    Q.  Do you have any data that tells you how many sites were

15    allowed or were there limits set on sites in other states

16    throughout the United States?

17    A.  I do not have that readily available.

18    Q.  Okay.  I want to talk to you -- and we're going to be

19    brief.  I know you've been up there a long time -- about

20    these waivers, get a better understanding for the jury on

21    this.

22    A.  Sure.

23    Q.  So there were exactly how many waivers?

24    A.  Oh, I don't know the exact number.  Around 120.

25    Q.  Yeah.  And some of these waivers ended up having

```
 1    extensions.

 2    A.  I would clarify that is within the 120.  Some of those

 3    120 were extensions on a previous waiver.

 4    Q.  Okay.  One of the waivers was congregate serving the

 5    food, correct?

 6    A.  The noncongregate waiver?  Correct.

 7    Q.  And so tell the members of the jury again what that was

 8    and why it was implemented, if you know.

 9    A.  Sure.  So these programs operate under normal

10    circumstances where children must be in a congregate

11    setting, therefore they are gathering.  And with the

12    COVID-19 pandemic and the need for social distancing, the

13    USDA issued a waiver so that children did not have to be

14    close together to receive the meals.

15    Q.  And, of course, those are things that you needed to have

16    a clear understanding of.

17    A.  I would agree.

18    Q.  And that's what opened the, put it in kind of layman's

19    terms, that's what opened the door for the need for other

20    sites.  Kids can't go and congregate at the spot they used

21    to congregate because we're trying to protect them.

22            Is that fair to say?

23    A.  Not at all.

24    Q.  So we're not trying to protect our children?

25    A.  No.  I disagree that congregate waiver led to the need
```

```
1    to more sites.  I strongly disagree with that.
2    Q.  Okay.  Yet, there were sites opened all over the state?
3    A.  There were sites that were existing opening in the
4    state, and there were brand-new sites opening.
5    Q.  And who approved those sites?
6    A.  Well, first, the sponsor would approve those to be
7    submitted and then the Minnesota Department of Education.
8    Q.  Okay.  And again, it's sort of a trickle down effect
9    that we have now some more regulations that people in the
10   position say where you are at clearly have to understand
11   that, right?
12   A.  I guess I don't understand what you are referring to as
13   "more regulations now."
14   Q.  Well, waivers.
15   A.  Oh, in terms of because of the waivers, there was more
16   that I had to know?
17   Q.  Yes.
18   A.  Sure.
19   Q.  And we walked away from noncongregate or we walked into
20   it, because the government decided we have to feed kids.
21   A.  The government decided there was a need for a safe way
22   to feed kids.
23   Q.  Okay.  Another waiver was how the children obtained the
24   foods.  In other words, there was a pickup?
25   A.  There was the opportunity for parent pickup, yes.
```

1    Q.  And when the parents would pick up, could they pick up

2    for all their children?

3    A.  If the site allowed that, yes.

4    Q.  And so if a child, if a parent is picking up at a meal

5    site, any site, let's say, at some point they bundle or

6    package these meals in multiple settings, correct?  They

7    have -- let me put it this way.  Let me see if I can make

8    sense out of what I'm trying to think about.

9          If a Somali woman went to Safari to pick up food

10   for her children, she would be entitled to pick up food for

11   her children, wouldn't she?

12   A.  So it depends on the program.  It depends on the

13   activity that those children are enrolled in or were

14   enrolled in.  It also depends on the type of food in order

15   for these to be claimed under the programs.

16   Q.  And all of these would have had to have been approved by

17   your agency, correct?

18   A.  Correct.

19   Q.  Yeah.  Okay.  So but if a Somali woman went to the

20   Safari Restaurant to pick up food, let's say, for eight

21   children, they can't discriminate against her, can they?

22   A.  No.

23   Q.  If a Caucasian woman went there with eight children, she

24   would be able to pick up the food, wouldn't she?

25   A.  Yes.

1   Q.  Okay.  They can't discriminate against an Asian woman,

2   right?

3   A.  Can't discriminate against any person.

4   Q.  There you are.  So if that were to happen and they had

5   eight children, for how many days could they get food?

6   A.  So it depended on how the sponsor and site were

7   operating.  I don't remember what the waiver allowed the

8   meals to be up to.  I believe it was seven.

9   Q.  Could it have been more?

10  A.  It could have been up to ten.

11  Q.  So this mom went to Safari, says I have eight kids, I

12  work, I can't get here every day, can I get meals for seven,

13  let's say ten days, they would give her that food, right?

14  A.  If Safari was in the program and that's what the meals

15  were being picked up under.

16  Q.  So this would be sort of like bulk, would be identified

17  as bulk food?

18  A.  Well, "bulk" refers to the meals that are being picked

19  up at one time.  The meals still had to be unitized and

20  ready to eat.

21  Q.  So the question again is, Could the mother get food for

22  eight children for ten days?

23  A.  And my answer would be still, if they were on the

24  program and enrolled in the program, then that is a

25  possibility.

1    Q.  Okay.  And you are saying it's a possibility because you

2    don't know if they could have done it for ten days or they

3    couldn't do it at all?

4    A.  Oh, because I don't know the exact operations of that

5    site.

6    Q.  Okay.  Well, let's talk about -- I'll ask you about

7    Safari.

8            Do you know the, how the operations were and were

9    they authorized to give these meals?

10   A.  So Safari, as we saw, had an approved application.  The

11   operations of those sites and operations of the waiver was

12   between the sponsor and the site.

13           So, no, MDE does not have all of those details.

14   Q.  Trying to make a point here.  See if I can get there

15   with you.

16           Assuming the sites got the approval and the food's

17   correct and the program's correct, a mom or a dad or a

18   grandma or grandfather might be able to go in and get meals

19   for eight children or their grandchildren for up to ten

20   days.

21           Again, that's correct?

22   A.  Yes.

23   Q.  Depending if everything else falls in place.

24   A.  If everything else was in place correctly, then yes.

25   Q.  Okay.  And so what one would have to do is start

1    multiplying all those numbers to figure out how many meals

2    that one person picked up for the eight children, correct?

3    A.  Sure.

4    Q.  I'm not going to ask you to do that because I'm not

5    going to do that, but that's how this program could work

6    when it came to picking up food.

7    A.  Correct.

8    Q.  Okay.  And you talked -- so they could pick up food

9    inside the site or outside a site.  Is that your

10   understanding?

11   A.  I would agree with that, again up to what was decided

12   between the sponsor and site.

13   Q.  And I think you testified or there was some discussion

14   about food being dropped off at, is it the homes of the

15   children?

16   A.  As part of the parent pickup waiver, the USDA also

17   allowed home delivery of meals that had some strict

18   limitations with it.

19            MR. COLICH:  I have no other questions Your Honor.

20            THE COURT:  Mr. Thompson.

21            MR. THOMPSON:  Thank you, Your Honor.

22            THE COURT:  Just for your planning purposes we're

23   going to 12:30 today for lunch.

24            So we'll break at 12:30.

25            MR. THOMPSON:  Okay.  Thank you.

0:22-cr-00223-NEB-DTS

```
 1                      REDIRECT EXAMINATION
 2   BY MR. THOMPSON:
 3   Q.  All right, Ms. Honer.
 4   A.  Hello.
 5   Q.  Thank you.  Good morning still, barely.
 6            I wanted to ask you some followup on the questions
 7   that you were asked by defense counsel.
 8            First off, Mr. Udoibok asked you some questions
 9   about in the early days of COVID the decrease in the number
10   of children that were receiving meals through their schools,
11   public schools, charter schools, whatever; is that right?
12   A.  That's correct.
13   Q.  And I think you had a clarification as to the timing and
14   how that changed over time from the early months of COVID
15   and going forward.
16   A.  That's correct.
17   Q.  Could you describe that for the jury, please?
18   A.  Sure.  So in the early months of COVID, again, mid
19   March, the COVID pandemic and the stay-at-home order,
20   schools closing, and schools had to completely switch their
21   operations.
22            Kids were sent home.  People were afraid to come
23   out, and schools saw a decrease in those first couple of
24   months.
25            As the waivers allowed for operations to change
```

0:22-cr-00223-NEB-DTS

```
 1    and schools were able to get their operations in place,
 2    school sites became more readily available.
 3    Q.  And what was, what happened then in terms of the number
 4    of children being served at the schools or through their
 5    schools, I should say?
 6    A.  Sure.  We did see it start to increase a bit.
 7    Q.  Okay.  Okay.  There was a lot of questions about the
 8    CLiCS data and when first off a site applies; is that right?
 9    A.  That's correct.
10    Q.  And there was questions about when is a human involved
11    when someone goes into the CLiCS system.
12              Could you describe that with respect to the
13    applications and then the actual claim submissions.
14    A.  Sure.  So when an application, let's say it's a
15    brand-new site, is being requested by the sponsor, the
16    sponsor fills out a form, sends that to MDE.
17              MDE staff, so a human being, is going to look at
18    that site ID, plot it on a map.  If it's in an eligible area
19    or eligible site, an ID will be created by our system.
20              Then the sponsor is notified by our system of that
21    site ID, and the sponsor inputs information to the site
22    application in CLiCS.  And then an MDE staff person reviews
23    that site application and approves or not approves.
24    Q.  That's the site application?
25    A.  That's the site application.
```

1    Q.  Now if I recall correctly, early on in COVID Ms. Bock

2    and her company, Feeding Our Future, applied to create sites

3    at various for-profit restaurants; is that right?

4    A.  That is correct.

5    Q.  Including Safari Restaurant?

6    A.  That is correct.

7    Q.  Initially, what was MDE's reaction when Ms. Bock

8    attempted to open sites at those for-profit restaurants such

9    as Safari in the spring of 2020?

10   A.  Well, we didn't think that they were eligible, and so

11   after pushback from Aimee Bock and Feeding Our Future, we

12   went to the USDA to ask for clarification.  And we received

13   flexibility from the USDA that distribution sites could be

14   created.

15   Q.  Allowing them to operate at for-profit restaurants?

16   A.  Correct.

17   Q.  Okay.  Then once the sites were open, people go into

18   CLiCS and actually submit the claims?

19   A.  Correct.  That is --

20   Q.  Who submits the claims?

21   A.  That is also the sponsor who is responsible for

22   submitting the claims.

23   Q.  Okay.  And remind us again, I'm showing you V3, and at

24   page 5 is one example of CLiCS, but I want to ask you a

25   question first.

1          Who submits the information into CLiCS, the actual

2     claimed -- this is claim for reimbursement?

3     A.  The actual claim information is entered by the

4     authorized representative from the sponsor.

5     Q.  So the sponsor submits the claims?

6     A.  The sponsor does.

7     Q.  Now remind me.  Well, first question:  Does an MDE

8     employee after receiving a claims submission from a sponsor

9     in CLiCS actually look at it before it's paid out?

10    A.  They do not.

11    Q.  Why not?

12    A.  Because the sponsor is responsible for ensuring that all

13    of the documentation and the meals are correct.  So CLiCS

14    simply looks to make sure that an application is approved in

15    the system and opens up that claim month.

16    Q.  Okay.  And essentially CLiCS just processes the payment;

17    is that right?

18    A.  That's correct.

19    Q.  Based on the representations of the sponsor?

20    A.  That is correct.

21    Q.  And so, for example, here at Government Exhibit V3,

22    page 5, we have the June 2020 CLiCS submissions for Safari

23    Restaurant?

24    A.  That is correct?

25    Q.  Submitted by its sponsor Feeding Our Future, correct?

```
1    A.  That is correct.
2    Q.  Look at the bottom.  The average daily attendance is
3    3,589 children per day?
4    A.  That is correct.
5    Q.  And on page 6, along with that CLiCS claim submission by
6    Feeding Our Future, there's a portion that says "Sponsoring
7    Authority Certification"?
8    A.  Yes.
9    Q.  What is that?
10   A.  So this is the certification that the sponsor is taking
11   before submitting a claim to ensure that the claim, as it
12   shows, accurately represents the number of meals or milks
13   served by reimbursement category, that there are records
14   available to support the claim, that the claim is in
15   accordance with the program agreement and that payment
16   therefore has not been received.
17   Q.  They're vouching for the payment?
18   A.  Yes, they are.
19   Q.  Why doesn't -- so the sponsor has records that are
20   available to support the claim.  What would happen if MDE
21   had to review all those records, the meal counts, the
22   attendance rosters, the invoices, prior to paying out the
23   claim each time a claim is submitted?
24   A.  It would have taken a very long amount of time.  We
25   receive tens of thousands of claims a year, I would assume.
```

1    Q.  And would that be problematic for the operation of the

2    child nutrition program?

3    A.  Yes.

4    Q.  How so?

5    A.  These programs are already reimbursement based, and

6    delaying that reimbursement even more for a fairly low

7    paying program, typically, would be a detriment to the

8    program.

9    Q.  What would the risk be in terms of participation in the

10   child nutrition program if there were such delays?

11   A.  The risk would be that we probably would not have as

12   many sponsors and operators of these programs, and therefore

13   children would not receive healthy, nutritious meals.

14   Q.  You mentioned in your prior answer that these are

15   relative low payments.

16   A.  Yes.

17   Q.  What do you mean by that?

18   A.  It is well-known that these federal reimbursements are

19   very low and barely pay for the costs of the food, if it

20   pays the total cost at all.  So most times an organization

21   has to put additional money into it for the food production.

22   Q.  Prior to the onset of COVID and the current difficulties

23   that brought us here to court to, was this viewed by you and

24   your colleagues at MDE, was this program viewed as one that

25   was particularly susceptible to fraud and abuse?

```
 1    A.  Not particularly, no.

 2    Q.  Why not?

 3    A.  Again, the low payment of these reimbursements and the

 4    high administrative requirements of a sponsor and a site, it

 5    would be quite a bit of work for a low amount of money.

 6    Q.  Prior to the onset of COVID, what were the typical

 7    payments you would see at the CACFP or SFSP programs?

 8    A.  These range based on sites or how many sites a sponsor

 9    has, of course.  A small child care center in a year may

10    only receive five to ten thousand dollars in a year.

11           A larger entity, let's say the YMCA, might be in

12    the tens or hundreds of thousands.

13    Q.  Okay.  Was the, the type of organizations that

14    participated in this program prior to the onset of COVID,

15    did that inform your -- you and your colleague at MDE's

16    assessment of the risk of fraud and abuse in this program?

17    A.  Sure.  So prior to COVID most of our sponsors are

18    schools and nonprofit organizations that are heavily

19    reviewed, heavily audited.  So the risk was low.

20    Q.  Okay.  We read the first, on this sponsoring authority

21    certification, you read the first line, which is that the

22    sponsor, in this case Feeding Our Future, was taking

23    responsibility for the accuracy of the claims and that

24    records are available to support the claim and the number of

25    meals served, correct?
```

1    A.  That's correct.

2    Q.  The second sentence, there's a second sentence in this

3    paragraph; is that right?

4    A.  That is correct.

5    Q.  And it reads, "I understand that this information is

6    being given in connection with the receipt of federal funds,

7    that officials of the U.S. Department of Agriculture and the

8    Minnesota Department of Education may verify this

9    information and that deliberate misrepresentation may

10   subject me to prosecution under applicable state and federal

11   criminal statutes."

12            Is that right?

13   A.  That is right.

14   Q.  And that was something that the sponsor had to certify

15   prior to submitting the claims in CLiCS; is that right?

16   A.  Correct, and every claim.

17   Q.  Including all the ones at issue in this case?

18   A.  That is correct.

19   Q.  Okay.  You had some questions about the changes in the

20   program that were implemented in the fall of 2020; is that

21   right?

22   A.  That is correct.

23   Q.  Could you remind us what, how the program changed in

24   2020?

25   A.  So specifically at the fall of 2020, we, MDE saw quite a

1    few site IDs looking to use the for-profit flexibility I had

2    talked about in June of 2020.

3              So MDE sought out additional guidance with the

4    USDA and ultimately received clarifications that that was

5    not allowable.

6    Q.  Okay.  And which program were for-profit restaurants not

7    allowed to participate?

8    A.  For-profit restaurants were not allowed to participate

9    in the CACFP at-risk program, and the way for-profit

10   restaurants that we saw were being operated was not

11   allowable also under the Summer Food Service Program.

12   Q.  Was there a way that for-profit restaurants could

13   continue to operate in the Summer Food Service Program after

14   the fall of 2020?

15   A.  I would say no.

16   Q.  Okay.  How could they continue to be involved in the

17   program in any way?

18   A.  For those two particular programs, a for-profit

19   restaurant could continue to be a vendor with an executed

20   contract with the sponsor or site.

21   Q.  Okay.  And after you rolled this, after you informed

22   Ms. Bock and others of this, this clarification to the

23   program, how did she respond?

24   A.  She responded days later with additional written

25   clarification that Feeding Our Future would be operating

1    these sites.

2    Q.  And that's Government Exhibit F7; is that right?

3    A.  Yes, I believe the clarification is in the attachment.

4    Q.  Directing your attention to page 2 of Government

5    Exhibit F7 --

6    A.  That's correct.

7    Q.  -- this is where she said that Feeding Our Future will

8    be staffing the following locations; is that right?

9    A.  That is correct.

10   Q.  What was the effect of her providing this clarification?

11   A.  That clarification did not allow us to stop those sites

12   any longer, as what was being provided to us by the sponsor

13   was in line with what could be operated.

14   Q.  Did that alleviate your concerns about the integrity of

15   the program?

16   A.  Not to this situation, no.

17   Q.  So why did you allow this to, why did you allow these

18   programs to continue being staffed after Ms. Bock told you

19   that Feeding Our Future employees were staffing them?

20   A.  We felt we did not have the regulatory authority to stop

21   them with this information.

22   Q.  Okay.  I'm just going to call out some of the ones here.

23   ASA Limited, that's one of the sites that was allowed to

24   continue?

25   A.  That is correct.

1    Q.  After Ms. Bock said it was being staffed by Feeding Our

2    Future?

3    A.  That is correct.

4    Q.  And she later, she and her organization later submitted

5    the claims on behalf of that organization?

6    A.  I believe so.

7    Q.  And certified that they were accurate?

8    A.  Yes, that is correct.

9    Q.  Brava Restaurant, the same way?

10   A.  That is correct.

11   Q.  Safari Restaurant.

12   A.  Yes, that is correct.

13   Q.  Ms. Bock said that it was being staffed by Feeding Our

14   Future; is that right?

15   A.  Yes, that is what is written.

16   Q.  And that Feeding Our Future's trained staff and

17   volunteers would be permitted to serve the meals; is that

18   correct?

19   A.  That is what is written, yes.

20   Q.  And then on page 5 of F7 there's another one I want to

21   call out here.  It's a site called Lido Restaurant, L-I-D-O?

22   A.  That's correct.

23   Q.  Did Ms. Bock also represent in October of 2020 that that

24   site was being staffed by Feeding Our Future employees?

25   A.  Yes, she did.

1    Q.  And again, when Ms. Bock submitted claims on behalf of

2    those sites, who was responsible for keeping the paperwork

3    documenting the claims?

4    A.  The sponsor is responsible.  She is.

5    Q.  And what documentation is required to be kept?

6    A.  Again, attendance records, meal planning documentation,

7    menus, documentation of the claims, how many meals were

8    served.

9    Q.  Okay.  And she, she kept those, and MDE did not receive

10   those?

11   A.  MDE did not receive these on the claim, no.

12   Q.  Finally, this stop pay, you said that at some point you

13   had to lift it; is that right?

14   A.  That is correct.

15   Q.  And is that because you, your concerns about potential

16   fraud or program integrity issues had been alleviated, had

17   been addressed by Ms. Bock?

18   A.  That was not the reason.

19   Q.  Had your concerns been alleviated?

20   A.  They had not.

21   Q.  And what did you do when you had to lift the stop pay,

22   but you continued to have those concerns?

23   A.  I called the FBI.

24   Q.  Thank you.

25            MR. THOMPSON:  No further questions, Your Honor.

D.HONER - RECROSS BY MR. UDOIBOK

1    THE COURT:  Any recross, Mr. Udoibok?

2    MR. UDOIBOK:  Yes, Your Honor.

3                    RECROSS-EXAMINATION

4    BY MR. UDOIBOK:

5    Q.  Let's just start with the easiest one so far.  Can you

6    call up exhibit, Government Exhibit F7.  Thank you.

7         Ms. Honer, you were just testifying about the

8    pushback resulting in your lifting the stop pay, correct?

9    A.  That is correct.  I was just talking about that, but

10    that's not what this documentation is in regards to.

11    Q.  True.  Yeah.  Just remove it for a while, and I'll call

12    when I need it.

