1        UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2

3     ------------------------------------------------------------
                                    )
      United States of America,     )   File No. 22-cr-223
4                                   )        (NEB/DTS)
              Plaintiff,            )
5                                   )
      v.                            )
6                                   )   Courtroom 13W
      Aimee Marie Bock(1),          )   Minneapolis, Minnesota
7     Salim Ahmed Said(3),          )   Thursday February 13, 2025
                                    )   9:00 a.m.
8             Defendants.           )
                                    )
9     ------------------------------------------------------------

10            BEFORE THE HONORABLE NANCY E. BRASEL
           UNITED STATES DISTRICT COURT DISTRICT JUDGE
11

               **VOLUME V - JURY TRIAL PROCEEDINGS**
12

13

14

15

16

17

18

19
      Court Reporter:          RENEE A. ROGGE, RMR-CRR
20                             United States Courthouse
                               300 South Fourth Street, Box 1005
21                             Minneapolis, Minnesota 55415

22                                  *   *   *

23        Proceedings recorded by mechanical stenography;
      Transcript produced by computer.
24
                                    *   *   *
25

1   <u>APPEARANCES:</u>

2   For Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
                            BY:   JOSEPH H. THOMPSON
3                                 HARRY JACOBS
                                  MATTHEW S. EBERT
4                                 DANIEL W. BOBIER
                            600 United States Courthouse
5                           300 South Fourth Street
                            Minneapolis, Minnesota 55415
6
    For Defendant           KENNETH UBONG UDOIBOK P.A.
7   Aimee Marie Bock(1):    BY:   KENNETH U. UDOIBOK
                            310 Fourth Avenue South, #5010
8                           Minneapolis, Minnesota 55415

9   For Defendant           COLICH & ASSOCIATES
    Salim Ahmed Said(3):    BY:   MICHAEL J. COLICH
10                                ADRIAN SCOTT LAFAVOR-MONTEZ
                                  RAGHEN LUCY
11                          10 South Fifth Street, #420
                            Minneapolis, Minnesota 55402
12

13

14                                  *    *    *

15

16

17

18

19

20

21

22

23

24

25

1                           **I N D E X**

                                                              PAGE
2

3    **JARED KARY**
       Cross-Examination By Mr. Montez                        926
       Redirect Examination By Mr. Ebert                      951
4      Recross-Examination By Mr. Udoibok                     969

5    **STACY KOPPEN**
       Direct Examination By Mr. Bobier                       999
6      Cross-Examination By Mr. Udoibok                      1030
       Cross-Examination By Mr. Colich                       1042
7      Redirect Examination By Mr. Bobier                    1048

8


9

     DEFENDANT SAID'S EXHIBITS                               REC'D
10     D3-0109                                                935
       D3-0115                                                938
11     D3-0121                                                944
       D3-0127                                                946
12
     DEFENDANT BOCK'S EXHIBITS                               REC'D
13     D1-882                                                1032

14

15                            *   *   *

16

17

18

19

20

21

22

23

24

25

```
1    9:00 a.m.

2                          IN OPEN COURT

3                          (JURY PRESENT)

4              THE COURT:  Good morning.  You may be seated.

5              Special Agent Kary, you are still under oath.

6              Mr. Montez, you may cross-examine.

7                          JARED KARY,

8    called on behalf of the government, was duly sworn, was

9    examined and testified as follows:

10                       CROSS-EXAMINATION

11   BY MR. MONTEZ:

12   Q.  Good morning, Special Agent Kary.

13   A.  Good morning.

14   Q.  At the outset of this trial, we discussed how we were

15   going to hear about a lot of different entities and a lot of

16   different people.  Do you recall that?

17   A.  Yes.

18   Q.  And now we've kind of come to the point of the trial

19   where we have heard about a number of entities that have

20   been formed at various times throughout 2020 and 2021.

21             Is that fair to say?

22   A.  That's fair, yes.

23   Q.  So I want to kind of break some of this down, if I can.

24   Okay?

25   A.  Okay.
```

1    Q.  Let's start with Cosmopolitan Solutions.

2              And, counsel, if you could please pull up what's

3    been previously admitted into evidence as W3.

4              Now, we saw this document yesterday; is that

5    correct?

6    A.  Correct.

7    Q.  And this is a, an account that was opened through

8    Associated Bank; is that true?

9    A.  Yes.

10   Q.  Can you tell the jury who the two original signatories

11   were on that account?

12   A.  Abdulkadir Salah and Abdirahman Ahmed.

13   Q.  Okay.  Now at some point later on, my client Salim Said

14   joins Cosmopolitan; is that correct?

15   A.  Yes.  Based on the records, yes.

16   Q.  Okay.  But initially the two signatories were Abdulkadir

17   Salah, and Abdirahman Ahmed, true?

18   A.  Yes.

19   Q.  I want to jump ahead a little bit now.  ASA Limited.

20   Can you remind the jury what ASA stands for, if you recall

21   the three individuals from ASA?

22   A.  Yeah, so the first A would be Abdirahman Ahmed -- I'm

23   sorry.  Abdihakim Ahmed, Salim Said, and Ahmed Ghedi.

24   Q.  Okay.  Abdihakim Ahmed, correct?

25   A.  Correct.

1    Q.  All right.  Now I want to talk about a third company

2    now, Total Financial Solutions or TFS.  Are you familiar

3    with that company?

4    A.  Yes.

5    Q.  Are you familiar with who the two individuals are that

6    are operating Total Financial Solutions?

7    A.  Yes.

8    Q.  Okay.  Who are they?

9    A.  Abdulkadir Salah, who is also a partner with the

10   Cosmopolitan/Safari and then last name Omar-Hashim.

11   Q.  And does Ahmed Sharif Omar-Hashim sound correct?

12   A.  Yes.

13   Q.  Okay.  So Abdulkadir Nur Salah, partner Total Financial

14   Solutions, correct?

15   A.  Correct.

16   Q.  Also an original signatory with Cosmopolitan Solutions,

17   correct?

18   A.  Correct.

19   Q.  Okay.  Abdulkadir Nur Salah and Ahmed Sharif

20   Omar-Hashim, are they related?

21   A.  I believe they're brothers, but I'm not certain of the

22   familial relation, but based on the beliefs that other

23   people have told me, I think they are brothers.

24   Q.  Okay.  Do they have a third brother?

25   A.  Yes.

1    Q.  Do you know who that is?

2    A.  Yes.

3    Q.  Who is it?

4    A.  Abdi Nur Salah.

5    Q.  Okay.  So Abdi Nur Salah, Abdulkadir Nur Salah and Ahmed

6    Sharif Omar-Hashim are all brothers?

7    A.  Yes.

8    Q.  Okay.  Just wanted to set the stage for that a little

9    bit.  Thank you.

10            Counsel, can you please pull up C15 that's been

11   previously admitted into evidence.

12            We saw this email yesterday, correct?

13   A.  Correct.

14   Q.  Now, if I remember accurately, this was an email from

15   Abdihakim Ahmed to the claims department at Feeding Our

16   Future, true?

17   A.  Yes.

18   Q.  Now, again, Abdihakim Ahmed is one of the three

19   individuals that owns ASA Limited, correct?

20   A.  Correct.

21   Q.  And again ASA is the site that we talked about

22   yesterday, McKnight Road?

23   A.  Yes.

24   Q.  Counsel, can you scroll down, please?

25            Now, these are meal counts that were submitted as

```
 1    part of this email from Abdihakim Ahmed to Feeding Our

 2    Future claims department; is that correct?

 3    A.  Correct.

 4    Q.  Can you tell the jury who signed these meal counts?

 5    A.  I'm not that familiar with this signature, so not at

 6    this point, but I can see the initials.

 7    Q.  Okay.  And those initials are?

 8    A.  Abdihakim Ahmed.

 9    Q.  Do you see on the top where it says "Supervisor"?

10    A.  Yes.

11    Q.  Can you read that to the jury, please?

12    A.  Ahmed.

13    Q.  Ahmed A?

14    A.  Yes.

15    Q.  Okay.  Now, counsel, can we pull up C24, please.

16             Now this was an email that we saw yesterday

17    between or from TFS, which we now know is Total Financial

18    Solutions, correct?

19    A.  Correct.

20    Q.  To Abdihakim Ahmed, correct?

21    A.  Correct.

22    Q.  Now Abdihakim Ahmed, as we just talked about, is the

23    same individual who is a partial owner of ASA Limited, true?

24    A.  Yes.

25    Q.  And again, we are talking about the site on McKnight
```

```
 1    Road, correct?

 2    A.  Correct.

 3    Q.  And this is an email exchange between Abdihakim Ahmed

 4    and Total Financial Solutions, true?

 5    A.  Yes.

 6    Q.  Who we also know Total Financial Solutions to be

 7    Abdulkadir Nur Salah correct?

 8    A.  Yes.

 9    Q.  And Ahmed Sharif Omar-Hashim, true?

10    A.  Correct.

11    Q.  And they are brothers?

12    A.  That's what I believe.

13    Q.  And Abdi Nur Salah is also one of the original

14    signatories on the Cosmopolitan account, true?

15    A.  Yes.

16    Q.  Okay.  Thank you.

17         Okay.  Now that we kind of have an idea who some

18    of these players are and the various businesses, let's move

19    to Safari.

20         So Safari is the Minneapolis site that's owned by

21    Abdulkadir Nur Salah, Abdirahman Mohamud Ahmed and my client

22    Salim Said, true?

23    A.  I believe there's another partner in there as well, but

24    those three, yes.

25    Q.  Okay.  And this had been a restaurant that had been
```

1   opened prior to 2020, correct?

2   A.  Correct.

3   Q.  Now, at some point in 2020 they began operating under

4   the child nutrition program, true?

5   A.  They became a site, yes.

6   Q.  And the FBI began its, I think you called it an active

7   investigation or maybe prior to that you started looking

8   back at everything that was going on in June or July 2021;

9   is that right?

10  A.  As far as the investigation timeline, we opened an

11  investigation April of 2021 and began compiling records,

12  which again took some time to have them come in and start to

13  get a picture in order to develop a probable cause.

14  Q.  Okay.  So I'm sorry.  It wasn't June or July.  It was

15  April 2021.

16  A.  The official investigation was opened.  There was a

17  predicated investigation, enough facts that we believed we

18  could articulate to open a full investigation.

19  Q.  Okay.  And then surveillance began December 2021?

20  A.  Pole cams up in December.  However, drive-bys to

21  identify locations and see what was going on happened

22  throughout, I guess, probably the fall leading up to the

23  pole cams going up.

24  Q.  Okay.  So April 2020, May 2020, June 2020, et cetera,

25  none of that's taking place, correct?

1    A.  That's correct.

2    Q.  Okay.  So I want to move now, if we can, to the pole

3    cameras that we talked about.

4         Now, the pole cameras were set up.  There were

5    multiple and multiple sites, correct?

6    A.  Correct.

7    Q.  But the one I want to talk about is the one pole camera

8    that was set up at Safari Restaurant.

9         Now, you testified yesterday that there was a

10   single pole camera, correct?

11   A.  Correct.

12   Q.  This pole camera would switch angles, but ultimately

13   there was one camera, true?

14   A.  That's correct.

15   Q.  Sometimes it would monitor a street side of the

16   building, and at another point it would monitor what appears

17   to be some type of alleyway or back way; is that correct?

18   A.  Well, when the camera first went up, it was placed in a

19   spot that, as the case agents, we determined we need to see

20   more of the activity where the signs are up, so we had the

21   camera moved to identify the street view.

22         And there was some activity, very little activity

23   down the alleyway, so we wanted to capture the more

24   activity.  So we moved the camera to a better angle.  When I

25   say "we," I didn't have anything to do with that.  The tech

1    agents did the moving of the camera.

2    Q.  Okay.  My point though is that there were two locations

3    ultimately that were being monitored?

4    A.  Yes.  I believe from December 10th when the camera went

5    up until the 15th, the camera was down the alley facing more

6    westward.  And then it was moved on the 15th to face sort of

7    the side, kind of north/south entrance to where the signs

8    were put up that said free kids meals.

9           So it was moved after about five days, so that was

10   the sequence of that camera being moved.

11   Q.  Based on your review of those pole cameras, did you form

12   an opinion as to whether there were, whether there was

13   activity that was going on on both locations?

14   A.  Both locations meaning?

15   Q.  Both angles?

16   A.  Yes.  Yes.

17   Q.  Okay.  Ms. Lucy, can you please pull up what has not

18   been admitted into evidence D3-0109.

19          Special Agent Kary, you reviewed hours and hours

20   of footage throughout your investigation; is that true?

21   A.  That is true, yes.

22   Q.  And actually I went over some of this with you

23   yesterday, and you confirmed that this was footage from that

24   pole camera that was set up; is that true?

25   A.  That is true.

1    Q.  And is this a fair and accurate copy of that pole camera

2    footage?

3    A.  This is, yes.

4            MR. MONTEZ:  Your Honor, the defense offers into

5    evidence D3-0109.

6            THE COURT:  Any objection?

7            MR. EBERT:  No objection, Your Honor.

8            THE COURT:  D3-0109 is admitted.

9            MR. MONTEZ:  Ms. Lucy, can you scroll to 335 or

10   roughly there.

11           Okay.  Play it, please.

12                   (Video recording played)

13   BY MR. MONTEZ:

14   Q.  Agent Kary, can you describe to the jury what we're

15   watching in this video?

16   A.  We're watching an individual walk into the building,

17   another individual walk out with a, looks like a cart with

18   boxes on it.

19   Q.  Okay.

20                   (Video recording played)

21   A.  Now the individual came back out of the building and is

22   loading the back of the white SUV with the boxes that were

23   on the cart.

24                   (Video recording played)

25           MR. MONTEZ:  Okay.  Thank you, Ms. Lucy.

```
1    BY MR. MONTEZ:

2    Q.  So, Special Agent Kary, do you know what were in those

3    boxes?

4    A.  I do not.

5    Q.  Do you have any idea how many meals were in those boxes?

6    A.  I do not.

7    Q.  Now I want to draw your attention to the date on this

8    video.  Can you tell the jury what the date is that we're

9    looking at here?

10   A.  December 10th at 11:18 a.m.

11   Q.  Thank you.

12            Ms. Lucy, can you please scroll ahead to 7:20.

13            Special Agent Kary, can you tell the jury what

14   we're looking at here?

15                    (Video recording played)

16   A.  It appears to be an individual, male individual, rolling

17   a cart out towards the back of a white vehicle.  The

18   individual appears to be opening the trunk of the vehicle.

19   The individual is loading what was on the cart into the back

20   of the white SUV.

21   Q.  Any idea what's in those boxes?

22   A.  I would presume it would be food, but I can't confirm

23   that.

24   Q.  Any idea what's in those bags?

25   A.  Again, same answer.  Would probably be food, but I can't
```

1    confirm it.

2                     (Video recording played)

3    Q.  Do you see another black van in that video?

4    A.  I see a black SUV with the back end open and backing up

5    towards the vehicle, and it appears that there's an

6    individual coming in and out of the building.

7              The white SUV is now pulling away.

8              It appears as if someone is exiting the building

9    and loading the back of the dark SUV.  It appears to be

10   boxes.

11   Q.  Do you know what's in those boxes?

12   A.  I do not.

13   Q.  Okay.  You can pause it, Ms. Lucy.  Thank you.

14              So when you watched this video, you saw a bunch of

15   boxes being loaded up into three different vehicles.  And as

16   you testified, you don't know what's in those boxes, but you

17   presume it's food.

18   A.  I would say it was a few boxes.  I would presume it was

19   food.  I wouldn't say a bunch.  I would say a few boxes.

20   Q.  Okay.  But again, you don't know what's in the boxes,

21   correct?

22   A.  I would presume it was food based on the food

23   distribution site.

24   Q.  Okay.  Did you see a row of cars with one child in each

25   car pull up to get one meal?

1    A.  I did not see that, no.

2    Q.  No.  What you saw was three cars pull up and have boxes

3    loaded into those vehicles with presumably food, correct?

4    A.  Yes.

5    Q.  Okay.  Ms. Lucy, can you please pull up what has not

6    admitted into evidence D3-0115.

7             Agent Kary, do you recognize this?

8    A.  I do.

9    Q.  This is also footage from that same pole camera; is that

10   true?

11   A.  Yes.

12   Q.  Fair and accurate copy of that?

13   A.  It is.

14   Q.  And the date is December 10th.  We're a little bit

15   further on.  Now it's 11:30 in the morning; is that true?

16   A.  I don't recall the timing on the last one, but, yes,

17   this is 11:32.

18             MR. MONTEZ:  Okay.

19             Your Honor, the defense offers into evidence

20   Exhibit D3-0115.

21             THE COURT:  Any objection?

22             MR. EBERT:  No objection, Your Honor.

23             THE COURT:  D3-0115 is admitted.

24             MR. MONTEZ:  Ms. Lucy, can you scroll to -- there.

25   That's good.  And if you could pause that, please.

 1            Special Agent Kary, are you familiar with what

 2    type of vehicle this is that just pulled up?

 3            THE WITNESS:  It appears to be a Sysco delivery

 4    truck.

 5    BY MR. MONTEZ:

 6    Q.  Can you tell the jury what Sysco is?

 7    A.  It's a food distribution company.

 8    Q.  Thank you.

 9            Ms. Lucy, can you play, please.

10                  (Video recording played)

11    Q.  Can you tell the jury what we're seeing now?

12    A.  Seeing an individual walking down the alley and then the

13    individual just walking towards a silver vehicle, between a

14    silver vehicle and a white SUV.

