# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 22-CR-223 (NEB/DTS) |
| Plaintiff, | |
| v. | ORDER ON MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR NEW TRIAL |
| AIMEE MARIE BOCK (1) and SALIM AHMED SAID (3), | |
| Defendants. | |

A jury found Defendants Aimee Bock and Salim Said guilty of multiple counts related to the fraud scheme generally known as "Feeding Our Future." Bock was convicted of one count of conspiracy to commit wire fraud, four counts of wire fraud, one count of conspiracy to commit federal programs bribery, and one count of federal programs bribery. (ECF No. 581.) Said was convicted of one count of conspiracy to commit wire fraud, four counts of wire fraud, one count of conspiracy to commit federal programs bribery, nine counts of federal programs bribery, one count of conspiracy to commit money laundering, and five counts of engaging in monetary transactions in property derived from unlawful activity. (ECF No. 582.) Both Defendants move for judgment of acquittal. (ECF Nos. 611, 626.) Bock also moves for a new trial. (ECF No. 626.) For the reasons below, the Court denies the motions.

## BACKGROUND

For purposes of this Order, the Court assumes the reader is familiar with the background facts and details of the fraud scheme. Bock and Said were among fourteen defendants charged in a sixty-one-count Indictment. (ECF No. 1.) The government alleged a "massive scheme to defraud" the Federal Child Nutrition Program. (*Id.* ¶ 1.) At trial, the government sought to prove that Bock oversaw the scheme through her role as executive director of Feeding Our Future. (*See* ECF No. 435 at 6.) It also sought to prove that Said participated in the scheme as a food site operator and through his ownership of LLCs and related entities. (*Id.* at 7–9.)

The Court held a twenty-one-day jury trial from February 3 to March 18, 2025. (*See* ECF Nos. 502, 578.) The government called over two dozen witnesses, including law-enforcement officers, forensic accountants, cooperators, and purported Feeding Our Future board members. The Court received into evidence bank statements, checks, meal count sheets, emails, text messages, pole camera surveillance footage, and search warrant photographs.

Bock and Said each put on a defense. Each testified on their own behalf. (ECF Nos. 567, 568, 573.) Said called one witness—Mohamed Liban, a local social media

"influencer." (ECF No. 605 at 151, 189; Tr. Trans. at 4378, 4416[1].) The jury ultimately convicted Bock and Said on all Counts.

## ANALYSIS

The Court must resolve three motions: (1) Bock and Said's motions for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure based on insufficient evidence, and (2) Bock's motion for a new trial under Rule 33 based on the grounds that the verdict was a miscarriage of justice.

### I.     Motion for Judgment of Acquittal

Under Rule 29(a), "on the defendant's motion [the court] must enter a judgment of acquittal for any offense for which the evidence is insufficient to sustain a conviction." "[H]owever, a district court has very limited latitude to do so and must not assess witness credibility or weigh evidence." *United States v. Hassan*, 844 F.3d 723, 725 (8th Cir. 2016). The Court views "the entire record in the light most favorable to the government," resolves "all evidentiary conflicts accordingly," and accepts "all reasonable inferences supporting the jury's verdict." *United States v. Broeker*, 27 F.4th 1331, 1335 (8th Cir. 2022) (citation omitted). "A verdict will only be overturned if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Weaver*, 554 F.3d 718, 720 (8th Cir. 2009).

---

[1] For citations to the trial transcript, the Court will cite the ECF docket number and ECF pagination. In addition, the Court will cite the trial transcript's original pagination, using numbering in the top right corner.

### A.    Wire Fraud

"Pursuant to 18 U.S.C. § 1343, to prove wire fraud, the government must prove (1) intent to defraud, (2) participation in a scheme to defraud, and (3) the use of a wire in furtherance of the fraudulent scheme." *United States v. Roberts*, 881 F.3d 1049, 1052 (8th Cir. 2018) (concluding no error in district court's denial of motion for judgment of acquittal of wire fraud conviction). "The false or fraudulent representation must be material." *Id.* Bock and Said were each convicted of four wire fraud counts. (ECF Nos. 581, 582).

### 1.    Bock - Counts 2, 4, 5, and 12[2]

Bock contends there was insufficient evidence of: (1) her intent to defraud; (2) that she participated in the scheme to defraud; (3) that she used a wire to further the fraudulent scheme; and (4) that her fraudulent misrepresentations were material to the scheme. (ECF No. 626 at 10–12.)

### a.    Intent to Defraud

Cooperating witnesses presented testimony that Bock intended to defraud. For example, Lul Ali testified (1) that Bock encouraged Ali to apply to operate a food site under Feeding Our Future's sponsorship and (2) that Ali's application was quickly approved to serve 1,000 meals a day, an improbably high number for Ali's small

---

[2] Bock's motion for acquittal references wire fraud Counts 4, 5, 8, and 12. (ECF No. 626 at 9.) But the jury convicted Bock of wire fraud on Counts 2, 4, 5, and 12. (ECF No. 581.)

restaurant. (ECF No. 589 at 154, 157; Tr. Trans. at 591, 594.) Ali testified that each month, when a Feeding Our Future employee would come collect a $30,000 kickback, that employee would FaceTime call Bock to confirm the kickback payment. (ECF No. 589 at 162, 179; Tr. Trans. at 599, 616.) Bock encouraged Ali to open more sites; according to Ali, Bock's message was "Open another facility, more facility, more money." (ECF No. 589 at 163; Tr. Trans. at 600.) Along with operating a food site, Bock encouraged Ali to participate in the scheme as a vendor, which would allow Ali to make more money. (ECF No. 589 at 164; Tr. Trans. at 601.) Bock encouraged Ali to falsely claim to serve 1,300 meals a day. (EC No. 589 at 171–73; Tr. Trans. at 608–10.) And Ali testified that Bock's motivation was to "make money." (ECF No. 589 at 175; Tr. Trans. at 612.) The jury heard similar testimony from five additional cooperating witnesses.