13         Is it your position that even though you lifted

14    the stop pay, you still had concerns about the meal count or

15    the number of food supplied by, let's just take Safari, for

16    example, correct?

17    A.  Yes, that is my position.

18    Q.  And the action that was left for you to take was to

19    contact FBI, Mr. -- who did you contact?

20    A.  I don't remember who was on the initial phone call.

21    Q.  Was it a -- it wasn't by correspondence, was it?

22    A.  I do not believe so.

23    Q.  You testified that MDE would not have the capacity to

24    review site applications, correct?

25    A.  That's not correct.

DANIELOWSKI - REDIRECT BY MR. PAULSON

1    Q.  Or capacity to review all site applications?  Is that --

2    A.  Also not correct.

3    Q.  Okay.  What about capacity to review all claims?

4    A.  That is correct.

5    Q.  And the reason is, you don't have enough sites -- you

6    don't have enough staff?

7    A.  That would be part of it.

8    Q.  And the reason being that the -- you have, across the

9    state there are a lot of claims for the food program,

10   correct?

11   A.  Yes.

12   Q.  Okay.  But you expect the sponsor to be able to review

13   all the claims.  Is that your expectation?

14   A.  That's how these programs are set up at the federal

15   level.

16   Q.  I want to know what your expectation is.

17   A.  My expectation is that sponsors follow the federal

18   regulation.

19   Q.  And the federal regulation says that, that sponsors

20   would inspect all application?

21   A.  Claims.

22   Q.  All claims?  Inspect all?

23   A.  Yes.  I believe there's a specific part of the

24   regulation that calls this out.

25   Q.  All right.  Now does the regulations also require the

0:22-cr-00223-NEB-DTS BY DOC. 589 IBO

1    sponsor to know whether or not a claim application is

2    fraudulent or not?

3    A.  I guess I don't understand the question.

4    Q.  Well, if a claims application, meal counts, the

5    numbers --

6    A.  A claims submission, yes.

7    Q.  Yeah, claims submission.  Let's just say, for example, a

8    site call Great Americans sends meal count, sends invoices,

9    I believe you testified that, that sponsors are required to

10    verify paperwork, correct?

11    A.  That is correct.

12    Q.  And there's meal counts and invoices.

13    A.  Yep.

14    Q.  If a sponsor looks, received an invoice, receives meal

15    count and the site certifies all those, all right, that they

16    are correct, what is, in your experience, what is a sponsor

17    supposed to do beyond that attestation?

18    A.  If a sponsor does not believe a claim is valid, they

19    don't need to submit it.

20    Q.  Correct.  But my question is, A sponsor sees an invoice,

21    sees meal count consistent with the application, what is a

22    sponsor supposed to do, beyond the same attestation that the

23    sponsor does with the CLiCS system?

24    A.  They could do their site visits.

25    Q.  All right.  Now, how many times does a sponsor have to

CASE 0:22-cr-00223-NEB-DTS BY DANI SPISAK-TIBOR
539

```
1    go to site for inspection per the regulation 226 that you
2    are familiar with?
3    A.  I believe the minimum is three times a year.
4    Q.  Three times a year.  Okay.  A sponsor does once a month,
5    that would be twelve times a year.  Goes to the site.  There
6    is food delivered.  There's pickups.  There's video, meal
7    counts, receipts.  Checks the receipt with the amount of
8    milk, for example.
9            What is the sponsor supposed to do beyond
10   approving, sending the claims to MDE?
11   A.  That's up for the sponsor.  If they have any concerns,
12   they can choose to look at additional documentation.  They
13   can choose to not submit the claim.  They can do their own
14   research.
15   Q.  All right.  The sponsor can choose not to submit a
16   claim, correct?
17   A.  Absolutely.
18   Q.  And do you believe that the sites have any authority to
19   compel the sponsor to submit the applications, if they
20   believe the applications are accurate?
21   A.  Are you talking about applications or claims?
22   Q.  Claims.
23   A.  I suppose that's between the site and the sponsor.
24   Q.  I know.  Let's take Brava, for example.  Brava has
25   receipts of purchases, correct?
```

DIRECT CROSS-EXAMINATION BY MR. UDOIBOK

```
 1                MR. THOMPSON:  Objection.  Foundation.

 2                MR. UDOIBOK:  Let's assume Brava.  Otherwise --

 3                THE COURT:  Wait a minute.  The objection is

 4      foundation.  I'm sustaining that objection.

 5                Now you may rephrase.

 6                MR. UDOIBOK:  I'll rephrase.

 7                Let's use Good American site.  They produce a

 8      receipt, receipts, invoices for purchases, submits to the

 9      sponsor.  Sponsor looks at receipts.  Looks at entry.  Sends

10      folks out.  Come back.  Came back and saw deliveries.

11      Sponsor sends the claims through CLiCS to MDE.  MDE pays.

12                THE WITNESS:  That is a possibility.

13      BY MR. UDOIBOK:

14      Q.  All right.  Has the sponsor met its obligation --

15                MR. THOMPSON:  Objection, Your Honor.

16                MR. UDOIBOK:  --  in your estimation?

17                MR. THOMPSON:  That's a compound hypothetical that

18      appears to call for a legal conclusion or some sort of legal

19      advice.

20                She's answered several times.

21                THE COURT:  Is Good American a site that's

22      involved here, or is this a hypothetical site?

23                MR. UDOIBOK:  No.  It's a hypothetical.

24                THE COURT:  The objection is sustained.

25
```

0:22-cr-00223-NEB-DTS BY MR. 589IBOK

```
1    BY MR. UDOIBOK:

2    Q.  All right.  I'll be specific.  Let me take Brava, for

3    example.

4           Back up.  I'll take Safari.  Safari Restaurant.

5    You are familiar with Safari Restaurant?

6    A.  Sure.  Yes.

7    Q.  Safari Restaurant submits through Feeding Our Future a

8    claim, correct?

9    A.  They would submit documentation to support a claim to

10   Feeding Our Future.

11   Q.  All right.  All right.  So the documentation are

12   receipts for purchase, right?

13   A.  That is one of the many documents.

14   Q.  All right.  Just many documents.  Then there's meal

15   count, correct?

16   A.  There should be meal counts, yes.

17   Q.  Okay.  And there's invoices, correct?

18   A.  There can be invoices.

19   Q.  Is Feeding Our Future required to send the invoices

20   along with the claims?

21   A.  Feeding Our Future, as I mentioned before, is not

22   required to submit documentation for the claim.

23   Q.  Okay.  Now Feeding Our Future has invoices, though, to

24   support the claims of Safari that it sent to MDE, correct?

25   A.  I don't know what Feeding Our Future has.
```

CROSS-EXAMINATION BY MR. IBOR

1    Q.  Okay.  But Feeding Our Future represented to you that

2    Feeding Our Future has boxes of records, correct?

3    A.  They might have said that.  I don't recall that

4    specifically.

5    Q.  So my question still is, If Safari provides Feeding Our

6    Future documents consistent with its application to

7    participate in the food program, what more do you expect

8    Feeding Our Future to do beyond relying on the documents

9    provided to Feeding Our Future by Safari?

10   A.  And my answer continues to be, and will always be, that

11   if Feeding Our Future did not like the claim, they should

12   not have submitted it.

13   Q.  The claims are consistent with the application for the

14   site that was approved, and the receipts, the meal counts,

15   are consistent with the application that was approved.

16          What more was Feeding Our Future to do?

17   A.  And, again, if Feeding Our Future did not trust or like

18   the claim, did not believe it, they should not have

19   submitted the claim.

20   Q.  Yes.  Let's, let's agree that Feeding Our Future agreed,

21   Feeding Our Future had no suspicion of any of the claims

22   because Safari provided the relevant document.

23          She has no other action she would have taken,

24   correct?

25   A.  Well, Feeding Our Future should have had a hunch because

CROSS-EXAMINATION BY MR. RICHBORN

1   we brought it up multiple times.

2   Q.  A hunch.  How do you, what, how do you come about a

3   hunch?

4   A.  Unrealistic meal claims.

5   Q.  All right.  Stop right there.  The meal claims were

6   approved, correct?

7   A.  By the CLiCS system, yes.

8   Q.  Yes.  And the meal counts supplied was consistent with

9   the approved meal counts, correct?

10  A.  I don't necessarily know that to be true on all of the

11  claims.

12  Q.  MDE has the authority to deny claims that are above the

13  allowed allocation, correct?

14  A.  I believe so.

15  Q.  So there is a mechanism for you to deny if it goes

16  above, correct?

17  A.  I believe so.

18  Q.  Now I want to know about this hunch.  Do you think the

19  hunch has to be impermissible reasons to deny a site their

20  claims?

21  A.  No, not necessarily.

22  Q.  What hunch will it be, because it is a Somali

23  restaurant?  What hunch?

24  A.  Serving an unrealistic number of children is cause for

25  concern of any site.

1    Q.  Ms. Honer, you have agreed that prior to the site

2    delivering the requisite number of food, all right,

3    delivering the requisite number of meals to people, to

4    children, the numbers have to be pre-approved.

5            We have gone through that, right?

6    A.  In the application and with the sponsor.

7    Q.  Okay.  Let's say 5,000.  All right?  You say it's

8    unrealistic, correct?

9    A.  Yes, I do.

10   Q.  But it was approved, correct?

11   A.  Yes, it was.

12   Q.  And the meal count, receipts and everything comes to

13   Feeding Our Future consistent with that number, your

14   position is Feeding Our Future ought to have had a hunch,

15   correct?

16   A.  With also MDE bringing concerns on multiple occasions.

17   Q.  Let's talk about your hunch.  I want to know what --

18   have you ever provided any training to a sponsor about

19   basing this federal program on a hunch?

20   A.  No.

21   Q.  Okay.  I didn't think so.

22            No further questions.

23            THE COURT:  Mr. Colich, any recross?

24            MR. COLICH:  No, Your Honor.

25            THE COURT:  Mr. Thompson.

```
 1                MR. THOMPSON:  Yes, Your Honor.

 2                      REDIRECT EXAMINATION

 3     BY MR. THOMPSON:

 4     Q.  Ms. Honer, thank you.  We're almost done.

 5                Both counsel have suggested today that potentially

 6     MDE wanted to deny or was suspicious of these claims because

 7     of racism and racial discrimination; is that right?

 8     A.  That is correct.

 9     Q.  Have you heard that before from Ms. Bock?

10     A.  Yes, I have.

11     Q.  When?

12     A.  In the lawsuit against MDE, it is my understanding was

13     based on a complaint that MDE was discriminating based on

14     race.

15     Q.  And what triggered Ms. Bock to file that lawsuit against

16     MDE?

17     A.  It was my understanding that MDE's questioning of the

18     site applications, and the eligibility triggered that.

19     Q.  So when you questioned their applications, you and your

20     colleagues, she sued you and accused you and your colleagues

21     of racism?

22                MR. COLICH:  I'm going to object.  Relevance.

23                THE COURT:  Overruled.

24                MR. THOMPSON:  Is that right?

25                THE WITNESS:  That is my understanding.
```

```
1    BY MR. THOMPSON:

2    Q.  Ms. Honer, have you experienced racism in your life?

3    A.  Yes, I have.

4    Q.  Could you please explain that to us?

5            MR. MONTEZ:  Objection, Your Honor.  We renew our

6    objection to relevance.

7            THE COURT:  Overruled.  You opened the door.

8            THE WITNESS:  I am a proud tribe member of the Red

9    Cliff Reservation.  I have experienced racism myself.  I

10   have seen my family experience racism.  I grew up in an area

11   where racism was all around, and I have no time for it in my

12   personal life or in my work life.

13   BY MR. THOMPSON:

14   Q.  How did it feel to get accused of racism by Ms. Bock

15   when you tried to scrutinize and raise concerns about the

16   integrity of the claims that she was submitting?

17   A.  It felt awful.

18   Q.  One final question:  The sponsor has to vouch for and

19   certify that these claims are accurate and is responsible

20   for maintaining, collecting, reviewing and maintaining the

21   records, the documentation, of those claims; is that right?

22   A.  That is correct.

23   Q.  What did Ms. Bock and Feeding Our Future get in exchange

24   for doing that, for approving those claims or sponsoring

25   them, vouching for them, certifying their accuracy?
```

```
1    A.  They could retain up to 15 percent.

2    Q.  And in 2021 I believe Feeding Our Future and sites under

3    its sponsorship obtained nearly $200 million in Federal

4    Child Nutrition Program funds; is that right?

5    A.  That is correct.

6    Q.  So 10 to 15 percent of $200 million is what Feeding Our

7    Future got to keep that year?

8    A.  That is correct.

9    Q.  20, 20 plus million dollars?

10   A.  That sounds right.

11            MR. THOMPSON:  Thank you, Your Honor.  No further

12   questions.

13            THE COURT:  You may step down.  Thank you.

14            MR. UDOIBOK:  Your Honor, may I?

15            THE COURT:  Very briefly.

16            MR. UDOIBOK:  Yes.

17                       RECROSS-EXAMINATION

18   BY MR. UDOIBOK:

19   Q.  You just testified that Aimee Bock and Feeding Our

20   Future got $200 million.

21            MR. THOMPSON:  Objection.  Misstates the

22   testimony.

23            THE COURT:  Sustained.

24   BY MR. UDOIBOK:

25   Q.  Did Ms. Bock receive $200 million?
```

0:22-cr-00223-NEB-DTS BY DOC. 589IBOK

```
 1    A.  I don't know what Aimee Bock received personally.

 2    Q.  Was there any time Ms. Bock herself accused you

 3    personally with racial bias?

 4    A.  I believe my name is mentioned in one of the complaint

 5    documents.

 6    Q.  What I'm saying, Ms. Bock herself, did she ever call you

 7    a racist?

 8    A.  Not that I can recall.

 9    Q.  All right.  Did you review the complaint of the lawsuit?

10    A.  I have seen it.

11    Q.  All right.  And did the complaint say you were racist?

12    A.  I do not recall seeing that.

13    Q.  All right.  In fact, didn't the complaint said that the

14    only difference between Feeding Our Future sites and the

15    majority of other sites was on account of race and national

16    origin; isn't that true?

17    A.  I don't recall that specifically.

18            MR. UDOIBOK:  No further questions.

19            MR. COLICH:  We have nothing, Your Honor.

20            THE COURT:  Mr. Thompson?

21            MR. THOMPSON:  No, Your Honor.

22            THE COURT:  You may step down.

23            We're going to take our lunch break at this time.

24    We'll be back at 1:30 for the government's next witness.

25            All rise for the jury.
```

1    12:27 p.m.

2                          **IN OPEN COURT**

3                        **(JURY NOT PRESENT)**

4            THE COURT:  All right.  Everyone, we're in recess

5    until 1:30.

6            (Recess taken at 12:28 p.m. till 1:31 p.m.)

7    1:31 p.m.

8                          **IN OPEN COURT**

9                          **(JURY PRESENT)**

10           THE COURT:  You may all be seated.

11           The government may call its next witness.

12           MR. THOMPSON:  Thank you, Your Honor.  The

13   government calls Ben Stayberg.

14           THE COURT:  Good afternoon, sir.  I'll have you

15   come up here to the witness stand; and before you are

16   seated, I'll have you stand before me to take the oath.

17           THE WITNESS:  Okay.

18           THE COURT:  Raise your right hand.

19                      BENJAMIN STAYBERG,

20   called on behalf of the government, was duly sworn, was

21   examined and testified as follows:

22           THE WITNESS:  Yes.

23           THE COURT:  Thank you.  You may be seated.

24           When you are settled there, I'll have you state

25   and spell both your first and last name for the record.

```
 1                    THE WITNESS:  Benjamin Stayberg.  You want me to
 2        spell it?
 3                    THE COURT:  Please.
 4                    THE WITNESS:  B-E-N-J-A-M-I-N, S-T-A-Y-B-E-R-G.
 5                    THE COURT:  Thank you.  All right.
 6              So Ms. Rogge is taking down everything that you
 7        say, so I'll have you wait for Mr. Thompson to ask his
 8        questions, and then you'll answer them.  Okay?
 9              So you are just trying not to talk over each
10        other.  Speak as slowly as you can and right into that
11        microphone.
12                    Mr. Thompson.
13                    MR. THOMPSON:  Thank you, Your Honor.
14                             DIRECT EXAMINATION
15        BY MR. THOMPSON:
16        Q.  Good afternoon, Mr. Stayberg.
17        A.  Hello.
18        Q.  How are you?
19        A.  Tired.
20        Q.  Okay.  Mr. Stayberg, where are you from?
21        A.  Hudson, Wisconsin.
22        Q.  Hudson, Wisconsin?
23        A.  Yep.
24        Q.  Do you want to pull that microphone a little closer to
25        you?
```

```
 1    A.  Hudson, Wisconsin.

 2    Q.  Were you born and raised in Hudson, Wisconsin?

 3    A.  Yep.

 4    Q.  How far did you go in school?

 5    A.  Graduated high school.

 6    Q.  From Hudson High?

 7    A.  Yep.

 8    Q.  When did you graduate?

 9    A.  2000.

10    Q.  What did you do after you graduated from high school?

11    A.  Drove my car to Colorado and lived there for a few

12    months, like eight, nine months and then came back.

13    Q.  Where in Colorado did you live?

14    A.  Fort Collins.

15    Q.  What were you doing in Fort Collins?

16    A.  Not a whole lot.  So I picked up an apprentice

17    electrician job for a little bit out there and then kind of

18    bounced around to different jobs.

19    Q.  Why did you leave Colorado?

20    A.  Ran out of money, and I moved back to my mom.

21    Q.  Okay.  When you got back home, were you staying at home

22    then in Hudson?

23    A.  Yeah, for about six months, and then I moved to

24    St. Paul.

25    Q.  What kind of work were you doing when you moved back
```

```
1    here?
2    A.  Pretty proud of this one.  Jimmy Johns and then roofing,
3    and then I went and started working for Champps Restaurant
4    and started as a host and worked my way up.
5    Q.  Okay.  At some point during this tale, you had some
6    issues with your driver's license; is that right?
7    A.  Yeah, 17 years.  I lost it for an accident in Colorado.
8    Q.  Okay.  Before you moved home?
9    A.  Yep.
10   Q.  Okay.  All right.  Now, you said so you worked at Jimmy
11   Johns.  Where else?
12   A.  I just did like a side job with roofing.  I can't
13   remember the guy's name.  It's been like 20 years, so that's
14   about it.
15   Q.  Later on you found a different line of work?
16   A.  Yeah.
17                    (Court reporter interruption)
18   BY MR. THOMPSON:
19   Q.  That's okay, Mr. Stayberg.  It happens a lot.
20   A.  Yeah.
21   Q.  Okay.  So you had Jimmy Johns, roofing, but at some
22   point you found a more steady job that you had for some
23   time; is that right?
24   A.  Yes.
25   Q.  What job?
```

```
 1    A.  At Champps.

 2    Q.  At Champps?  Champps is a restaurant?

 3    A.  Yeah.  It still is a franchise somewhere, but there used

 4    to be a bunch of them, and they closed a bunch down.

 5    Q.  Where was the Champps you worked at?

 6    A.  Right by the airport kind of on Highway 5, West Seventh

 7    Street.

 8    Q.  In St. Paul?

 9    A.  Yep.

10    Q.  What did you do at Champps?

11    A.  I started off as a host and then bar-backed and then

12    served.

13    Q.  How long did you work at Champps?

14    A.  I believe like five years, three years, somewhere in

15    there.

16    Q.  What time frame roughly?

17    A.  I was 19 or 20 when I started, and then I got out of

18    there when I was like 22, I think.

19    Q.  Roughly the mid --

20    A.  Yeah, roughly in that area.

21    Q.  Okay.  What did you do after you -- why did you leave

22    Champps?

23    A.  Because I got a job bartending at a place called Tavern

24    on the Avenue.

25    Q.  What's Tavern on the Avenue?
```

1    A.  It's just another restaurant, but it was like a younger
2    crowd, I suppose, not as much dinner.  Just I bartended
3    there for seven years and managed as well.
4    Q.  Okay.  And you left there at some point.  Where did you
5    go?
6    A.  I went to Bennett's Chop and Railhouse to bartend there
7    as well.
8    Q.  Where is that located, Bennett's?
9    A.  West Seventh Street and right by -- on West Seventh
10    again.
11    Q.  Okay.  How long did you work at Bennett's Railhouse?
12    A.  Seven years.
13    Q.  What time frame, roughly?
14    A.  Just can't remember.  Let's see.  I got out of Tavern on
15    the Ave. when I was, like I believe probably 2008 to like
16    2015ish, maybe around there, and I kind of, then I went --
17    go ahead.  I'm sorry.
18    Q.  Where did you go after Bennett's?
19    A.  I went to Bay Street.
20    Q.  Another bar?
21    A.  Yep.
22    Q.  In St. Paul?
23    A.  Yes.
24    Q.  What kind of work were you doing at Bay Street?
25    A.  I was the GM and bartender as well.