15    Q.  What are they carrying?

16    A.  I can't really tell.

17    Q.  Does it look like trays of food?

18    A.  I can't really tell.  It does look like a tray in one

19    person's hand and maybe a bag in the other.

20    Q.  Okay.  Any idea what's in that tray?

21    A.  I would presume it would be food.

22    Q.  How about what's in that bag?

23    A.  I don't know.

24    Q.  Do you know the dimensions of that tray?

25    A.  I don't, no.

1     Q.  Okay.  Ms. Lucy, can we skip ahead to 3:48.

2              Can you describe to the jury what we're seeing

3     now?

4     A.  An individual walking down the sidewalk with what

5     appears to be a tray, again appears to be getting into what

6     appears to be a gray SUV.

7     Q.  Okay.  Can we pause that.

8              So again we're not seeing cars lined up with kids,

9     right?

10    A.  No.

11    Q.  We're seeing trays of food and bags of food going out,

12    correct?

13    A.  Two trays there, yes.

14    Q.  Okay.  Can we skip ahead to 6:30, please.

15                        (Video recording played)

16    Q.  What are we seeing?

17    A.  That SUV is backing out and then we see, it appears to

18    be the delivery person from the Sysco truck rolling in one,

19    two, three -- six or eight boxes into the Safari Restaurant

20    door.

21    Q.  Any idea what's in those boxes?

22    A.  I would presume it would be food based on it coming from

23    the Sysco truck.

24    Q.  What do we see now?

25    A.  We see an individual going to an orange SUV and opening

1    the back of the vehicle and putting what appears to be trays

2    into the back of the vehicle.

3    Q.  What about on the other side?

4    A.  A couple of individuals going to a vehicle.

5    Q.  Did you see what they were carrying?

6    A.  I did not.

7    Q.  Can we skip ahead to 8:15, please.

8             What do we see here?

9                 (Video recording played)

10   A.  See an individual coming out the side door with what

11   appears to be two bags, going to the orange SUV.

12   Q.  And again, I don't mean to be redundant, but do you have

13   any idea what are in those bags?

14   A.  I would presume it to be food.

15   Q.  Do you see what else is happening right now?

16   A.  See the Sysco delivery person bringing in boxes to the

17   Safari Restaurant.

18   Q.  Ms. Lucy, can we skip ahead to 14:50, please.

19                 (Video recording played)

20   A.  And there we see a Sysco driver bringing in boxes to the

21   Safari Restaurant.

22   Q.  Can we skip ahead to 17:20, please.

23                 (Video recording played)

24   Q.  What do we see now?

25   A.  It appears to be the Sysco driver again bringing boxes

 1    into the Safari Restaurant.

 2    Q.  Can we skip ahead to 21:10, please.

 3                        (Video recording played)

 4    A.  There we see the, what appears to be the Sysco driver

 5    bringing boxes into the Safari Restaurant.

 6    Q.  Thank you.  Ms. Lucy, can you pause the video.

 7            Okay.  So this all took place on December 10th

 8    within roughly a half hour time span; is that true?

 9    A.  Yes.

10    Q.  Okay.  Ms. Lucy, can you please skip ahead to 24:40.

11            Now, we just saw sort of a switch in lighting and

12    things like that.  Can you look down at the date and tell

13    the jury what date we're looking at now?

14    A.  12/13 at 3:39 p.m.

15    Q.  Okay.  So we jumped ahead three days now, correct?

16    A.  Correct.

17    Q.  All right.  Can you play the video, please.

18                        (Video recording played)

19    Q.  What do we see here?

20    A.  Appears to be a Sysco delivery truck.

21    Q.  Ms. Lucy, can you scroll ahead to 32:40, please.

22                        (Video recording played)

23    A.  Appears to be a Sysco delivery driver bringing, wheeling

24    in boxes.

25    Q.  Can we skip ahead to 39:15, please.

```
 1                    (Video recording played)

 2   A.  It appears to be a Sysco driver wheeling in boxes.

 3   Q.  Can we skip ahead to 45 minutes, please?

 4                    (Video recording played)

 5   A.  That appears to be a Sysco driver wheeling in boxes.

 6                    (Video recording played)

 7   Q.  Can we skip ahead to 47:20.

 8                    (Video recording played)

 9   A.  Appears to be a Sysco driver rolling in boxes.

10   Q.  So this is its fifth trip of boxes?

11   A.  That sounds right.

12   Q.  Can we skip ahead to 51 minutes, please.

13                    (Video recording played)

14   A.  Appears to be a Sysco driver rolling in boxes.

15   Q.  Thank you.

16           Ms. Lucy, can you please pull up what has not been

17   admitted into evidence D3-0121.

18           Do you recognize this?

19   A.  Yes.

20   Q.  Same camera angle, same pole video, true and accurate

21   copy?

22   A.  Yes.

23   Q.  And the date at the bottom is 12/15 at approximately

24   7:36 a.m., true?

25   A.  Correct.
```

1          MR. MONTEZ:  Your Honor, the defense offers in

2   evidence D3-0121.

3          THE COURT:  Any objection?

4          MR. EBERT:  No objection, Your Honor.

5          THE COURT:  D3-0121 is admitted.

6          MR. MONTEZ:  Ms. Lucy, if we could move to

7   40 seconds, please.

8                    (Video recording played)

9   BY MR. MONTEZ:

10  Q.  Sysco truck?

11  A.  Yes.  It appears to be, yes.

12  Q.  Can we move ahead to 5 minutes, 5 seconds.

13                    (Video recording played)

14  A.  It appears to be a Sysco driver making a delivery to the

15  Safari Restaurant.

16  Q.  All right.  We can just pause that.

17          Would you take my word for it if I were to tell

18  you that if we continue to watch this video we would see

19  four more trips going into the restaurant?

20  A.  I will let the images speak for themselves.

21  Q.  Okay.  Now this camera angle was on one side of the

22  restaurant, true?

23  A.  Yes.

24  Q.  And it was your decision to switch this angle because

25  you didn't think it was capturing any activity; is that

1    true?

2    A.  It was capturing minimal activity compared to the other

3    side of the building which had more.

4    Q.  So my point is, there was activity going on on both

5    sides of the building, true?

6    A.  I only could tell one at a time, but based on what we

7    observed where the signs were going out, we wanted to

8    capture the meal distribution happening, so we determined to

9    move the camera.

10   Q.  Okay.  Let me see if I can ask my question again because

11   you said you observed activity going on on the other side of

12   the building, correct?

13   A.  Yes.

14   Q.  We just saw activity going on on this side of the

15   building, correct?

16   A.  Correct.

17   Q.  So I think it's safe to assume there's activity going on

18   on both sides of the building, true?

19   A.  Yes.

20   Q.  Okay.  Ms. Lucy, can you please pull up D3-0127, which

21   has not been admitted into evidence.

22           Special Agent Kary, is this that view of the other

23   side of the building that you're talking about?

24   A.  Yes, it is.

25   Q.  And this is -- you reviewed this prior to today?

1    A.  Yes.  As far as the overall video, yes, I did review

2    this.

3    Q.  Okay.  Fair and accurate copy of the FBI surveillance

4    camera?

5    A.  Yes, it is.

6              MR. MONTEZ:  Your Honor, the defense offers in

7    evidence D3-0127.

8              THE COURT:  Any objection?

9              MR. EBERT:  No objection.

10             THE COURT:  D3-0127 is admitted.

11             MR. MONTEZ:  Ms. Lucy, can you play the video

12   please?

13                    (Video recording played)

14   BY MR. MONTEZ:

15   Q.  And again, this is the activity that you were talking

16   about on this side of the building; is that true?

17   A.  Yes.

18   Q.  Okay.  That's good.  Thank you.

19             Now you generated a summary of your findings after

20   reviewing hours and hours of this footage; is that true?

21   A.  Yes.

22   Q.  Do you recall whether you documented any activity

23   occurring at Safari Restaurant on December 10th, 2021, in

24   your report?

25   A.  I did not fully review that side from the 10th to the

1    15th because it wasn't as much activity.  I documented from

2    the 15th where there was more activity, and like I said the

3    average of 40 cars, I documented that.  I hadn't fully

4    reviewed from the 10th to the 25th, because I was looking

5    for the more meal distribution.

6    Q.  Okay.  But we just saw on December 10th several examples

7    of meal distribution, true?

8    A.  Yes, there was a few on those days.  I want to say for

9    like three to five SUVs would come to the back of -- that

10   side there, yes.

11   Q.  Okay.  But did you review the footage from December 10th

12   or no?

13   A.  I reviewed parts of it, not all, not every bit from the

14   10th to the 15th, but every bit from the 15th all the way

15   through till the January 20th.

16   Q.  Okay.  So the answer to my question is, no, you did not

17   review all of the footage on December 10th, true?

18   A.  Not every single hour, correct.

19   Q.  Okay.  What about December 13th?

20   A.  Same effect.  I would have scanned through, very quick,

21   through that footage, just to see a little bit of activity.

22   Q.  Okay.  So here's my point:  You're summarizing generally

23   that there's on average X number of cars that are pulling up

24   and there's grabbing X number of trays of food, X number of

25   bags of food, correct?

1    A.   Yes.

2    Q.   Okay.  And that's based on your observation with your

3    eyes, correct?

4    A.   Correct.

5    Q.   Can you tell the jury what Hooya Chicken is, H-O-O-Y-A?

6    A.   What Hooya chicken is?  No, I cannot.

7    Q.   Can you tell the jury what Chicken Suqaar, S-U-Q-A-A-R,

8    is?

9    A.   I cannot, no.

10   Q.   Do you have any idea how that food is portioned out?

11   A.   Portioned out?  In what I guess --

12   Q.   How it's served.  How it's served when someone is

13   serving it.  Do you know what it looks like?

14   A.   I know what chicken looks like.  I guess what type of

15   chicken?

16   Q.   Yeah, do you know how Hooya Chicken looks when it's

17   being served?

18   A.   I do not.

19   Q.   What about Chicken Suqaar?

20   A.   I do not know what it looks like when it's served.

21   Q.   Okay.  So it's safe to say you don't know what the food

22   looks like inside of these trays; is that true?

23   A.   I've seen, let's see, what have I -- I've seen pictures

24   of trays, so I guess I don't know -- I mean, I've seen the

25   rice and chicken, yes.  So I know what it looks like, yes.

1    Q.  Okay.  Do you know exactly how much food is in those

2    trays?

3    A.  I do not.

4    Q.  Okay.  Do you know exactly how much food is in those

5    bags?

6    A.  I do not.

7    Q.  Do you know exactly how much food is in those boxes?

8    A.  I do not know exactly, no.

9    Q.  Okay.  So when you're estimating, you are assuming and

10   speculating as to how much food is actually going out in

11   those vehicles, true?

12   A.  I wouldn't consider it speculation, because I went

13   through meal distribution as a parent to my kids' school,

14   and I went and I got boxes of food that were supposed to

15   serve my kid as a meal pack for a number of days, and it was

16   three boxes.

17          It was supposed to be three or four days of food.

18   So, I mean, I am not speculating.  I lived it as well, and

19   there's no way that that amount of food was being

20   distributed at that site.

21   Q.  Okay.  So a box would serve three or four days?

22   A.  A box would be a few meals in a meal pack for my kids.

23   So it didn't --

24   Q.  You just said three or four days.  Would it serve kids

25   for three or four days?

1    A.  It was a meal pack that was supposed to be a few days.

2    Q.  Did you get any Hooya Chicken at your school?

3    A.  No.  We didn't get any hot meals, no.

4    Q.  Okay.  You testified yesterday that you didn't think it

5    was possible for food to be delivered on one side of that

6    building.

7         Do you remember saying that?

8    A.  In the context of delivered to the degree of 3500 meals

9    was the context of me saying I didn't think that would be

10   possible, yes.

11   Q.  Who is saying that 3500 meals were delivered to people?

12   Who is saying that?

13   A.  The meal count sheets reflected in December of 2021 that

14   3500 meals were served from the Safari site.

15   Q.  Served.  That includes pickups, right?

16   A.  It would, yes.

17   Q.  Okay.  So would you be surprised to know that there's a

18   video of United States Representative Ilhan Omar serving

19   food out of that exact door that you are saying it's

20   impossible for it to be delivered?

21   A.  Would that surprise me?  No.

22   Q.  Okay.  We're going to shift gears here very quickly.

23   Total Financial Solutions, going back to Total Financial

24   Solutions.  Can you remind the jury who the operators are of

25   Total Financial Solutions?

1   A.  My understanding is Abdikadir Salah and Mr. Omar-Hashim.

2   Q.  Okay.  And again, Abdulkadir Nur Salah, one of the

3   founding signatories of Cosmopolitan Solutions?

4   A.  One of the business partners, yes.

5   Q.  One of the original ones?

6   A.  Yes.

7   Q.  Do you know what Total Financial Solutions does?

8   A.  My understanding, it's an accounting firm of some type.

9   Q.  Okay.  So they keep track of the money?

10  A.  Do accounting is what my understanding would be.

11  Q.  Okay.  Thank you, Special Agent Kary.

12          I have no further questions, Your Honor.

13          THE COURT:  Mr. Ebert, redirect.

14          MR. EBERT:  Briefly, Your Honor.

15                  REDIRECT EXAMINATION

16  BY MR. EBERT:

17  Q.  Good morning, Special Agent Kary.

18  A.  Good morning.

19  Q.  All right.  So you were just shown a series of

20  additional video clips from the December 2021 pole camera

21  footage; is that right?

22  A.  Correct.

23  Q.  And this concerns the Safari food site location in

24  Minneapolis; is that right?

25  A.  Yes.

1    Q.  Do you recall seeing a series of clips in which there

2    was a person rolling a dolly towards the back of the Safari

3    Restaurant?

4    A.  Yes.

5    Q.  And were you shown approximately six trips with that

6    dolly?

7    A.  About that number, yes.

8    Q.  And just based on your visual memory, approximately how

9    many boxes did you see on each of those six trips?

10    A.  Six to eight.

11    Q.  Enough to feed 6,000 children per day?

12          MR. MONTEZ:  Objection, Your Honor.  Calls for

13    speculation.

14          THE COURT:  Overruled.

15          THE WITNESS:  Not at all, no.

16    BY MR. EBERT:

17    Q.  We also saw a few clips where a few individuals were

18    seen exiting the back of the restaurant.  Do you recall

19    that?

20    A.  Yes.

21    Q.  And they were carrying in one hand an item; is that

22    right?

23    A.  Yes.

24    Q.  What do you recall that item was?

25    A.  It appeared to be a tray.

```
1    Q.  And what was inside is not clear?

2    A.  That's correct.

3    Q.  Enough to feed 6,000 kids per day?

4    A.  Definitely not.

5    Q.  Did you ever see a single child in any of the video

6    clips shown to you by defense counsel?

7    A.  I don't believe so, no.

8    Q.  You, you said you have seen images of some food in this

9    investigation, trays of food; is that right?

10   A.  Yes.

11   Q.  Does that include trays that have rice in it?

12   A.  Yes.

13   Q.  And at times does that include chicken with the rice?

14   A.  Correct.

15   Q.  Is it your understanding that Chicken Suqaar is simply

16   chicken together with rice?

17           MR. MONTEZ:  Objection, Your Honor.  Leading.

18           THE COURT:  Overruled.

19           You may answer.

20           THE WITNESS:  That sounds correct.

21   BY MR. EBERT:

22   Q.  And to be clear, the bags that you saw, do those appear

23   to be take-out bags?

24   A.  It appears to be take-out bags, yes.

25   Q.  And we saw a large truck pull up on two or so occasions;
```

```
1    is that right?

2    A.  I think it was three.

3    Q.  A large truck on three occasions?

4    A.  Yes.

5    Q.  From that large truck, would you describe the deliveries

6    out of it as small or large deliveries?

7    A.  Small.

8    Q.  What do you mean?

9    A.  In comparison to the Minneapolis, or -- sorry -- the

10   St. Paul central kitchen where they were serving far fewer,

11   they had loading docks they would back 18-wheelers up to and

12   unload in order to distribute less food than what they were

13   claiming at Safari.

14   Q.  Now, you indicated in one of your answers that your own

15   household for a time picked up food during the pandemic; is

16   that right?

17   A.  Correct, during the first couple of weeks.

18   Q.  You also indicated in response to questioning yesterday

19   at certain points that I believe "common sense" was part of

20   your understanding in formulating your response to whether

21   or not food was served at that location.  Do I have that

22   right?

23   A.  Yes.

24   Q.  What do you mean by that when you say "common sense"?

25   A.  Just the sheer volume and requirements it would have to
```

1    do the numbers that were being reported, 6,000, 5,000, 3500,

2    in order to do that volume, it just doesn't make any sense.

3    Q.  In your own household, do you have an awareness of

4    groceries on a daily or weekly basis?

5    A.  Yes.  I mean, I would say filling up my trunk of my

6    vehicle is going to feed my family of four, you know, for a

7    week or so or, I mean, it's definitely a situation where the

8    volume matters.  And common sense, you load up your

9    groceries and there's large -- I mean, bags of items, not

10   hundreds of meals in one bag.

11   Q.  Do you in your household fit 6,000 daily meals in your

12   vehicle at one time?

13   A.  No.

14   Q.  And Safari, to be clear, was claiming to feed 6,000

15   meals to children every day?