Intent to defraud "can seldom be shown by actual testimony reflecting a defendant's state of mind." *United States v. Porter*, 441 F.2d 1204, 1210 (8th Cir. 1971). But "[t]he cases are legion that intent may properly be inferred from all the facts and circumstances surrounding the transactions." *Id*. Viewing the record in the light most favorable to the government, there was sufficient evidence for a reasonable jury to conclude that Bock acted with an intent to defraud. *See Roberts*, 881 F.3d at 1052–53 (concluding circumstantial evidence demonstrated intent to defraud).

b.    Participation in the Scheme to Defraud

Bock argues that "[t]he evidence presented at trial did not demonstrate that [she] knowingly engaged in any fraudulent activity." (ECF No. 626 at 11.) The Court disagrees. As just described, cooperating witnesses testified that Bock encouraged them to (1) join the fraud, (2) submit inflated meal counts, and (3) expand their participation in the fraud. In fact, the jury heard testimony that Bock was *central* to the fraud scheme. One cooperator testified that Bock called a meeting of food site operators and warned them not to buy houses and cars with fraud proceeds because it could draw unwanted attention to the scheme. (ECF No. 598 at 85–88; Tr. Trans. 2694–97.) Viewing the record in the light most favorable to the government, there was sufficient evidence for a reasonable jury to conclude that Bock participated in the fraud scheme.

c.    Use of a Wire

Bock's wire fraud convictions stem from four emails. (ECF No. 1 ¶ 145.)

In the first two emails, Bock emailed applications to the Minnesota Department of Education ("MDE") to open two food sites: ASA Limited and Stigma-Free Willmar. (*Id.*; Gov't Exs. C-2, G-3.) The government presented evidence that, once approved by MDE, both food sites claimed millions of dollars in false reimbursements. (Gov't Exs. X-4, X-6.)

The third email was sent by Bock to MDE in October 2020 with the subject line "For-Profit Restaurant Clarifications." (ECF No. 1 ¶ 145; Gov't Ex. F-7.) The government introduced evidence suggesting that this email facilitated for-profit restaurants'

continued participation in the scheme. Shortly before the email, the relevant regulations had changed, and for-profit restaurants could no longer participate in the Federal Child Nutrition Program. (*See* ECF No. 588 at 209–10; Tr. Trans. at 420–21.) At the time of the change, Feeding Our Future sponsored many for-profit restaurants as food sites. (Gov't Ex. F-7.) Given the new regulations, MDE tried to close those sites. (ECF No. 589 at 94–96; Tr. Trans. at 531–33.) But in her email, Bock claimed that the for-profit restaurants were being staffed by Feeding Our Future volunteers. (ECF No. 588 at 208; Tr. Trans. at 419; Gov't Ex. F-7.) As a result, MDE determined that the for-profit restaurants listed by Bock would remain eligible to participate. (ECF No. 589 at 96; Tr. Trans. at 533.)

In the fourth email, a Feeding Our Future employee sent Bock a series of meal counts for October 2021. (Gov't Ex. Z-12.) The meals counts showed a remarkably—and, according to the government, suspiciously—consistent number of meals served every day. (*See generally id.*) For example: 1,996 meals served on Sunday; 1,995 meals served on Monday; 1,990 meals served on Tuesday; 1,997 meals served on Wednesday, and so on. (*Id.* at 3.) Also attached to the email were rosters depicting names of purported children who received the meals. (*Id.* at 10–53.)

Bock argues that "[t]he evidence presented at trial did not establish that [she] used any wire communication with the intent to further a fraudulent scheme." (ECF No. 626 at 11–12.) Again, the Court disagrees. Viewing the record in the light most favorable to

the government, there was sufficient evidence for a reasonable jury to conclude that these four emails were sent or received with an intent to further the fraud scheme.

d.    Materiality

Last, Bock argues that "[t]he evidence presented at trial did not establish that the alleged false claims were material to the reimbursement process." (ECF No. 626 at 12.) "A misrepresentation is material if it is *capable* of influencing the intended victim." *United States v. Louper-Morris*, 672 F.3d 539, 555 (8th Cir. 2012) (citation omitted) (emphasis added). The jury heard testimony contextualizing how each email influenced and misled MDE. For example, Bock's October 2020 "For-Profit Restaurant Clarifications" email hampered MDE's efforts to close the for-profit restaurant sites. (ECF No. 588 at 209–10; Tr. Trans. at 420–21.) A reasonable jury could find that, had Bock not sent her "clarification" email, MDE would have discontinued the for-profit restaurants' participation in the Federal Child Nutrition Program. "Accordingly, the government offered sufficient evidence that [Bock's emails] were capable of influencing the intended victim, and, as such, were material." *Roberts*, 881 F.3d at 1053.