BOCK/DIRECT/SINGLETON - DIRECT

```
 1    Q.  How long did you work there?

 2    A.  Three years, I believe.

 3    Q.  Okay.  Now at some point while you were working as a

 4    bartender and at restaurants and bars, did you meet Aimee

 5    Bock?

 6    A.  Yes.

 7    Q.  When did you meet Aimee Bock?

 8    A.  Probably, I mean we had mutual friends, so probably back

 9    in my Bennett's days --

10    Q.  How did you meet her?

11    A.  -- beginning of them.  Through mutual friends.

12    Q.  Were you friends, or how did you, could you give me a

13    sense of the interaction you had with her back when you

14    worked at Bennett's in St. Paul?

15    A.  She would come in with a friend of ours, Coley.  I don't

16    know his first name, and they would just come in and have

17    cocktails and do a little gambling.

18    Q.  How often would Ms. Bock and Coley come in?

19    A.  Probably like once a month.

20    Q.  Okay.  What did Ms. Bock do for a living, did you know?

21    A.  I just knew that she worked for a nonprofit with one of

22    her friends.

23    Q.  Okay.  At some point -- well, let me take you back a few

24    years here to 2022.  At some point a reporter came to talk

25    to you; is that right?
```

```
1    A.  No.  Called me.

2    Q.  Okay.

3    A.  I was, yeah, they just they called my phone.  I was like

4    I have no idea what you are talking about, and I hung up on

5    them, and then I got subpoenaed to be here.

6    Q.  Okay.  When the reporter reached out to you and the

7    U.S. Attorney's Office reached out to you, what did they

8    want to talk to you about?

9    A.  About the feed your starving children, feed you future,

10   whatever it is called.

11   Q.  Feeding Our Future?

12   A.  Yeah.

13   Q.  And specifically why did people want to talk to you

14   about Feeding Our Future?

15   A.  Well, apparently I was signed on as part of the

16   situation that they had going.  I had no idea.  I just saw a

17   piece -- I got mail, and I would just chuck it.  I didn't

18   think it was anything for me, so --

19   Q.  Okay.

20   A.  By the time it finally got to that, I looked up my name

21   on online, and then it started to hit me, especially when I

22   found somebody looking in my windows trying to give me a

23   whatever you call it, subpoena.

24   Q.  What did you find online?

25   A.  Just my name in like the New York Times.
```

1    Q.  Okay.  I'm going to show you now.  Why did the New York
2    Times put your name in the paper?
3    A.  For the situation I had here.
4    Q.  Okay.  To be clear, had you ever worked at Feeding Our
5    Future?
6    A.  No.
7    Q.  I'm going to show you had been admitted as Government
8    Exhibit A3.  We'll just confirm it's been admitted.  It has.
9          Mr. Stayberg, this is an organizational chart from
10   Feeding Our Future.  Do you know what an organizational
11   chart is?
12   A.  I get the gist of it, yeah.
13   Q.  Okay.  If you look right at the top of the org chart,
14   your name is on it, and it lists you as the board president.
15   A.  Yeah, big shoes.
16   Q.  Mr. Stayberg, were you the president of the board
17   directors of Feeding Our Future?
18   A.  No.
19   Q.  Do you know how you came to be on this document?
20   A.  From what I gather, in the beginning it was a petition
21   to start a, you know, a support for somebody, and I'm like,
22   well, I don't know.  If it's feeding for kids or something,
23   sure, I'll sign my name, and that's all I heard of it.
24   Q.  So this is a conversation you had with Ms. Bock; is that
25   right?

```
 1    A.  Yes.
 2    Q.  Where did this conversation take place?
 3    A.  It was at Bennett's while I was working.
 4    Q.  What did Ms. Bock talk to you about?
 5    A.  No depth.  Just it was a petition.
 6    Q.  You say "a petition."  What did she want you to do?
 7    A.  Sign my name to like a support, I suppose.
 8    Q.  What did she want you to support?
 9    A.  She says she starting a new deal.  That's about it.
10    That's like the extent of it.
11    Q.  Okay.  You didn't really know.
12    A.  No.
13    Q.  Did she tell you that you were joining the board of
14    directors of the company?
15    A.  No.
16    Q.  Did you join the board of directors of the company?
17    A.  No, I didn't even know that the -- the first I even
18    heard that there was like a local spot where they started
19    was when you told me last month.  I had no idea I was any
20    part of that.
21    Q.  Okay.  This org chart lists other members of the board
22    as the board secretary a man named John Senkler?
23    A.  Yep.
24    Q.  Do you know John Senkler?
25    A.  Yes.
```

```
1    Q.  Who is he?

2    A.  He was, well, he's a friend of mine that used to own

3    Fabulous Fern's.

4    Q.  What's Fabulous Fern's?

5    A.  A restaurant, bartender.

6    Q.  In St. Paul?

7    A.  Yeah.

8    Q.  And how did you know Mr. Senkler?

9    A.  We go to bars, similar.

10   Q.  What does John Senkler do for a living?

11   A.  I don't know.  He recently fell ill, so I'm not sure

12   what he's up to these days.

13   Q.  What was he up to back at that time?

14   A.  To be honest, I don't really know.  After Fern's shut

15   down and I moved to Cottage Grove, I didn't really have much

16   contact with anybody.

17   Q.  Do you know what Mr. Senkler does these days?

18   A.  No.

19   Q.  Did you ever serve on a board of directors with him?

20   A.  No.

21   Q.  Do you know whether he served on a board of directors?

22   A.  I couldn't say.  I am highly doubting it.

23   Q.  Why would you highly doubt that John Senkler would have

24   served on a board of directors?

25   A.  Have you met him?
```

```
 1    Q.  Why don't you describe for us?  I take it you have?

 2    A.  Yeah.

 3    Q.  Why don't you describe --

 4    A.  He's the last person that you would think would be in

 5    that position.

 6    Q.  Why?

 7    A.  Well, I mean, kind of feels like I'm talking behind his

 8    back.  He just didn't seem -- it's not what he would do.

 9    Q.  You can describe him warmly but accurately.

10    A.  Well, him and I like to party, you know, like drink, and

11    we knew everybody so we just would like bar hop and stuff

12    like that.

13            And the last place that either of us would be

14    doing would be like in a room like this trying to explain

15    ourselves for something we never did.  It's just ridiculous.

16    Q.  How about Jamie Phelps?  He is listed as the board

17    treasurer.  Do you know Jamie Phelps?

18    A.  Yeah.

19    Q.  How do you know him?

20    A.  He used to come and visit me at the bar.

21    Q.  Did you serve on a board of directors with him?

22    A.  No.

23    Q.  Did he have anything to do with Feeding Our Future as

24    far as you know?

25    A.  No.
```

1   Q.  What does he do for a living, or what did he do for a

2   living?

3   A.  I think some sort of construction.

4   Q.  Did he seem like a guy who would serve on a board of

5   directors?

6   A.  No.

7   Q.  Mr. Stayberg, I'm going to show you now what's been

8   admitted as Government Exhibit A2, and this is a folder that

9   was recovered during the search of Feeding Our Future, and

10  it's labeled FY, or fiscal year, '19 board training.

11          Okay?  You see that?

12  A.  Mm-hmm.

13          THE COURT:  Is that a yes?

14          THE WITNESS:  Oh, yes.  Sorry.

15  BY MR. UDOIBOK:

16  Q.  And I direct your attention to page 10 and 11.  Page 10

17  here is a document labeled Household Income Statements Quiz.

18  And it says, "Adult care."

19          Do you see that?

20  A.  Yeah.

21  Q.  And --

22  A.  Yes.

23  Q.  It appears to be some sort of quiz or training document;

24  is that right?

25  A.  I didn't start to read it, but it's foreign to me, if

BENJAMIN STAYBERG - DIRECT

1    that makes sense.

2    Q.  Have you ever seen this before?

3    A.  No.

4    Q.  And on page 11 it's signed, and it looks like it says

5    Benjamin Stayberg?

6    A.  That's not my signature.

7    Q.  No?

8    A.  A million percent it's not.

9    Q.  Did you take this quiz?

10   A.  No.

11   Q.  Have you ever taken a quiz like this?

12   A.  No.

13   Q.  On page 12 there's another household income statements

14   quiz, this time for child care.  And again, it appears to

15   contain some sort of training document; is that right?

16   A.  Yep, same as the last one.

17   Q.  And on page 13 --

18   A.  No, that is not my signature.

19   Q.  Did you take that quiz?

20   A.  No.

21   Q.  On page 14 of Government Exhibit A2, there's another

22   Feeding Our Future document titled Claims For Reimbursement

23   Quiz, and it talks about things like meal counts and

24   attendance for site classrooms.

25            Do you see that?

```
1    A.  Yep.

2    Q.  Have you seen this document before?

3    A.  No.

4    Q.  Did you take this quiz?

5    A.  No.

6    Q.  Is that your signature?

7    A.  No.

8    Q.  On page 15 of Government Exhibit A2, there's a meal

9    counts quiz.  Do you recognize this document?

10   A.  No.

11   Q.  Did you ever take this quiz?

12   A.  No.

13   Q.  Do you know anything about it?

14   A.  No.

15   Q.  The signature at the bottom, it appears to say Benjamin

16   Stayberg.  Is that your signature?

17   A.  No, it is not.

18   Q.  On page 16 of Government Exhibit A2, there's a document

19   titled Feeding Our Future Procurement and Financial

20   Recordkeeping Quiz.  Do you recognize this document?

21   A.  Nope.

22   Q.  Did you ever take this quiz?

23   A.  No.

24   Q.  Have you ever received any training about procurement or

25   financial recordkeeping?
```

```
 1    A.  No.

 2    Q.  And the printed name on page 17 here says Benjamin

 3    Stayberg, and then there's a signature.  Is that your

 4    signature?

 5    A.  No.

 6    Q.  Do you have any idea how your signature and your name

 7    came to be on those quizzes?

 8    A.  No idea.  That's not my signature.  So a signature of my

 9    name is on there.

10    Q.  But you didn't put it there?

11    A.  No.

12    Q.  Mr. Stayberg, I'm now going to show you Government

13    Exhibit A80, which is a Feeding Our Future board minute

14    meetings -- board meeting minutes.

15               First off, Mr. Stayberg, have you ever attended a

16    board of directors meeting?

17    A.  No.

18    Q.  For Feeding Our Future?

19    A.  No.

20    Q.  For any other entity?

21    A.  No, never in my life ever.

22    Q.  Do you know what a board of directors is?

23    A.  Yeah, I have a pretty good idea.

24    Q.  What is it?

25    A.  It's usually where there is a president, CEO, all the
```

1    people that are on the board get together and talk.

2    Q.  Okay.  Here this one, this board meeting at page 1 of

3    Government Exhibit A80 is a date of November 1st of 2018; is

4    that right?  That's what it says?

5    A.  Yeah.

6    Q.  And it says there's a conference call, and it lists as

7    attending Aimee Bock, Jamie Phelps, Norma Cabadas as board

8    members and then you as a guest; is that right?

9    A.  That's what it says, yes.

10    Q.  Did you attend this meeting or this conference call?

11    A.  No.

12    Q.  Have you ever been on a conference call having to do

13    with Feeding Our Future?

14    A.  No.

15    Q.  And at the bottom of page 1 under new business topic 1,

16    it states, New board member Benjamin Stayberg, extensive

17    knowledge of food sourcing and food costs, interested in

18    being the board chair.

19    A.  No.

20    Q.  Mr. Stayberg --

21    A.  I serve drinks.

22            No.

23    Q.  What did you say after that?

24    A.  I serve drinks.

25    Q.  Do you have extensive knowledge of food sourcing and

1    food costs?

2    A.  No.

3    Q.  Were you interested in becoming the board chair for

4    Feeding Our Future?

5    A.  No.

6    Q.  Did you become a board chair or a board member?

7    A.  No.

8    Q.  On page 2 there's the, the meeting minutes continue from

9    November 1st of 2018.  And the board minutes indicate that

10   you made a motion on this topic, the recruitment of sites,

11   review of recruitment policy and approve to use with new

12   hires.  The goal of Feeding Our Future is to recruit

13   programs that are not participating in the CACFP.

14          Did you, do you know anything about this?

15   A.  No.

16   Q.  Did you make a motion on this topic?

17   A.  No.

18   Q.  Do you know anything about recruiting sites or even what

19   the CACFP is?

20   A.  Not a clue.

21   Q.  And at the bottom of page 2 of Government Exhibit A80,

22   it says the meetings are submitted and certified by Aimee

23   Bock; is that right?

24   A.  That's what it looks like, yes.

25   Q.  All right.  I'm turning to page 3 of Government

1    Exhibit A80.  There's board meeting minutes for another

2    Feeding Our Future board meeting on January 14th of 2019; is

3    that right?

4    A.  Yeah.

5    Q.  The location of the meeting is 13299 Bronze Parkway in

6    Rosemount.

7                (Broadcast over sound system as follows:

8           May I have your attention please may I have your

9    attention please, there has been an emergency reported in

10   the building please stand by for further information.

11          May I have your attention please, may I have your

12   attention please, there has been an emergency reported in

13   the building.  Please stand by for further information.)

14          THE COURT:  That was our marshal, so hang tight,

15   and we will see what we need to do.

16          Let's go off the record.

17                        **(Off the record)**

18          THE COURT:  Just making sure everyone is awake,

19   apparently.

20          All right.  Never a dull moment.  Sorry for the

21   interruption.

22          Mr. Thompson, we are back on the record, and you

23   may continue.

24          MR. THOMPSON:  Thank you, Your Honor.

25

STAYBERG - DIRECT

```
 1    BY MR. THOMPSON:

 2    Q.  All right.  Mr. Stayberg before we were interrupted by

 3    the loud buzzing noise --

 4    A.  Mm-hmm.

 5    Q.  -- I believe we were talking about these Government

 6    Exhibit A80, page 3, which purport to be minutes of a board

 7    meeting for Feeding Our Future that occurred on January 14th

 8    of 2019.

 9            The location, according to the minutes, was at

10    13299 Bronze Parkway in Rosemount.  Are you familiar with

11    that address?

12    A.  No.

13    Q.  Did you attend this meeting?

14    A.  No.

15    Q.  The roll call suggests that you were there along with

16    Jamie Phelps; is that right?

17    A.  That's what it looks like.

18    Q.  But you weren't there?

19    A.  No.

20    Q.  Did you make a motion to approve the agenda or to

21    approve the budget?

22    A.  No.

23    Q.  And on page 4 of Government Exhibit A80, it lists your

24    name and what purports to be your signature as certifying

25    the accuracy of these board minutes.
```

```
 1    A.  No, that's not.

 2    Q.  You didn't sign these minutes?

 3    A.  No.

 4    Q.  That's not your signature?

 5    A.  No.

 6    Q.  Page 6 of Government Exhibit A80 purport to be the

 7    minutes of another board meeting on July, on July 22nd of

 8    2019; is that right?

 9    A.  Yep.

10    Q.  The location is listed as Feeding Our Future at 3055 Old

11    State Highway 8.  Are you familiar with that location?

12    A.  No.

13    Q.  Have you ever been there?

14    A.  No.

15    Q.  Ever been to the offices of Feeding Our Future?

16    A.  No.

17    Q.  It says the meeting was called to order at 8:25 a.m.

18    A.  Nope.  I mean, yes, but I was not there.

19    Q.  Okay.  And then it lists you and Mr. Phelps as being

20    present, along with Aimee Bock; is that right?

21    A.  Yep.

22    Q.  Do you know Norma Cabadas?  She's listed as a board

23    member here.

24    A.  Never heard of her.

25    Q.  I take it you didn't move to approve the agenda here as
```

1    listed on page 5?

2    A.  Nope.

3    Q.  And on page 6, again, your name is listed and what

4    purports to be your signature as certifying these proposed

5    minutes on July 22nd of 2019.

6    A.  That is not my handwriting, not my signature.

7    Q.  Not your signature?  Page 7 of Government Exhibit A80 is

8    another set of minutes or what purports to be minutes of a

9    board meeting for Feeding Our Future on March 22nd of 2020.

10   Did you attend that board meeting?

11   A.  No.

12   Q.  You are listed as being there with Jamie Phelps and John

13   Senkler, as well as Aimee Bock and Ikram Mohamed?

14   A.  No.

15   Q.  Do you know who Ikram Mohamed is?

16   A.  No.

17   Q.  Have you met her?

18   A.  No.

19   Q.  New business:  Topic one, COVID outbreak, shutdown

20   plans.  Did you discuss that with anyone?

21   A.  No.

22   Q.  On page 8, is that your signature as certifying the

23   accuracy of these board minutes on March 22nd of 2020?

24   A.  No.

25   Q.  Page 9 of Government Exhibit A80 purport to be the

STAYBERG - DIRECT

```
 1    minutes of another board meeting at Feeding Our Future on

 2    July 3rd of 2020; is that right?

 3    A.  Yep.

 4    Q.  At 8:35 a.m., it lists you as being present, along with

 5    Jamie Phelps, John Senkler, Aimee Bock and Ikram Mohamed.

 6    Were you at that meeting?

 7    A.  No.

 8    Q.  On page 10, your name is listed and with what purports

 9    to be an electronic signature of your name is listed as

10    certifying these board minutes on July 3rd of 2020.

11            Did you actually do so?

12    A.  No.

13    Q.  Mr. Stayberg, did you ever, were you ever a member of

14    the board of directors of Feeding Our Future?

15    A.  To my knowledge, no.

16    Q.  When did you learn that you purportedly were?

17    A.  When I got the call from the New York Times.

18    Q.  Thank you, Mr. Stayberg.

19            No further questions.

20            THE COURT:  Mr. Udoibok, cross-examination.

21            MR. UDOIBOK:  Yes, Your Honor.

22            Ms. Mallet, will you please pull up exhibit, let's

23    start with A2.

24

25
```

```
1                          CROSS-EXAMINATION
2      BY MR. UDOIBOK:
3      Q.  Mr. Stayberg, my name is Kenneth Udoibok.  We haven't
4      met.  Good afternoon.
5      A.  Good afternoon to you too.
6      Q.  And have you seen, other than today, have you seen
7      Exhibit A2 before?
8      A.  All I see is a black screen.
9               MR. UDOIBOK:  Pull up Exhibit A2.
10              MS. MALLET:  It's not working.
11              MR. UDOIBOK:  We'll blame the alarm.
12              THE COURT:  Okay.  Can we just use the
13     government's copy?
14              MR. UDOIBOK:  Yeah.
15              MR. THOMPSON:  A2?
16              MR. UDOIBOK:  Yes.
17     BY MR. UDOIBOK:
18     Q.  So you testified earlier about Exhibit A2.  Basically
19     you haven't seen Exhibit A2 before.
20     A.  No.
21     Q.  But you have seen Ms. Bock before.
22     A.  Yes, I have seen her before.
23     Q.  And how many times do you believe you have had any
24     contact with Ms. Bock?  Many times?
25     A.  Not many.  I mean, like I would say, I saw her like
```

```
 1    about once a month for a span of about eight years, so --
 2    Q.  And --
 3    A.  -- give or take.
 4    Q.  And during your meetings with her, you don't have any
 5    occasion to know what her handwriting looks like, would you?
 6    A.  No, not really.  I mean, she signed her slip, I suppose.
 7    Q.  But you don't have any recollection what her handwriting
 8    would look like, do you?
 9    A.  No.
10    Q.  Okay.  Now, have you ever received any correspondence
11    about Feeding Our Future from MDE?
12    A.  I just threw them away with my other stuff.
13    Q.  So you received correspondence about MDE, about Feeding
14    Our Future from MDE, correct?
15    A.  I just saw the Department of Education on the thing, and
16    I tossed it.
17    Q.  Was it certified mail, do you think?
18    A.  Yeah.
19    Q.  Certified mail, okay.
20    A.  Yeah.
21    Q.  And you have to sign for it, don't you?
22    A.  No.
23    Q.  But it's certified?
24    A.  Yeah.
25    Q.  All right.  And when was that?  When did you receive
```

```
1    certified mail from MDE?

2    A.  A long time ago.  Little fresher in your head than it is

3    mine, if you know what I mean.

4    Q.  Well, yeah.  Shall we say 2020?

5    A.  No.  It's been -- it was when I used to live in

6    South St. Paul probably.  So maybe even before that.  I

7    don't know.  It's over ten years for sure, it feels like.

8    Q.  Feel like ten years, but maybe it's not ten years,

9    right?

10   A.  I haven't got anything recently at all.

11   Q.  No.  I'm just saying you've received --

12   A.  Yeah.

13   Q.  -- certified mail from, from MDE relating to Feeding Our

14   Future, correct?

15   A.  Yeah.

16   Q.  All right.  And you testified earlier that you received

17   a subpoena from the federal government.

18   A.  From who?

19   Q.  From the United States Attorney's Office?

20   A.  Yes.

21   Q.  When did you receive that subpoena?

22   A.  I don't know.  Do you have the information?  I don't.

23   Q.  All right.  Was it this year?

24   A.  No.

25   Q.  Was it 2024?
```