16   A.  Correct.

17   Q.  Week after week?

18   A.  Yes.

19   Q.  Every day of a month?

20   A.  Correct.

21   Q.  Whether it rained?

22   A.  Correct.

23   Q.  Whether it was a holiday?

24   A.  Correct.

25   Q.  Whether it was a blizzard?

1    A.  Correct.

2    Q.  Even when school districts were providing food as well?

3    A.  Correct.

4    Q.  And to be clear, the 6,000 was 6,000 breakfasts; is that

5    right?

6    A.  Breakfasts, yes.

7    Q.  And lunches as well?

8    A.  Correct.

9    Q.  Did you ever see anything to that degree being served in

10   the video surveillance?

11              MR. MONTEZ:  Objection.  Asked and answered.

12              THE COURT:  Overruled.

13              THE WITNESS:  No.

14   BY MR. EBERT:

15   Q.  Now in questioning this morning and throughout the

16   afternoon yesterday, you were asked a lot about the video

17   clips; is that right?

18   A.  Correct.

19   Q.  And you were also asked by counsel for the defendants

20   about some of the meal counts; is that right?

21   A.  Yes.

22   Q.  But to be clear, are the video surveillance and the meal

23   counts the only basis upon which you are offering your

24   testimony today?

25   A.  No.

```
1    Q.  Does it also include things like financial records?

2    A.  Correct.

3    Q.  For example, the financial records of Feeding Our

4    Future?

5    A.  Yes.

6    Q.  As seen here in Exhibit W2?

7    A.  That's correct.

8    Q.  Including seven-figure checks; is that right?

9    A.  Yes.

10   Q.  That came out on a monthly basis from Feeding Our

11   Future?

12   A.  Yes.

13   Q.  And who is signing those checks?

14   A.  Aimee Bock.

15   Q.  And who is the recipient of those checks?

16   A.  Safari.

17   Q.  How much is the first check at the top of the screen?

18   A.  $1,065,000.

19   Q.  And that's dated December 29th, 2020; is that right?

20   A.  Correct.

21   Q.  And then just a few weeks later on January 14th, 2021,

22   is there another check from Aimee Bock's Feeding Our Future

23   to Safari?

24   A.  Yes, for over $1.1 million.

25   Q.  And checks of this magnitude continue on and on; is that
```

```
 1    right?

 2    A.  Correct.

 3    Q.  The next one, as we see, February 18th, 2021, also for

 4    about 1.1 million; is that right?

 5    A.  Yes.

 6    Q.  Also signed by Aimee Bock?

 7    A.  Yes.

 8    Q.  This was significant to the investigation?

 9    A.  It was.

10    Q.  How so?

11    A.  This was supposed to be reimbursement for meals actually

12    being served, and it did not appear that that could possibly

13    happen.

14    Q.  And as that money went from Feeding Our Future to Salim

15    Said's Safari Restaurant, you pursued investigating those

16    accounts as well; is that right?

17    A.  Correct.  Yes.

18    Q.  And from there did you see transactions like this one

19    from W82, page 9?

20    A.  Yes.

21    Q.  And remind the jury what we see on the screen?

22    A.  This is the $2.7 million wire for the purchase of the

23    2722 Park Avenue mansion where the Safari group would meet

24    at the TFS location.

25    Q.  Total Financial Solutions?
```

1    A.  Correct.

2    Q.  Namely, the building we see here in Exhibit U8?

3    A.  That's correct.

4    Q.  Purchased out of an account that Salim Said controlled;

5    is that right?

6    A.  Yes.

7    Q.  Using money from what source?

8    A.  They -- bless you.

9             Federal Child Nutrition Program.

10   Q.  And as we saw in the previous exhibit, that wire was

11   dated July 15th of 2021; is that correct?

12   A.  Yes.

13   Q.  For $2.7 million?

14   A.  Yes.

15   Q.  Was that a significant fact for you and your fellow

16   investigators?

17   A.  Absolutely.

18   Q.  Why "absolutely"?

19   A.  It was, again, funds that were supposed to go feed

20   children, and it was buying properties.

21   Q.  Was that the only instance of such transactions?

22   A.  No.

23   Q.  For example, on the screen here is Exhibit W27; is that

24   right?

25   A.  Yes.

1    Q.  Is this another check from Mr. Salim?

2    A.  Yes.  From Mr. Salim Said, this is a cashier's check

3    that was part of the payment for his residence.  There was

4    another cashier's check for 250,000 to pay for that house.

5    Q.  And this is dated July 28th of 2021?

6    A.  Correct.

7    Q.  Approximately two weeks after that $2.7 million wire

8    transfer to buy the Park Avenue home that we just looked at?

9    A.  Correct.

10   Q.  What is the source of this funds, for this check?

11   A.  Again, Federal Child Nutrition Program funds meant to

12   feed children.

13   Q.  But instead it purchased this; is that right?

14   A.  Correct.

15   Q.  And by "this," the home we see in Exhibit U6?

16   A.  Yes.

17   Q.  And to be clear, who bought that home?

18   A.  Salim Said.

19   Q.  If my math is right, is that approximately $3.5 million

20   spent on real estate in the span of two weeks?

21   A.  That's correct.

22   Q.  All child food money?

23   A.  Yes.

24   Q.  You were asked some questions yesterday afternoon about

25   the role of Feeding Our Future with respect to CLiCS data.

1    Do you recall that?

2    A.  Correct.

3    Q.  On the left is Exhibit V38, which is CLiCS data

4    submitted to the State of Minnesota; is that right?

5    A.  Yes.

6    Q.  Specifically, for the Safari site in Minneapolis at the

7    top; is that right?

8    A.  Correct, on the left side.

9    Q.  On the left side, excuse me.  And on the right

10   Exhibit V13, what is that?

11   A.  That is the CLiCS claims data for the ASA Limited site.

12   Q.  Which was located where?

13   A.  McKnight Road in Maplewood.

14   Q.  And if we scroll down to the twelfth page of Exhibit V38

15   on the left, do you see where it indicates for that

16   particular month how many breakfasts were served?

17   A.  Yes.  For that month alone 185,903.

18   Q.  And then how many lunches?

19   A.  That same exact amount of 185,903.

20   Q.  And with respect to those numbers, that 185,000, would

21   you believe my math that divided by the number of 31 days,

22   that comes out to approximately 5,996 breakfasts?

23   A.  I would.

24   Q.  5,000 additional 996 meals in the form of a lunch?

25   A.  That's correct, yes.

1    Q.  Now at the bottom of this, do you see where it says

2    "sponsoring authority certification"?

3    A.  I do.

4    Q.  And to be clear, who is the sponsor for Safari

5    Restaurant?

6    A.  Feeding Our Future.

7    Q.  Feeding Our Future has the sponsoring authority; is that

8    right?

9    A.  Yes.

10   Q.  Who is in charge of Feeding Our Future?

11   A.  Aimee Bock.

12   Q.  Aimee Bock; is that right?

13   A.  Yes.

14   Q.  And this sponsoring authority certification, do we see

15   this on every CLiCS submission for a claim like this one

16   example month?

17   A.  Yes.

18   Q.  And do we see it to the right in Exhibit V13, page 7,

19   for the ASA Limited claims for that exact same month,

20   March 2021?

21   A.  Yes.  We do see that, yes.

22   Q.  And with respect to the one on the right, does it

23   indicate that supposedly breakfast was served 31 days that

24   month and lunches served 31 days that month as well?

25   A.  Correct.

```
 1    Q.  For how many in total?

 2    A.  92,898.

 3    Q.  And again, would you believe my math if you divide that

 4    by 31, it comes out to 2,996 supposed breakfasts served

 5    every day at that little deli that we looked at yesterday on

 6    McKnight Road?

 7    A.  Yes.

 8    Q.  As well as another 2,996 lunches served from that same

 9    location?

10    A.  Yes.

11    Q.  And you said this is the same sponsoring authority

12    certification that appears below that?

13    A.  It is.

14    Q.  I'm going to enlarge it, and I would ask you to read

15    that aloud to the jury.

16    A.  "I hereby take full responsibility for ensuring that

17    this claim accurately represents the number of meals/milks

18    served by reimbursement category, that records are available

19    to support this claim, that this claim is in accordance with

20    the program agreement, and that payment therefore has not

21    been received.  I understand that this information is being

22    given in connection with the receipt of federal funds, that

23    officials of the U.S. Department of Agriculture and the

24    Minnesota Department of Education may verify this

25    information, and that deliberate misrepresentations may
```

1    subject me to prosecution under applicable state and federal

2    crime statutes."

3    Q.  Now that certification has the pronoun "I" in it at

4    several points; is that right?

5    A.  Correct.

6    Q.  Who is the "I" in that paragraph, as you understand it?

7    A.  Aimee Bock.

8    Q.  Now, you heard some questions yesterday from Ms. Bock's

9    counsel asking you to the effect of what more could she have

10   done.  Do you recall that?

11   A.  I do.

12   Q.  In other words, how was she to know what might be

13   happening with respect to claims?

14   A.  Correct.

15   Q.  Questions to that effect; is that right?

16   A.  Yes.

17   Q.  I want to direct your attention on that front to

18   Exhibit A61.

19          Is this an email message that was sent to Aimee

20   Bock on April 6th, 2021?

21   A.  Yes.

22   Q.  From a person named Hamdi at Feeding Our Future; is that

23   right?

24   A.  Correct.

25   Q.  And, among other things, is Hamdi explaining that she

1   visited a location on April 5th, 2021?

2   A.  Correct.

3   Q.  And is it described as a restaurant?

4   A.  It is.

5   Q.  Does she go on to cite a number of concerns that she has

6   for Aimee Bock?

7   A.  She does.

8   Q.  Can you read that beginning with the word "all"?

9   A.  "All these sites claim that they have a very high

10  serving volume.  During my observation, I didn't see enough

11  movement aid that level in the restaurant, and that was a

12  red flag for me.  All my three sites had the same invoice,

13  but different names.  Even though we have no contract with

14  this kitchen, I really am concerned.  Please take a look at

15  this site.  Thanks."

16  Q.  And does did Aimee Bock respond to that message?

17  A.  Yes.

18  Q.  Did she indicate that she would supposedly look into

19  this right away?

20  A.  Correct.

21  Q.  And this, again, is April of 2021?

22  A.  Yes.

23  Q.  And it was January of 2022 when federal agents arrived

24  with a search warrant at Aimee Bock's office; is that right?

25  A.  Correct.

1   Q.  Well prior to that?

2   A.  Yes.

3   Q.  Next I want to direct your attention to Exhibit A78.  Is

4   this another email message?

5   A.  It is.

6   Q.  Is it sent on December 14th, 2021?

7   A.  Correct.

8   Q.  From a woman named Norma Lopez with a Feeding Our Future

9   email address; is that right?

10  A.  Correct.

11  Q.  And it is sent to Aimee Bock, correct?

12  A.  Yes.

13  Q.  And you were asked questions about what Ms. Bock might

14  have known about the claims department.  Do I have that

15  right?

16  A.  Yes.

17  Q.  At the bottom, what's indicated beneath Ms. Lopez's

18  name?

19  A.  Claims.

20  Q.  And she wrote a message on this day; is that correct?

21  A.  Correct.

22  Q.  Did she write to Aimee Bock, "They strongly believe you

23  are doing fraud"?

24  A.  Yes.

25  Q.  "You not answering their questions on Monday.  You

1   prepaying people and having a GoFundMe."

2          Did I read that correctly?

3   A.  Correct.

4   Q.  Did she go on to say, "So many questions they are afraid

5   to ask because no one questions the boss"?

6   A.  Correct.

7   Q.  Does she go on to say, "But I feel like this needs to be

8   ask"?

9   A.  Yes.

10  Q.  Directing your attention back to where we began

11  yesterday morning, Exhibit X1.

12          In the upper right, do you see a number that

13  begins with a 2?

14  A.  I do, yes.

15  Q.  Approximately $246 million?

16  A.  Correct.

17  Q.  And this is the amount of money that was paid out

18  through Feeding Our Future; is that right?

19  A.  Paid to Feeding Our Future from the Minnesota Department

20  of Education, yes.

21  Q.  In the years that we see here?

22  A.  Correct.

23  Q.  Primarily 2020 and 2021; is that right?

24  A.  Correct.

25  Q.  Who was the gatekeeper of that quarter billion dollars?

1    A.  Aimee Bock.

2    Q.  And to be clear, that quarter billion dollars was all

3    Federal Child Nutrition Program money?

4    A.  Yes, it was.

5    Q.  And in fact here in Exhibit W2, do we see the signature

6    card for the Feeding Our Future bank account?

7    A.  Yes.

8    Q.  How many names are on it?

9    A.  Just one.

10   Q.  Whose name?

11   A.  Aimee Bock.

12   Q.  And what's her title?

13   A.  Executive director.

14   Q.  Is that the same signature we've seen throughout this

15   trial next to her title?

16   A.  Yes.

17   Q.  Likewise, who was the gatekeeper to use that money to

18   write checks like these to Salim Said?

19   A.  Aimee Bock.

20   Q.  The boss?

21   A.  Correct.

22            MR. EBERT:  Thank you, Your Honor.  I have no

23   further questions.

24            THE COURT:  Mr. Udoibok, any recross?

25            MR. UDOIBOK:  Yes, Your Honor.

CROSS BY MR. UDOIBOK

1                        RECROSS-EXAMINATION

2     BY MR. UDOIBOK:

3     Q.  Good morning, Officer.

4     A.  Good morning.

5     Q.  Let me see if I can fire up my system.

6              Well, I want to start off first with the last

7     exhibit that you just discussed.  Did you get a chance to

8     talk with Ms. Lopez?

9     A.  I believe I was in an interview with her some time ago,

10    yes.

11    Q.  How many times did you interview her?

12    A.  I believe I was in one interview with her.

13    Q.  Ms. Mallet, would you please pull up Exhibit A78,

14    please.  A78.  Oh, yes.  A78.

15             And let's work a little slowly.  Why don't you

16    call out the first few lines.  All right.

17             And this email is written by Ms. Lopez to Aimee

18    Bock, correct?

19    A.  Yes.

20    Q.  And that is about December 14, 2021, correct?

21    A.  Correct.

22    Q.  Now let's go to the body of the email, because it's --

23    just call up a few sentences or maybe you can pull up all of

24    it.  There you go.  However you want to do it.

25             So it starts off with, "They strongly believe you

GAREY - CROSS - BY MR. UDOIBOK

```
 1    are doing fraud and you not answering their questions on
 2    Monday."
 3              Who are the "they"?
 4    A.  I believe it would be other Feeding Our Future
 5    employees.
 6    Q.  You are guessing.  Is that what you --
 7    A.  Well, based on the investigation, that's what I would
 8    believe.
 9    Q.  And who would be these Feeding Our Future employees?
10    A.  I don't know which one, which specific ones that would
11    be.
12    Q.  Are you just guessing now that it was Feeding Our Future
13    employees?
14    A.  Based on the email content, that's what I believe.
15    Q.  Let's continue.  It says, "So many questions they are
16    afraid to ask because no one questions the boss."
17              Do you see that?
18    A.  I do see that, yes.
19    Q.  "But I feel like this needs to be ask."
20              Do you see that?
21    A.  Yes.
22    Q.  "They rather take you to court instead of sitting down
23    and having an honest conversation."
24              Do you see that?
25    A.  I do see that, yes.
```

1   Q.  Now, based on your investigation, did any Feeding Our

2   Future employee take Feeding Our Future to court?

3   A.  I don't believe so, no.

4   Q.  All right.  Is it possible that this email was regarding

5   sites that Feeding Our Future or Ms. Bock terminated and

6   they were just mad?

7   A.  I don't know that at this time.

8   Q.  Okay.  Let's go to the next sentence.

9           By the way, did you get a sense that Ms. Lopez had

10  a gripe with another employee of Feeding Our Future?

11  A.  I do not know.

12  Q.  Do you know an employee called Norma Cabadas?

13  A.  Yes.

14  Q.  Do you know the nature of the relationship between Norma

15  Cabadas and Ms. Lopez?

16  A.  I know -- it's not fresh in my mind, but I believe

17  there's a familial relationship, but I'm not exactly sure of

18  it right now.

19  Q.  Well, did you get a sense that Ms. Lopez did not like

20  what Norma Cabadas was doing?

21          MR. EBERT:  Objection.  Lack of foundation.

22          THE COURT:  Overruled.

23          You may answer if you can.

24          THE WITNESS:  I don't know about what she wouldn't

25  have liked or not liked with Norma Cabadas.  I don't know.

1   BY MR. UDOIBOK:

2   Q.  But you don't have any information whether or not there

3   was bad blood between Lopez and Cabadas?

4           MR. EBERT:  Objection.  Lack of foundation.  He

5   said he does not know.

6           THE COURT:  Sustained.

7   BY MR. UDOIBOK:

8   Q.  All right.  Do you know which department Ms. Lopez

9   worked?

10  A.  Based on the email, I believe claims.

11  Q.  Are you sure?  Based on the email?  Where in this

12  email -- all right.  Thank you.

13          Let's go to the next sentence.  "My whole thing."

14  "My whole thing."  The next sentence.

15          You can go back and pull out and highlight the

16  next sentence.  "My whole thing."  Director.  There you go.

17  Take from, "My whole thing."  All right.

18          So the next says, "My whole thing is they had to

19  see this and know from the beginning now that they don't

20  like they are benefitting from this job.  They feel the need

21  to put a stop.  To me" -- put a stop.