2.    *Said – Counts 2, 5, 8, and 12*

a.    Count 2

The jury convicted Said on Count 2, which stemmed from Bock's September 8, 2020 email to MDE. That email contained a site application for ASA Limited. (Gov't Ex. C-2.) Said argues that his involvement with ASA Limited was

confined to his financial investment. (ECF No. 611 at 5.) He contends that the government's "own evidence showed that Said never signed a single meal count for ASA Limited." (*Id.*) And because his involvement with ASA Limited was narrow, "Said had no knowledge of his co-owners committing fraud at ASA Limited and did not intend for ASA Limited to be a fraudulent food site." (*Id.*)

The government introduced 2021 text messages in which Said asked Bock about the payments for ASA Limited. (*E.g.*, Gov't Ex. BB-30b at 3 ("Any checks today bravo or asa please let me know thanks"); Gov't Ex. BB-30d ("Aimee any checks for asa summer").) The jury saw an October 2021 email from a co-defendant to Said with the subject line "ASA meal count"; attached was an Excel spreadsheet that autogenerated fake ages for the purported children receiving meals. (Gov't Ex. C-22 (Excel spreadsheet attached to email containing formula "RANDBETEWEEN(7,17)" to randomly generate ages between 7 and 17).) The government introduced two November 2021 emails sent directly to Said. (Gov't Exs. C-28, C-29.) Both contained meal counts that contained remarkably consistent numbers of meals served each day. (Gov't Exs. C-28, C-29.) And Said's personal LLC—Salim Limited LLC—earned $871,00 from ASA Limited through January 2022. (Gov't Ex. X-4.) Even if Said never *signed* an ASA Limited meal count, there was sufficient evidence for a reasonable jury to convict Said of wire fraud on Count 2.

b.    Count 5

The jury also convicted Said on Count 5, which stemmed from the October 2020 "For-Profit Restaurant Clarifications" email sent by Bock to MDE. (Gov't Ex. F-7.) Said argues that the government "presented no evidence that Said knew about or acquiesced in the sending of" that email. (ECF No. 611 at 6.) True, Said was neither a sender nor a recipient of the email. But the government only needed to prove beyond a reasonable doubt that Said "cause[d]" the wire (i.e., the email) to be transmitted. 18 U.S.C. § 1343. And "a defendant will be deemed to have 'caused' the use of . . . interstate wires if the use was the reasonably foreseeable result of his actions." *United States v. Wrehe*, 628 F.2d 1079, 1085 (8th Cir. 1980).

The jury heard evidence tying Said to two for-profit food sites: Safari Restaurant and ASA Limited. (*See* Gov't Ex. X-3 at 2 (calculating that Said's personal LLC received $1.9 million in fraud proceeds through Safari Restaurant); Gov't Ex. X-4 (calculating that Said's personal LLC received $871,000 in fraud proceeds through ASA Limited).) Evidence showed that both entities applied to become food sites at a time when for-profit restaurants were still allowed to participate. (Gov't Ex. B-4 (April 13, 2020 application for Safari Restaurant); Gov't Ex. C-2 (September 8, 2020 application for ASA Limited).) As executive director of Feeding Our Future, the jury heard testimony that Bock was the main point of contact between food sites and MDE. (*E.g.*, ECF No. 588 at 151; Tr. Trans. at 362.) When Bock learned that for-profit restaurants would no longer be able to operate

10

food sites, the jury heard testimony that Bock sought to continue the restaurants' participation in the fraud and ward off further investigation. (ECF No. 588 at 209–10; Tr. Trans. at 420–21.) Jurors also saw many text exchanges suggesting a close working relationship between Bock and Said; they discussed reimbursement payments, rallying political support for Feeding Our Future, and controlling site operators who were conspicuously displaying wealth. (*E.g.*, Gov't Exs. BB-30a, BB-30b, BB-30c, BB-30d, BB-30e.) And as part of the Court's instructions, the jury received the following guidance

> It is not necessary that the defendant himself or herself contemplate the use of an interstate wire communication or specifically intend that an interstate wire communication be used. It is sufficient if an interstate wire communication was in fact used to carry out the scheme and the use of an interstate wire communication by someone was reasonably foreseeable.

(ECF No. 580 at 26.)

Viewing the record in the light most favorable to the government, there was sufficient evidence for a reasonable jury to conclude that the October 2020 "For Profit Restaurant Clarifications" email was reasonably foreseeable to Said, given his relationship to both for-profit food sites and Bock. *See United States v. Hetherington*, 256 F.3d 788, 794–95 (8th Cir. 2001) (affirming wire fraud conviction and concluding that the use of interstate wires was reasonably foreseeable).

c.    Count 8

Count 8 relates to a March 1, 2021 email by Said through Safari Restaurant's email account to a co-defendant with the subject line "February summer meal counts Claims

11

for Safari restaurant." (ECF No. 1 ¶ 145; Gov't Ex. B-20.) The attached meal counts contained consistently high numbers of meals served every day of the week: 5,996 on Sunday; 5,995 on Monday; 5,998 on Tuesday, 5,997 on Wednesday, and so on. (Gov't Ex. B-20 at 3.)

Said contends that by March 2021 he was no longer involved in the "day-to-day operations" at Safari Restaurant. (ECF No. 611 at 5.) By March 2021, he "trusted" that his business partner "would continue running the food program operation like Said had throughout 2020"—i.e., legitimately. (*Id.*) At the time that Said sent the March 1, 2021 email, he "had no knowledge that any meal counts going from Safari to Feeding Our Future were fraudulent or inflated." (*Id.*)

Said testified at trial. Part of his testimony to the jury was that his initial participation in the food program was lawful, and that it was his business partners who originated and partook in the fraud scheme. For example, after initially becoming a food site under Feeding Our Future's sponsorship, he testified that Safari Restaurant ran a legitimate food distribution site throughout 2020. (ECF No. 606 at 71–72; Tr. Trans. at 4506–07.) And he directly denied that Safari Restaurant's initial participation was part of a fraud scheme. (ECF No. 606 at 70; Tr. Trans. at 4505.)

For its part, the government introduced evidence that Said's participation in the scheme continued after February 2021. (*E.g.*, Gov't Exs. BB-30a, BB-30b, BB-30c, BB-30d, BB-30e, Ex. C-22, C-28, C-29.) It also introduced evidence that Said's involvement in the

scheme grew beyond Safari Restaurant as a single location, and into the "Safari Group" as a collection of fraudulent meal sites. (Gov't Ex. FF-2 at 229; ECF No. 606 at 236–37; Tr. Trans. at 4671–72.)