BOCK - CROSS - UDRENKA

```
 1    A.  I don't believe -- I'm trying to think.  I don't really
 2    know when I got subpoenaed, but I bet they have that
 3    information right in front of them.
 4    Q.  I'm sure they do, but I'm just trying to find out what
 5    you recall.  Did you receive a subpoena in 2023?
 6    A.  It was in the -- let's see.  It was within the last
 7    probably like 2021, somewhere there.
 8    Q.  2021.  Did it come in the mail, or was it served by a
 9    deputy?
10    A.  No.  There was a guy looking around my window at night,
11    and I have dogs, and I almost got into it.  So that's how I
12    kind of remember what time of the year it was.
13    Q.  Do you recall whether the subpoena came before the
14    certified mail you received from MDE?
15    A.  No.  It was after.
16    Q.  All right.  Do you know how many employees work for
17    Feeding Our Future?
18    A.  No.
19    Q.  Do you know any other employee that work for Feeding Our
20    Future other than Ms. Bock?
21    A.  No.
22    Q.  All right.  So it's only Ms. Bock that you know that
23    work at Feeding Our Future?
24    A.  Yep.
25    Q.  Correct?
```

```
 1    A.  As far as I know.

 2    Q.  Is it your testimony, just want to be clear, and I'll

 3    ask this way:  Do you know who wrote your name on Exhibit A,

 4    A2?

 5    A.  There's no name on it.

 6    Q.  What?

 7    A.  There's no name on it.

 8    Q.  All right.  And Exhibit A80, would you pull up A80, I

 9    just want to go down.

10            MR. THOMPSON:  Page 4?

11            MR. UDOIBOK:  Page 4.  Go to A80, page 4.

12            THE WITNESS:  We are there.

13    BY MR. UDOIBOK:

14    Q.  Do you see that?  Do you see Ben Stayberg?

15    A.  Yep.

16    Q.  As chair, correct?

17    A.  Yes.

18    Q.  And also signature?

19    A.  Right.

20    Q.  Your testimony is, you didn't write your name and that's

21    not your signature, correct?

22    A.  Correct.

23    Q.  But you don't know who wrote your name and signature on

24    the document?

25    A.  That wouldn't make a lot of sense, would it?  If I knew,
```

1    I wouldn't be standing there watching someone sign my name

2    for me.  I have no idea who did it, but I know it wasn't me.

3    Q.  Was there any time after you received the certified mail

4    from -- you can take that down -- a certified mail from

5    MDE --

6              By the way, MDE is Minnesota Department of

7    Education.  You know that, right?

8    A.  Now I do.

9    Q.  Okay.  So when you received that certified mail, did you

10   in any occasion after you received that mail call Ms. Bock?

11   A.  I tried to get ahold of her and Coley to see.

12   Q.  My question, just listen to my question.  Did you call

13   Aimee Bock?

14   A.  I think I tried her Facebook Messenger, yes.

15   Q.  You tried, or are you sure you talked to her?

16   A.  This was a long time ago, but as far as I remember when

17   I got it, I opened it up, and it said my name in there, and

18   so I got ahold of Coley, Coley Flynn.

19   Q.  Okay.  So you spoke with Coley, but you're not sure

20   whether you spoke with Ms. Bock?

21   A.  To my knowledge, yes.

22   Q.  Okay.  And then when you received the subpoena from the

23   United States, did you, do you recall speaking with Aimee

24   Bock about the subpoena?

25   A.  No.

```
1    Q.  You never spoke.  Did you speak with Coley?

2    A.  Yeah.

3    Q.  And --

4    A.  I don't remember the conversation, to be honest with

5    you, though.

6    Q.  You spoke with Coley about your subpoena.  All right.

7            You don't know whether Ms. Bock wrote this, do

8    you?

9    A.  Say again?

10   Q.  You don't know whether Ms. Bock herself wrote your name

11   and signature?

12   A.  No, I do not know that.

13            MR. UDOIBOK:  No further questions.

14            THE COURT:  Mr. Colich?

15            MR. COLICH:  No questions, Your Honor.

16            THE COURT:  Mr. Thompson?

17            MR. THOMPSON:  No, Your Honor.

18            THE COURT:  You may step down, sir.  Thank you.

19            THE WITNESS:  Thank you.

20            THE COURT:  And the government may call its next

21   witness.

22            MR. THOMPSON:  Thank you, Your Honor.  The

23   government calls Lul Ali.

24            THE COURT:  This is off the record.

25                    (Off the record)
```

```
 1              THE COURT:  Good afternoon, ma'am.  I will have
 2     you come forward.
 3              Good afternoon.
 4              THE WITNESS:  Good afternoon.
 5              THE COURT:  You are going to come all the way up
 6     here.  How are you with steps?
 7              THE WITNESS:  Good.
 8              THE COURT:  You can come up them?
 9              THE WITNESS:  Sure.
10              THE COURT:  Okay.  And could you stand up for one
11     moment and take the oath?
12                          LUL ALI,
13     called on behalf of the government, was duly sworn, was
14     examined and testified as follows:
15              THE WITNESS:  Sure.
16              THE COURT:  All right.  You may have a seat in the
17     chair there.
18              THE WITNESS:  Sure.
19              THE COURT:  Ma'am, could you state and spell both
20     your first and last name for the record?
21              THE WITNESS:  My name is Lul Ali.  L-U-L, A-L-I.
22              THE COURT:  Thank you.  I'm going to have you take
23     that microphone that's right up there, put it right in front
24     of your mouth.  There you go.  That should be good.
25              Mr. Thompson, you may inquire.
```

```
 1              MR. THOMPSON:  Thank you, Your Honor.
 2                    DIRECT EXAMINATION
 3    BY MR. THOMPSON:
 4    Q.  Good afternoon, Ms. Ali.
 5    A.  Yes.
 6    Q.  How are you?
 7    A.  Good.  How are you?
 8    Q.  Good.  All right.  I'm going to have you pull that
 9    microphone close.  You will see me do it too.
10    A.  Excuse me.
11    Q.  Now, Ms. Ali, I know English is not your first language;
12    is that right?
13    A.  Yeah.
14    Q.  So I'm going to take it nice and slow, and if you don't
15    understand what I'm saying, just please ask me to repeat it.
16    Okay?
17    A.  Thank you.
18    Q.  Ms. Ali, I want to start by talking a little bit about
19    your background.  Okay?
20    A.  Sure.
21    Q.  Where are you from originally?
22    A.  I'm from Somalia.
23    Q.  How old were you when you left Somalia?
24    A.  22.
25    Q.  How far, did you go to school in Somalia?
```

1    A.  Yes.

2    Q.  How far did you go to school in Somalia?

3    A.  I finished high school, and I go to college.  After that

4    civil war is coming.

5    Q.  Did you leave Somalia during the Somalia civil war?

6    A.  Yes.

7    Q.  How old were you?

8    A.  At that time?

9    Q.  Yes.

10   A.  22, 21, 22, the time civil war.

11   Q.  Where did you go when you fled Somalia when you were 22?

12   A.  I go Nairobi.

13   Q.  Nairobi, Kenya?

14   A.  Yes.

15   Q.  How long did you stay in Nairobi, Kenya?

16   A.  Around two years.

17   Q.  Where did you go then?

18   A.  Egypt.

19   Q.  Where in Egypt?

20   A.  Cairo.

21   Q.  How long did you live in Cairo, Egypt?

22   A.  Ten, nine, something like that.

23   Q.  Nine or ten years?

24   A.  Yes.

25   Q.  Did you work when you lived in Egypt?

```
 1    A.  No.

 2    Q.  What did you do?

 3    A.  No work, just we live there.  We are refugee.  The

 4    United States, UN, they give us some money.  And our family,

 5    they send some money to live there.

 6    Q.  You said the UN.  You mean the United Nations?

 7    A.  Yes.

 8    Q.  When did you move to the United States?

 9    A.  1998.

10    Q.  Where did you move when you first came to the

11    United States?

12    A.  Virginia.

13    Q.  How long did you live in Virginia?

14    A.  Four to five years.

15    Q.  Did you work while you were in Virginia?

16    A.  Yes.

17    Q.  What did you do?

18    A.  I work for restaurant, cook, Somalia restaurant, and I

19    work for the Exxon gas station, Mobile Exxon.

20    Q.  Okay.  At some point did you move to Minnesota?

21    A.  Yeah.

22    Q.  When was that?

23    A.  2021.

24    Q.  2001?

25    A.  2001.  I'm sorry.
```

```
1    Q.  That's okay.  Ms. Ali, are you married?

2    A.  Yes.

3    Q.  What is your husband's name?

4    A.  Mohamed Hussein.

5    Q.  How long have you been married to Mr. Hussein?

6    A.  I married 2005.  I -- almost 30 years, 28, 29, something

7    like that.

8    Q.  28 or 29 years?

9    A.  Yes.

10   Q.  Congratulations.

11   A.  Thank you.

12   Q.  You said you moved to Minnesota in 2001.  Where did you

13   move in Minnesota?

14   A.  Owatonna.

15   Q.  What did you and your husband do when you moved to

16   Owatonna, Minnesota, in 2001?

17   A.  Factory work.

18   Q.  Factory work?

19   A.  Yes.

20   Q.  What factory did you work in?

21   A.  I work SBS, and his work in different company.  Me too.

22   I worked turkeys Faribault.  He work in turkey store.  He

23   worked in Itron in Waseca.

24   Q.  Okay.

25   A.  And I work --
```

```
 1    Q.  Let me go back.

 2    A.  -- printing company.  I don't remember the printer

 3    company.  Waseca, I work there some.

 4    Q.  At a printer company?

 5    A.  Yeah.

 6    Q.  Okay.  You said you worked at a factory that did turkey?

 7    A.  Turkey store in Faribault.  I work three months.

 8    Mohamed he work like two years.

 9    Q.  This is the Jennie-O Turkey plant?

10    A.  Yeah, Jennie-O Turkey store.

11    Q.  Okay.  At some point did you start your own business --

12    A.  Yes.

13    Q.  -- after moving to Minnesota?

14    A.  I start own business the time I live in Owatonna.  I

15    start the Sambusa Service Company.  I make Sambusa.

16    Q.  For those of you who don't know, maybe the jurors aren't

17    familiar, what's Sambusa?

18    A.  The Sambusa is a meat product.

19    Q.  Like a meat pie?

20    A.  Yeah.

21    Q.  Okay.  And you sold, you made Sambusas?

22    A.  I made Sambusa.  I sell Sambusa a lot.  I have a license

23    for Minnesota.  That first person has license in Sambusa is

24    me, Lul Ali.

25    Q.  Okay.
```

585

```
1    A.  Okay.  I have that business a while.  And I have kids.

2    I have kids.  They growing kids.  I can do business.

3    Sambusa is a very difficult business.

4    Q.  Okay.  So did you change jobs at some point?

5    A.  Yes.  I buy halal meat.  I do halal meat, and I sell

6    again for halal meat, and I move in Faribault.  The reason I

7    move Faribault, Mohamed he start a job for the school

8    district for interpreter for Somalia kids and the school

9    system.

10   Q.  So you and your husband moved to Faribault?

11   A.  Faribault.

12   Q.  Because your husband Mohamed Hussein got a job for the

13   Faribault school district?

14   A.  High school.

15   Q.  The high school?

16   A.  He work there.

17   Q.  As an interpreter?

18   A.  Yes.

19   Q.  Okay.  And what did you do after you and your husband

20   moved to Faribault?

21   A.  I do some interpreter for the hospital for me.  I work

22   little bit there because my kids, they very young.  I change

23   for home daycare for my job.

24   Q.  You started a home daycare?

25   A.  Yes, because I want to raise my kids, and I want to make
```

```
1    money.

2    Q.  How many kids did you take care of at your home daycare

3    in Faribault?

4    A.  Ten kids at the time.

5    Q.  Okay.

6    A.  For the home daycare.

7    Q.  Approximately when was it that you started your home

8    daycare in Faribault?

9    A.  I started '06, I think, or '005.  I don't remember,

10   guys, now.  A lot I don't remember.  Okay?

11   Q.  Okay.

12   A.  It long time ago.

13   Q.  That's okay.  Let's turn to the topic that we're here to

14   discuss.  Okay?

15   A.  Okay.

16   Q.  At some point did you open a restaurant --

17   A.  Yes.

18   Q.  -- in Faribault?

19   A.  After they close my daycare, my felt is a cook.  I start

20   my restaurant, an investment, to do sell food.  All my

21   community, they like my food.

22   Q.  When you say your community, what do you mean?

23   A.  My Somali community.  They like my food.

24   Q.  Okay.

25   A.  That's why I start restaurant.  They need restaurant.
```

1    Q.  Your restaurant was called Lido Restaurant?

2    A.  Yes.

3    Q.  That's L-I-D-O?

4    A.  Yes.

5    Q.  When did you open Lido Restaurant?

6    A.  2020.

7    Q.  Okay.  Right before COVID happened?

8    A.  Before the, the corona time.

9    Q.  In that time?

10   A.  Yeah.  At the time I start Feeding Our Future, I like

11   working like three months, four months, open my restaurant

12   before the program.

13   Q.  Before you got involved with Feeding Our Future?

14   A.  Yes.

15   Q.  Okay.  Let's talk about that, those three or four months

16   after you opened the restaurant before you got involved with

17   Feeding Our Future.  Okay?

18   A.  Yes.

19   Q.  Lido Restaurant, could you describe it for me?  What

20   does it look like?  How large is it?  How many tables did it

21   have?

22   A.  Like nine table.

23   Q.  Nine tables?

24   A.  Yeah.  Very small place.

25   Q.  You said that your Somalia, people in the Somali

1    community liked your food.

2    A.  Yes.

3    Q.  Who would generally come to your restaurant?

4    A.  Usually like people working turkey store, work people.

5    All mens, they buy my food because they go work, usually

6    they to-go food.

7    Q.  To-go food?

8    A.  Yes.

9    Q.  You said young men?

10   A.  Young men, yes.

11   Q.  Tell us about that.

12   A.  Like, you know, 20 years, 25 years old, young people,

13   because, you know, they don't, some kids they don't have

14   families.  They wanted food to go to work, and you know,

15   some kids like -- it's not like, like our kids, you know.

16          The American kids, they drink, they smoke, you

17   know, they don't have time to cook home.  They come.  They

18   get it, food.  I work usually kids young.  It's not kids.

19   Like teenager.

20   Q.  The younger generation?

21   A.  Yes.

22   Q.  Okay.  You mentioned several times the turkey store?

23   A.  Yes.

24   Q.  Are you referring to the Jennie-O Turkey plant, the big

25   factory?

```
1     A.  Yes.

2     Q.  Okay.

3     A.  That's where they work.

4     Q.  That's where those young men work?

5     A.  Yes.

6     Q.  Okay.  Ms. Ali, you mentioned that three or four months

7     after you opened Lido Restaurant in Faribault in 2020 that

8     you got involved with Feeding Our Future.  How did that

9     begin?

10             Can you tell us about the first conversation, the

11    first time you learned about Feeding Our Future?

12    A.  One guy, he come to me, my restaurant, like age 30 years

13    old I think he is.  His name Shafi.

14    Q.  Shafi came to your restaurant?

15    A.  Yes.  He told me I have this program, are you interest.

16    Q.  What was the program that Shafi told you about?

17    A.  The corona program.  We feed the kids, and now we buy

18    the food for you.

19    Q.  Who buys the food for you?

20    A.  The company.

21    Q.  What company?

22    A.  Feeding Our Future.

23    Q.  Okay.  So what did Shafi want you to do when he came to

24    your restaurant that day?

25    A.  Application, fill out the application.
```

590

1    Q.  Okay.  Did you talk to anyone else at Feeding Our Future

2    after that conversation with Shafi?

3    A.  He called the lady Aimee.

4    Q.  Who called Aimee?

5    A.  Shafi.

6    Q.  Okay.  Where was he when he called her?

7    A.  He's my office.  He's my place.  My restaurant.

8    Q.  Okay.  What happened when Shafi called Aimee Bock?

9    A.  He say I found this lady.  She have a restaurant in

10   Faribault.  He says she say fill out the application, bring

11   us, we see her application.

12   Q.  So Shafi told -- is this Aimee Bock?

13   A.  Yeah.

14   Q.  I'm sorry.  Do you see Aimee Bock here today in court?

15   A.  Yes.  I know.  She there.

16          MR. THOMPSON:  Your Honor, could the record

17   reflect that the witness has identified Ms. Bock?

18          THE COURT:  Where is Ms. Bock located in the

19   courtroom today?

20          THE WITNESS:  She is there.

21          MR. THOMPSON:  What is she wearing?  What color

22   shirt?