22          What was that all about?

23  A.  I would let the text speak for itself.  I am not exactly

24  sure, but for what it reads.

25  Q.  Does it read like someone is complaining that they are

1    not benefitting from the job at Feeding Our Future?

2    A.  That's reasonable.

3    Q.  Go to the next one.

4         "I feel like everyone is in it for the wrong

5    reasons and no one cares about the workers that work here

6    and will lose a good job just because someone was hurt and

7    instead of staying and fighting it the right way, they

8    rather be petty about things."

9         Do you see that?

10   A.  I do see that, yes.

11   Q.  "Staying and fighting," does that also read like someone

12   who has a gripe?

13        MR. EBERT:  Objection.  Lack of foundation, Your

14   Honor.

15        THE COURT:  Sustained.

16   BY MR. UDOIBOK:

17   Q.  Do you know what Ms. Lopez meant that people ought to

18   stay and fight?

19   A.  I do not know.

20   Q.  All right.  The next sentence, I believe, says, "Like I

21   said everything could be handled differently.  I know this

22   job is a big blessing for a lot of us, and I don't take

23   people for granted that help me have this opportunity, but

24   if I truly feel like it's not the right thing, I won't be a

25   follower either."

1              Do you have any idea what that's about?

2     A.  I think I might know what that's about.

3     Q.  What's that about?

4     A.  I think people were leaving because they were afraid

5     that the FBI was going to come raid them because of the

6     fraud.

7     Q.  You read that from that?

8     A.  I -- that's what I believe based on interviews.

9     Q.  All right.  But you thought people were afraid FBI would

10    come.  Is FBI mentioned in that email?

11    A.  No, but you asked me what I --

12    Q.  No.  I know I asked.

13    A.  FBI is not, no.  They are not, yes.

14    Q.  Is even police mentioned?

15    A.  No.

16    Q.  Is law enforcement mentioned?

17    A.  No.

18    Q.  All right.  Next sentence.

19              "I really hope you understand what I am telling

20    you and understand if you say anything about this right away

21    they will know I told you."

22              Do you see that?

23    A.  Yes.

24    Q.  All right.  She is, Ms. Lopez is actually confiding with

25    Aimee Bock, correct?

1     A.  Correct.

2     Q.  And Ms. Lopez is not accusing Ms. Bock of fraud, is she?

3     A.  Based on that first line, I believe so.

4     Q.  All right.  The first line says, "They strongly believe

5     you are doing fraud."

6     A.  Correct.

7     Q.  And that "they," you don't know who the "they" are,

8     correct?

9     A.  Again, I believe it was the staff.  I could be wrong,

10    but someone believes Ms. Bock's doing fraud.

11    Q.  Sir, if you are guessing, it's okay to say you are

12    guessing.  Okay?

13    A.  I'm not going to guess.

14    Q.  All right.  So you don't know who they are.

15         And the next sentence says, "And will make this

16    place extremely difficult to work in."

17         Do you see that?

18    A.  I do.

19    Q.  Is that a threat?

20         MR. EBERT:  Objection, Your Honor.  Lack of

21    foundation.

22         THE COURT:  Sustained.

23    BY MR. UDOIBOK:

24    Q.  Do you understand what that meant?

25    A.  I mean, reading the email, it speaks for itself.

```
1    Q.  All right.  It goes -- the next one says, "I may not say
2    much and people might think I'm dumb, but one thing I don't
3    like is feeling controlled by people and playing these games
4    instead of just asking and having all of us be honest."
5             Do you see that?
6    A.  I see that, yes.
7    Q.  When you met with Ms. Lopez, did you have access to this
8    email?
9    A.  When I met with her, I don't believe I did.
10   Q.  All right.  "I have other important things going on in
11   my life and I know others do too.  Please, please.  I hope
12   you understand what I am telling you.  If you want to have a
13   meeting, we can.  It would just have to be when they leave."
14            Do you see that?
15   A.  Yes.
16   Q.  Do you know who "they" are?
17   A.  In what context?
18   Q.  Then last says, "And again I hope you can keep this
19   between us.  You'd be surprise who turned on you if you
20   don't already know."
21            Do you see?
22   A.  I see that, yes.
23   Q.  Do you know who Ms. Bock is referring to "turning on
24   her"?
25   A.  Ms. Lopez, you mean?
```

GARBE - CROSS BY MR. UDOIBOK

1    Q.  I mean Ms. Lopez.  Sorry.

2    A.  Yeah.  Who's going to turn on her?

3    Q.  Yes.

4    A.  Who specifically, I don't know.

5    Q.  Do you get a sense that Ms. Lopez felt that there are

6    people at Feeding Our Future that would turn on Ms. Bock?

7            MR. EBERT:  Objection.  Calls for speculation.

8            MR. UDOIBOK:  If he knows.

9            THE COURT:  You may answer if you know.

10           THE WITNESS:  I don't know who.  I mean, I don't

11   know which employee or which site or individuals may turn on

12   Ms. Bock.

13   BY MR. UDOIBOK:

14   Q.  Do you have any information one way or the other whether

15   Ms. Bock upon receiving this email on December 14th, 2021,

16   took any action?

17   A.  I do believe they had an all-office meeting at one

18   point, but whether it's before or after this, I can't

19   recall.

20   Q.  An all-office meeting addressing this concern, correct?

21   A.  I don't, I don't know that to be true.

22   Q.  It wasn't something that Ms. Bock disregarded, was it?

23   A.  I don't know that.  When I say "all-office," I meant

24   sites as well coming.  I do recall a large meeting.

25   Q.  To describe what an employee may have told her about

GARRET KNOX - CROSS BY MR. UDOIBOK

```
1    what, whatever is going on out there regarding fraud,
2    correct?
3    A.  No.  It was about, it was somewhat about fraud and how
4    individuals were spending their money.
5    Q.  She wanted to know, correct?
6    A.  She --
7    Q.  By "she," Ms. Bock.
8              MR. EBERT:  Objection.  Lack of foundation.
9              THE COURT:  You may answer if you can.
10             THE WITNESS:  There was a meeting where she told
11   individuals at sites to stop spending and flaunting their
12   money because it's going to be exposed, is what happened at
13   that big meeting.
14   BY MR. UDOIBOK:
15   Q.  All right.  Is your testimony that -- by the way, when
16   did that meeting occur?
17   A.  It was sometime in December is my understanding from
18   what witnesses have told us.
19   Q.  Was that after Ms. Lopez or before Ms. Lopez's --
20   A.  That's, as I said before, I'm not sure when that meeting
21   with all the sites occurred.
22   Q.  Do you have a recording of that meeting?
23   A.  I do not, but there is -- there are witnesses that said
24   that the meeting was recorded.  I have not seen that
25   recording or obtained it.
```

GARRETT-BOCK - REDIRECT BY MR. UDOIBOK

1   Q.  Okay.  The meeting was recorded and let me -- tell me

2   what you know about what was discussed at that meeting.  The

3   first you testified that Ms. Bock was advising sites not to

4   flaunt their money, correct?

5   A.  Correct.

6   Q.  Do you know whether anyone was flaunting money?

7   A.  Yes, I mean new vehicles, new houses.

8   Q.  Is that flaunting money?  Buying a car?

9   A.  Buying multiple cars, having a new car.

10  Q.  So let's just discuss a little bit about flaunting.  At

11  that meeting the word "flaunting" was, was used, you said?

12  A.  I can't be certain, but that was my understanding of

13  what the meeting, based on what people told me.

14  Q.  All right.  What site was that?

15  A.  Sorry.  Which site?

16  Q.  What site was it?  Was it at Feeding Our Future or at a

17  site?

18  A.  The meeting, my understanding, was it took place at

19  Feeding Our Future.

20  Q.  Okay.  At Feeding Our Future building.  Suppose all the

21  employees were there, most of the employees?

22  A.  You know, I remember it being a lot of the sites, and it

23  was a time when Ms. Bock had just created a new entity.

24  Q.  Wait a minute.  When you said, "A lot of the sites," are

25  you referring to the Feeding Our Future, owners of Feeding

1      Our Future sites?

2      A.  Yeah.  So a lot of the sites from around the state came

3      to a meeting that was being held at Feeding Our Future, is

4      my understanding.

5      Q.  And the purpose of that meeting based on your

6      investigation is to tell the sites not to flaunt money?

7      A.  Well, it was actually to get money for legal fees, sell

8      a binder, and also the discussion of, you know, getting in

9      trouble.

10     Q.  Okay.  Selling a binder.  And that meeting occurred

11     sometime in December?

12     A.  Some people have told us it was in November.  Some have

13     told us December.  Pinpointing that actual meeting, that's

14     why I said when I talked about this December 14th, I wasn't

15     sure whether it was before or after that.  I believe it was

16     after.

17     Q.  And it involved, just I want to make sure, one is

18     selling binders and not to flaunt money?

19     A.  Or words to that effect.

20     Q.  And what else?

21     A.  At the meeting there were a number of people there that

22     were told they needed to step up.

23     Q.  "Step up."

24             Just a moment, Your Honor.

25             Ms. Mallet, would you pull up Exhibit 895 that is

```
 1   not in evidence.
 2                        (Counsel confer)
 3         MR. EBERT:  Your Honor?
 4         MR. UDOIBOK:  Your Honor, may I approach?
 5         THE COURT:  We're going to take our 15-minute
 6   break and come back at 10:35.
 7         All rise for the jury.
 8   10:29 a.m.
 9                    IN OPEN COURT
10                  (JURY NOT PRESENT)
11         THE COURT:  Counsel, I don't have an 895.
12         MR. UDOIBOK:  I wasn't -- Your Honor, we weren't
13   planning -- it wasn't an exhibit that we were going to offer
14   in the case in chief.  I didn't know that this, the witness
15   would even bring that up.
16         THE COURT:  Well, figure it out.  You have till
17   10:45.
18         MR. UDOIBOK:  All right.
19       (Recess taken at 10:30 a.m. till 10:47 p.m.)
20   10:47 a.m.
21                    IN OPEN COURT
22                   (JURY PRESENT)
23         THE COURT:  You may all be seated.
24         Mr. Udoibok, you may continue.
25         MR. UDOIBOK:  Thank you, Your Honor.
```

CROSS EXAMINATION BY MR. UDOIBOK

1    BY MR. UDOIBOK:

2    Q.  And so your testimony before we took a break was,

3    Ms. Bock had an all out meeting and discuss a binder?

4    A.  Something about that related to child care locations.

5    Q.  And do you know what the binder was about?

6    A.  It was related to regulations.

7    Q.  And then, and then not -- the next topic, based on your

8    testimony, was talk about don't flaunt your money?

9    A.  Something of that nature, yes.

10   Q.  It's not a good thing to flaunt money, is it?

11   A.  It depends, I guess.

12   Q.  And the third was to step up?

13   A.  Yes.

14   Q.  Do a good job?

15   A.  Step up in the terms of, it was more related to

16   providing money for legal defense related to Feeding Our

17   Future is my recollection what people have told me.

18   Q.  And legal defense, is it, was it relating to the lawsuit

19   that Feeding Our Future had with the State of Minnesota?

20   A.  Specifics around what the funds were for or to be used

21   was not something that I had an understanding of.

22   Q.  But it was for legal, legal -- should I call it legal

23   defense fund?

24   A.  Again, it was something related to being legal defense

25   and stepping up in that nature, meaning provide money for

GARZARELLI - CROSS BY MR. UDOJI/BROOK

1    legal for Feeding Our Future because they were the ones that

2    have given you this opportunity, it was time for you to step

3    up.

4    Q.  Do you know whether Feeding Our Future can use food

5    money for litigation?

6    A.  I don't know -- I guess the percentage that they are

7    allowed to maintain, the 10 to 15 percent, I would assume

8    there would be something in there.  But I do not know the

9    regulations related to the legal, the way they could use

10   their specific administrative fee funds.

11   Q.  Would you, would it surprise you that certain nonprofits

12   cannot use, you know, their funds for litigation?

13   A.  I am not familiar with the regulations related to a

14   nonprofit and their use of funds for legal reasons.

15   Q.  Okay.  All right.  And nonetheless, talking about

16   Ms. Lopez, did you gather any information who within Feeding

17   Our Future that Ms. Lopez suspected?

18   A.  I'm sorry.  Could you rephrase or repeat?

19   Q.  I said, do you know who within Feeding Our Future that

20   Ms. Lopez suspected of not stabbing Ms. Bock in the back?

21   A.  I don't really understand the question.

22   Q.  All right.  I will try.

23          Do you know who Ms. Lopez was referring to not

24   getting something out of the job?

25   A.  "They don't feel like they are benefitting from this

1    job."

2    Q.  Yes.

3    A.  I don't know what specific person she would be referring

4    to.

5    Q.  Do you know what the benefit of the job was?

6    A.  I know there were a number of individuals that were

7    happy they were making money they'd never made before.

8    Q.  Yes.  And do you know -- I believe you testified earlier

9    about Norma Cabadas, correct?

10   A.  Yes.

11   Q.  All right.  Do you know whether Norma Cabadas was one of

12   the employees who did not benefit from the job?

13   A.  I believe she benefited from the job.

14   Q.  She did?

15   A.  Yes.

16   Q.  Do you know whether Norma Cabadas wanted a site at

17   Feeding Our Future?

18   A.  I don't know if she wanted a site specifically, no.

19   Q.  Do you know whether Ms. Lopez informed through this

20   email for Ms. Bock to be concerned about employees who

21   aren't happy and will make, you know, allegations of fraud

22   like that?

23   A.  I'm sorry.  Could you repeat?

24   Q.  Do you know whether Ms. Lopez, this email to Ms. Bock by

25   Ms. Lopez, was to alert Ms. Bock that there are unhappy

DIRECT EXAMINATION BY MR. UDOIBOK

```
 1    employees who will make allegations of fraud?
 2    A.  I would let the email speak for itself related to what
 3    she was conveying.
 4    Q.  All right.  So let me just make sure I understand what
 5    your testimony is.
 6            You believe that this email indicated that there
 7    was someone that "they," more than one person, believe
 8    Feeding Our Future was engaged in fraud, correct?
 9    A.  As the first line reads, "They strongly believe you are
10    doing fraud," and the email is directed to Aimee Bock.
11    Q.  Yet at the same time, Ms. Lopez felt that the employees
12    should remain and fight, correct?
13    A.  Remain and fight?
14    Q.  Why don't you go to the -- it's a lot of run-over
15    sentencings, but we will try.
16            It says, the third line from the bottom, it says,
17    if you can see it, "I have other important things going on
18    in my life and I know others do too.  Please.  Please.  I
19    hope you understand what I am telling you.  If you want to
20    have a meeting, we can.  It would just have to be when they
21    leave."
22            Correct?
23    A.  That's what it says, yes.
24    Q.  All right.  Do you understand that email as Ms. Lopez
25    telling Ms. Bock confidentially about unhappy people maybe
```

1    within Feeding Our Future, correct?

2    A.  I interpret that as she wants to meet with her in

3    private so that others don't know that they are meeting.

4    Q.  All right.  Did you get the sense from this email that

5    Ms. Lopez believe that Ms. Bock was engaged in fraud?

6    A.  It's someone else is saying that to her that they

7    believe that, not necessarily Ms. Lopez.

8    Q.  Now did you get the sense from this email that Ms. Lopez

9    believed Aimee Bock was engaged in fraud?

10   A.  It's my interpretation it somewhat alludes to it, but

11   not specifically.

12   Q.  So where in this document do you discern that Ms. Lopez

13   believed Aimee Bock was engaged in fraud?

14   A.  Where it says, "You are not answering their questions."

15   "You are prepaying people," which is a reimbursement

16   program.  "Not having honest conversations."

17   Q.  No.  No.  Let's just -- where are you just -- could

18   you --

19   A.  Or sit down and have an honest conversation.

20   Q.  So let's just make sure we are on the same spot.

21        So that sentence says, "So many questions they are

22   afraid to ask because no one questions the boss, but I feel

23   like this needs to be ask.  They rather take you to court

24   instead of sitting down and having an honest conversation."

25        Do you see that?

1    A.  I do, yes.

2    Q.  It says they are afraid to talk Ms. Bock, but they

3    rather take her to court rather than talk to her?

4    A.  Correct.

5    Q.  All right.  Is it possible based on your investigation

6    and this exhibit that these are just people having a gripe

7    but don't have the guts to talk to Ms. Bock about what their

8    problems are?

9            MR. EBERT:  Objection.  Argumentative.  Also calls

10   for speculation.

11           THE COURT:  Sustained.

12   BY MR. UDOIBOK:

13   Q.  All right.  Based on the first three lines of this

14   document, the first sentence, it doesn't say, does it, that

15   Ms. Bock is engaging in fraud, does it?

16   A.  It does not specifically say those words, no.

17   Q.  Okay.  The next thing, the next sentence says, My whole

18   thing is that had to -- they had to see this and know from

19   the beginning now that they don't like they have -- they

20   don't like they are benefitting from this job.  They feel

21   the need to put a stop to me -- or put a stop.  To me I feel

22   like everyone is in it for the wrong reasons.

23           Do you see that?

24   A.  I do.

25   Q.  "Everyone," do you know who she's referring to?

1    A.  Everyone.

2    Q.  How about all of those who are complaining in the job

3    for the wrong reason.  Is it possible?

4    A.  I mean, it states, "Everyone."

5    Q.  All right.  Does it say all members of Feeding Our

6    Future?

7    A.  Again, I'm going to go with what the email says.  It

8    says, "Everyone."