Between these two competing theories, the jury credited the government's theory. *See United States v. Lundstrom*, 880 F.3d 423, 439 (8th Cir. 2018) ("The jury ultimately rejected Lundstrom's theory that he did not have the requisite knowledge and intent and accepted the government's competing theory that he did."). The attachment to the March 1, 2021 email contained remarkably consistent numbers of meals served seven days a week. (Gov't Ex. B-20 at 3.) Viewing the record in the light most favorable to the government, there was sufficient evidence for a reasonable jury to conclude that the March 1, 2021 email constituted wire fraud. *See United States v. Nshanian*, 821 F.3d 1013, 1017 (8th Cir. 2016) (affirming wire fraud conviction and rejecting argument that defendant "was unaware of the fraud orchestrated by others").

### d.    Count 12

Count 12 stems from a November 4, 2021 email from a co-defendant to Bock. (ECF No. 1 ¶ 145; Gov't Ex. C-31.) Attached to the email was (1) a list of names titled "Attendance for After School Program" for the ASA Limited site, (2) invoices for ASA Limited, and (3) meal counts for ASA limited. (Gov't Ex. C-31 at 2, 198, 200.) Said was neither a sender nor a recipient of the email.

Said argues that he "had nothing to do with the creation of the ASA Roster" in the November 4, 2021 email. (ECF No. 611 at 5.) He contends that the government "failed to prove that Said knew about the creation of a fake roster, asked anyone to create a fake roster, or intended for a fake roster to be sent to Feeding Our Future or elsewhere." (*Id.*) A defendant causes the use of interstate wires "if the use was the reasonably foreseeable result of his actions." *Wrehe*, 628 F.2d at 1085. The jury saw evidence tying Said to ASA Limited. (*See* Gov't Ex. X-4 (listing Said's personal LLC as receiving $871,000 in fraud proceeds through ASA Limited).) The government introduced text messages between Said and Bock in which both defendants discussed ASA Limited's reimbursement payments. (*E.g.*, Gov't Exs. BB-30b, BB-30d.) Even if he did not send or receive the November 4, 2021 email, the jury saw other emails in which Said directly received ASA Limited's meal counts and rosters. (Gov't Exs. C-22, C-28, C-29.)

Said need not have known about the fake roster, asked another to create the roster, or intended for the roster to be emailed to Bock. A conviction survives a motion for acquittal so long as the use of interstate wires was reasonably foreseeable. *See Hetherington*, 256 F.3d at 795. Viewing the record in the light most favorable to the government, there was sufficient evidence for a reasonable jury to conclude that the November 4, 2021 email was reasonably foreseeable to Said.

14

B.    *Federal Programs Bribery*

"Federal statutes criminalize both the making and the taking of bribes, with separate subsections laying out different elements for defendants who pay bribes (the payor) and defendants who take bribes (the payee)." *United States v. Suhl*, 885 F.3d 1106, 1111 (8th Cir. 2018). Bock was convicted for accepting a bribe in violation of 18 U.S.C. § 666(a)(1)(B). Said was convicted for bribe-giving in violation of 18 U.S.C. § 666(a)(2).

1.    *Bock - Count 40*

At trial, the government argued that Cosmopolitan Business Solutions' August 2021 purchase of Bock's daycare center constituted a bribe.[3] (Gov't Ex. S-11; *see* ECF No. 607 at 89; Tr. Trans. at 4842; ECF No. 1 ¶ 180.) As framed by the government, the $310,000 purchase was a kickback that allowed Cosmopolitan Business Solutions to continue to operate the fraudulent food site that existed at the same location as the daycare. (*See* ECF No. 604 at 230–31; Tr. Trans. at 4180–81.) To support its argument, on cross-examination the government elicited testimony from Bock that there was no daycare license and no customers. (ECF No. 604 at 227, 232; Tr. Trans. at 4177, 4182.) It also elicited testimony from Bock that the $310,000 check was made to her personally. (ECF No. 604 at 226; Tr.

---

[3] Cosmopolitan Business Solutions LLC did business as Safari Restaurant. (Gov't Ex. B-1.) Said was involved with both Cosmopolitan Business Solutions and Safari Restaurant. (*E.g.*, Gov't Exs. B-9, B-13, B-18.) The government introduced evidence that Cosmopolitan Business Solutions netted $16.6 million in fraudulent food program money. (Gov't Ex. X-3 at 2.) In other words, Cosmopolitan Business Solutions was a key player in the fraud scheme.

Trans. at 4176.) And it presented to the jury the purchase agreement between Bock and Said for the daycare center. (Gov't Ex. HH-26; *see* Gov't Ex. S-19.) In other words, because there was not a functioning daycare, the $310,000 purchase was a kickback.

In her defense, Bock testified that the sale of the daycare center was legitimate, that she had applied to a state licensing agency to open the center, and that she had prepared classrooms and furniture. (ECF No. 604 at 34–35; Tr. Trans. at 3984–85.) Because of lower demand for childcare during the COVID-19 pandemic, she testified that she sold the daycare center before it opened. (ECF No. 604 at 37–38; Tr. Trans. at 3987–88.) She explicitly denied that the $310,000 sale of the daycare center was a kickback. (ECF No. 604 at 40–41; Tr. Trans. at 3990–91.)

Viewing the record in the light most favorable to the government, there was sufficient evidence to sustain a conviction against Bock for federal programs bribery. A reasonable jury could have concluded that the $310,000 daycare sale was a bribe.