23          THE WITNESS:  Purple on white.

24          THE COURT:  The record will so reflect.

25          MR. THOMPSON:  Thank you.

```
 1                    THE WITNESS:  Isn't it?
 2                    MR. THOMPSON:  Yes, Ms. Ali.  It's not a quiz.
 3                    THE WITNESS:  Okay.  Sometimes confusing.
 4      BY MR. THOMPSON:
 5      Q.  Ms. Ali, you were talking.  You said Shafi called Aimee
 6      Bock?
 7      A.  Yes.
 8      Q.  Did he call her on the phone, or was it a video
 9      conference?
10      A.  Video conference.
11      Q.  Okay.  And he told her that he had found a woman, you,
12      who had a restaurant in Faribault?
13      A.  Yes.
14      Q.  How did Ms. Bock respond during that video call?
15      A.  She say fill out application.  Fill out application,
16      come to me.  After that we talk about it, for Shafi not me.
17      Q.  Were you on the call with her?
18      A.  Yes.
19      Q.  Okay.
20      A.  His phone.  It's not my phone.
21      Q.  Okay.  What did, what was your reaction when they
22      offered this to you?
23      A.  I talked to him.  I say how much you buy my food?
24      Q.  How much would they pay?
25      A.  Yes.
```

```
 1    Q.  And how did Shafi respond when you asked how much they
 2    would pay for your food?
 3    A.  He say $4.50.
 4    Q.  $4.50?
 5    A.  Yes.
 6    Q.  Per meal?
 7    A.  Yes.
 8    Q.  What was your reaction to that?
 9    A.  I say, no, it's too small because I sell my food is $12.
10    Q.  $12 normally?
11    A.  Yeah.
12    Q.  So that wasn't enough?
13    A.  Yeah.  It's not enough.
14    Q.  What did Shafi say when you expressed concern about --
15    A.  Make money, don't worry.  I say how.
16              MR. UDOIBOK:  Hearsay.  Hearsay.
17              MR. THOMPSON:  I'm sorry.  I'm going to ask that
18    again.
19              Ms. Ali, what did Shafi say when you expressed
20    concern about how much they were paying or how little they
21    were going to pay?
22              MR. UDOIBOK:  Same.
23              THE COURT:  The objection is hearsay response?
24              MR. THOMPSON:  Coconspirator statement, Your
25    Honor.
```

```
 1              THE COURT:  I'm going to conditionally allow it
 2      under the procedure that we've discussed.
 3              You may answer.
 4              MR. THOMPSON:  Go ahead.
 5              THE WITNESS:  Answer?
 6              THE COURT:  You may answer, yes.
 7              THE WITNESS:  Okay.  They say is $12.  I say $12
 8      my meal.  And you say 4.50.  Is not a match what I wanted.
 9      He say you make more than that.  How much you want, say
10      more.  And whatever I said, it is $12.  He told me you make
11      more, more than anybody.
12              I say how.  He said we buy more than thousand.
13      BY MR. THOMPSON:
14      Q.  More than a thousand what?
15      A.  Meal.
16      Q.  Per day?
17      A.  Per day.
18      Q.  What was your reaction to that?
19      A.  I say you think so?  It's a lot of work.  Thousand food
20      is a lot of work.
21      Q.  Had you ever sold a thousand meals a day?
22      A.  Never in my life.
23      Q.  Never in your life?
24      A.  No.
25      Q.  What would you normally do at your restaurant a day?
```

```
1    A.  It's CC 50 if somebody -- sometimes they order like

2    waiting food, like thousand, maybe, less than thousand, 500,

3    600.  But nobody can do 1,000 meal my place.

4    Q.  Okay.  Why not?  Why not at your place?

5    A.  Capacity.

6    Q.  What do you mean by that?

7    A.  We don't have enough kitchen.

8    Q.  Okay.

9    A.  We don't have enough employee.

10   Q.  What did Shafi say to this?

11   A.  You can do it, Lul, do it.  I say first take

12   application, we will see.

13   Q.  Okay.  Did you submit an application?

14   A.  I signed the paper.  He take the application.  Next day

15   he called me around 8:30, 8:00.  He said you are approved,

16   start today.

17   Q.  I'm sorry.  What did he say the next day?

18   A.  He said your approval application start today, the time

19   he called me.

20   Q.  What was your reaction when he said you've been

21   approved, you can start today?

22   A.  How I start today?  I don't have enough money to shop.

23   I don't have enough people to cook.  He say start at noon.

24   Don't worry about that.  I say okay.

25   Q.  Did you agree to join the program?
```

1    A.  Clearly we don't think about it.  We think of the money
2    only, honestly.
3    Q.  Ms. Ali, before I go on about what you did, I want to
4    talk to you about what brought you to testify to here today.
5    Is that okay?
6    A.  Yes.
7    Q.  You've been charged for your involvement in a fraud
8    scheme; is that right?
9    A.  Yes.
10   Q.  In fact, at one point agents came to interview you; is
11   that right?
12   A.  Yes.
13   Q.  When they first came to interview you, what did you tell
14   them?
15   A.  I'm thinking I'm right.  The day they come to me, that
16   guy and another guy, I never forget that day.  I'm sorry.
17   Q.  Ms. Ali, after the agents came to talk to you, did you
18   retain a lawyer?
19   A.  Yes.
20   Q.  And did you agree to plead guilty?
21   A.  Yes.
22   Q.  Have you pled guilty?
23   A.  Yes.  They explain to me.  They explain to me what I
24   did.  I'm very sorry.  What I did is not good.
25   Q.  Ms. Ali, when you pled guilty, did you agree to

```
 1    cooperate and testify?

 2    A.  Yes.

 3    Q.  And what did you agree to do?

 4    A.  The truth.

 5    Q.  To tell the truth?

 6    A.  Yes.

 7    Q.  Is that what you are here to do today?

 8    A.  Yes.

 9    Q.  Now, in agreeing to tell the truth, what do you hope to

10    accomplish?

11    A.  She send me to ask Shafi.  He come to me.  He bring the

12    guy named Eidleh.

13    Q.  Before we get to that, Ms. Ali, though, when you decided

14    to, when you agreed to testify and tell the truth, did you

15    do that hoping that you'd get less of a sentence?

16    A.  No.

17    Q.  No?

18    A.  Nobody told me that.

19    Q.  Okay.

20    A.  Just -- you say you get sentenced.  We don't know.

21    Q.  Okay.  But you hope that it will help you at sentencing,

22    right?

23    A.  Yes.

24    Q.  Who will decide what your sentence is?

25    A.  Nancy.
```

```
 1    Q.  The judge?

 2    A.  Yeah.

 3    Q.  And I think you just answered it, but let me make clear.

 4    Have you and I ever discussed what your sentence might be?

 5    A.  No.  No.

 6    Q.  Do you know what's going to happen?

 7    A.  Nobody knows.

 8    Q.  Okay.  Okay.  Ms. Ali, let's talk about what happened

 9    after you agreed to Shafii's proposition, that you agreed to

10    join the program.

11    A.  Shafi bring the guy.  His name Eidleh.

12    Q.  He brought a man named Eidleh to talk to you?

13    A.  Yeah.  He said I'm gone.  For the work, he working with

14    this guy.

15    Q.  Okay.  Who was going to work with you going forward?

16    A.  Eidleh.

17    Q.  Not Shafi?

18    A.  Not Shafi anymore.

19    Q.  I want to show you a photo that's not yet been admitted

20    into evidence.  It's Exhibit Y2.

21            Do you recognize that photo on your screen?

22    A.  Yeah.

23    Q.  Who is that?

24    A.  Eidleh.

25            MR. THOMPSON:  Your Honor, I move to admit
```

```
1    Government Exhibit Y2.
2              THE COURT:  Any objection?
3              MR. UDOIBOK:  No objection.
4              MR. COLICH:  No objection, Your Honor.
5              THE COURT:  Y2 is admitted and may be published.
6    BY MR. THOMPSON:
7    Q.  Ms. Ali, that picture on your screen that we can all see
8    now, that's Mr. Eidleh?
9    A.  Yeah.
10   Q.  Okay.  So after Mr. Shafi told you that Mr. Eidleh was
11   going to be working with you, what happened?
12   A.  He explained everything.
13   Q.  What did Mr. Eidleh explain to you?
14   A.  He say 15 percent for the job Feeding Our Future.  They
15   cut the check for the 15 percent.
16   Q.  They would keep 15 percent?
17   A.  Yeah, they keep the company.
18   Q.  Okay.
19   A.  30,000 cash, he need to take it every month.
20   Q.  I'm sorry.  What did Mr. Eidleh tell you about $30,000
21   in cash?
22   A.  In cash.
23   Q.  What was, what did he -- what did he want?
24   A.  Part of the benefit.  It's not the company benefit.
25   Aimee and Eidleh benefit.
```

1    Q.  What was their benefit?

2    A.  30,000.

3    Q.  A month?

4    A.  A month.

5    Q.  In cash?

6    A.  In cash.

7    Q.  How did Mr. Eidleh communicate that to you?

8    A.  He come every month after I get the check.  He come.  He

9    say is ready cash for 30,000.  After he take the 30,000, he

10   call Aimee.

11   Q.  He would call Aimee?

12   A.  Yes.

13   Q.  Every month when he came?

14   A.  Yes.

15   Q.  How would he call her?  On a phone call or a video

16   conference?

17   A.  Video conference, video call.

18   Q.  And what would you, Mr. Eidleh and Ms. Bock discuss on

19   that video call each month?

20   A.  I receive the money.  I have the money.  That's what he

21   say.

22   Q.  Eidleh would tell Ms. Bock that he had the money?

23   A.  Yeah, I have the money.  He took the money, and

24   sometimes she talk to me.  Sometimes she's not.

25   Q.  When Ms. Bock talked to you, what would she say?

1    A.  Open another facility, more facility, more money.

2    Q.  She want you to --

3    A.  American dream.

4    Q.  I'm sorry.  There's a couple things you said there.

5    First off, Ms. Bock told you she said she wanted you to open

6    another facility?

7    A.  Yes, more facility.

8    Q.  What do you mean "another facility"?

9    A.  More facility to working with the kids.

10   Q.  Another food site?

11   A.  Yeah.  Site, yes.  Site.

12   Q.  What was your reaction when Ms. Bock asked you to open

13   another facility?

14   A.  Because we make money more, everybody.  She make money.

15   I make money.  He make money.

16   Q.  That's what she told you?

17   A.  Yes.

18   Q.  What did you say when she said that?

19   A.  American dream.  You don't need American dream?

20   Q.  Who said that?  Who talked about the American dream?

21   A.  That lady.

22   Q.  Ms. Bock?

23   A.  Yeah.

24   Q.  What did Ms. Bock tell you about the American dream?

25   A.  You make money a lot if you helping facility, different

 1    facility.

 2    Q.  That you'd make more money if you opened another

 3    facility?

 4    A.  Yeah, you the -- you do for, what is that called, you

 5    make the shopping for that facility and you make money.

 6    Q.  I'm sorry.

 7         Could you repeat that?

 8    A.  Like, like if you have a restaurant, you buy the food

 9    another place, like Costco, like Sysco.  You buy the food.

10    Q.  Okay.

11    A.  What is it called?

12    Q.  Vendor?

13    A.  Vendor.

14    Q.  What did Ms. Bock tell about a vendor?

15    A.  Make, you make vendor.  If you make a lot of facility,

16    you will make vendor license and you sell your food on other

17    sites.

18    Q.  You could be the vendor for multiple sites?

19    A.  Yeah, yes.

20    Q.  Did your husband in fact open a site at some point?

21    A.  He has organization.

22    Q.  What was his organization called?

23    A.  Somali organization, Somali education, something

24    Faribault.  I don't remember the name, but Somali

25    organization education Faribault.

602

1    Q.  Somali American Faribault Education?

2    A.  Yes.

3    Q.  SAFE?

4    A.  Yes, SAFE.

5    Q.  Did your husband Mohamed Hussein have a site called

6    SAFE?

7    A.  Yes.

8    Q.  And what did he do there?

9    A.  After we finish the food for the, for the hot food, they

10   open dry food for the Feeding Our Future.

11   Q.  What's dry food?

12   A.  Meaning I do hot food.

13   Q.  Hot food?

14   A.  Yes, cooked food.

15   Q.  Okay.

16   A.  And they close the cooked food, that program.  They open

17   dry food.

18   Q.  And that's what your husband's organization did?

19   A.  Yes.  And I am the vendor for that organization.

20   Q.  You were the vendor for that organization?

21   A.  Yes.

22   Q.  What did that mean?

23   A.  Means I buy the shopping as a legal vendor.

24   Q.  You buy the food?

25   A.  I buy the food.  I sell the food for him.

603

1    Q.  Now, Ms. Ali, I want to talk a little bit about how you

2    ran your site.  Okay?

3            One second, Ms. Ali.  I'm going to show you some

4    exhibits that are not yet in evidence.  Okay.  So it's going

5    to be on the screen.  Okay?

6            First off, I'm going to show you what's been

7    marked as Government Exhibit Q40.  Do you see that?

8    A.  What?

9    Q.  And that's an email from Ms. Bock to Feeding Our Future,

10   and it has an application for Lido Restaurant; is that

11   right?

12   A.  Mm-hmm.

13           MR. UDOIBOK:  Objection.  This document is not in

14   evidence.

15           THE COURT:  Sustained.

16   BY MR. THOMPSON:

17   Q.  Do you recognize this application?

18   A.  Yes.

19   Q.  Is it the application that was submitted?

20   A.  Yes.

21           MR. THOMPSON:  Your Honor, I move to admit

22   Government Exhibit Q40.

23           THE COURT:  Any objection?

24           MR. UDOIBOK:  No objection.

25           MR. COLICH:  No objection.

```
 1                    THE COURT:  Q40 is admitted.

 2                    MR. THOMPSON:  Thank you, Your Honor.

 3      BY MR. THOMPSON:

 4      Q.  Ms. Ali, I'm starting at page 5, which is an agreement

 5      for the Child and Adult Care Food Program between Feeding

 6      Our Future and Lido Restaurant; is that right?

 7      A.  Yeah.

 8      Q.  And Lido Restaurant, that's your restaurant?

 9      A.  Yes.

10      Q.  Is this the -- well, let me just, is this the address

11      where your location is on on page 6?

12      A.  Yes, yes.

13      Q.  113 Central Avenue?

14      A.  Yes.

15      Q.  And I'm going to have you pull that microphone a little

16      closer.

17      A.  Yes.

18      Q.  We both have to lean in here.

19                    And the date here is June 10th, 2020; is that

20      right?

21      A.  Yes.

22      Q.  And on page 10, who signed on behalf of Lido Restaurant?

23      A.  Me.

24      Q.  Is that your name and signature?

25      A.  Yeah.  Owner, me.
```

605

1    Q.  That's you?

2    A.  Yeah.

3    Q.  Is this the document you signed to apply for the

4    program?

5    A.  Yeah.

6    Q.  Okay.  Did you read through this carefully before you

7    signed it?

8    A.  No.

9    Q.  Who told you to sign it?

10   A.  Shafi.

11   Q.  Shafi.  Okay.  After you signed that application, did

12   you submit other paperwork to Feeding Our Future?

13   A.  Yeah.  The time sheet, the one he teach me.  Eidleh.

14   Q.  He taught you how to do it?

15   A.  Yeah.

16   Q.  Let me show you an example of one, and then we'll talk

17   through it.  Okay?

18   A.  Sure.

19   Q.  I'm going to show you what's been marked but not yet

20   admitted as Government Exhibit Q41.

21          And is this an email containing, that you sent

22   back in July 29th of 2020?

23   A.  (Moves head up and down.)

24          MR. THOMPSON:  Your Honor, I move to admit

25   Government Exhibit Q41.

```
1                    THE COURT:  Any objection?

2                    MR. UDOIBOK:  No objection.

3                    MR. COLICH:  No objection.

4                    THE COURT:  Q41 is admitted.

5       BY MR. THOMPSON:

6       Q.  On page 1 here, there's an email from Lul Ali, and the

7       email address is lidorestaurants20@gmail.com.  Do you

8       recognize that email address?

9       A.  Yes.

10      Q.  Whose email address is that?

11      A.  It's me, my restaurant email.

12      Q.  That's your restaurant email?

13      A.  Yeah.

14      Q.  Okay.  And then you sent this email to Eidleh at

15      feedingourfuturemn.org?

16      A.  Mm-hmm.

17      Q.  Who is that?

18      A.  Eidleh.

19      Q.  That's Mr. Eidleh?

20      A.  Yeah.

21      Q.  Okay.  And the subject line of this email, which is

22      dated July 29, 2020, is meal count sheets; is that right?

23      A.  Yes.

24      Q.  And you write, Attached are the meal count sheets for

25      most of July.  I will send the rest of July next week; is
```

```
 1    that right?
 2    A.  Yeah.
 3    Q.  It looks like there's an attachment to this email, and
 4    then Mr. Eidleh forwarded to Feeding Our Future, correct?
 5    A.  Yeah.
 6    Q.  Okay.  Page 2 of this exhibit says, Summer meal counts,
 7    clicker.  Do you recognize this?
 8    A.  Absolutely, I give it to you.  You remember?
 9    Q.  Yes.
10            THE COURT:  Come on forward to the microphone each
11    time you speak, please.  Thank you.
12            MR. THOMPSON:  I'm sorry.
13            THE WITNESS:  I give it to the clicker.
14    BY MR. THOMPSON:
15    Q.  Okay.  Tell me about the clicker.
16    A.  They told me the clicker, just put the click.  We see
17    how many people we have --
18    Q.  Okay.
19    A.  -- in the system.  They thinking -- they told us they
20    have a system to click.
21    Q.  What was the -- who told you this?
22    A.  Eidleh.  He bring the, the click.  He say do it this
23    one.  We see how many you give.
24    Q.  Okay.  Did, and did you do that?
25    A.  Yes.  Every day.
```

```
1    Q.  I notice here starting on page 4 it looks like every day
2    is 1,000?
3    A.  Yes.
4    Q.  Or nearly 1,000.  Why was that?  Why 1,000?
5    A.  Is 1,000 first three month, I think.  Of the three month
6    Eidleh say why don't it raise.  I say I don't think so.
7    It's working well for this facility, more than 1,000.
8    Q.  Okay.
9    A.  You know, I know a lot of the cooking.  And they say you
10   can do it, Lul, just extra 500.  I say I don't think so.
11   Extra 500 is a lot.  They say try.  Extra 300 is most.  This
12   one is 1300 for month.
13   Q.  Were you actually serving all those meals, Ms. Ali?
14   A.  No.
15   Q.  Did everyone know that?
16   A.  No.  Huh?
17   Q.  Did people know that?
18   A.  They know.
19   Q.  Who knew?
20   A.  Feeding Our Future.
21   Q.  How did they know?
22   A.  Everything is lie.  They know that.  She know me.  Aimee
23   and he know.  They teaching us to do it.
24   Q.  Aimee and -- Ms. Bock?
25   A.  Yes.
```

1    Q.  And Eidleh taught you how to do this?

2    A.  Yes.

3    Q.  What did they teach you?

4    A.  You know, Ms. Bock, she's very smart lady.  She's not

5    coming at facility.  She's just over the phone.  You did

6    good job.  We like you how you work, do it, you know.

7             But it's not -- she's not coming at our place.

8    She doesn't know where we live, but the -- she using the

9    kids like Eidleh, young people.  We trust them because they

10   are Somali.  They know better than us.  Old people, they

11   don't know a lot.

12            They know a lot.  But they, they know the game.

13   They know the game.  They're planning to stole the money,

14   reality.

15   Q.  When you say, "They know the game," what do you mean by

16   that?

17   A.  The game is, mean 1300 is not enough for this facility,

18   and they know that.  Why they give the clicker.  The clicker

19   is not working anywhere, like this one (indicating).  Do you

20   understand?  I counted for the God.  We pray for this all

21   the time.