9    Q.  Does it say Ms. Lopez herself is engaged for the wrong

10   reason?

11            MR. EBERT:  Your Honor, I'm going to object to

12   asked and answered.  I think that the email speaks for

13   itself.

14            THE COURT:  Sustained.

15   BY MR. UDOIBOK:

16   Q.  All right.  It says, "Nobody cares about the workers

17   that work here and will lose a good job just because someone

18   was hurt, and instead of staying and fighting it the right

19   way, they rather be petty about things."

20            So someone was hurt, and instead of the person

21   staying and fighting, they rather be petty.

22            Do you see that?

23   A.  I do.

24   Q.  And the petty, does it read to you that "petty" is the

25   accusation of fraud?

1   A.  I guess I don't believe they said the accusation of

2   fraud is petty.  No.  I guess I don't understand the

3   question.

4   Q.  But Ms. Lopez is saying that the job is a blessing for a

5   lot of us.  I don't like people -- I don't take people for

6   granted that help me and have this opportunity, but I truly

7   feel like it is not the right thing.  I won't be a follower

8   either.

9          Do you see that?

10  A.  I do see it says that, yes.

11  Q.  Does it admit to you that she, Ms. Lopez, will not be a

12  follower of those making accusation of fraud?

13  A.  Again, I'd say that she, I guess I interpreted it a

14  certain way.

15  Q.  All right.  I want to direct you to V13 and V38 that you

16  testified earlier.  V13 and V38.  Let's take V13, 13.

17          Ms. Mallet, would you call out the sponsoring

18  authority section, the bottom half, the bottom section.  My

19  system is very slow.  V13.  Call out sponsoring authority

20  certification section.  There you go.

21          You testified earlier that that sponsoring

22  certification implied, correct me if I am wrong, that

23  Ms. Bock took full responsibility for whatever documents she

24  submitted to MDE; is that correct?

25  A.  Correct.

1    Q.  Now let's take that sentence clearly.  All right.  It

2    says, "I hereby take full responsibility for ensuring that

3    this claim accurately represents the number of meals served

4    by the reimbursement category."

5            Do you see that part?

6    A.  I do.

7    Q.  And, "That records are available to support this claim."

8            Do you see that part?

9    A.  I do.

10   Q.  Now, as far as you know from Exhibit 13, did Feeding Our

11   Future receive an approved site identification ID?

12   A.  I believe this one associates with the Safari location,

13   so yes, they would.

14   Q.  Yes.  You couldn't get this far without an approved site

15   ID, correct?

16   A.  Yes, that's correct.

17   Q.  And then there was a meal count, approved meal count,

18   correct, for Safari?

19   A.  I don't know what you mean by "approved meal count."

20   Q.  Well, there was an allocation.  There was a number of

21   meals that Safari was able -- allowed?

22   A.  A number of allowable meals approved, correct.  Yes.

23   Q.  And then the compensation came from that allowable meal

24   counts, correct?

25   A.  Yes.

1   Q.  You saw, based on your investigation, you saw receipts

2   from Safari, correct?

3   A.  I did, yes.

4   Q.  And you also saw, you've testified to that meal counts?

5   A.  I have, yes.

6   Q.  And obviously was the CLiCS data, was it consistent with

7   the allow meal counts?

8   A.  When you say the "CLiCS data consistent with the meal

9   counts," I --

10  Q.  Well, you remember the allowed, the monthly allowance.

11  And say how many days do we have in March?

12  A.  31.

13  Q.  31 days.  You testified about 31 days, all right,

14  earlier?

15  A.  Correct.

16  Q.  Now was the math, was the math in excess of 31 days of

17  meals, of food deliveries?

18  A.  It's not, no.

19  Q.  Okay.  So Ms. Bock certifies that based on this

20  certification the site was approved, meal count was

21  consistent and the receipts were there, and she sent it to a

22  place for payment.  Again, I don't want to repeat myself.

23          What additional obligation did Feeding Our Future

24  and Ms. Bock have when attesting that she went through claim

25  verification?

DARRIS COX - CROSS BY MR. UDOJI BOOK

1   A.  The contractual obligation and, I mean, really common

2   sense to know that that wouldn't be possible to serve that

3   many meals.

4   Q.  Well, you testified earlier that you saw videos from

5   your pole cam video of food being delivered.  You saw that,

6   right?

7   A.  Very minimal amounts, yes.

8   Q.  But let's assume, let's assume Ms. Bock saw the same

9   video you saw.  Remember you are the federal government and

10  you had a pole cam that she can't have, she saw what you

11  saw.

12          What more would she have done?  Would she have

13  stood outside the Safari Restaurant and searched food

14  delivery?

15  A.  Confirm rosters, I mean, that site there, Safari.  There

16  was another site right next door that was doing just as

17  many.  I guess I would expect more to be done, yes.

18  Q.  But what more?  Tell me what is reasonably more.

19  A.  Confirm children that are in need in that area.

20  Q.  How?  By she sent her staff for inspection.  As you, as

21  you have seen from the video, you were not able to tell the

22  amount of food that was delivered.  Could you?  You

23  couldn't.

24  A.  I could tell the difference between thousands of meals

25  and a few meals being distributed, I could tell that, yes.

1    Q.  But your testimony wasn't that, though.  Your testimony

2    was, you didn't know the amount of food being carried into

3    the vehicles.

4    A.  I would disagree with that.  My testimony is clear that

5    I couldn't know exactly the portions that were provided, but

6    there was no possible way that the meal count sheets would

7    add up to that total huge volume that was being submitted

8    daily, month after month.

9    Q.  Let's go to the next line.  It says, "That I understand

10   this information is being given in accordance with the

11   receipt of federal funds that officials of the U.S.

12   Department of Agriculture and Minnesota Department of

13   Education may verify this information."

14           Do you see that?

15   A.  I do.

16   Q.  Do you know whether or not Minnesota Department of

17   Education at any time verified the information?

18   A.  I believe Ms. Honer testified about trying to get

19   clarification and more verification and other information to

20   support the claims by not only did they issue a stop pay so

21   that they could review the claims before the payments were

22   made, they wanted to see the rosters of the children before

23   they got paid.

24           So, yes, they did try to verify.

25   Q.  They did try to verify, and was it based on your

1    investigation, did Minnesota Department of Education at any

2    time stop Feeding Our Future claims submitted for fraud?

3    A.  Did they stop them?

4    Q.  Yeah.

5    A.  Yes.  They put a stop pay on.  They attempted to stop.

6    However, they continued to pay.

7    Q.  My question is, Did they at any time, for fraud, though,

8    did they stop payment for fraud?

9    A.  I don't know the technical what they did.  On

10   January 20th of 2022, when our affidavits were unsealed,

11   they took action to stop the pay.

12   Q.  All right.  When your affidavit was unsealed.  I'm

13   saying before the search warrant, before the search warrant,

14   based on your investigation, did Minnesota Department of

15   Education at any time stop payment because of fraud?

16   A.  They attempted to but were unsuccessful.

17   Q.  All right.  And they were unsuccessful because the

18   courts won't allow them?

19   A.  It was a variation of that, but, yes, essentially the

20   rules that were in place didn't allow them to stop.

21   Q.  Okay.  And then the next part -- I want to make sure the

22   jury understands this -- that the next one, "And that

23   deliberate misrepresentation."  "Deliberate

24   misrepresentation."

25             You know that, right?  You know what that means?

995

```
 1    A.  Yes.
 2    Q.  If you know something is wrong and you pushed it to MDE,
 3    right?
 4    A.  Correct.
 5    Q.  Knowledge is important, right?
 6    A.  Yes.  Intentional, yes.
 7    Q.  Let's pull up V38.  What month are we talking about
 8    here?
 9    A.  June of 2020.
10    Q.  Now, how many days is the claims for?
11    A.  It appears to be 21.
12    Q.  And how many days is in June?
13    A.  I believe it's 30 days in June.
14    Q.  All right.  And how many meals are claimed?
15    A.  75,366.
16    Q.  For how many days?
17    A.  Be 21 days.
18    Q.  It's not for more days than we have in June, correct?
19    A.  No.  This would be the changeover of programs.  They end
20    at --you know, it switches over.  In June the program
21    switches over to the end of the school year CACFP.
22    Q.  Nevertheless, the meal count is consistent with the
23    approved meal count for the site, correct?
24    A.  Yes.  It's the allowable amount, yes.
25    Q.  Well, I want to talk about the concerns that you
```

1   testified earlier about concerns Hamdi raised.  Do you

2   remember that testimony?

3   A.  Yes, I do.

4   Q.  Ms. Mallet, would you call up S119.  That's a government

5   exhibit.

6              Just a second, Your Honor.

7              (Counsel confer)

8   BY MR. UDOIBOK:

9   Q.  Let's -- sorry.  Not S119.  Let's go to W27.  W27.  My

10  system is slow.

11             (Counsel confer)

12  BY MR. UDOIBOK:

13  Q.  All right.  So you testified about this account,

14  correct?

15  A.  Correct.

16  Q.  Now, I just want to know, is it your testimony that

17  Ms. Bock in any way should have had information about this

18  banking process?

19  A.  No, it's not my testimony.

20  Q.  What about W -- let's go to W82.

21             Is Ms. Bock in any way connected to this account?

22  A.  Just the deposits coming in from Feeding Our Future.

23  That's the only connection, but not --

24  Q.  Her relation, it's just payment?

25  A.  Correct.

1    Q.  Okay.  What about, let's talk about A61, please.

2              All right.  And this is, this is an email that you

3    discuss from Ms. Bock to Hamdi, is that it?

4    A.  Yeah, the chain starts with an email from Hamdi to

5    Ms. Bock and then Ms. Bock saying that we will look at this

6    right away.

7    Q.  All right.  Do you have any information whether or

8    not -- or no.  By the way, what site was that about?

9    A.  The Halal Food Kitchen and the U.S. Chamber of Commerce

10   and Care Community Services.

11   Q.  Now do you know one way or the other whether Ms. Bock

12   through Feeding Our Future terminated that site?

13   A.  I believe that site was eventually terminated, yes.

14              MR. UDOIBOK:  No further questions.

15              THE COURT:  Mr. Montez, do you have any recross?

16              MR. UDOIBOK:  No, Your Honor.  Thank you.

17              THE COURT:  Mr. Ebert.

18              MR. EBERT:  No, Your Honor.  Thank you.

19              THE COURT:  You may step down, Special Agent Kary.

20   Thank you.

21              THE WITNESS:  Thank you.

22              THE COURT:  And the government may call its next

23   witness.

24              MR. BOBIER:  Your Honor, the government calls

25   Stacy Koppen.

DIRECT EXAMINATION BY MR. BOBIER

998

```
1              THE COURT:  Good morning.  You are going to come
2     all the way up here.  And then I will have you stand before
3     me to take the oath.  Raise your right hand.
4                          STACY KOPPEN,
5     called on behalf of the, was duly sworn, was examined and
6     testified as follows:
7              THE WITNESS:  I do.
8              THE COURT:  Thank you.  You may be seated.
9              And then when you are comfortable, would you
10    please state and spell both your first and last name for the
11    record.
12             THE WITNESS:  Certainly.  My name is Stacy Koppen,
13    spelled S-T-A-C-Y, last name is K-O-P-P-E-N.
14             THE COURT:  All right.  Ms. Koppen, counsel is
15    going to ask you some questions.  I'd like you to speak
16    directly into the microphone.  In addition, the court
17    reporter is taking down everything you say, so I'm going to
18    caution you to be as slow as you can.
19             THE WITNESS:  Slow.  Okay.
20             THE COURT:  And you and Mr. Bobier are not going
21    to talk over each other.  All right?
22             THE WITNESS:  Okay.
23             THE COURT:  Mr. Bobier, you may proceed.
24             MR. BOBIER:  Thank you, Your Honor.
25
```

0:22-cr-00223-NEB-DTS

1                        DIRECT EXAMINATION

2       BY MR. BOBIER:

3       Q.  Good afternoon, Ms. Koppen, or maybe I guess good

4       morning.

5              How are you?

6       A.  Good.

7       Q.  Thank you for waiting.

8              The jury's heard your name.  Could you tell them

9       where you live?

10      A.  Yes.  My name is Stacy Koppen.  I live in Maplewood,

11      Minnesota.

12      Q.  Maplewood, that's north St. Paul --

13      A.  Correct.

14      Q.  Or right outside St. Paul?

15      A.  Yes.  Sorry.

16             THE COURT:  Don't talk over him.  Go slow.  I

17      know.  This is not a natural setting for you.  I understand

18      that.

19             THE WITNESS:  Thank you.

20             THE COURT:  You may continue.

21             MR. BOBIER:  And that one was my fault.

22      BY MR. UDOIBOK:

23      Q.  Where are you from?

24      A.  I am originally from east Texas.

25      Q.  It is a lot colder up here.

0:22-cr-00223-NEB-DTS

1000

1    A.  Much colder.

2    Q.  Just to give the jury an idea for your background, can

3    you tell them how far you went in school?

4    A.  Yes.  Certainly.  I actually have a master's of science

5    degree.  I attended Stephen F. Austin University for both my

6    bachelor's and master's degree.

7    Q.  After you left Stephen F. Austin University with your

8    master's, what did you do for work?

9    A.  I worked as a registered dietitian, so I started off in

10   large hospitals and then went on to large hospital systems

11   until I gained my employment at St. Paul Public Schools

12   where I am today.

13   Q.  What do you do for St. Paul Public Schools?

14   A.  Yes.  So at St. Paul Public Schools, I am the nutrition

15   services director, so I oversee all the aspects of our child

16   nutrition programs, as well as our programs that we have

17   with our community partners as well.

18   Q.  So first, just to level set, the jury heard a little bit

19   earlier when you weren't here about St. Paul public school

20   district.

21          But maybe you could tell us.  How large of a

22   district is that?

23   A.  Yes.  So we are one of the largest school districts in

24   Minnesota.  We have 34,000 students in our district right

25   now, and that's students in every age across the child and

1     adolescent span.

2             So pre-K through 12 are our normal grade levels,

3     but we do have also a number of adult programs, as well as

4     some very early childhood daycares as well.

5     Q.  So how many buildings are in the district that house the

6     classrooms for the 34,000 students?

7     A.  Students, yes.  So we have 60 buildings where we provide

8     services on-site to our students.

9     Q.  Did you say 60, six zero?

10    A.  60, yes.  And just to add on to that to give you the

11    full breadth, we do provide supports in parks, recs and

12    community centers.  So we have about 20 locations outside of

13    our district where we also provide meals or snacks.

14    Q.  We'll talk about the nutrition function of your job in

15    just a second, but I want to make sure I understand the

16    scope of your responsibilities.

17            Could you give us your title again?

18    A.  Yes.  I'm the nutrition services director.

19    Q.  And how many people are under your supervision as

20    director?

21    A.  Yes.  For this program, the number of employees in our

22    department is just over 325 employees.

23    Q.  What sorts of jobs do these 325 employees have?

24    A.  Yes.  So these employees are doing everything for the

25    production and the service of meals.  So everything from we

1   have truck drivers who receive meals and warehouse drivers

2   who put those away, as well as getting those meals out to

3   our sites.

4           But we have front line staff who are handling that

5   food, preparing that food, packaging that food as well.  We

6   operate somewhat as a manufacturer to a certain degree

7   because of our size.

8           It includes the management team, the purchaser, as

9   well as myself.  And then everyone in the schools and the

10  cafeterias.  So everyone is serving food or serving as a

11  cashier and anyone who is doing paperwork in those schools,

12  too.

13  Q.  Pretty large operation?

14  A.  Yes.

15  Q.  I want to talk to you a little bit about your school

16  district's paragraphs in the federal food programs.  Do you

17  have some familiarity with those programs?

18  A.  Yes, very much.

19  Q.  And does your school district participate in those?

20  A.  Yes.

21  Q.  Has that been true historically?

22  A.  Yes.

23  Q.  And I take it that's still true today?

24  A.  Correct.

25  Q.  First let's just talk about the district's participation

1    in those programs before COVID.  Okay?

2    A.  Okay.

3    Q.  Districtwide, could you have give us an estimate if you

4    have one in those pre-COVID years for about how many meals a

5    day the school district would provide?

6    A.  Yes.  Certainly.  So prior to the pandemic, we served an

7    average of 28,000 lunches each day and about 21,000

8    breakfasts each day, and we also did serve suppers at a

9    number of our schools too.

10              So I think it was around a quarter of a million

11   suppers per year.

12   Q.  Per year?

13   A.  Yes.

14   Q.  And again, the 29,000 meals per day you are describing,

15   that's just part of your distribution being one of the

16   largest school districts in the state?

17   A.  Correct.

18   Q.  Across those 60 buildings you described?

19   A.  Yes.

20   Q.  I want to ask you a little about the infrastructure your

21   school district has to be able to provide that many meals.

22   All right?

23   A.  Yes.

24   Q.  Well, first, you mentioned you, I think you used the

25   word "manufacture" some of the meals?

```
1    A.  Yes.

2    Q.  What do you mean by that?

3    A.  So that's my way of sort of painting the picture.  We

4    are one of only two school districts in the state that has

5    what we call a central kitchen, so it's a very large

6    building where we receive very, very large quantities of

7    food, you know, pallets and pallets of ingredient for

8    example.

9            And we take that, those raw ingredients, and we

10   actually make very large volumes of food that then we

11   package into, again, also a large quantity that would be

12   suited for like a school building where we're serving

13   hundreds or maybe a thousand students.

14           So we package that.  We, obviously we put it in

15   refrigerators or freezers to keep it safe, but then we also

16   truck it to those schools each day.  That's what I'm really

17   referring to when I talk about our central kitchen.

18   Q.  You said you truck the food from the central kitchen to

19   the schools every day?

20   A.  Every day.

21   Q.  Each of those 60 buildings?

22   A.  Yes.  Every building gets a delivery each day, and just

23   to, you know, paint an even clearer picture, it's part of a

24   very complex system.  So we do this part of it, and I would

25   say it resembles what a manufacturer would do.  That's
```

0:22-cr-00223-NEB-DTS

1005

1    really like the level of volume that we're talking about.