In support of her motion, Bock makes three arguments. First, Bock claims that the government did not present sufficient evidence that she "acted with the requisite corrupt intent." (ECF No. 626 at 14.) The Court disagrees. The statute criminalizes an individual who "corruptly solicits or demands . . . or accepts or agrees to accept" a bribe. 18 U.S.C § 666(a)(1)(B). The Court's federal programs bribery jury instruction defined "corruptly."

> As used in this instruction, the term "corruptly" means that Aimee Bock acted voluntarily and intentionally and, at least in part, in return for being influenced or induced to cause, or as a reward for causing, Feeding Our

Future to sponsor Cosmopolitan Business Solutions' fraudulent participation in the Federal Child Nutrition Program.

(ECF No. 580 at 41); *see* Model Crim. Jury Instr. 8th Cir. § 6.18.666B (2023). The government's theory of corruption was that the $310,00 sale was a bribe that enabled Cosmopolitan Business Solutions to gain a profitable food site. Bock argued that the sale of the daycare center was legitimate. Between these two competing theories, the jury credited the government's theory. *See Lundstrom*, 880 F.3d at 439. A reasonable jury could conclude that Bock "corruptly" accepted the $310,000 in return for Feeding Our Future's continued sponsorship of Cosmopolitan Business Solutions' participation in the scheme.

Next, Bock argues that the government failed to prove that she "solicited or accepted anything of value." (ECF No. 626 at 15.) Not so. The Court admitted (1) a purchase agreement memorializing the sale of the daycare center; (2) a $310,000 check from Cosmopolitan Business Solutions to Bock; and (3) video surveillance depicting Bock depositing the $310,000 check into her personal account. (Gov't Exs. HH-26, S-11, S-12, Z-40; ECF No. 600 at 74; Tr. Trans. at 3159.) There was sufficient evidence for a reasonable jury to conclude that Bock solicited or accepted a bribe.

Last, Bock contends that "the Government failed to establish a direct connection between the alleged bribes and specific transactions involving the federal program." (ECF No. 626 at 16.) The Court notes that neither the statute, the Eighth Circuit's Model Jury Instructions, nor Eighth Circuit case law require a direct connection between the bribes and a federal program. *See United States v. Hines*, 541 F.3d 833, 836 (8th Cir. 2008*)*

("[T]he plain language of [18 U.S.C. § 666] does not require, as an element to be proved beyond a reasonable doubt, a nexus between the activity that constitutes a violation and federal funds."). In any event, there was sufficient evidence for a jury to conclude that the $310,000 check was made to continue Cosmopolitan Business Solutions' participation in the Federal Child Nutrition Program scheme. (*See* ECF No. 604 at 230–31; Tr. Trans. at 4180–81 (testimony that Cosmopolitan Business Solutions continued to run a food site at the location of the daycare after the $310,00 payment to Bock); ECF No. 604 at 241; Tr. Trans. at 4191 (testimony that Bock paid $476,000 to Cosmopolitan Business Solutions the day before she received $310,000 check for purported daycare center).)

2.    *Said – Counts 16, 17, 18, 19, 32, 34, 36, 37, and 38*

The jury convicted Said of nine counts of federal programs bribery under 18 U.S.C. § 666. (ECF No. 582 at 3–5.) Counts 16, 17, 18, 19, 36, and 38 originated from checks paid by Cosmopolitan Business Solutions to Eidleh Inc. (ECF No. 1 ¶ 180.) Each check ranged in value from $1,500 to $14,000. (*Id.*) Counts 32 and 37 related to checks paid by Salim Limited LLC to Eidleh Inc.; those checks ranged from $7,000 to $14,000. (*Id.*) And Count 34 was for a $14,000 check from Salim Limited LLC to Hope Suppliers LLC, an entity created by Eidleh. (*Id.*; Gov't Ex. S-74.)

In June 2024, the Supreme Court clarified that 18 U.S.C. Section 666 proscribes bribes, but not gratuities. *Snyder v. United States*, 603 U.S. 1, 20 (2024). A bribe payor like Said violates Section 666 either by (1) offering "an up-front payment for a future official

act" or (2) promising to pay "a future reward for a future official act." *See id.* at 19. Given that it changed the law in the Eighth Circuit, *Snyder* was a focus of Defendants' pre-trial motions. *United States v. Bock*, No. 22-CR-223 (NEB/DTS), 2025 WL 18629, at *7, 9 (D. Minn. Jan. 2, 2025) (acknowledging "that *Snyder* established a new essential element of federal programs bribery," but declining to dismiss indictment).

To comply with *Snyder*, the Court supplemented the Eighth Circuit's model jury instruction. *Compare* Model Crim. Jury Instr. 8th Cir. § 6.18.666C (2023), *with* ECF No. 580 at 35–39. The Court added a new element—Element Three—which clarified that "the payment, or the agreement to make the payment occurred before an official act in order to influence the agent with respect to that future official act." (ECF No. 580 at 35.) As it pertained to Said, the Court further instructed

> In Element Three, the payment, or the agreement to make the payment, occurred before an official act in order to influence Abdikerm Eidleh with respect to that future official act, meaning sponsoring or continuing to sponsor Salim Said and/or his co-conspirators' fraudulent participation in the Federal Child Nutrition [Program].

(*Id.* at 36.)

Said first appears to contest the "continuing to sponsor" language from the jury instructions. (*See* ECF No. 611 at 6–7.) As Said would have it, this case involves one official act: Feeding Our Future's April 2020 sponsorship of Safari Restaurant's initial food site application. (*See* Gov't Ex. B-4 at 9.) And because each bribery check post-dates that April

2020 application, the government "failed to prove that Said took any action to corruptly influence an official act before the act took place." (ECF No. 611 at 6.)