22   Q.  Prayer beads?

23   A.  Yeah.  Is the system?  No, it's not the system.  It's

24   like that this one.  The one we have is the same, just the

25   number.

```
1    Q.  Just made up the number every day?

2    A.  Yes, make up the number.

3    Q.  Where did you get the number to make up?

4    A.  1300.

5    Q.  Who told you to do -- did anyone tell you to do 1300?

6    A.  Yes.

7    Q.  Who told you?

8    A.  Eidleh and Aimee.

9    Q.  And how did they tell you?

10   A.  Aimee, all the time she's on the FaceTime.

11   Q.  Why did Ms. Bock and Mr. Eidleh tell you to make, to

12   claim to serve meals that you hadn't actually served?

13   A.  Because they need the money.  We need the money, end of

14   the discussion.  We need the money.  We not planning -- we

15   do the job, but we don't have that much kids, and we can do

16   it, the facility.  The facility is the half of this

17   building.

18   Q.  Okay.  Half of this room?

19   A.  I swear to God, half of this (indicating).  Nine table.

20   Q.  That's how big Lido Restaurant was?

21   A.  Yes.  I don't know exactly, but like half of this.  I

22   don't know.  He see the building.  Did you see the building,

23   that guy you talk to --

24   Q.  Ms. Ali?

25   A.  I'm sorry.
```

```
 1    Q.  The agent can't testify yet.

 2    A.  Yeah.

 3    Q.  All right.  I'm going to show you another exhibit.  This

 4    is not yet in evidence.  It's Government Exhibit Q42.

 5              And is this another email that you sent to

 6    Mr. Eidleh containing meal count sheets?  Is that right,

 7    Ms. Ali?

 8    A.  Yes.

 9              MR. THOMPSON:  Your Honor, I move to admit

10    Government Exhibit Q42.

11              THE COURT:  Any objection?

12              MR. UDOIBOK:  No objection.

13              MR. COLICH:  No objection, Your Honor.

14              THE COURT:  Q42 is admitted.

15              MR. THOMPSON:  Permission to publish.

16              THE COURT:  Yes.

17    BY MR. THOMPSON:

18    Q.  All right.  Ms. Ali, this is an email dated

19    September 1st, 2020; is that right?

20    A.  Yeah.

21    Q.  From you to Mr. Eidleh?

22    A.  Yes.

23    Q.  And then Mr. Eidleh forwarded it along, it looks like?

24    A.  Yeah.

25    Q.  And on, as we continue through here, it looks like the
```

```
 1    meal counts are the same number every day?

 2    A.  Yes.

 3    Q.  Did you actually serve all those meals to kids every

 4    day?

 5    A.  No.

 6    Q.  Why did you say you did?

 7    A.  Can you repeat it?

 8    Q.  Why, if you didn't actually serve all those meals, why

 9    did you claim that you did on these forms?

10    A.  They need more than that.

11    Q.  What do you mean?

12    A.  More, more than that, they want to claim it, but it

13    doesn't work.  I say no.

14    Q.  Who wanted to claim more than that?

15    A.  Feeding Our Future, the company.  The head of the

16    Feeding Our Future is the Aimee and Eidleh.

17    Q.  Why did Aimee Bock and Mr. Eidleh want you to claim more

18    than a thousand kids a day?

19    A.  They make money.  I make money.

20    Q.  I'm going to show you now what's been marked but not yet

21    admitted as Government Exhibit Q43.

22            I believe this is another email that you sent to

23    Mr. Eidleh and Feeding Our Future; is that right?

24    A.  Yeah.

25            MR. THOMPSON:  Your Honor, I move to admit
```

```
 1   Government Exhibit Q43.
 2               THE COURT:  Any objection?
 3               MR. UDOIBOK:  No objection.
 4               MR. COLICH:  No objection, Your Honor.
 5               THE COURT:  Q43 is admitted and may be published.
 6   BY MR. THOMPSON:
 7   Q.  At the bottom of page 1 here, Government Exhibit Q43, is
 8   an email that you sent to Mr. Eidleh on September 30th of
 9   2020; is that right?
10   A.  Yeah.
11   Q.  And it contained meal counts for September?
12   A.  Yeah.  September, yes.
13   Q.  And I'm looking starting at page 2.
14   A.  I think one time they close and they open again.  I
15   don't know which month.
16   Q.  Okay.
17   A.  Did you see that?
18   Q.  In September 2020 it looks like --
19   A.  Yes.
20   Q.  -- 1,000 a day; is that right?  Did you actually serve
21   1,000 kids a day?
22   A.  No.
23   Q.  And it looks like two meals, breakfast and lunches; is
24   that right?
25   A.  Yeah.
```

```
 1    Q.  Was that true?

 2    A.  No.

 3    Q.  I'm showing you what's been marked but not admitted as

 4    Government Exhibit Q44.

 5            Ms. Ali, is this another email that you sent on

 6    December 1st of 2020?

 7    A.  Mm-hmm.

 8            MR. THOMPSON:  Your Honor, I move to admit

 9    Government Exhibit Q44.

10            MR. UDOIBOK:  No objection.

11            MR. COLICH:  No objection.

12            THE COURT:  Q44 is admitted and may be published.

13            MR. THOMPSON:  Thank you, Your Honor.

14    BY MR. THOMPSON:

15    Q.  And, Ms. Ali, this email that you sent on December 1st,

16    2020, contains meal count sheets for November of 2020; is

17    that right?

18    A.  Mm-hmm.

19            THE COURT:  Is that a yes?

20            THE WITNESS:  Yes.  I'm sorry.

21    BY MR. THOMPSON:

22    Q.  And starting on page 2, 1,000 a day every day; is that

23    right?

24    A.  Yeah.

25    Q.  Breakfast and lunch?
```

```
1    A.  Yes.

2    Q.  Day after day?

3    A.  Seven days a week.

4    Q.  Was that true?  Did you actually do that?

5    A.  No.

6    Q.  You said before that every month Eidleh would come down

7    to your business in Faribault; is that right?

8    A.  Yeah, he took the money after I get the check.

9    Q.  After, he bring the check?

10   A.  No.  I go get it or my husband get it.

11   Q.  Okay.  The check of the food money?

12   A.  Yes.  After we get it, we waiting for the bank.  They

13   don't give us cash usually.  It is difficult to get the

14   cash.  Like 30,000 cash, they ask you why you take it, what

15   do you do, you buy property, a million question.

16          That takes a little bit of time.  We take the

17   cash.  I call him.  I say it's ready, money.  He come to get

18   it.

19   Q.  After you went to the bank and got the money, you tell

20   him it's ready?

21   A.  Yes.

22   Q.  Mr. Eidleh?

23   A.  Yes.

24   Q.  And then after you told Mr. Eidleh the money was ready,

25   what would he do?
```

```
1     A.  He would call Aimee, FaceTime call.

2     Q.  From your restaurant?

3     A.  Yes, his phone.

4     Q.  And would Ms. Bock talk to you?

5     A.  Yes.  After she talk to him, she say, hi, Lul, how are

6     you.  Good.  And thank you.  What you do, you doing good

7     job.  Why don't try open another facility.  Why don't do

8     this.

9               I say no, man.  This is too much for us.

10    Q.  Did that, did Ms. Bock talk to you multiple times about

11    opening a site?

12    A.  Couple times.

13    Q.  Okay.

14    A.  All the time.  God helping us to not open another

15    facility.

16    Q.  What was that?

17    A.  If we accept that, it's more money to go on my name.  If

18    we accept and open another facility, it's -- the more money

19    we get it.

20    Q.  Had you done that?

21    A.  No, we don't.

22    Q.  Okay.

23    A.  You know a lot of families, they have five people one

24    family.  You see that case?  One family, five people.  One

25    family, they use different facility.  That's what the plan
```

```
 1    is.

 2    Q.  You're talking about another family that --

 3    A.  Yes.

 4    Q.  -- got involved in the food program under Feeding Our

 5    Future?

 6    A.  Yes.

 7    Q.  And what --

 8    A.  Every Somali, they have five facilities, six facilities,

 9    same name family.  My brother, my son, my sister, my -- you

10    know, destroy whole family.  That make sense to you guys?

11         One person and two person it makes sense, but the

12    five people, six people doing same job, same mistake is

13    acceptable?

14    Q.  What was the mistake?

15    A.  Take the money all the time.  That's what she looking.

16    Q.  Who was looking for that?

17    A.  Aimee.  She destroy us as a community, reality.  I don't

18    like to remember that reality.  The one thing, I'm so sad --

19         MR. COLICH:  Nonresponsive, Your Honor.

20         THE COURT:  Overruled.  You may answer.

21         THE WITNESS:  -- why working for all Somali

22    people.

23         I'm sorry, guys.  I'm sorry.  I am so upset.  I

24    have to remember.

25         MR. THOMPSON:  Okay.
```

```
 1                THE WITNESS:  Sorry, ma'am.

 2    BY MR. THOMPSON:

 3    Q.  Ms. Ali, I'm going to show you now another --

 4    A.  Give me few minutes, please.

 5    Q.  Are you okay, Ms. Ali?

 6                THE COURT:  She said give her a few minutes.

 7                Let's take a brief break.  We're going to come

 8    back at --

 9                I'm going to have you step down.  All right?

10                We'll take 15 minutes.  Let's take a 15-minute

11    break.

12                All rise for the jury.

13            (Recess taken at 2:53 p.m. till 3:11 p.m.)

14    3:11 p.m.

15                          IN OPEN COURT

16                          (JURY PRESENT)

17                THE COURT:  You may all be seated.

18                Mr. Thompson, you may inquire.

19                MR. THOMPSON:  Thank you.

20    BY MR. THOMPSON:

21    Q.  All right.  Ms. Ali, welcome back.

22                I want to show you another couple of exhibits that

23    are not yet in evidence.  Government Exhibit Q45, is that

24    another email that you sent this time to an email, Feeding

25    Our Future email account on March 4th of 2021?
```

```
1     A.  Mm-hmm.

2     Q.  Is that a yes?

3     A.  Yes.

4     Q.  And then Q46, is this an email that you sent containing

5     meal counts to Feeding Our Future on April 5th of 2021?

6     Yes?

7     A.  Yes.

8             MR. THOMPSON:  Your Honor, I move to admit

9     Government Exhibit Q45 and Q46.

10            THE COURT:  Any objection?

11            MR. UDOIBOK:  No, Your Honor.

12            MR. COLICH:  No objection, Your Honor.

13            THE COURT:  Q45 and Q46 are admitted and may be

14    published.

15            MR. THOMPSON:  Thank you, Your Honor.

16    BY MR. THOMPSON:

17    Q.  I'm showing you on the screen, Ms. Ali, Q45, which is an

18    email that you sent to an email account claims at

19    feedingourfuturemn.org.  Do you recognize that email

20    address?  This one?

21    A.  Okay.  Claims, Feeding Our Future, yes.

22    Q.  Okay.  And the subject line is February meal counts and

23    invoices, correct?

24    A.  Yes.  Yes.

25    Q.  I'm directing your attention to pages 2, 3, 4.
```

```
1    A.  Yes.

2    Q.  What do we see here in terms of the meal counts?

3    A.  Exactly 1600.  That's what I'm talking about.

4    Q.  You said it's 1600, and that's what you are talking

5    about?

6    A.  That's what I'm talking about, 13 and 16 to up.  Yes, I

7    remember now.  1600, yes.

8    Q.  Per day?

9    A.  Per day.

10   Q.  Why did you increase the meal counts from 1,000 a day to

11   1600 a day?

12   A.  That's what they told me.

13   Q.  Who told you?

14   A.  Aimee and Eidleh.  They need 2,000.  I say 16.  More

15   than 16, it doesn't work.

16   Q.  Ms. Ali, you said that your husband also got involved in

17   the food program in Feeding Our Future; is that right?

18   A.  Yes.

19   Q.  How did that happen?

20   A.  The part we are talking about they say is closed, the

21   cook food.  The time is closed to cook food, is starting

22   from dry food.  Do you have an organization or you want to

23   create it?  I say we have already organization established

24   long time ago.

25   Q.  Who asked you this?
```

621

```
 1    A.  Aimee and Eidleh.

 2    Q.  Okay.

 3    A.  They bring us application for SAFE.  We fill out the

 4    application.  We waited almost four to five month for that

 5    because the program is changed.

 6    Q.  And this happened in the spring of 2021; is that right?

 7    A.  Yes.

 8    Q.  The program was changing then?

 9    A.  Yeah, for the hot food to dry food.

10    Q.  Okay.  And when you say it changed from hot food to dry

11    food, could you explain that?

12    A.  Meaning the hot food, meaning the cook food, the meal

13    for the kids, cook.

14    Q.  That's what you were doing at Lido Restaurant?

15    A.  Yes, at Lido Restaurant because it's a restaurant.  It's

16    a dry food menus.  We buy the food.  We give the people dry

17    food, like flour, sugar, meat, whatever is the food.

18    Q.  Uncooked?

19    A.  Yes, uncooked.

20    Q.  Why did Ms. Bock and Mr. Eidleh want you and your

21    husband to create another food site using your husband's

22    organization SAFE?

23    A.  Because it is closed to hot food.  If it's closed hot

24    food, it's another program.  They need to enjoy -- join for

25    them because they make money, we make money.
```

622

```
1    Q.  Who makes money?

2    A.  Mohamed, he make money, and they make money for 30,000

3    still continue.

4    Q.  Okay.

5    A.  That make sense to you?

6    Q.  Yeah, who was going to be paid 30,000?

7    A.  Mohamed again.

8    Q.  He was going to pay?

9    A.  Yeah, he pay, but I do.  I pay the money.  Mohamed, he's

10   the chair of the organization because he create organization

11   2009.

12   Q.  Okay.  This is an organization he already had?

13   A.  Yes.

14   Q.  After he enrolled it in the food program?

15   A.  He enjoy it.  We fill out the application.  They say it

16   is coming up for the dry food, to prepare for that.  Just

17   apply for new organization, and I say we have already

18   organization.

19   Q.  Ms. Bock and Mr. Eidleh told you to create a new

20   organization?

21   A.  Yes.  Yes.

22   Q.  You said you didn't have to?

23   A.  Yes, already I have the organization.

24   Q.  When you told Ms. Bock and Mr. Eidleh that your husband

25   already had an organization, what did they say?
```

623

1    A.  Fill out application, wait until open.

2    Q.  And did you do that?

3    A.  Yes.

4    Q.  Did you have a conversation how many kids, children, to

5    claim under this new organization SAFE?

6    A.  2500 a day.

7    Q.  25 --

8    A.  Seven days a week.

9    Q.  2500 kids a day seven days a week?

10   A.  Yes.

11   Q.  Who came up with that number?

12   A.  Eidleh and Aimee.

13   Q.  Did you and your husband actually serve dry food to 2500

14   kids a day --

15   A.  No.

16   Q.  -- in Faribault, Minnesota?

17   A.  No.

18   Q.  Did you and your husband continue to pay $30,000 a month

19   in cash?

20   A.  That miss -- if you don't pay you don't enjoy the

21   program.  That's the part of the deal.

22   Q.  You mentioned earlier that there was some issues with

23   getting the cash to pay every month.

24   A.  Yeah, it's difficult, but they coming back.  It just, do

25   you get it?  Not yet.  Did you get it?  Not yet.  10,000,

624

```
 1    9,000 take out today.  Tomorrow, 9,000 again.  Next week,

 2    get another 9,000, you know.

 3    Q.  Why was it difficult to withdraw $30,000 in cash?

 4    A.  The bank rule.  The bank, nobody give you 30,000 one

 5    time every month.  You can use a check, but you can't get

 6    the cash usually.

 7    Q.  Okay.

 8    A.  That's how they work in the bank.

 9    Q.  So your husband's site, SAFE, through that site you guys

10    claimed to feed 2500 kids a day in Faribault, correct?

11    A.  Yes.

12    Q.  And you had your site called Lido Restaurant, correct?

13    A.  My, yes, mine is Lido Restaurant.

14    Q.  Okay.  Altogether, you and your husband received a lot

15    of money; is that right?

16    A.  A lot, yes.

17    Q.  How much money did you receive from Feeding Our Future

18    in 2020 and 2021, you and your husband?

19    A.  Together almost 5 million.

20    Q.  $5 million?

21    A.  Yes.

22    Q.  What did you do with that money?

23    A.  We buy house, two houses.

24    Q.  How many houses did you buy with the money you received

25    from Feeding Our Future?
```

```
 1    A.   Two.

 2    Q.   Did you also buy a car?

 3    A.   We buy car and get accident.  It is destroy.

 4    Q.   Okay.  Ms. Ali, how do you feel about what you did?

 5    A.   It's very bad.

 6              MR. THOMPSON:  No further questions, Your Honor.

 7              THE COURT:  Mr. Udoibok.

 8              MR. UDOIBOK:  Yes, Your Honor.  May I, Your Honor?

 9              THE COURT:  Yes, you may.

10                      CROSS-EXAMINATION

11    BY MR. UDOIBOK:

12    Q.   Ms. Ali, my name is Kenneth Udoibok.  We haven't met,

13    have we?

14    A.   Huh?  I don't understand any of that.  I'm sorry.

15    Q.   I'll try to speak a little slowly.

16    A.   Sure.

17    Q.   I have a Nigerian accent.

18    A.   Thank you.

19    Q.   Have we met?

20    A.   No, ever in my life.

21    Q.   Yes.  Thank you.

22              You talked to members of the U.S. Attorney's

23    Office before you testified today, correct?

24    A.   Yes.

25    Q.   All right.  Just think, I want you to think how many
```

626

```
1    times did you meet before you came today?
2    A.  I think just today.
3    Q.  Just today?
4    A.  Yeah.
5    Q.  Is this the first time that you are talking to anyone
6    from the U.S. Attorney's Office?  Yes, once?
7    A.  Can you repeat it, please?
8    Q.  I'll try.  I just want to know how many times you met
9    with -- maybe this is U.S. Attorney's Office is a little
10   difficult.
11          Did you meet with any member of the FBI?
12   A.  No.  Three years ago.
13   Q.  Three years ago.  How many times did you meet with --
14   A.  One time interview.  That's it.
15   Q.  Ms. Ali, let me finish.  Then you can answer, so we know
16   what you are answering to.  All right.
17          So you met with an FBI agent three years ago once?
18   A.  Yes.
19   Q.  All right.  And you never met with that agent any, an
20   FBI agent any other time.  Is that your testimony?
21   A.  Yeah.  They call one time.  I see another time, that's
22   it, and today.
23   Q.  All right.  So you saw, you saw an FBI agent three years
24   ago once, correct?
25   A.  Yeah.
```

RENEE A. ROGGE, RMR-CRR
612-664-5107

```
 1    Q.  And then you met with an FBI agent again before today?
 2    A.  Yes.
 3    Q.  All right.  Did you meet with an FBI agent twice in
 4    2022, do you think?
 5    A.  No just one time only.
 6    Q.  All right.
 7    A.  I met one time at my place and next time in the office.
 8    That day just beginning interview.
 9    Q.  Yes.  So did you meet with an FBI agent in October 14th,
10    just think about it, 2022, if you can recall?
11    A.  The day they come to me yes.
12    Q.  And then was there any other time before they met with
13    you with your husband, is that possible?
14    A.  Yeah.  Another day we come here this building one time
15    interview for each one.
16    Q.  All right.  And then again did you meet with an
17    attorney, with your lawyer present?
18    A.  No.
19    Q.  Do you recall whether or not you had a plea agreement
20    with the United States Attorney's Office?
21    A.  No.
22    Q.  You never had a plea agreement.  All right.
23              And then did you go before a judge?
24    A.  Excuse me.
25    Q.  Sorry.  Go ahead.
```

```
 1    A.  I don't understand what you asking me.  I'm sorry, man.

 2    Q.  All right.

 3    A.  I just don't have any related wherever.  The FBI, just

 4    one time we see, and next time is here.  That's it.

 5    Q.  All right.

 6    A.  I don't know what you talking about, the plea guilty,

 7    everything, just plead guilty.  I did plead guilty the time

 8    I see the 2022.

 9    Q.  Okay.  Let's just break down.  I know this is a

10    complicated thing.

11    A.  Yes.

12    Q.  Yes, very complicated, even for us lawyers.

13            At some point you agreed to plead guilty, correct?

14    A.  Yes.

15    Q.  All right.  And before you pled guilty, you met, you had

16    a lawyer, correct?

17    A.  I don't have a lawyer.  The time I meet the guy --

18    Q.  Okay.

19    A.  -- is two people coming to me --

20    Q.  Yes.

21    A.  -- explain to me what happen.

22    Q.  Yes.

23    A.  That day I know I'm wrong.  I'm looking lawyer at that

24    day.

25    Q.  All right.  And that day -- were you nervous when you
```

```
1    met with the two FBI agents?
2    A.  Yes.
3    Q.  Were you nervous?
4    A.  The people?
5    Q.  Yes.
6    A.  That day they come to me?
7    Q.  Yes.
8    A.  I know them.
9    Q.  Were you nervous?  Were you worried?  Were you fearful?
10   A.  A lot.
11   Q.  And you told the truth then, correct?
12   A.  That day, no.
13   Q.  You didn't tell the truth.
14   A.  Not that day.  The next day I'm meeting with them.  I
15   tell them everything I know.
16   Q.  Okay.  The first day, you lied.
17   A.  I'm not lie.  I explain what I'm thinking.  The way I
18   work, I'm thinking I'm working hard, but it's not.  How they
19   explain to me, I know I'm wrong that day.
20   Q.  Let's just back up.  The first day, all right, you were
21   nervous?
22   A.  Yes, scared, nervous.
23   Q.  My question is, Did you tell the agents the truth that
24   day, the first day?
25   A.  I say I don't want to talk about a lot.  I'm looking
```

```
 1    lawyer.
 2    Q.  All right.  And then you got a lawyer?
 3    A.  I get a lawyer.  I make appointment.  I come here.  I
 4    tell whatever I know.
 5    Q.  Hold on.  Hold on.  Hold on.  You got a lawyer, and then
 6    did you meet with the agent with your lawyer present with
 7    you?
 8    A.  Yes.
 9    Q.  And then you agreed to tell the truth, correct?
10    A.  Absolutely.
11    Q.  All right.  And then after that meeting, you met again
12    with your lawyer and the U.S., somebody from the
13    U.S. Attorney's Office?
14    A.  No.
15    Q.  You never met -- okay.
16    A.  After three years --
17    Q.  All right.  So, nonetheless, after that meeting with
18    somebody with your lawyer, you came before a judge, right?
19    A.  After the meeting?
20    Q.  Yes.
21    A.  They make appointment again.
22    Q.  Okay.
23    A.  To come here admitted with Nancy.
24    Q.  The judge?
25    A.  Yes.  I come here to admit that day.  I forget it.  I'm
```

631

```
 1    sorry.  Long time.
 2    Q.  Okay.  All right.
 3    A.  Okay?
 4    Q.  So when you came before judge, Judge Brasel here --
 5    A.  Mm-hmm.
 6    Q.  -- you told the truth, right?
 7    A.  Yes.
 8    Q.  Okay.  I just want to establish that first.
 9    A.  Thank you.
10    Q.  All right.  Now, you know someone called Abdikerm
11    Eidleh?
12    A.  Yes.
13    Q.  All right.  Who is that?
14    A.  Somali boy.
15    Q.  Is it a Somali man?
16    A.  Yes.
17    Q.  All right.  And he work for Feeding Our Future, correct?
18    A.  He work, yes.
19    Q.  All right.  How many times did Aimee Bock come to your
20    store?
21    A.  She never come.
22    Q.  She never did.  Okay.
23    A.  Absolutely not.
24    Q.  And you would have liked her to come to your store,
25    right?
```

```
1    A.  No.

2    Q.  No?

3    A.  She never come.

4    Q.  She never came.  Okay.  Good.

5            But Eidleh came to your store all the time,

6    correct?

7    A.  Yes.

8    Q.  And is it your testimony that Eidleh came to your store

9    once a month, and you gave Eidleh $30,000?

10   A.  Yes, but it's not Eidleh only.

11   Q.  Just, just, just hang on.  You gave, you gave Eidleh

12   $30,000?

13   A.  Yes.

14   Q.  All right.  And, and another person that came with

15   Eidleh was Shafi, correct?

16   A.  Yes.

17   Q.  All right.  When Shafi would come to your store, did he

18   come with Eidleh every time, every month?

19   A.  No.  The one day he introduce me, he said this guy

20   working with you.  I'm not coming anymore.

21   Q.  All right.  So Shafi introduced Eidleh to you?

22   A.  Yes.

23   Q.  And then did Shafi tell you that you must give Eidleh

24   $30,000?

25   A.  No.  The 30,000 Eidleh and me and Aimee.  It is not
```

0:22-cr-00223-NEB-DTS   CROSS - MS. UDDIN

633

```
 1    Shafi.
 2    Q.  All right.  And it is in a phone conversation, correct?
 3    A.  Three conversation is not four.
 4    Q.  Okay.  I didn't say four.  It's in a phone conversation
 5    or video conversation?
 6    A.  Video conversation.
 7    Q.  Do you know that the federal government has Ms. Bock's
 8    phone?  Do you know that?
 9    A.  I don't know.
10    Q.  Oh, okay.  Do you know that there is no communication
11    from you and Ms. Bock.  Do you know that?
12    A.  Yes, I never communicated with her.
13    Q.  All right.
14    A.  Absolutely.
15    Q.  You never did?
16    A.  No.
17    Q.  Okay.
18    A.  But she know what she's doing.
19    Q.  She knows what she's doing?
20    A.  Yes, that's why she never contact me.
21    Q.  Oh, all right.
22    A.  Absolutely.
23    Q.  All right.  You believe she knows what she's doing based
24    on what Eidleh told you, correct?
25    A.  It's not what Eidleh told me.  That's what they do
```

0:22-cr-00223-NEB-DTS   UNDOC05

1    together.