2    It is like a small manufacturer.

3            But then in our school buildings, our school

4    buildings are also still receiving deliveries from, you

5    know, other vendors as well.  It's, it's not a small

6    operation.  Let's just put it that way.

7    Q.  Before I ask you a bit more about the central kitchen

8    you are describing, are there other kitchens at some of the

9    buildings in your broader school district?

10    A.  Can you say that one more time?

11    Q.  Do those individual schools have their own kitchens in

12    addition to the large central kitchen you described?

13    A.  That's a great question.  All of our schools do have

14    kitchens.

15    Q.  And I assume those are operational and have the ability

16    to make food for kids?

17    A.  Yes.  And they are all, we are all -- always adhering to

18    the Minnesota Department of Health's regulations as well.

19    So we're fully functioning and licensing kitchens.

20    Q.  Let me ask you a little bit about this central kitchen

21    you mentioned.

22    A.  Okay.

23    Q.  How big are we talking here?  Is it bigger than this

24    courtroom?  Help us get an idea for the size.

25    A.  Yes.  It's much bigger than this courtroom.  Our

1    production floor is also bigger than this courtroom.

2              The total square footage of the central kitchen is

3    37,000 square feet.  So reference-wise, I think a football

4    field is around 50,000 square feet, if I'm correct.  So

5    we're talking about something that, even though we do have

6    some vertical height, but we are talking about something

7    that's, you know, can take up a substantial amount of land

8    and take quite a bit of space.

9    Q.  So what is housed in that 37,000-square-foot facility

10   you've described?

11   A.  Yep.  So we have a very large production space.  As I

12   just mentioned, it's 10,000 square feet.  We have 17,000

13   square feet of refrigeration, meaning both freezers and

14   coolers, another 10,000 square feet of dry storage space,

15   two loading docks.  And that is just the tip of the iceberg.

16   We do also still have some offices in that building as well.

17   Q.  All right.  I want to go through each of those, if you

18   will allow me.

19   A.  Okay.

20   Q.  You mentioned 10,000 square feet of dry food storage; is

21   that right?

22   A.  Correct.

23   Q.  Why is that important?

24   A.  That's critical because in order to provide the number

25   of meals that we, that we provide each day, we absolutely

1   have to have that ample amount of space in order to get

2   things in to have them ready on hand and to be able to route

3   those out to our schools and/or our partner sites.

4   Q.  So just talking about this dry food storage part of the

5   bigger 37,000 square foot facility, is there staff that

6   handles inventory in that part of the facility?

7   A.  Yes.  So we have two dedicated warehouse staff members

8   who are helping with the receiving and putting away of that

9   food, as well as getting it ready for the seven truck

10  drivers.

11          But aside from that, we have 30 front line staff

12  members that are constantly handling that food, staging it,

13  reorganizing it, and that's just for the front line staff.

14  Q.  And when the jury might picture this dry food storage,

15  are we picturing individual staff members picking up sacks?

16  Are we picturing forklifts?  What's the scope?

17  A.  So most of the food is on pallets, and those pallets are

18  vertically stacked as well.  So you actually have to have

19  staff who -- and the food can only be really transferred

20  with either a pallet jack or a forklift, depending on what

21  it is and how tall it's going.

22          So that's the type of equipment that those staff

23  members are using.

24  Q.  All right.  So that's the 10,000 square feet for the dry

25  food storage, right?

1    A.  Correct.  Yes.

2    Q.  I think you also mentioned 17,000 square feet of

3    refrigeration?

4    A.  Correct.

5    Q.  Why is that important?

6    A.  So whether we're preparing a meal or we're getting

7    something in that we're going to be routing that it's

8    probably just like maybe heat and serve, right, it doesn't

9    matter what it is.  We need that amount of space in order to

10   store all of our perishable goods.

11         Perishable goods, you don't have an option.

12   Because of food safety, you've got to be able to get those

13   in very quickly and have those put away and then also be

14   able to maintain those in a clean environment.  So it

15   requires a lot of space.

16   Q.  I guess I had a similar question.  In moving items

17   around that 17,000 square feet of refrigeration space,

18   moving inventory around, is any machinery required?

19   A.  Again, pallet jacks and forklifts.

20   Q.  You mentioned some trucks.  Are those trucks owned by

21   the school district?

22   A.  Yes.  We have a lease-to-own program for all of our

23   trucks.

24   Q.  And the drivers I take it are district employees?

25   A.  Yes.

1    Q.  How many trucks do you use?

2    A.  Seven refrigerated box trucks.

3    Q.  Every day?

4    A.  Yes, every day.

5    Q.  To distribute out to those 60 buildings you talked

6    about?

7    A.  Yes.

8    Q.  Let's talk a little more about staffing.

9    A.  Okay.

10   Q.  You told us how many staff report up to the department

11   in total.  I think that number was 300 and change?

12   A.  Just over 325, yes.

13   Q.  You mentioned cooks and prep staff; is that right?

14   A.  Correct.

15   Q.  And warehouse staff we discussed?

16   A.  Mm-hmm.

17   Q.  At the beginning of your testimony, I think you

18   mentioned something about a purchasing agent or someone in

19   purchasing; is that right?

20   A.  That's correct.  And let me just say our entire

21   management team, we have about 20 individuals who are part

22   of the management team, all very important people.

23          But I referenced the purchasing manager earlier

24   who is also a professional employee in our department that

25   works exclusively for the nutrition services team.  And I

1    say that because I work in a school district, and I just

2    want to illustrate sort of the difference between what

3    somebody might be doing for the school versus just the

4    department themselves.

5    Q.  And you say that purchasing person is full time?

6    A.  Full time.

7    Q.  That's a full-time job?

8    A.  Correct.

9    Q.  And what is their job?

10   A.  So they are responsible for everything from identifying

11   what the menu planner needs, to developing the contracts,

12   getting those through the purchasing department, getting

13   those signed, as well as coordinating the deliveries and

14   then ensuring that those deliveries come in and that we

15   don't have any quality issues or shortages.

16          Oftentimes we are letting our vendors know what we

17   need a year in advance.  So that's the type of work that

18   that individual does and of course any sort of management

19   problems that pop up.

20   Q.  Why does the district often tell its vendors up to a

21   year in advance about the inventory the district is going to

22   need?

23   A.  Mm-hmm.  I think we all learned this, that the food

24   system in our nation is very, very interconnected.

25          There's -- it's sort of like a gear box.  Any one

1    thing that moves affects everything else.  So in a scale

2    that we're talking about, if you need something, you have

3    got to think about all the way back to the grower.

4           You know, growers need time to know what they're

5    going to be growing, how much they're going to be

6    contributing to their customers, and then we're just down

7    the line from that.

8           So all of these things have to be coordinated all

9    the way back.  Even our distributors have to do that type of

10   planning with the partner that they have.

11          So that's why it takes so much time and so much

12   coordination to have all of that organized amongst all of

13   the stakeholders.

14   Q.  And you mentioned about 20 management team members?

15   A.  Correct.

16   Q.  At a high level, what do they do?

17   A.  So a high level overview, we do have individuals who are

18   primarily designated to oversee our finances, to work with

19   our, the accounting at the district level.

20          We have five individuals who serve sort of like an

21   area manager to make sure that, whether it's a school site

22   or community site, that regulations are being followed and

23   that, you know, staff are trained well and that we don't

24   have any personal issues.

25          We also just have a crew dedicated to processing

1    paperwork for our, our students as well.

2         There are so many different facets of a school

3    nutrition program that when you get to the level of like

4    35,000 students, you really have to have somebody who is an

5    expert in all those different areas of the child nutrition

6    program to be able to make sure that you're keeping pace

7    with what you are supposed to be doing and getting it done

8    as accurately as possible.

9    Q.   So, Ms. Koppen, you've described your district's kitchen

10   facilities, the dry storage space, the cold storage space,

11   the trucks, the management team, the other staff.  How would

12   you describe the size of the operation you oversee in the

13   district?

14   A.   So I would -- it's very dynamic.  There's absolutely

15   zero monotony.  Every day, you know, every day is different

16   than the next.

17        And that's also kind of what makes it so exciting.

18   It's very, you know, compelling to be able to come in and,

19   you know, any given day you are going to have some sort of

20   problem you have to solve.

21        So you have got to be able to wear multiple hats,

22   even though you do have a team that's that large.  And

23   pretty much everyone is moving, you know, all day every day

24   in order to get the work done.

25   Q.   All right.  So the jury's heard the details about your

1013

1   program and facilities in general.  Now I want to ask you a

2   few things about the COVID time.  Okay?

3   A.  Okay.

4   Q.  So on March 2020 COVID hits.  We've already heard in

5   this case schools close down.  I take it your school

6   district was not an exception.

7   A.  Correct.

8   Q.  So when COVID was first hitting, March 2020, what

9   changes to the curriculum did the school district make?  Did

10  you go to distance learning?

11  A.  Well, and so much happened.  So much happened, but

12  initially schools were just closed.  It took a while to even

13  get to distance learning, quite frankly.

14            So initially schools were just closed, but I think

15  the essence of the question is, what did we do?  We did

16  close our school buildings, and staff and students were

17  staying at home.

18  Q.  And when staff and students were staying at home, did

19  these school districts need to implement any changes to the

20  way that it provided meals to its kids?

21  A.  Yes.

22  Q.  Let me ask you about a few of those.

23            At the very beginning of COVID, did you implement

24  a delivery program?

25  A.  Yes.

```
1    Q.  Can you tell us about that?
2    A.  Yes.  We changed models a lot, especially early on, but
3    by the first day of the school closure, we did have a
4    process in place.  We had curbside pickups.  We also had,
5    were using school buses to drop off meals on what we called
6    like a bus route delivery.
7              That was the very first week of the shutdown.
8    Q.  You said from the first day of closure?
9    A.  From the first day.
10   Q.  Your team --
11   A.  Yes.
12   Q.  -- was able to put this plan into effect by the first
13   day?
14   A.  That's correct.
15   Q.  The bus routes you described, were these ones the direct
16   invented new, or were these the established bus routes you
17   had used for months or years?
18   A.  It was the established bus route that we had for our
19   students, so it was established route for our existing
20   students.
21   Q.  About how many buses were at the beginning helping the
22   program deliver meals to kids in your district?
23   A.  So it was basically the entire fleet of buses that we
24   had.  I would, I would be speculating, but I think that it
25   was over 300.  It was a complete -- it was a total -- it was
```

0:22-cr-00223-NEB-DTS

1    the entire bus barn.

2    Q.  Why did you use the established bus routes?

3    A.  We did that because we needed to work off of or leverage

4    any consistency we already had in the most inconsistent

5    time.  So we already had communication, strong

6    communications to the communications department with our

7    families, and so we felt it was the easiest way to tell

8    parents where they could expect to finds our, our meals.

9           So we used the established bus routes, and we said

10   to our families, you can arrive at your normal bus stop.

11   You can pick up a box of food for each of your children, and

12   we will be there at your normal start time.  It was the most

13   consistency that we could offer to our families.

14   Q.  And in addition to the bus route delivery, you mentioned

15   meal pickup; is that right?

16   A.  Yes.  We also had curbside meal pickup at each of our

17   schools, and we organized that based on the school's normal

18   start time for efficiencies for parents.

19   Q.  And to be clear, when you say each of our schools, you

20   mean each of those 60 buildings?

21   A.  60 buildings.  60 building.  Yes.

22   Q.  In switching over from the traditional in-building meal

23   service from the pre-COVID time --

24   A.  That's right.

25   Q.  -- to this bus delivery and the meal pickup you

1    described once COVID hit, what use, if any, did you make of

2    the existing school infrastructure?

3    A.  So we actually depleted our existing structure very

4    quickly.  To put that into perspective, though the plans

5    sound really novel and well thought out, we were extremely

6    surprised by the volumes on the first day.

7         So we actually, in order to get that into,

8    basically into the, the food into the boxes into reality, we

9    were using things we already had in our coolers and our

10   freezers.  We were using boxes that we already had on hand

11   that we were normally using for a different purpose.

12        But we used that existing supply of food, well

13   that existing supply of food and materials to create these

14   boxes.  And across the city we ran out within 15 minutes

15   that very first day.

16   Q.  And in --

17   A.  It was shocking.

18   Q.  Sorry.  I committed a faux pas and our court reporter

19   will be mad.

20        Ms. Koppen, this high demand that you are

21   describing at the beginning of COVID with that switchover,

22   did that remain a consistent high demand as the months wore

23   on, or did you see that drop off?

24   A.  We definitely saw that drop off.

25   Q.  Can you describe that.

1    A.  Certainly.  I would say that initially there was a lot

2    of panic and we were ramping up.  We were honestly working

3    day and night in order to meet needs, and we were challenged

4    very much in that regard because of supply chain issues and

5    those types of things.

6            However, we did get to a very steady point within,

7    I would say, by May of that year we got to a very steady

8    point, and we had somewhat of a leveled participation at any

9    model that we were using for food transaction.

10           By June across the locations, I will tell you that

11   we were seeing about 25 to 75 percent of the volume that we

12   had previously seen as our high.  And then by that fall,

13   some of the sites were so slow that we completely closed

14   them, and others were -- other than our home delivery

15   system, the others were half of what they had been in June.

16           So it was a very consistent pattern.

17   Q.  When you say "by that fall," that's the fall of 2020?

18   A.  Correct, fall of 2020.

19   Q.  So to give the jury some perspective, in that very

20   beginning, that high demand period you described that

21   tapered off afterward, at your busiest pickup site in that

22   initial high demand, about how many meals were being handed

23   out to children?

24   A.  Yes.  So initially the average for the highest site was

25   a thousand meal boxes per week.

1    Q.  And was that at a lot of sites throughout the district

2    or was that one or two sites with that number?

3    A.  It was two sites.

4    Q.  Just two sites --

5    A.  Two sites.

6    Q.  -- during this initial high demand period?

7    A.  Correct.

8    Q.  How about the other sites during that initial high

9    demand period?  What was their high water mark in this early

10   high demand time?

11   A.  In the early high demand time, it was about 350 meal

12   boxes.

13   Q.  For the day?

14   A.  For the day -- for the week actually.  For the week.

15   They were --

16   Q.  Those are the numbers for the week?

17   A.  Yes.  I'm using numbers for the week, and they were all

18   handed out on one day so --

19   Q.  So, Ms. Koppen, just to be clear, and I'm glad you

20   clarified for me.  When we were describing the initial

21   period of high demand in the food program in your district

22   right after COVID hit, the high water mark at two of your

23   sites was a thousand meals for the entire week?

24   A.  And I'm talking, I'm referring to about May, yes.  So

25   that high but level, high but level.  So we're not talking

1    about the vary start of the pandemic where I think everyone

2    was facing neighbors and customers that were just completely

3    frantic.  I'm talking about the high initial.

4    Q.  And after that high initial demand, as you've told us,

5    demand dropped off considerably?

6    A.  Yes.

7    Q.  You've talked about your district's own activities in

8    the food program.  During this period, were you partnering

9    with any other organizations in the St. Paul area?

10   A.  Yes.  We were partnering not only with other

11   organizations in St. Paul, but also anyone who was willing

12   to partner with us quite frankly across the United States.

13   We had relationships that we were able to leverage, and we

14   also built new relationships very quickly in order to do

15   what we needed to do.

16   Q.  When you say "relationships," what do you mean?

17   A.  So just one example.  You know, we were putting these

18   meal boxes together, something that we did not typically do,

19   and originally we were taping all these boxes by hand, which

20   as you can imagine that many meal boxes, it takes a lot of

21   unnecessary time.

22           And knowing that people are really pressing you to

23   make sure that you are not leaving them without food, there

24   was a high sense of urgency to automate that as quickly as

25   possible, if not oversight.  So one of our relationships we

1    actually ended up with a contact for an equipment vendor

2    that we had not previously had.

3            There were a different person that we had already

4    been working with, and we were extremely thrilled to learn

5    that there was a taping machine.  It was out of state, but

6    someone was willing to donate that to us.

7            So, for example, we did a little bit of stop, drop

8    and roll to get that type of equipment in.  And we also

9    worked with other food service providers who were not open,

10   and we actually worked with them to get their food because

11   we did not have enough food on hand.

12           So those were the types of sort of out-of-the-box

13   thinking that we had to do to not only -- we're not

14   exhausting what current contacts and stakeholders we were

15   already working with, but also forging new relationships and

16   breaking new boundaries.

17   Q.  So other than the relationships you'd had before through

18   the school district and these new ones --

19   A.  Yep.

20   Q.  -- you are describing, during the period of COVID,

21   2020/2021, were you aware of any other organizations

22   operating in St. Paul providing substantial numbers of meals

23   to children?

24   A.  I think the way that you are describing "substantial"

25   may vary, but, you know, my perspective is, if we're talking

1    about was there any other provider who was handing out

2    thousands of meal boxes per day across the city, the answer

3    is no.