But Said has not pointed the Court to any Eighth Circuit case that precludes a "continuing sponsorship" theory of official acts. As the Court understands it, the government requested the "continuing to sponsor" language as part of its theory that Feeding Our Future's monthly submissions of meal counts and corresponding reimbursements from MDE constituted "continuing" sponsorship. (ECF No. 607 at 111; Tr. Trans. at 4864; *see* ECF No. 419 at 103 (government's proposed jury instructions).) In other words, each recurring interaction between Feeding Our Future and MDE—including, importantly, the payments by MDE to Feeding Our Future—constituted an official act. Accepting all reasonable inferences supporting the jury's verdict, a reasonable jury could have tied each individual check to a particular official act of Feeding Our Future.

Second, Said challenges the sufficiency of the evidence: "At trial, the Government failed to prove that Said took any action to corruptly influence an official act before the act took place." (ECF No. 611 at 6.) The Court disagrees. The government presented testimony from three cooperating witnesses, each of whom testified that a Feeding Our Future employee named Abdikerm Eidleh demanded and collected bribes for the cooperators to continue their involvement in the fraud. (ECF No. 594 at 156–58; Tr. Trans. at 1760–62; ECF No. 596 at 62–63, 68; Tr. Trans. at 2127–26, 2133; ECF No. 598 at 56–57;

Tr. Trans at 2665–66.) All of Said's nine convictions for federal programs bribery involved a check to Eidleh. (ECF No. 1 ¶ 180.)

In his defense, Said testified that he believed the payments to Eidleh to be legitimate business consulting payments. (ECF No. 606 at 118–24; Tr. Trans. at 4553–59.) He based that belief on the representations of a colleague and co-defendant. (ECF No. 606 at 120; Tr. Trans. at 4555.) Viewing the evidence in the light most favorable to the government, a reasonable jury could have concluded that the nine checks written by Said to Eidleh constituted bribes.

### C.    Money Laundering

The jury convicted Said of five counts of engaging in monetary transactions in property derived from unlawful activity in violation of 18 U.S.C. Section 1957. The convictions pertain to five transactions: (1) $47,000 towards the purchase of a Chevrolet truck; (2) $60,000 towards the purchase of a Mercedez Benz; (3) a $1.175 million home in Plymouth, Minnesota; (4) a $2.735 million commercial building in Minneapolis, Minnesota; and (5) $2.4 million towards the purchase of a commercial building in Columbus, Ohio. (ECF No. 1 ¶ 199.)

Said challenges only the third element of his money laundering conviction—that he knew that the payment involved proceeds of a criminal offense. He argues that, based on representations made to him by a co-defendant, he "believed that he could make a

profit in the food program." (ECF No. 611 at 7.) He thus used those profits "just as he would with profits made outside the food program." (*Id.*)

During his testimony, Said shared his understanding of the food program. In the early weeks of the COVID-19 pandemic, an individual affiliated with Feeding Our Future came to Safari Restaurant to convince Said and Said's business partners to partake in the Federal Child Nutrition Program. (ECF No. 606 at 63; Tr. Trans. at 4498.) That individual represented that Safari Restaurant would be entitled to make a profit. (ECF No. 606 at 66–67; Tr. Trans. at 4501–02.) As a small business owner, Said testified that Safari Restaurant participated in the food program *because of* the ability to make a profit. (ECF No. 606 at 164–65; Tr. Trans. 4599–600.)

The government did not necessarily contest whether the relevant regulations allowed a food site to make a profit. Instead, on cross-examination, the government challenged the authenticity of Said's beliefs.

> **Q.** And rather than take that money and feed food, you bought a house for a million dollars?
> **A.** I did feed the food. I did give out food. If anything, we give out more than -- we work more every single day. It's -- what I see here is a company told us we can make a profit. You telling us we cannot make a profit.
> **Q.** Aimee Bock told you [that] you could make that kind of money?
> **A.** Feeding Our Future, the company said --
> **Q.** No. Feeding Our Future doesn't talk, Mr. Said. Who told you that?
> **A.** Company told us we can make a profit.
> **Q.** Aimee Bock?
> **A.** Company told us we can make a profit.
> **Q.** Companies can't talk, Mr. Said.

> **A.** [A Feeding Our Future employee] came to me saying, the first time I met him, You can make a profit.
> **Q.** The [same employee] you paid $40,000 to?
> **A.** He told me I can make a profit. . . .

(ECF No. 606 at 309–10; Tr. Trans. at 4744–45.)

Between these two competing theories, the jury credited the government's theory. *See Lundstrom*, 880 F.3d at 439. And, as discussed above, because the evidence presented at trial was sufficient for a reasonable jury to find that Said committed wire fraud, there was also "sufficient evidence for a reasonable jury to find that [Said] knew" that the payments made towards the cars, home, and commercial buildings "were proceeds of criminal activity." *United States v. Kock*, 66 F.4th 695, 704 (8th Cir. 2023) (affirming 18 U.S.C. § 1957 conviction).

### D.    *Conspiracy*

Bock challenges her convictions of wire fraud conspiracy (Count 1) and federal programs bribery conspiracy (Count 15). Likewise, Said challenges his wire fraud conspiracy conviction (Count 1) and federal programs bribery conspiracy conviction (Count 15). He also challenges his conviction of conspiracy to commit concealment money laundering (Count 41).

To sustain a conspiracy conviction, the government must prove that "1) an agreement existed among two or more people to accomplish an illegal purpose, 2) the defendant knew of the conspiracy, and 3) the defendant knowingly joined and

participated in the conspiracy." *United States v. Rodriguez-Ramos*, 663 F.3d 356, 361 (8th Cir. 2011) (citation omitted).