2    Q.  You believed that, right?

3    A.  I see it.  It's not belief.  I see it.

4    Q.  You see?

5    A.  My face.

6    Q.  You see what Ms. Bock is doing, but you've never seen

7    her at your store, correct?

8    A.  No.

9    Q.  All right.  Now, you work with, you work with someone at

10   Feeding Our Future, right?  Do you know who is Farhia?

11   Farhia Sheikdon?

12   A.  Farhia?

13   Q.  Yeah, Farhia.

14   A.  She's coming.  She's coming.  She never took the money.

15   Q.  Oh, no.  But did Farhia come to your store?

16   A.  Sometimes, yes.

17   Q.  All right.  And did you, did you, did Farhia ever

18   receive $30,000 from you?

19   A.  Never.

20   Q.  Okay.

21   A.  And another guy coming sometimes.

22   Q.  Who's that guy?

23   A.  I don't know his name.  He's -- I think he's Oromo.

24   Q.  He's Oromo?  Ethiopian?

25   A.  Oromo.  Oromo.  He doesn't know Somali language.

0:22-cr-00223-NEB-DTS  ui Doc. 589

635

```
 1    Q.  Okay.

 2    A.  Sometimes he's coming with Farhia.

 3    Q.  Okay.  So --

 4    A.  But the money taken Eidleh.

 5    Q.  Yes, Eidleh took the money.  All right.

 6            And at some point, though, Ms. Ali, you lost your

 7    nonprofit status, didn't you?

 8    A.  Yes.

 9    Q.  All right.  And, and after you lost your nonprofit

10    status, Ms. Bock terminated your organization from Feeding

11    Our Future, didn't she?

12    A.  No.  We have, we work with her until close the program,

13    until problem coming up.

14    Q.  Yeah.  But I'm saying, did your, did you lose your

15    nonprofit status or not?

16    A.  I don't know what you talking about.

17    Q.  Okay.

18    A.  I can't answer that question.

19    Q.  Do you know what SAFE?

20    A.  I know SAFE is my husband organization.

21    Q.  All right.  Did, did SAFE lose its nonprofit status?

22    A.  I didn't have any idea what you asking me.

23    Q.  Were you at any time mad at Ms. Bock for terminating

24    SAFE?

25    A.  One month only is have the job, for not the SAFE only.
```

0:22-cr-00223-NEB-DTS - UNSEALED

```
 1      Every organization in the program is hold one month.
 2      Q.  Did, did you close Lido?  Not SAFE.  Did you close Lido
 3      in April 2021?
 4      A.  Yes, 2022 I think, because I, yes, I start to work 2020.
 5      Yes, you are right.
 6      Q.  2021?
 7      A.  Yes.
 8      Q.  You close Lido?
 9      A.  Yes.
10      Q.  And if you close Lido --
11      A.  It's open here.
12      Q.  Excuse me?
13      A.  It's open SAFE.
14      Q.  Yeah, you close Lido and open SAFE, correct?
15      A.  Yeah.
16      Q.  Right.  And Lido was your restaurant, correct?
17      A.  Yes.
18      Q.  All right.  And Feeding Our Future terminated Lido,
19      correct?
20      A.  It's not terminated.  It's the program is started.
21      Q.  Okay.  But my question is, Lido was no longer --
22      A.  Because hot food --
23      Q.  Let me finish, ma'am.  Let me finish.  Lido was no
24      longer sending claims to Feeding Our Future, correct?
25      A.  Yes.
```

1    Q.  All right.  And then you shifted to SAFE, right?

2    A.  Yes.

3    Q.  And SAFE is owned by your husband, correct?

4    A.  Yes.

5    Q.  All right.  But did you rent out space?  In 2021, when

6    Lido closed, did you rent out a big space?

7    A.  Yes.

8    Q.  Bigger than the original one you had nine tables?

9    A.  Yes.

10   Q.  All right.  And then were you mad at Ms. Bock for

11   terminating your relationship with Feeding Our Future, and

12   you were mad that you rented all this space, and you didn't

13   have money coming in.

14   A.  It's not true.

15   Q.  Were you mad, though?

16   A.  No, it's not true what you say.  Absolutely not.

17   Q.  Did you rent space, additional space?

18   A.  Okay.  The program --

19   Q.  Just tell me whether you rented.

20   A.  I rented, but it's not that way.  The way you say, it's

21   not.

22   Q.  All right.  Go ahead.  Tell me.  Tell me whether or not

23   you rented a bigger space.

24   A.  Okay.  Eidleh, he come to me, he say is a long problem

25   coming up.  The space, we need.  Kids coming the place to

0:22-cr-00223-NEB-DTS    CROSS B MS. UDOEOS

1    eat the place, to doing homework.  The place we have is very

2    small.  It doesn't work that way.

3    Q.  So for kids to come to your store --

4    A.  It's tough.

5    Q.  -- and do homework, they need a bigger space?

6    A.  Yes.

7    Q.  And you went and got a bigger space?

8    A.  Rented it, yes.

9    Q.  Okay.  When you got the bigger space, at some point

10   Feeding Our Future terminated your contract with Feeding Our

11   Future, correct?

12   A.  No.

13   Q.  When did, when did Feeding Our Future terminate your

14   contract?

15   A.  The time is close.  The program, all program is close.

16   Q.  What year?

17   A.  2022 December.

18   Q.  December 2022, Feeding Our Future --

19   A.  No.  '21.  I'm sorry.  The date, I missed the date.  I'm

20   sorry.

21   Q.  So you said December 2021 Feeding Our Future closed?

22   A.  January it is closed.  20 -- January 20th is closed, the

23   program.  We don't receive the check for November.

24   Q.  Okay.

25   A.  Because a lot of corruption that program.  Everybody,

1    nobody get the check.

2    Q.  So you were not terminated?

3    A.  Nobody terminated.  She closed the program.  The

4    government closed the program.  It's not her.

5    Q.  All right.  Just give me a second.  I want to take a

6    look at what already is in evidence, Q40.  I take that back.

7    Go to Q41.

8              Call out summer meal counts, clicker on page 2.

9    No.  That's too big.  All right.

10             So now are you able to -- can you see that, by the

11   way?

12   A.  Okay.  You talking about SAFE or you talking about the

13   Lido?

14   Q.  I'm just showing you what has been marked as Exhibit Q1

15   that you testified to earlier, 31.

16   A.  No.  G28 is me.

17   Q.  No.  No.  Okay.

18   A.  Lido.  Please explain to me which one you want to talk

19   about it, Lido or SAFE?

20   Q.  I'm trying to --

21   A.  Thank you.

22   Q.  Ms. Mallet, could you highlight summer meal counts,

23   clicker?

24             Ms. Ali, do you see that summer meal counts,

25   clicker?

1    A.  I see it.

2    Q.  You see that?

3    A.  Yes.

4    Q.  And, Ms. Mallet, why don't you highlight number of meals

5    received on 1, 2, 3, 4 columns.  There you go.

6    A.  Did you see the date, please?

7    Q.  Highlight that for her too.

8            All right.  That is June 28, 2020, correct?

9    A.  Yes.

10   Q.  And this is the summer meal counts you were talking

11   about, the clicker, correct?

12   A.  Yes.

13   Q.  And Eidleh gave you a clicker for you to use to fill in

14   those numbers, correct?

15   A.  Absolutely.

16   Q.  Yes.  And you filled out nine, 900, correct?

17   A.  Yes.

18   Q.  900 on Wednesday, Thursday, Friday and Saturday,

19   correct?  Right?

20   A.  Yeah.

21   Q.  And who did the totalling for you?  You did it yourself,

22   right?

23   A.  I'm sorry?

24   Q.  Who calculated the total 3800 for you?  You did it

25   yourself?

641

```
1    A.  Me.
2    Q.  All right.  Now, I want -- I'm curious about.
3            Ms. Mallet, could you highlight the food
4    temperature.
5            You, you put the food temperature in, right?
6    A.  Everything is me.
7    Q.  Everything is you?
8    A.  Yes.
9    Q.  Did you do with Eidleh, or you did it yourself?
10   A.  The day he showed me, he did.  After that I do.
11   Q.  So on June 28, 2020, you, you completed this with
12   Eidleh.  Is that your testimony?
13   A.  Yes.
14   Q.  And Eidleh told you the food has to be 41 degrees
15   Fahrenheit?
16   A.  Yes.
17   Q.  Do you know what 41 degrees Fahrenheit is?
18   A.  Absolutely.
19   Q.  Okay.  When you completed Exhibit Q41, you knew it was a
20   lie, didn't you?
21   A.  Which one is that?  41?
22   Q.  Well, when you put, when you put the 900 on Wednesday,
23   900 Thursday, 900 Friday, Saturday, Saturday, total 3800,
24   you knew it was a lie?
25   A.  Yes.
```

```
1    Q.  All right.  And you were good with it.  It didn't bother
2    you that you were lying?
3    A.  You know, the first, you know that the, did you see the
4    date first?
5    Q.  My question is, Did it bother you that you were lying?
6    A.  Absolutely.
7    Q.  All right.  But did Eidleh force you to put those
8    numbers down?
9    A.  It's not forcing me.
10   Q.  He didn't force you.  You did it voluntarily?
11   A.  Absolutely.
12   Q.  All right.  Now, did Ms. Bock force you to write those
13   numbers down?
14   A.  Absolutely not.
15   Q.  All right.
16   A.  But she told me, teaching me.
17   Q.  She taught you over the phone?
18   A.  Yes.  FaceTime she said do it this, you make money doing
19   this.  You make money doing this.  Encourage me.
20   Q.  She encouraged.  That first day, she encouraged you with
21   Eidleh sitting there?
22   A.  Together.
23   Q.  Together?
24   A.  Absolutely.
25   Q.  But you remember when I, when I said there is no record
```

1    of you speaking with Ms. Bock anywhere.

2    A.  I'm not calling her whatsoever in my life.

3    Q.  All right.  Good.  All right.  Let's go, let's go to the

4    next one.  I want to direct you to page 4 of Exhibit Q41.

5            Please highlight the date, or call it out and

6    highlight it, however you want to do.

7            So you see the date July 5th, 2020?

8    A.  Yes, I do.

9    Q.  Do you see that?

10   A.  Yeah.

11   Q.  And then you put it -- by the way, did Eidleh or Shafi

12   help you with Exhibit Q41?

13   A.  Nobody help me.  They teach me.  They gone.

14   Q.  Okay.

15   A.  It's not Shafi.  He teach me, Eidleh.

16   Q.  All right.  And then on July 5th, 2020, this one

17   highlighted, you did it all by yourself, correct?

18   A.  Absolutely.

19   Q.  Okay.

20   A.  The reason I make the money is I have to do this.  They

21   teach me.  They gone.

22   Q.  I realize they taught you and they left, but I want to

23   know whether on this one, page 4, you did it all by

24   yourself.  Correct?  You did it by yourself, ma'am?

25   A.  Yes, I'm telling you one day only they teach me.

644

```
1    Q.  So --
2    A.  If they come in my office, Eidleh, he check the paper
3    before I send it.  He check the paper, oh, you doing good
4    job.
5    Q.  Okay.
6    A.  You follow me, you are good.  That's what he say.
7    Q.  All right.  And then call out the number of meals
8    received.
9    A.  I don't understand your question.
10   Q.  No.  I'm talking to -- so you see the highlighted the
11   called out section, and on Sunday, on the entire week, you
12   put a thousand meals prepared, totaling 7,000.  Do you see
13   that?
14   A.  Yes.
15   Q.  And, and then you actually said you fed 982 on Sunday,
16   correct?  Do you see that, the number of firsts served to
17   children?  Do you see that?
18   A.  Okay.
19   Q.  I'm sorry.
20   A.  I see it, but you know why we doing this, why we cut the
21   numbers, because they show me some meaning.  We throw it.
22   We lost it.  That's what they do in this.
23   Q.  I realize that.
24   A.  Yeah.
25   Q.  But my question to you is, When you wrote down 982, you
```

```
 1    did it all by yourself, correct?

 2    A.  Yes.

 3    Q.  Did your husband help you?

 4    A.  No.

 5    Q.  All right.  And you knew when you were doing it, it was

 6    a lie, didn't you?

 7    A.  Yes.

 8    Q.  All right.  Did you call the police to say, hey, these

 9    people are making me lie?  Did you?

10    A.  I don't call police.  If I know that I will do it

11    freely.

12    Q.  All right.

13    A.  But I don't know the situation.

14    Q.  All right.  So --

15    A.  But I did, I need the money.  End of discussion.

16    Q.  Oh, yeah, you needed the money, and you spent the money,

17    didn't you?

18    A.  Absolutely.  I buy houses.

19    Q.  All right.  I'm directing you to Exhibit Q42 that's

20    already in evidence.  Scroll down to page 13.  Page 13.

21             Now, call out the number of firsts, number of

22    first meals on Sunday.

23             Do you see that?  What happened there?  You

24    didn't, you didn't supply any food on Sunday?

25    A.  I don't.
```

1    Q.  Do you see the zero?  Why did you put a zero in there?

2    A.  I don't remember, really.

3    Q.  Okay.  What about the number of firsts served to

4    children, 992.  Do you see that?

5    A.  Yes.

6    Q.  And that was a lie also?

7    A.  Yes.  Yes.

8    Q.  Ms. Ali, you didn't tell anyone about what you were

9    doing until the FBI came to you, correct?  Is that correct?

10   A.  Yeah, but you know --

11   Q.  Just a second.  You testified earlier that Eidleh will

12   come to you, and you will give Eidleh $30,000 in cash,

13   correct?

14   A.  With Aimee, all the time.

15   Q.  Aimee never came.  You've testified that Aimee never

16   came to your store, correct?

17   A.  Never, but she's in the face.

18   Q.  She FaceTime you, and it was established that the

19   government hasn't produced that FaceTime you supposedly had.

20   A.  No problem.

21            MR. THOMPSON:  Objection.  Facts not in evidence.

22            THE COURT:  Sustained.

23   BY MR. UDOIBOK:

24   Q.  Do you know whether or not -- strike that.

25            Would you dispute with me --

```
1    A.  I don't understand what question is.
2    Q.  Wait a minute.  Let me put it in a way you can
3    understand.
4         Do you disagree with me that there is no FaceTime
5    between you and Ms. Bock?
6    A.  All the time I talk to her, it's not my phone.  It's
7    not -- their phone together, they are working together.
8    Q.  All right.  They are working together?
9    A.  Yeah.  They have, they call every time.
10   Q.  Now, you know when Eidleh left the United States, don't
11   you?
12   A.  Yeah.  I hear that, yes.
13   Q.  Yeah.  Do you know, do you know when he left the
14   United States?
15   A.  I don't know.
16   Q.  Was it --
17   A.  I mean --
18   Q.  When was the last time you spoke with Eidleh?
19   A.  The last time he come, he take hundred thousand check.
20   Q.  He took hundred thousand check?
21   A.  Yeah, because he need four months, five months together
22   cash.  Nobody has that money.
23   Q.  All right.  And you wrote him a check?
24   A.  Yes, I wrote a check.
25   Q.  All right.  And my question, though, was, When was the
```

```
1    last time?  I want you to think very hard, because this is
2    really important.
3              When was the last time you spoke with Eidleh?
4    A.  The day I write the check.  I will double-check that
5    day.
6    Q.  What date was that?
7    A.  I don't remember.
8    Q.  Was it in 2020?
9    A.  No.
10   Q.  Was it in 2021?
11   A.  2021 he go.
12   Q.  2021 was the last time you spoke with Eidleh.  What
13   month was that?
14   A.  I don't remember.
15   Q.  Okay.  Was it after Lido was closed?
16   A.  Yes.  Lido is closed.  SAFE is open.  That's why we give
17   a hundred thousand check for SAFE money.
18   Q.  And you don't know when he left the country?  Do you
19   know when he left the country or not?
20   A.  He left the country I know, but exactly, I don't know.
21   Q.  Do you know the month?
22            MR. THOMPSON:  Objection, Your Honor.  Asked and
23   answered.  She doesn't know.
24            THE COURT:  Sustained.
25
```

```
 1      BY MR. UDOIBOK:

 2      Q.  So if Eidleh, you know, left the country, was -- do you

 3      know whether he was calling you from overseas?

 4      A.  He never call me.

 5      Q.  He never called you after he left the country?

 6      A.  No.

 7      Q.  All right.  So since Eidleh left the country, you

 8      haven't done any FaceTime with Eidleh and Ms. Bock, correct?

 9      A.  No.

10      Q.  All right.

11              MR. UDOIBOK:  No further questions.

12              THE WITNESS:  It closed the time after Eidleh

13      left.

14              MR. UDOIBOK:  Okay.  Thank you.

15              THE COURT:  Mr. Colich.

16              MR. COLICH:  I have no questions, Your Honor.

17              THE COURT:  Mr. Thompson.

18              MR. THOMPSON:  No further questions, Your Honor.

19              THE COURT:  Thank you.

20              Ms. Ali, you may step down.  You are done.  Thank

21      you.

22              THE WITNESS:  Thank you.

23              THE COURT:  And the government may call its next

24      witness.

25              MR. JACOBS:  Thank you, Your Honor.  The
```

```
 1    government calls Kevin Erdman.

 2              THE COURT:  Are you Mr. Erdman?

 3              THE WITNESS:  Yes.

 4              THE COURT:  You may come forward here.  I'll have

 5    you come up to the witness stand and stay standing to take

 6    the oath, if you would.

 7              THE WITNESS:  Okay.

 8              THE COURT:  Raise your right hand.

 9                           KEVIN ERDMAN,

10    called on behalf of the government, was duly sworn, was

11    examined and testified as follows:

12              THE WITNESS:  Yes, I do.

13              THE COURT:  Thank you.  You may be seated.

14              And when you are settled, I will have you speak

15    into the microphone and state and spell both your first and

16    last name.

17              THE WITNESS:  Sure.  My name is Kevin, K-E-V-I-N.

18    Last name Erdman, E-R-D-M-A-N.

19              THE COURT:  Thank you.

20              Mr. Jacobs, you may inquire.

21              MR. JACOBS:  Thank you, Your Honor.

22                        DIRECT EXAMINATION

23    BY MR. JACOBS:

24    Q.  Good afternoon, Mr. Erdman.

25    A.  Good afternoon.
```

1    Q.  Can you tell the jury where you work?

2    A.  Sure.  I'm employed at Associated Bank.

3    Q.  And how long have you worked for Associated Bank?

4    A.  I'm going on 12 years.

5    Q.  Prior to working at Associated Bank, have you had any

6    other jobs in the financial industry?

7    A.  Yes.  I've been in banking for about 28 years.

8    Q.  What is your current position at Associated Bank?

9    A.  I am the corporate Bank Secrecy Act Officer.

10   Q.  And can you explain to the jury, generally speaking,

11   what a Corporate Bank Secrecy Officer does?

12   A.  Sure.  I provide oversight of our daily program to

13   ensure compliance with the Bank Secrecy Act.