4    Q.  Ms. Koppen, let me show you something on the screen you

5    have in front of you there.  This is an exhibit that's

6    already in evidence.  It's Government's C37.

7            I know you weren't here, but the jury has already

8    heard that these are some records obtained via a search

9    warrant.  I want to direct your attention to the fourth and

10   then the fifth page.

11           Now, first, are you generally familiar with

12   recordkeeping that looks something like that?

13   A.  Yes.

14           MR. UDOIBOK:  Objection.  Calls for speculation,

15   relevance, competence.

16           THE COURT:  Overruled.

17   BY MR. BOBIER:

18   Q.  And is the source of your familiarity with these your

19   role as director of the food program for the second largest

20   school district in the state?

21   A.  Can you say that one more time?

22   Q.  What's the basis for your familiarity with this type of

23   recordkeeping?

24   A.  Yes.  So these types of records are kept at absolutely

25   every single location, whether it's a school or a community

1    site.  These are the types of records that are required for

2    us to not only participate in the program, but also for us

3    to put our claims together, our reimbursement claims

4    together.

5            So these are a standard part of daily business.

6    Q.  Because, as you described before, the school district

7    participates in the federal food programs; is that right?

8    A.  Correct.

9    Q.  And receives through those programs reimbursements for

10   meals served to kids?

11   A.  Yes.

12   Q.  Do staff under your supervision fill out claims that

13   look something like this, even if not that exact form?

14   A.  Our staff do fill out paperwork that looks a lot like

15   this, either on paper or via computer, mm-hmm.

16   Q.  Now, the jury's heard that this particular count relates

17   to a food site called ASA Limited, and they've heard that

18   that was in St. Paul.

19           Do you see the date at the bottom of this one.

20   We're talking about October of 2020; is that right?

21   A.  Correct.

22   Q.  Now on this claim, draw your attention to a few things.

23   First, at the bottom do you see there are initials for every

24   day?

25   A.  Correct.

1    Q.  Do you have any reaction to seeing that, same set of

2    initials every day?

3    A.  Yes.  I was just trying to count the days, actually.  I

4    was just looking to see how many days in the week this is.

5            Oh, this is a full week.  So this person worked

6    seven days a week and had maculate attendance.  That's

7    unusual.

8    Q.  If we go to the next page, got the same initials for

9    another seven days; is that right?

10   A.  Correct.

11   Q.  Go to the next page, we see the same initials every day,

12   seven days; is that right?

13   A.  Correct.

14   Q.  Last week in October, same initials every day; is that

15   right?

16   A.  Correct.

17   Q.  You said this person has immaculate attendance?

18   A.  Yes.

19   Q.  Why did you comment on that?

20   A.  Even for a normal, or excuse me, even for a five-day

21   work period, I have never seen anyone who has had perfect

22   attendance at that level.  Adding on weekends, it's even

23   more unrealistic, and this is during a global pandemic.

24           You know, we had requirements from the CDC where

25   if you had symptoms, you were not permitted to come to work

1   and you had to wait for those symptoms to resolve for so

2   many days.

3           If you did contract COVID, you also had to

4   quarantine for five days.  So all of those things combined

5   are what lead me to say that this is very unrealistic.

6   Q.  You said your staff fills out paperwork like this every

7   day?

8   A.  Correct.

9   Q.  Every school day, at least, correct?

10  A.  Correct.

11  Q.  Is immaculate attendance, to use your phrase, consistent

12  or inconsistent with your experience?

13  A.  Inconsistent.  We have a perfect attendance award, and I

14  have 325 employees.  The most we've ever given out is four

15  in a year, and that was before the pandemic.

16  Q.  Now there are a lot of little boxes on this form; is

17  that fair to say?

18  A.  Correct.

19  Q.  It looks like other than the total column on page 5 of

20  Government Exhibit C37, every single one of them is filled

21  out?

22  A.  That's correct.

23  Q.  Do you have any reaction to that based on the paperwork

24  you are familiar seeing as your role of director of the

25  second largest school district food program in the state?

 1    A.  Yes, I do.  I will just tell you that the only thing

 2    consistent is the inconsistency.  Over a time period like

 3    we've just looked at, there would be some point where

 4    someone would most likely forget or they would have a

 5    mathematical error or they would maybe even flip some

 6    numbers.

 7              That is what you generally see in the day-to-day

 8    reality.

 9    Q.  You mentioned consistency.  If you look at the first two

10    bolded categories of this sheet, this claim represents about

11    3,000 meals purportedly given to kids every day.  The range

12    is from 2995 up to 2998.

13              Do you see that?

14    A.  I do.

15    Q.  Do you have any views on that degree of variability

16    between those days and this week?

17    A.  That's actually the first thing that I noticed because

18    attendance rates are never this close to enrollment, and

19    they are also never that consistent.  Keep in mind what I

20    just had mentioned about the pandemic and the quarantine

21    guidelines that were existing at that particular point in

22    history.

23              But I looked at attendance for our district, and

24    before the pandemic across the entire city, we were seeing

25    about 94 percent of students show up every day, and this is

1    at school where students are required to go.

2              And we actually pick students up and bring them to

3    our buildings.  After the pandemic, it was actually like

4    more like 88 percent.  So never in my over a decade of

5    experience have I seen attendance that is this close to

6    enrollment or that consistent day-to-day.

7    Q.  Just to be clear, this degree of variation just within

8    plus or minus eight kids, maybe ten, that's the same degree

9    we see in every week in this meal count for the month of

10   October; is that right?

11   A.  That's right.

12   Q.  I imagine you have the same reaction to the other weeks?

13   Sorry.

14              For the record?

15   A.  Yes.  For the record, yes.

16   Q.  So, Ms. Koppen, this is October of 2020.  Let's just

17   talk about the number.  Were you aware of any organization

18   in St. Paul in October of 2020 providing 3,000 meals to kids

19   a day?

20   A.  No.

21   Q.  Do you think you would have been aware of that if it had

22   been happening?

23   A.  Yes, I do.

24   Q.  Why do you believe that?

25   A.  So I believe that for a number of reasons.

1       St. Paul Public Schools, this is the type of

2   service that we provide day in, day out.  So we already have

3   a very large network that exists.

4       We also have a lot of communication collaboration

5   with other partners, as well as government officials and

6   board members who have constituents.

7       So this type of information does get back to us.

8   You know, if there are a large number of students who are at

9   a park, for example, or a community center, that's just

10  something that, that type of information flows.

11      But I will also say we also have those sites

12  ourselves, and no building under any model or any

13  circumstance did we see this number of students.  And we

14  already had a customer, we just called a customer base of,

15  you know, over 30,000 students to, as our, within our

16  framework.

17      So that's why I say that, and if I could just say

18  one more thing, too.  You know, we were serving meals in the

19  same time period, and I would just like to add that in our

20  own sites where we had very large number of people dedicated

21  to the same type of work, it -- we did not see this type of

22  consistency, either.

23      We saw large variations from day-to-day every day

24  regardless of the site or the program.

25  Q.  These counts we just saw, these are for purported

1    breakfasts handed out to kids; is that right?  Do you see

2    that clicked here --

3    A.  Correct.

4    Q.  -- as opposed to --

5           We go down to page 10 of the same exhibit, same

6    month, October 2020; is that right?

7    A.  Yes.

8    Q.  Same site here.  I know you might not recognize the

9    name, but same site, ASA Limited; is that right?

10   A.  Yes.

11   Q.  And this one is claiming lunches; is that right?

12   A.  Correct.

13   Q.  For this month I'm going down to page 11, another

14   basically 3,000 every day; is that right?

15   A.  Correct.

16   Q.  And we're seeing here the same consistency for purported

17   attendance represented by the initials at the bottom; is

18   that right?

19   A.  That's right.

20   Q.  And you are seeing the same large numbers you've

21   commented on every single day; is that right?

22   A.  Correct.

23   Q.  And these same low degree of variation in terms of meals

24   purportedly handed out each day; is that right?

25   A.  That's right.

1    Q.  Ms. Koppen, do you believe this many meals could have

2    been handed out to children, prepared from a modest sit-down

3    restaurant?

4    A.  No.

5    Q.  Why not?

6    A.  This number of meals, this is -- there is going -- I'm

7    just -- sorry.  Let me start over.

8         Almost 3,000 meals a day prepared in a kitchen,

9    you have got to have the capability to be able to get that

10   food into the kitchen in order to be able to handle it and

11   prepare it to begin with.

12        The space it takes to store that is already

13   something that sounds like it's going to take a lot of

14   space, and it's quite unrealistic.  We have very large

15   kitchens in our school district that serve about half of the

16   meals that we're talking about right here, so they're larger

17   than a modest sit-down restaurant to begin with.

18        And we're bursting at the seams in order to get

19   that number of meals prepared, and this is something that we

20   do every day.

21        We also have a tray line where students, you know,

22   filter in and they get that food.  We're not taking it out

23   to them.  So we have a lot of equipment that's specialized

24   for that, and even in a very large space, we would not be

25   able to do this number of meals.

0:22-cr-00223-NEB-DTS    CROSS BY MR. UDOIBOK

1    Q.  And, Ms. Koppen, this site, the jury's heard, was

2    located in Maplewood where I believe you said you live; is

3    that right?

4    A.  Yes.

5    Q.  You live in Maplewood.  You're the director for the

6    second largest food program through a school district in the

7    state.  On the basis of your experience, do you believe that

8    these meals represented on this count were handed out to

9    children?

10   A.  I do not.

11   Q.  Thank you.

12          MR. BOBIER:  Nothing further, Your Honor.

13          THE COURT:  Mr. Udoibok?

14          MR. UDOIBOK:  Yes.  Thank you.

15                    CROSS-EXAMINATION

16   BY MR. UDOIBOK:

17   Q.  Good afternoon.  Is it morning or afternoon?  My name is

18   Kenneth Udoibok.

19          We haven't met, I hope.

20   A.  No.

21   Q.  And I have just a few questions for you.

22          Are you familiar with the 2020 food service

23   financial report?

24   A.  Yes, I'm familiar with it.

25   Q.  And what is it?

1    A.  The 2020 food service report?

2    Q.  Yes.

3    A.  I believe you are referring to the Minnesota Department

4    of Education's statistics that they provide, showing what

5    each provider has claimed for meals for that year.

6    Q.  And so the State of Minnesota publishes it, and it is --

7    there's a section for St. Paul, correct?

8    A.  That is correct.  It's on the food and nutrition

9    services website.

10   Q.  And when was the last time you reviewed that food

11   service financial report?

12   A.  I normally review that in the summer.  So I normally

13   review that in the summer when we're looking at our

14   projections for the next year, but I will go so far as to

15   say that our business manager looked at that last year, and

16   she used that information.

17   Q.  Well, let me just see -- maybe this might be helpful.

18   A.  Okay.

19   Q.  Ms. Mallet, would you call up Exhibit D1-882.  It's not

20   in evidence, but maybe it would help to talk.

21   A.  All right.

22   Q.  Are you familiar with the 2020 St. Paul food service

23   financial report?

24   A.  Yes.  Our accountant puts this together and submits the

25   data each year, and then the report is compiled and is

GRAC-CR-00223-NEB-DTS   CROSS BY MR. UDOIBOK

1    posted as public data.

2              MR. UDOIBOK:  Your Honor, would like to offer

3    D882.

4              THE COURT:  Any objection?

5              MR. BOBIER:  No objection, Your Honor.

6              THE COURT:  D1-882 is admitted.

7    BY MR. UDOIBOK:

8    Q.  Just for starters, what is the unit cost per meal as

9    published in that report?

10   A.  As published.

11   Q.  Yes.

12   A.  So are you talking about breakfast or lunch?

13   Q.  Let's take, let's take breakfast.

14   A.  Okay.  And are we talking about 2020?

15   Q.  Yeah, 2020.

16   A.  2020?  Okay.  So help -- let me just say this:  I don't

17   know have everything memorized but it's just over $2.  I

18   actually used a blended rate a lot of times.  So I would

19   combine breakfast and lunch because the type of model that

20   we had.

21              And I do that specifically, that blended rate if

22   you took breakfast and lunch, you divide it by two, it was

23   3.26.

24   Q.  Ms. Mallet, would you call out the bottom part, the meal

25   cost data?

0:22-cr-00223-NEB-DTS   CROSS BY MR. UDOIBOK

1   A.  Are you talking to me?

2   Q.  No.  I'm sorry.  I was talking to Ms. Mallet.

3   A.  Sorry.

4   Q.  Do you see the meal cost data?  Would you explain what

5   that is?

6   A.  You are talking to me?  You are asking me?

7   Q.  Yes.

8   A.  Okay.  Thank you.

9         So the meal cost data here is the reported

10  expenses for food that was used to pay for those meals that

11  were then claimed for reimbursement.

12  Q.  All right.  So what, what is the reimbursement in this

13  case?

14  A.  So in 2020 it would have been just over $2 for

15  breakfast, just around four and a half dollars for lunch.

16  Again if you took those two numbers together, divide them by

17  two, it would be 3.26 if you took like a full day breakfast

18  and lunch.

19  Q.  So it's not a lot of money to, you know, make breakfast,

20  isn't it?

21  A.  I think that it is a lot of money.  I mean, in general

22  we normally spend around half of the total reimbursement or,

23  excuse me, just under half of the total reimbursement on the

24  food.

25  Q.  Well --

1034

0:22-cr-00223-NEB CROSS BY MR. PAULSON-BOK

1    A.  On the food alone.

2    Q.  So let's look at this same column that -- you said that

3    the food section says percentage of costs is 25 percent?

4    A.  That's correct.  I think that's significant.

5    Q.  All right.  And then the cost per meal is $0.24, isn't

6    it?

7    A.  The cost per meal?

8    Q.  Yes.

9    A.  I don't think that that's accurate, no, because 24,

10   25 percent, if you took 24, that would be like a dollar.

11   Q.  The document says 0.24 for cost per meal, isn't it?

12   A.  So that's food and -- so these numbers are not, I think

13   there's something wrong with the numbers because this does

14   not add up.

15   Q.  Well, I'm just --

16   A.  Yeah.  Go ahead.

17   Q.  Let's just see what the document says.

18   A.  Sure.  Go ahead.

19   Q.  Does it say $0.24?

20   A.  That does say $0.24.

21   Q.  All right.  And what, what is the next column, cost per

22   meal, it says $0.15.  What is that?

23   A.  That's breakfast food.

24   Q.  Okay.  All right.  So cost about $0.15 to make

25   breakfast?

1035

```
1    A.  That's not accurate.  Go ahead.  Yeah.

2              MR. BOBIER:  Objection.  The document speaks for

3    itself, Your Honor.  It's not her document.

4    BY MR. UDOIBOK:

5    Q.  All right.  Let's --

6              THE COURT:  I'm going to overrule the objection.

7    BY MR. UDOIBOK:

8    Q.  All right.  Now does St. Paul public school make a

9    profit?  I don't want to belabor this.

10   A.  Okay.

11   Q.  Do they make a profit?

12   A.  Most years we break even.

13   Q.  All right.  So you don't make a profit?  Is that --

14   A.  Most years we break even, so it varies from year to

15   year, and I can give you an idea of like good year versus a

16   bad year.  Some years we've also lost money.

17   Q.  All right.  Let's look at 2020 report.

18   A.  Okay.

19   Q.  Just let -- is that visible?

20   A.  That's visible.  It's very small.  I'm sorry.  It is

21   very small, but it is visible.

22   Q.  So where -- I'm going to help you.

23              Is there a profit margin on that?

24   A.  I can give you the profit margin.  Here it's, let's see,

25   this first column says NSLP.
```

0:22-cr-00223-NEB-DTS    CROSS BY MR. CUSHIMBOK

1036

```
1    Q.  Hang on.

2    A.  Okay.  Go ahead.

3    Q.  You don't always know what those acronyms are?

4    A.  Oh.  National School Lunch Program.

5            Go ahead.

6    Q.  All right.  So the NSLP, what is NSLP?

7    A.  Okay.  So let me just slow down a little bit.

8    Q.  All right.

9    A.  The columns at the top are indicating what type of

10   program this revenue is coming from across the page, so the

11   first column, NSLP, stands for the National School Lunch

12   Program.

13   Q.  Okay.  And then what's the next one?

14   A.  The next program is the After School Snack Program.

15   Q.  Now, and then the next column is what?

16   A.  That is the milk program, so for just a program where a

17   student would get a milk, outside of their meal.

18   Q.  Okay.  Forgetting the rest of the column, go to all

19   programs.

20   A.  Yes.

21   Q.  Now at the end, what does it say?

22   A.  So --

23   Q.  The revenue, the total operating revenue?

24   A.  Mm-hmm.

25   Q.  For all programs?
```

GUZMAN-LOPEZ - CROSS BY MR. UDOIBOK

1    A.  The total operating revenue for 2020 showed a net

2    positive of $1.5 million when that school year was closed.

3    Q.  Now, I'm talking about all programs, the total operating

4    revenue.

5    A.  Yes.  That's accurate.  That shows the total revenue,

6    excuse me, I'm sorry.  It shows the total revenue of

7    $33.4 million.

8    Q.  All right.  Now you live, you said, you testified that

9    you live in Maplewood --

10   A.  Correct.

11   Q.  -- correct?  And you don't live in St. Paul.

12              Would you take that down?

13              Did you have a chance to visit any of the Feeding

14   Our Future sites?

15   A.  I did not visit any Feeding Our Future sites, no.

16   Q.  Have you had the chance to visit a Feeding Our Future

17   office?