      1.     *Wire Fraud Conspiracy*

     "To prove conspiracy to commit wire fraud, the United States must show that 1) there was a conspiracy, an agreement to commit wire fraud; 2) [Bock and Said] knew of the agreement; and 3) they intentionally joined in the conspiracy." *Louper-Morris*, 672 F.3d at 555. "The elements of conspiracy may be proved by direct or circumstantial evidence, and the jury may draw reasonable inferences from the evidence presented about [] the defendant's state of mind." *United States v. Cervantes*, 646 F.3d 1054, 1059 (8th Cir.2011) (citation omitted).

     Viewing the record in the light most favorable to the government, a reasonable jury could have found Bock guilty beyond a reasonable doubt of conspiracy to commit wire fraud. The jury heard testimony that Bock was motivated to illicitly "make money" through her role as Feeding Our Future's executive director. (ECF No. 589 at 175; Tr. Trans. at 612.) The jury also heard testimony that Bock personally encouraged co-defendants to join, and then expand their participation in, the fraud scheme. (*E.g.*, ECF No. 589 at 154, 157, 164; Tr. Trans. at 591, 594, 601.) A cooperating witness testified that Bock knowingly joined and participated in the conspiracy, for example, by warning food site operators to not conspicuously spend their fraud proceeds. (ECF No. 598 at 85–88; Tr. Trans. 2694–97.) In addition, the government presented evidence that Bock submitted

fraudulent food site applications, submitted every reimbursement claim, and lobbied MDE for for-profit restaurants to remain in the scheme. (Gov't Exs. C-2, F-7, G-3, V-3; ECF No. 588 at 208–10; Tr. Trans. at 419–21; ECF No. 589 at 94–96, 154; Tr. Trans. at 531–33, 591.)

Likewise, a reasonable jury could have found Said guilty beyond a reasonable doubt of conspiracy to commit wire fraud. The jury saw evidence that Said communicated directly with Bock about checks for the fraudulent food sites. (*E.g.*, Gov't Exs. BB-30b, BB-30d.) The government introduced evidence that Said personally received millions of dollars from the fraudulent food sites. (*See* Gov's Ex. X-3 at 2, X-4.) And the government presented evidence that Said's involvement in the scheme grew into the self-described "Safari Group" as a collection of fraudulent meal sites. (Gov't Ex. FF-2 at 229; ECF No. 606 at 236–37; Tr. Trans. at 4671–72.)

2.    *Federal Program Bribery Conspiracy*

Federal programs bribery has four elements: (1) two or more people agreed to commit the crime of federal programs bribery; (2) the defendant voluntarily and intentionally joined in the agreement; (3) at the time the defendant joined, the defendant knew the purpose of the agreement; and (4) while the agreement was in effect, a person, or persons who had joined in the agreement knowingly did one or more acts for carrying out or carrying forward the agreement. (ECF No. 580 at 28); *see also United States v.*

*Baumann*, 684 F. Supp. 2d 1146, 1149 (D.S.D. 2010) (listing elements of 18 U.S.C. § 66(a)(1)(B).)

As to Aimee Bock, the government presented evidence that Bock and Said conspired to commit federal programs bribery—the Court admitted (1) a purchase agreement memorializing the sale of the daycare center, (2) a $310,000 check from Cosmopolitan Business Solutions to Bock, and (3) video surveillance depicting Bock depositing the $310,000 check into her personal account. (Gov't Exs. HH-26, S-11, S-12, Z-40; ECF No. 600 at 74; Tr. Trans. at 3159.) At trial, the government's theory was that co-defendants purchased Bock's daycare center for $310,000 as a bribe for their continued participation in the fraud. (*See* ECF No. 607 at 89; Tr. Trans. at 4842.) During her testimony, Bock explained that the sale of the daycare center was legitimate. (ECF No. 604 at 34–35; Tr. Trans. at 3984–85.) But on cross-examination, the government impeached Bock's credibility, for example, by eliciting testimony that there was never a functioning daycare center to warrant a $310,000 payment. (ECF No. 604 at 226–27; Tr. Trans. at 4176–77.) Viewing the record in the light most favorable to the government, a reasonable jury could have found Bock guilty beyond a reasonable doubt of conspiracy to commit federal programs bribery.

As to Salim Said, the government presented testimony from cooperating witnesses that Abdikerm Eidleh served as a bribe collector for Feeding Our Future. (ECF No. 598 at 56–57; Tr. Trans at 2665–66; ECF No. 596 at 62–63, 68; Tr. Trans. at 2127–26, 2133; ECF

No. 594 at 158; Tr. Trans. at 1760–62.) Each of Said's nine federal programs bribery convictions involved a check to Eidleh. (*E.g.*, Gov't Exs. Z-17, Z-18, Z-19.) And as described above, the jury heard testimony about (1) how Said's businesses profited from the fraud scheme, (2) how Said collaborated with Bock to partake in the scheme, and (3) how the food sites operated or owned by Said vastly exaggerated the meal counts. Viewing the record in the light most favorable to the government, a reasonable jury could have found Said guilty beyond a reasonable doubt of conspiracy to commit federal programs bribery. *See United States v. Reyes*, 239 F.3d 722, 738–39 (5th Cir. 2001) (affirming conspiracy to commit federal programs bribery conviction where "the record would allow the jury to infer an unlawful agreement arose" between two co-defendants).

### 3.    *Money Laundering Conspiracy*

Conspiracy to commit concealment money laundering has four elements: (1) two or more people agreed to commit the crime of concealment money laundering; (2) the defendant voluntarily and intentionally joined in the agreement; (3) at the time the defendant joined in the agreement, the defendant knew the purpose of the agreement; and (4) while the agreement was in effect, a person, or persons who had joined in the agreement knowingly did one or more acts for carrying out or carrying forward the agreement. (ECF No. 580 at 43); *see also United States v. Good*, 386 F. Supp. 3d 1073, 1097 (D. Neb. 2019) (discussing elements of money laundering conspiracy).