14   Q.  Okay.  So I want to unpack that a little bit.  First,

15   can we start with a brief explanation to the jury about what

16   the Bank Secrecy Act is?

17   A.  Sure.  The Bank Secrecy Act is the law that requires

18   banks to have an understanding of who their customers are,

19   expectations on how accounts that we open will be used, and

20   procedures in place for us to monitor for any potentially

21   suspicious transactions in accounts.

22          But the overall purpose, to prevent money

23   laundering or financial crimes from occurring in the

24   accounts.

25   Q.  Can you explain what you and your team at Associated

1    Bank do to ensure compliance with the Bank Secrecy Act?

2    A.  Sure.  We have several procedures in place.  One, to

3    ensure that we identify who our customers are.  We do that

4    at a time of account opening.  Typically when you go in to

5    open an account, you are asked to provide your driver's

6    license or passport for us to show who you are.

7          If you are opening up a business account, we

8    collect different business documents, such as formation

9    documents for an LLC or partnership agreements so we can

10   understand who the customer is.

11         On top of that, then we do ask a series of

12   questions at time of account opening so we can get a

13   baseline of expected activity, how you plan to use that

14   account with us, and then we do have procedures in place to

15   monitor those accounts for any variations of expected

16   activity.

17   Q.  Okay.  So I want to go through each of those three

18   procedures.

19         The first I believe you said was the

20   identification procedure.  And as part of that, you ask for

21   ID when someone opens a bank account?

22   A.  Correct.

23   Q.  And what is the purpose of asking for identification?

24   A.  The BSA, the Bank Secrecy Act, requires us to form a

25   reasonable belief that we understand the true identity of

653

1    the person in front of us that's opening the account.

2    Q.  And that can be an individual or a corporation?

3    A.  Correct.

4    Q.  And what type of identification would you ask for for

5    someone opening a corporate account?

6    A.  For a corporate account, it depends on the structure of

7    that corporate entity.  So if it's an LLC, typically there

8    will be an LLC agreement or a corporate records information

9    search that shows that the account or the business has been

10   registered with the state to do business.

11   Q.  So after obtaining identification, the next step you

12   mentioned was gathering anticipated activity; is that right?

13   A.  Yes.

14   Q.  Can you explain what you mean by "gathering anticipated

15   activity"?

16   A.  Sure.  At the time of account opening, we have a series

17   of we call know-your-customer questions and

18   know-your-account.

19         For know-your-account, we are going to ask, one,

20   how is the account intended to be used, what type of account

21   are you opening.

22         From there, we're looking at taking a look at what

23   are anticipated activity levels for things like cash

24   deposits, cash withdrawals, international ACH, international

25   wires, domestic wires.

1          Typically a business will have a good

2     understanding of their anticipated activity based off of

3     their revenue, their sales that they conduct.

4     Q.  And from your perspective at Associated Bank, why are

5     you inquiring about what the account anticipated activity

6     will be?

7     A.  Sure.  The anticipated activity sets the baseline for

8     the beginning of our monitoring.

9          When a customer over the lifecycle of their

10    account, they may vary from what their anticipated activity

11    was.  When that happens, it does trigger an alert within our

12    system for my team to review and conduct an investigation.

13    Q.  Okay.  So that brings us to the third component, which

14    is monitoring.  And you briefly touched on it, but explain

15    what monitoring is.

16    A.  Sure.  Monitoring is basically taking that alert.  It

17    could be a system generated alert.  It could be a referral

18    from one of our business lines or the front line, meaning

19    the account officers, tellers, who interact with customers

20    on a daily basis.

21         And our analysts are taking a look in their

22    investigation to see what was the alerting activity or the

23    original concern and can they determine a reasonableness of

24    the activity.

25    Q.  Okay.  And when you are talking about "a reasonableness

1    of the activity," what do you mean by that?

2    A.  Sure.  Sometimes maybe a variance may occur from that

3    baseline.  When I think of individuals, several times if an

4    individual is getting married, graduating, they may have an

5    influx of cash or check deposits.

6            But we can obtain information to understand that

7    that variance, although different from anticipated activity,

8    there's a reasonableness to that activity.

9    Q.  An explanation for the variance?

10   A.  Yep.

11   Q.  In the case of a system flag, what next steps do you

12   take?

13   A.  Sure.  When we have the system flag, the analyst is

14   taking a look at the activity.  Typically we're looking at

15   source of funds and use of funds to identify, you know, what

16   is happening in the account.  We take a step back.

17           Many times the alerting activity may be one piece

18   of the puzzle, and we take a look at the entire customer

19   relationship over a period of time to determine, is that

20   activity anticipated or not, can we reach out to the

21   customer to potentially get a reasonable explanation of

22   activity?

23           And from that point, they would determine, is the

24   activity reasonable or not?

25   Q.  Okay.  And if you get a reasonable explanation, what

1    happens?

2    A.  Then we would close out the alert and continue to

3    monitor the accounts.

4    Q.  And if you don't get a reasonable explanation, what

5    happens in that event?

6    A.  Then we typically escalate that information to our

7    remedial action process.

8    Q.  And can you explain to the jury what a remedial action

9    process is?

10   A.  Sure.  At our bank we utilize a remedial action process

11   to determine if we've identified potentially suspicious

12   activity, we will take a look from a committee that I chair

13   to determine is the relationship within our risk appetite to

14   continue.

15   Q.  Okay.  You talked about a few things there.  First you

16   talked about relationship.  Can you explain what you mean by

17   a relationship in the context of a commercial bank?

18   A.  Sure.  So a relationship from a customer side is, we're

19   taking a look at all of the accounts, not just the account

20   that maybe introduced the initial alert.  We're looking at

21   all of the accounts owned by that entity.  And we're also

22   taking a look at any related entities.

23           Several times we will find that owners own

24   multiple businesses or are signers.  We will expand our

25   review into that full related party and account

1    relationship.

2    Q.  Okay.  And you mentioned another phrase, which was risk

3    appetite.

4    A.  Yes.

5    Q.  What is risk appetite in the context of what we're

6    talking about?

7    A.  Sure.  For Bank Secrecy Act, within my area we're taking

8    a look at several areas of risk, the largest being the

9    violation of that Bank Secrecy Act.

10             If we have knowledge of potentially suspicious

11   activity occurring in an account, we don't take, you know,

12   we won't take a look at profits over compliance.  We need to

13   be compliant with our law to monitor and potentially exit

14   relationships.

15   Q.  And when you talk about exiting a relationship, what do

16   you mean by that?

17   A.  Sure.  Through the remedial action process, if we make

18   the determination that the activity is not expected, not

19   reasonable, we will move to close the account.  And with

20   that, we do issue out letters to advise the customer that

21   they have the option to close the accounts out within

22   30 days, otherwise the bank will be closing the account.

23   Q.  I'd like to show you now a couple of exhibits that are

24   marked for identification but not yet in evidence.

25             I'm going to show you Government Exhibit W3.  Do

```
1      you recognize this document?
2      A.  Yes, this document would be our standard signature card
3      for Associated Bank.
4      Q.  Is it a true and correct copy of an Associated Bank
5      document?
6      A.  Yes.
7              MR. JACOBS:  Your Honor, the government offers W3.
8              THE COURT:  Any objection?
9              MR. UDOIBOK:  No objection.
10             MR. COLICH:  No objection, Your Honor.
11             THE COURT:  W3 is admitted and may be published.
12     BY MR. JACOBS:
13     Q.  Okay.  W3 is in front of the jury now.
14             Can you explain to them what they're looking at
15     here?
16     A.  Sure.  A signature card is created at the time of
17     account opening or at any change in account signers.  So
18     this is going to give you the title that the account is
19     under, the account number, the type of account, and the
20     signers, who has authority to act on the account itself.
21     Q.  Okay.  So I'm going to enlarge the top portion here, and
22     under the title of organization, what is the name of the
23     organization who owns this account?
24     A.  This is for Cosmopolitan Business Solutions LLC doing
25     business as Safari Restaurant.
```

1    Q.  And what's the address, the street address of that

2    entity?

3    A.  Street address is 3010 Fourth Avenue South.

4    Q.  Okay.  And the account type is checking/money market?

5    A.  That is correct.

6    Q.  That's just a normal checking account?

7    A.  Yes.

8    Q.  Okay.  And then moving down here, can you tell the jury

9    the date that this account was opened?

10   A.  Yes.  This account ending in 913 was opened on July 7th,

11   2010.

12   Q.  I'm moving down to the second page of it, it looks like

13   a similar document.  Can you explain to the jury what we're

14   seeing here?

15   A.  This again is a signature card for account ending in

16   913, and I believe the difference here is a change in

17   signers on the account.

18   Q.  Okay.  So an account can have multiple signature cards?

19   A.  Correct.  Over a lifecycle, ownership my change.

20   Signers may be added or removed from an account.

21   Q.  Okay.  So it looks like this one is dated from April of

22   2017?

23   A.  Correct.

24   Q.  And who are now the signers on this account?

25   A.  The signers as of that date were Abdikadir Salah and

1    Salim Ahmed Said.

2    Q.  And the owner of that account is listed as Abdikadir

3    Salah and the manager is Salim Said?

4    A.  That is correct.

5    Q.  And there are several other signature cards as I'm

6    scrolling through here; is that correct?

7    A.  That is correct.

8    Q.  And if I down to this signature card, which is from

9    6/21/2019, who is listed on the signature card as the sole

10   signatory?

11   A.  That would be Salim A. Said.

12   Q.  And what is the name of office or title that's included?

13   A.  As owner.

14   Q.  I'd like to show you another exhibit that is marked but

15   not yet in evidence.  And I'm pulling up Government

16   Exhibit W23.

17            What is Government Exhibit W23?

18   A.  This again is another signature card for an account that

19   was opened.

20            MR. JACOBS:  Your Honor, the government would

21   offer W23.

22            MR. UDOIBOK:  No objection.

23            MR. COLICH:  No objection, Your Honor.

24            THE COURT:  W23 is admitted and may be published.

25

```
 1    BY MR. JACOBS:
 2    Q.  Okay.  So this is in front of the jury now.  Can you
 3    explain to them, again, what we're seeing here?
 4    A.  Sure.  This is a signature card that would again detail
 5    the name and ownership of the account, the account number,
 6    the date it was opened, and who the authorized signer is to
 7    transact on the account.
 8    Q.  Okay.  I'm going to enlarge the top portion here, and
 9    what is the title of this business account?
10    A.  This one is titled Salim Limited LLC.
11    Q.  And what is the date that the account was opened?
12    A.  That's August 1st, 2020.
13    Q.  And moving down here, highlighting the middle, the
14    signatory part, who is the sole signatory for that account?
15    A.  That is Salim Said.
16    Q.  And he's listed as the owner?
17    A.  Correct.
18    Q.  When we were talking earlier, you mentioned that
19    sometimes people have multiple different accounts that
20    they're signatories for.  This is an example of what you are
21    talking about?
22    A.  Correct.  Correct.  The first exhibit was regarding the
23    restaurant, and this is now for a different legal entity,
24    yet ownership was the same.
25    Q.  I'm going to pull up a third document that is marked for
```

```
1    identification, but not yet admitted as, W13.

2              Another signature card of an Associated Bank

3    account?

4    A.  That is correct.

5    Q.  True and accurate copy of that?

6    A.  Yes.

7              MR. JACOBS:  Your Honor, the government would

8    offer W13.

9              THE COURT:  Any objection?

10              MR. UDOIBOK:  No objection.

11              MR. COLICH:  No objection, Your Honor.

12              THE COURT:  W13 is admitted and may be published.

13    BY MR. JACOBS:

14    Q.  Okay.  Again, the jury's looking at this bank signature

15    card?

16    A.  That is correct.

17    Q.  I'm going to enlarge the top portion here.

18              Can you read off the title of the business

19    account?

20    A.  Sure.  This title is ASA Limited LLC.

21    Q.  Okay.  And the date the account opened is what?

22    A.  September 9th, 2020.

23    Q.  So just a couple weeks after the account we just looked

24    at.

25    A.  Correct.
```

```
1    Q.  And I'm pulling up the signatories here, and there are
2    three signatories; is that right?
3    A.  That is correct.
4    Q.  And can you read off the names of, the names and titles
5    of the signatories?
6    A.  Yes.  We have a manager of Abdihakim A. Ahmed, a member
7    of Salim A. Said, and member Ahmed A. Ghedi.
8    Q.  Are you familiar with these three various accounts that
9    are opened, that were opened at Associated Bank?
10   A.  Yes.
11   Q.  And in this case, did one or more of these accounts
12   raise a red flag with Associated Bank?
13   A.  It did.
14   Q.  And which account was that?
15   A.  That I don't have in front of me.
16   Q.  Okay.  And can you explain what in the accounts raised a
17   red flag to Associated Bank?
18   A.  Sure.  This one hit our radar first from an internal
19   referral from an account officer that was helping with one
20   of the account openings.  This was an account opening not
21   for the restaurant, but for one of the LLC accounts.
22   Q.  Okay.  So you just mentioned an internal referral.  Can
23   you explain to us what that is?
24   A.  Sure.  Within our bank, we do promote and train all
25   colleagues on the Bank Secrecy Act, and ultimately we say if
```

1    you see something, say something.  And that's an indication

2    of, if something seems wrong at the time of account opening

3    or in your normal transaction helping a customer, to send a

4    referral, an internal referral to my department.  We then

5    take the investigation.

6    Q.  Okay.  And in this case, what was the basis for the

7    referral?

8    A.  The basis of this referral was that at time of account

9    opening, they were taking funds.  They were funding the new

10   account from the restaurant account.  The account officer

11   had a conversation with one of the signers, indicating that

12   the size of the withdrawal indicated the restaurant must be

13   doing very well.

14          At that point, they were informed that they had a

15   contract to feed six -- or five to six thousand children a

16   day at their restaurant.

17          MR. COLICH:  Your Honor, objection.  Hearsay.

18          THE COURT:  Sustained.

19          MR. JACOBS:  Your Honor, if I may, this isn't as

20   to the truth of the matter.  This is going as to the notice

21   for the steps that they took after receiving this

22   information.

23          THE COURT:  Fair.  I'm going to overrule, and the

24   answer will stand.

25

1    BY MR. JACOBS:

2    Q.  You can continue.  You heard that they were serving five

3    or six thousand meals a day?

4    A.  Correct.

5    Q.  And what happened next?

6    A.  At that point, we received the referral based off of

7    that information, and then my team started their

8    investigation.

9    Q.  Okay.  And can you tell the jury about what that

10   investigation entailed?

11   A.  Sure.  With an investigation, again we're looking at

12   source of funds and use of funds.  When we had information

13   of a restaurant feeding that amount of children meals, we're

14   taking a look at the use of funds to see are they paying

15   large amounts to food suppliers, food vendors, to help

16   support that restaurant's mission in feeding those children.

17   Q.  Earlier we talked about anticipated activity.  That's

18   what you would anticipate as the activity?

19   A.  Correct.

20   Q.  And in this case, what did you see in the course of your

21   investigation?

22   A.  In this case, we did not see the funds or use of funds

23   used to pay food suppliers.

24   Q.  Did you see them used to pay for other things?

25   A.  Yes.

```
1    Q.  For example, what?
2    A.  There were large dollar withdrawals and transfers to the
3    signers and owners of the accounts.
4    Q.  And what was the conclusion of you and your committee
5    after performing this investigation?
6    A.  We determined that based off of the incoming credits to
7    feed those children, we did not see that that activity of
8    the use of funds supported the claim of the deposit or
9    source of funds.
10   Q.  So earlier we were talking about a sufficient
11   explanation.  Was that explanation deemed a sufficient
12   explanation?
13   A.  It was not.
14   Q.  What steps did Associated Bank then take as to these
15   accounts that we're talking about?
16   A.  At that point it was referred to our remedial action
17   process for us to determine if we would close the
18   relationship.
19   Q.  And what determination was made after the remedial
20   action process?
21   A.  We determined that we would exit the full relationship.
22   Q.  Approximately when did the bank make that determination
23   to close those accounts?
24   A.  That I do not have the date.
25   Q.  Pulling up W3.  So I'm pulling up W3, the account
```

1    statement for Cosmopolitan Business Solutions d/b/a Safari

2    Restaurant, and this is the last statement activity period

3    for October of 2020.

4            Does that refresh your recollection as to the date

5    the account was closed?

6    A.  Yes.

7    Q.  So October 2020, Associated Bank shut down this account.

8    A.  That would be correct.

9    Q.  And the other accounts associated with this account.

10   A.  Yes.

11   Q.  How much risk does Associated Bank have to see before it

12   terminates an existing customer relationship?

13   A.  It's a bit of a gray area because we, again, we have to

14   comply with the law.  Many times we take our position in

15   remedial action process very seriously.

16           In this case or in other cases, when we cannot

17   form a reasonable belief that an account is, is operating

18   the way that we should, we take the position that it's

19   outside of our risk tolerance and our risk appetite, and we

20   move to exit the relationship.

21   Q.  And what is the risk that Associated Bank is trying to

22   avoid?

23   A.  The risk again is any potential violation of the law.

24   If we continue to bank a relationship or an account where

25   we've formed a reasonable belief that there's potentially

KEZATI BROKKS - CROSS BY MR. UDOIBOK

1    suspicious activity, that could be a violation of the Bank

2    Secrecy Act.

3              MR. JACOBS:  Your Honor, no further questions.

4    Thank you.

5              THE COURT:  Thank you.

6              Mr. Udoibok.

7              MR. UDOIBOK:  Yes, Your Honor.  Thank you.

8                        CROSS-EXAMINATION

9    BY MR. UDOIBOK:

10   Q.  Just a few questions.  My name is Kenneth Udoibok.  I

11   represent Aimee Bock in this matter.

12             Did Ms. Bock have an account with Associated Bank?

13   A.  She did not.

14   Q.  And when you made a determination that you didn't find

15   the requisite expenditure to satisfy your curiosity with the

16   amount of deposit, you based that on just the information

17   you had with the account, correct?

18   A.  That is correct.

19   Q.  Is it possible for a business to use moneys from another

20   account in purchasing food without reflecting in your bank's

21   accounting?

22   A.  It is possible for a customer to open accounts at

23   multiple financial institutions.

24             MR. UDOIBOK:  No further questions.

25             THE COURT:  Mr. Montez?

```
 1                        CROSS-EXAMINATION

 2    BY MR. MONTEZ:

 3    Q.  Good afternoon, sir.

 4          The way that I understand risk is that an internal

 5    calculation that's made within your company in determining

 6    whether or not to continue a relationship with a particular

 7    customer; is that true?

 8    A.  That is correct.

 9    Q.  Sometimes risk can lead to fraud, but not always; is

10    that true?

11    A.  That is correct.

12          MR. MONTEZ:  No further questions.

13          THE COURT:  Mr. Jacobs?

14          MR. JACOBS:  Nothing else, Your Honor.  Thank you.

15          THE COURT:  Thank you, sir.  You may step down.

16          Can I have a sidebar with counsel, please, just to

17    talk about what we've got next.

18                     (Sidebar discussion)

19          THE COURT:  Where are we?

20          MR. EBERT:  Your Honor, can you hear me?

21          THE COURT:  I can.

22          MR. EBERT:  Our -- our next witness is Special

23    Agent Jared Kary.  I anticipate he will be a lengthy

24    witness.  If it is acceptable to the court, I might suggest

25    that we recess early, if that's all right.
```

1          THE COURT:  Mr. Udoibok or Mr. Colich, do you have

2     any objection to that?

3          MR. MONTEZ:  No objection.

4          MR. UDOIBOK:  No, judge.  I never object to a

5     recess.

6          THE COURT:  Okay.

7                        **(In open court)**

8          THE COURT:  Everyone has agreed we're going to be

9     done for the day.  All right?  So I'll wish you a good

10    evening, and I'll see you tomorrow morning at nine.

11         All rise for the jury.

12    4:20 p.m.

13                      **IN OPEN COURT**

14                  **(JURY NOT PRESENT)**

15         THE COURT:  Anything else for the record this

16    evening?

17         MR. THOMPSON:  No, Your Honor.

18         THE COURT:  All right.  All right.  Have a good

19    evening, everyone.  We will see you again tomorrow morning.

20         (Court adjourned at 4:20 p.m., 02-11-2025.)

21                        *   *   *

22         I, Renee A. Rogge, certify that the foregoing is a

23    correct transcript from the record of proceedings in the

24    above-entitled matter.

25                    Certified by:  /s/Renee A. Rogge
                                     Renee A. Rogge, RMR-CRR