18   A.  No.

19   Q.  Now, do you, do you know who the Feeding Our Future

20   sites purchase food from?

21   A.  I do not.

22   Q.  Do you know whether the food was delivered or was picked

23   up?

24   A.  No.

25   Q.  Now, regarding -- you testified earlier that the numbers

CROSS BY MR. MUSBOK

```
 1    seems -- I want to make sure I use your words -- was, did
 2    you say "unreasonable"?
 3    A.  Unrealistic.
 4    Q.  Unrealistic?
 5    A.  Yes.
 6    Q.  When the St. Paul drivers dropped food, did they, did
 7    drivers return with receipts of deliveries?
 8    A.  So I think you're talking about two different things.
 9    Q.  All right.
10    A.  Are you talking about our nutrition services drivers
11    dropping off food --
12    Q.  Yes.
13    A.  -- to our locations.
14    Q.  Yes.  Yes.  Was there any documentation of deliveries?
15    A.  Yes, we did have documentation of delivery.
16    Q.  And what type of documentation?
17    A.  Yes.  So we have routing sheets, so we have routing
18    sheets because that's not only what we use to establish what
19    needs to go on the truck, but then at that site, the
20    individual, even though it's another SPPS employee in
21    nutrition services who takes it, they have to verify that
22    that driver dropped off all of the food that they were
23    supposed to have on that truck.
24    Q.  That's what I'm getting at.
25    A.  Yeah.
```

0:22-cr-00223-NEB-DTS   CROSS BY MR. DUDNIKOV

```
 1   Q.  Does that verification process, it was a sheet of paper,
 2   isn't it?
 3   A.  It's on a piece of paper, correct.
 4   Q.  Okay.
 5   A.  And it does go back to the originating point.
 6   Q.  Yes.  And the sheet of paper goes back to the St. Paul
 7   Public Schools?
 8   A.  Yes.  So, yes.
 9   Q.  And as a practice with St. Paul Public Schools, did you
10   have a video camera reporting the delivery?
11   A.  So we had, some of our sites do have cameras.
12   Q.  From where?
13   A.  So they are already in the school parking lots and near
14   the loading docks.  There are a lot of cameras in our
15   district.
16   Q.  No.  I'm talking about delivery to homes.  Did you do
17   any delivery to homes?
18   A.  We did a lot of deliveries to homes.
19   Q.  All right.  Did you have video cameras?
20   A.  We had video cameras at the, at the hub where we were
21   taking the meals.
22   Q.  No.  No, that's not what I'm --
23   A.  Oh.
24   Q.  -- referring to.  I'm saying when you take the meals to
25   the home.
```

ROGGE - CROSS BY MR. UDOIBOK

```
 1    A.  To the home?  So we did not have videos we had in our

 2    possession there.  We did have paperwork, however.

 3    Q.  You had paperwork --

 4    A.  Yes.

 5    Q.  -- that someone would fill out and return?

 6    A.  Yes.  Absolutely.

 7    Q.  I just had, I had some questions about the exhibit that

 8    you just testified about.

 9    A.  Okay.

10    Q.  Ms. Mallet, would you bring up Exhibit C37.  I'll see if

11    I can pull it up.

12              MR. THOMPSON:  Which one?

13              MR. UDOIBOK:  W37.

14              MS. MALLET:  It's up.

15              MR. UDOIBOK:  It's up.

16              MS. MALLET:  Yes.

17              MR. UDOIBOK:  So looking at Exhibit C37, counsel

18    asked you some questions.  I'm not going to spend too much

19    time on it.

20              Do you see on the bottom initials of person taking

21    daily count certify that the information is true and

22    accurate?  Do you see that?

23              THE WITNESS:  I see the initials, yes.

24    BY MR. UDOIBOK:

25    Q.  And then followed with that is a site supervisor, "By
```

GIZA - CROSS BY MR. UDOIBOK

1    signing, I certify that the above information is true and

2    accurate."

3              Do you see that?

4    A.  I do.

5    Q.  And that seem to be two people attesting to the accuracy

6    of these numbers?

7    A.  That's correct.

8    Q.  And that's paperwork, right?

9    A.  That's paperwork, yes.  This is standard.

10   Q.  And this paperwork will go back to, in your case, to a

11   St. Paul Public Schools?

12   A.  Yes.

13   Q.  And St. Paul Public Schools is a sponsor, right?

14   A.  Correct.

15             MR. UDOIBOK:  No further questions.

16             THE COURT:  Mr. Colich.

17             MR. COLICH:  Your Honor, I promise I will do this

18   in ten minutes.

19             THE COURT:  All right.

20             MR. COLICH:  I know that you have commitments

21   elsewhere.

22             Can you leave that up for one moment?

23             MR. THOMPSON:  I have it.

24             THE COURT:  Thank you.  Mr. Colich.

25

0:22-cr-00223-NEB-DTS    CROSS BY MR. COLICH

1    CROSS-EXAMINATION

2    BY MR. COLICH:

3    Q.  Good morning.

4    A.  Good morning.

5    Q.  I'm Mike Colich.  I am Mr. Said's attorney, along with

6    Mr. Montez, Ms. Lucy.

7         So as I understand your testimony is that once the

8    pandemic hit, there was a big spike but then there was a big

9    drop?

10   A.  Correct.

11   Q.  But kids still had to get food?

12   A.  That's right.

13   Q.  Where did they get the food?

14   A.  So they got the food from organizations like St. Paul

15   Public Schools.

16   Q.  And other sites that may have been created?

17   A.  That's correct, yes.

18   Q.  Okay.  Now there's been some discussion about summer

19   meal counts.  Do you have that on there right there?  It's

20   Exhibit 37.

21   A.  This is still the sheet.

22   Q.  Yeah.

23   A.  Okay.  So this one, yes.

24   Q.  Yeah.  So counsel just asked you about looking at the

25   bottom where there are some initials regarding the person

0:22-cr-00223-NEB-DTS   CROSS BY MR. MCCARTH

1    taking the daily meal count.  Can you make out what those

2    initials are?

3    A.  AA.

4    Q.  Okay.  And there's a signature below that.  Can you make

5    that out?

6    A.  It's very hard to read, but it does look like the first

7    capital letter is an A, and that second capital letter is

8    either an O or another A.

9    Q.  Okay.  Thank you for that.

10             So are you familiar with the Somali community?

11   A.  Yes.

12   Q.  In what way?

13   A.  In what way?

14   Q.  Yeah.

15   A.  So I do have the role and responsibility and the

16   privilege of engaging with our Somali parents and families,

17   and I get to do that at my job at St. Paul Public Schools,

18   day in day out.

19   Q.  So you are familiar with their culture?

20   A.  Yes.  I am -- excuse me.  Let me rephrase that.

21             I try to be as familiar as possible, but I do rely

22   on engagement to help me in the areas where I know that I

23   need direct feedback from Somalia families.

24   Q.  And you are familiar with their dietary type of demands

25   or what they, what they like to eat?

1044

```
 1    A.  Yeah.  So I don't claim to be an expert, and I'll give
 2    you an example.  During the pandemic for one situation --
 3    Q.  Okay.
 4    A.  -- I did --  our chef also met with a number of Somali
 5    parents at a grocery store so that we could learn
 6    specifically which foods and which brands of foods our
 7    Somali parents had in their pantries at home.
 8            So I don't purport to know that myself, but I know
 9    how to work with families and to get that information,
10    because it is very important.
11    Q.  And in your school districts, did you prepare food for
12    Somali children?
13    A.  We did, yes.
14    Q.  Separately?
15    A.  So we actually had a -- during the pandemic is what you
16    are referring to?
17    Q.  Yes.
18    A.  Yes.  So we actually had a theme for each of our meal
19    boxes, and we had several boxes.  One box, through the help
20    of those Somali parents, was entirely created with their
21    feedback.  So it was representative of exactly what we put
22    together and the foods that we were sourcing, including the
23    brands that they wanted that we developed together in the
24    grocery store.
25    Q.  When the pandemic hit and your numbers started to go
```

0:22-CR-00223-NEB-DTS   CROSS BY MR. COCUZZA

```
 1    down, is there any way to separate the Somali population?
 2    Were they coming more or less or at all?
 3    A.  So we actually did have a lot of feedback from Somali
 4    households, and there's also an individual from the city.
 5    His name is Rainier.  I think his last name is Katuremis
 6    (phonetic), but his first name is Rainier, and he was also
 7    was integral, along with our parent liaison for our Somali
 8    families, in getting feedback to us.
 9              And I will say that of all the families that gave
10    feedback through those different channels, we did hear from
11    Somali parents a lot.
12    Q.  Okay.  But you don't know whether or not those families
13    may have gone to other resources for food?
14    A.  Could --
15    Q.  Yes or no.
16    A.  So I would say no then.  Thank you.
17    Q.  And would it make any sense to you that perhaps at that
18    time in the crisis, Somali members of this community might
19    seek out, say, somewhere where they can get Somali food,
20    other than through you?
21    A.  Other than our Somali food?
22    Q.  Yes.
23    A.  Yes.
24    Q.  Okay.  And are you familiar how many Somali citizens
25    live in Minneapolis?
```

CROSBY - CROSS BY McCONKIE

```
 1    A.  I don't work in Minneapolis, no.

 2    Q.  Would it surprise you if it's up to over a hundred

 3    thousand Somali citizens?

 4    A.  It would not surprise me.

 5    Q.  Okay.  Well, let's go to where you're more familiar

 6    obviously, St. Paul.

 7              Do you have any idea for the jury of how many

 8    Somali citizens live in St. Paul?

 9    A.  How many Somali citizens live in St. Paul?

10    Q.  Yeah.

11    A.  I think the last quote I saw may have been 750,000 but I

12    don't look at St. Paul statistics.  I look at our school

13    district.

14    Q.  Now I am correct.  You don't prepare the food yourself?

15    A.  I have prepared the food myself.

16    Q.  Okay.  Good.  Great.

17    A.  Mm-hmm.

18    Q.  So can you tell me, would you say a staple in Somali

19    diet is rice?

20    A.  Would I say a staple --

21    Q.  Yeah.

22    A.  -- in Somali diet is rice?

23    Q.  Yes.

24    A.  One of the foods that's been requested a lot is yellow

25    rice.  We developed a recipe with our Somali parents for
```

1    yellow rice but, that's just one food in a whole diet.

2    Q.  And when you order rice, how large are the bags?

3    A.  It depends on which model you are talking about.

4    Q.  That's a hard one for me.

5    A.  It is, yes.

6    Q.  Let's say it's rice that you want to order specifically

7    because you are going to be serving Somali children.

8    A.  Okay.  So you are talking about we would be preparing

9    that rice in our building.

10   Q.  Yeah.

11   A.  Not putting it into a box, right?

12   Q.  Right.

13   A.  Okay.  Because we've done both.

14           So if we're getting that rice, it's like a

15   25-pound bag that we're getting, and then we get that out to

16   our schools.

17   Q.  And do you have any idea how many meals for children

18   that would produce?

19   A.  Well, we have a production record, so I don't know off

20   the top of my head, but that is something that we do put

21   into our records on a daily basis.

22           It's also in the recipe.  So if you needed to make

23   50 portions, for example, it would tell you how much of that

24   rice to take.  Likewise, if you needed to make 200, it will

25   also tell you how much of that rice to take.

1    Q.  So they would keep dipping into that bag of rice making

2    that rice till they run out.

3    A.  We make rice every single day in our district, for

4    breakfast and lunch.

5    Q.  Thank you.  Do you have any idea how many single meals

6    could be made from a 25-pound bag of rice?

7    A.  Again, not off the top of my head, but we have recipes

8    and we have tools that our kitchen staff do use for every

9    single meal.  This is a part of the standard of that work.

10   Q.  Okay.  Thanks.

11   A.  Thank you.

12           MR. COLICH:  Thank you, Your Honor.

13           THE COURT:  Any redirect?

14           MR. BOBIER:  If you will permit me.  Very briefly,

15   Your Honor.

16           THE COURT:  Very briefly.

17           MR. BOBIER:  Thank you, Your Honor.

18                      REDIRECT EXAMINATION

19   BY MR. BOBIER:

20   Q.  Ms. Koppen, I know you're not an expert in census data.

21   A.  Thank you.

22   Q.  You don't hold yourself out to be one, do you?

23   A.  No.

24   Q.  I think counsel said there were 750,000 Somalis in

25   Minneapolis.  I believe that was the question put to you.

0:22-cr-00223-NEB-DTS

1049

1    A.  I don't remember what he said exactly.  I think he asked

2    me how many, and I do not know how many residents live in

3    Minneapolis.

4    Q.  Any idea what the population of St. Paul is?

5    A.  Technically?  No.

6    Q.  Sorry.  Technically?

7    A.  No.

8    Q.  Would you believe me if I told you it's only 300,000

9    people?

10   A.  I would not have known that.

11   Q.  Let me show you something --

12   A.  Okay.

13   Q.  -- on your screen.  This is Defendants' D1-882.  Do you

14   remember counsel asked you a few questions about this?

15   A.  Yes.

16   Q.  And this is a food service financial report for the year

17   2020; is that right?

18   A.  That's correct.  And this is prepared by MDE, yes.

19   Q.  Do you remember counsel asked you about that number,

20   that $33 million figure number, which represented for 2020

21   the total districtwide revenue; is that right?

22   A.  That's correct.

23   Q.  I'm going to direct your attention to that 31,861,574.

24   Do you see that?

25   A.  Yes.

1    Q.  My counsel is a lot better than I am at the tech.

2    That's your total operating expenses districtwide; isn't

3    that right?

4    A.  Correct.

5    Q.  On direct you said that typically you spend about half

6    of reimbursements from the program on food alone, right?

7    A.  Yes.

8    Q.  I take that to mean you spend typically the balance of

9    the reimbursement on the many other expenses your district

10   has related to the food program; is that right?

11   A.  Labor, supplies, the trucking, the utilities.

12   Q.  The facilities you've described?

13   A.  The facilities, correct.

14   Q.  Including that 37,000-square-foot facility at the

15   central kitchen?

16   A.  Correct.

17   Q.  Ms. Koppen, you described that in most years the school

18   district under the food program breaks even; is that right?

19   A.  That's correct.

20   Q.  On the rare occasion as in 2020 that the school district

21   does better than breaking even, are you permitted to take

22   that surplus and use it for something outside of the food

23   program?

24   A.  No.  That money has to go back into the food program.

25   Q.  Are you permitted to take that surplus and buy a bunch

1    of cars?

2    A.  No.

3    Q.  Are you permitted to take that surplus and get some

4    plane tickets to Vegas for everyone in your department?

5    A.  No.

6            MR. BOBIER:  Thank you.

7            THE COURT:  Thank you, Ms. Koppen.  You may step

8    down.

9            Members of the jury, we're going to break for the

10    weekend at this point.  We'll come back Tuesday at 9:00.

11            Let me just remind you of our recess instruction,

12    which is that you are to talk to no one about the case.  You

13    are not to receive any information about the case.  You are

14    to contact staff immediately if anyone tries to contact you.

15    You are not to look at any media or do any investigation.

16            I know I've given you that instruction multiple

17    times.  I'll continue to just remind you of it.  You are

18    always under that instruction.

19            I hope you have a great weekend, and we'll see you

20    at 9:00 a.m. on Tuesday.

21    12:24 p.m.

22                      **IN OPEN COURT**

23                   **(JURY NOT PRESENT)**

24            THE COURT:  Counsel, anything else before the

25    break?

1       MR. COLICH:  No, Your Honor.

2       MR. THOMPSON:  No, Your Honor.

3       MR. UDOIBOK:  I only want to know when I am in

4    trouble.

5       THE COURT:  All right.  You are not in trouble.

6       I don't have any hearings tomorrow or Monday and

7    the courtroom will be locked, but -- so I wouldn't leave any

8    electronics, but if you need to leave paper, I think that's

9    fine.

10       MR. COLICH:  Your Honor, if I just may point

11    something out for the court?

12       I spoke with Mr. Thompson earlier this morning

13    regarding them calling out other defendants that come in the

14    courtroom, and I have concerns for that, not only for the

15    defendants in this matter, how that may impact the jury's

16    thought process, knowing other defendants are here, or how

17    it may impact the jury, knowing the history of the previous

18    trial, et cetera.

19       I asked Mr. Thompson if he was going to continue

20    to do that.  He said absolutely not.  I just want to make

21    sure the record is clear on that.

22       THE COURT:  All right.  Thank you.

23       Mr. Thompson, do you want to say anything for the

24    record?

25       MR. THOMPSON:  I always want to say something,

1    Your Honor, but, no.  That's fine.  We're happy not to, and

2    obviously, you know, it's an uneasy time with what happened

3    in the last trial.

4           And we've also -- I asked Mr. Colich to talk to

5    those other codefendants who may or may not come into the

6    courtroom about not riding down with the jurors and not

7    having any contact with them, and he agreed to do so.

8           THE COURT:  All right.  Thank you, all.

9           I'll see you Tuesday.  Have a good weekend,

10   everybody.

11          (Court adjourned at 12:27 p.m., 02-13-2025.)

12                          *   *   *

13          I, Renee A. Rogge, certify that the foregoing is a

14   correct transcript from the record of proceedings in the

15   above-entitled matter.

16

17                   Certified by:  /s/Renee A. Rogge
                                    Renee A. Rogge, RMR-CRR
18

19

20

21

22

23

24

25