27

For each of Said's money laundering conspiracy counts, the government presented summary charts detailing how money flowed from Feeding Our Future, through various LLCs owned by Said and other co-defendants, and into the purchase at issue. (Gov't Exs. U-16, U-17, U-18, U-19.) For example, the jury saw evidence mapping out the source of funds behind the $2.78 million purchase of a commercial building in Minneapolis. (Gov't Ex. U-19 (tracking flow of money and citing exhibits referenced).) Nine entities—implicating Said and other co-defendants—funneled Federal Child Nutrition Program funds into an entity called Cosmopolitan Business Properties LLC to buy the commercial building. (*Id.*) On cross-examination, Said did not deny this flow of money. Instead, he maintained that the money derived from legitimate profits earned through his participation in the food program. (*See* ECF No. 606 at 217–23; Tr. Trans. at 4652–58.) He agreed that he bought the building with other co-defendants and that the money originated from his partnership with Feeding Our Future. (ECF No. 606 at 311–13; Tr. Trans. at 4746–48.) Viewing the record in the light most favorable to the government, a reasonable jury could have found Said guilty beyond a reasonable doubt of conspiracy to commit money laundering.

## II.    Bock's Motion for a New Trial

Bock also moves for a new trial. Under Rule 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Unlike a motion for an acquittal, "the court has broad discretion in deciding

motions for new trial" and "is permitted to weigh the evidence and evaluate the credibility of the witnesses." *Hassan*, 844 F.3d at 725–26.

Bock contends that she should receive a new trial for two reasons. First, she claims that the jury "could not have considered all the exhibits presented after six weeks of trial in less than five hours of deliberation." (ECF No. 626 at 2.)

To start, the Court notes that, although trial occurred across six weeks, the jury sat for twenty-one days of trial. The Court also managed to observe the jury take copious notes throughout the trial, including, for some jurors, filling multiple notebooks. And "[a] jury is not required to deliberate for any set length of time. Brief deliberation, by itself, does not show that the jury failed to give full, conscientious or impartial consideration to the evidence." *Wilburn v. Eastman Kodak Co.*, 180 F.3d 475, 476 (2d Cir. 1999). The Eighth Circuit has affirmed convictions involving a similar trial-to-deliberation ratio. *E.g.*, *United States v. Lucas*, 932 F.2d 1210, 1213, 1225 (8th Cir. 1991) (affirming conviction when jury took twelve hours to deliberate after nine-week trial). The Court declines to grant a new trial based on the length of the jury's deliberation.

Second, Bock argues that the government presented evidence designed to "inflame" the jury. (ECF No. 626 at 2.) She contends the government "paraded as evidence" (1) "flamboyant purchases and lifestyles of co-defendants involved in the food program" and (2) Bock's "African American former boyfriend." (*Id.*) The Court disagrees that any evidence inflamed the jury. As to the purchases and lifestyles of co-defendants,

a cooperating witness testified that as Bock learned of other co-defendants' conspicuous purchases, she called a meeting, and then warned them not to draw attention to themselves by purchasing cars or houses. (ECF No. 598 at 85–88; Tr. Trans. 2694–97.) Such evidence was meant not to inflame the jury but to show that Bock sought to avoid unwanted attention.

As to her boyfriend, the government introduced evidence that he benefited from the overall fraud scheme. Bock testified that her boyfriend's handyman company performed $871,500 worth of construction work on Feeding Our Future's offices. (ECF No. 604 at 30; Tr. Trans. at 3980.) On cross-examination, the government cast doubt on the legitimacy of the boyfriend's company. It elicited testimony that the boyfriend was a paid employee of Feeding Our Future in addition to receiving the $871,500 contract. (ECF No. 605 at 7; Tr. Trans at 4234.) The government doubted the veracity of that construction project by noting that the boyfriend's construction company spent $20,000 at Dick's Sporting Goods, $50,000 in travel expenses, and made purchases at Wedding Day Diamonds. (ECF No. 605 at 13; Tr. Trans. at 4240.)

The government also used the boyfriend's company to impeach Bock's credibility. When asked if Bock "benefited from the checks" made to her boyfriend's company, Bock answered "no." (ECF No. 605 at 12; Tr. Trans. at 4329.) The government then elicited testimony that her boyfriend bought Bock plane tickets to Las Vegas and rented luxury cars that Bock rode in; she denied knowing the source of those purchases. (ECF No. 605

at 16–17; Tr. Trans. at 4243–44.) The jury saw photographs chronicling these trips. (*E.g.,* Gov't Ex. BB-51.) During this line of questioning, the government portrayed the boyfriend's spending as fruits of the fraud scheme; Bock countered that the trips to Las Vegas were a legitimate use of her boyfriend's company's profits.

The Court concludes that no evidence improperly inflamed the jury. Even if the spending habits of Bock's boyfriend were not directly linked to any charged conduct, the evidence allowed the jury to evaluate Bock's credibility. *See United States v. Maybee*, 687 F.3d 1026, 1033 (8th Cir. 2012) (rejecting an argument that crash scene photos inflamed jury because the "photographs of the accident scene were relevant to . . . the jury's evaluation of the credibility of the witnesses who described the crash").

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.    Aimee Bock's Motion for Judgment of Acquittal or a New Trial (ECF No. 626) is DENIED; and

2.    Salim Said's Motion for Judgment of Acquittal (ECF No. 611) is DENIED.


Dated: August 22, 2025                    BY THE COURT:

                                          s/Nancy E. Brasel
                                          Nancy E. Brasel
                                          United States District Judge

31