**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**Criminal No: 22-cr-223 (NEB/DTS)**

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>vs.<br><br><br>Aimee Marie Bock (1),<br><br>        Defendant. | **DEFENDANT AIMEE MARIE BOCK'S SENTENCING POSITION AND MEMORANDUM** |

# Table Contents

I.    INTRODUCTION ................................................................................................ 1
II.   THE GOVERNMENT'S LOSS CALCULATION IS DEFECTIVE.................. 3
*A.    The PSR's loss calculation fails based on multiple independent reasons.* .......... 3

1.   The PSR incorrectly used gross reimbursements as loss. .......................................... 3
2.   The Government failed to deduct the fair market value of services provided. ........... 4
3.   Documented food purchases between $28 million and $33.1 million derived from food vendors in the program lend impetus to Ms. Bock's argument about the unreliability of the Government's loss amount. .......................................................... 6
4.   The fair market value of meals served is a multiple of the raw food cost. ................. 7
5.   No attempt was made to value educational and enrichment services. ...................... 10
6.   The mandatory fair market value credit changes the total loss calculation. ............. 11
7.   The Government's financial tracing methodology is unreliable. .............................. 13
8.   Post-notice of fraud payments by MDE breaks the causal chain............................. 15
9.   Being that the Minnesota Department of Education had reports of program integrity concerns about FOF as early as April 2020 and took no appropriate actions, attribution of the $243 million loss amounts to Aimee Bock alone is unfair............ 16
10.  The Government's own evidence contradicts its loss figure................................... 19

    .............................................................................................................................21
III.   WHAT WOULD BE A JUST AND FAIR SENTENCE CONSIDERING THE CONDUCT OF OTHER AGENCIES DURING THE COVID-19 FOOD PROGRAM IN MINNESOTA? ...............................................................................21

i

*A.     Although the jury convicted Ms. Bock of all charges, the Government's failure to prove the actual loss amount is attributable to the Government witness, who did not know the food program that was the subject of Ms. Bock's prosecution.* ................... 23

*B.     MDE intentionally misled the Government, as shown by MDE's statements to the Government's investigating agents when compared to MDE's record.  MDE's conduct resulted in the Government's failure to show the accurate loss amount attributable to Aimee Bock.* ................................................................ 26

1.     What do legitimate programs actually spend on food? ............................................. 27

*C.     Restitution requires proof of actual or proximate loss caused by the offense conduct, not speculation.* ............................................................................. 30

1.     The same deficiencies apply. ................................................................................ 30
2.     USDA's failure to seek repayment underscores the uncertainty. ........................... 30

*D.     Forfeiture* ................................................................................................. 31

1.     This Government's forfeiture theory should not substitute USSG's loss. ............... 31
2.     Forfeiture is limited to personal proceeds. .......................................................... 33
3.     FOF and Aimee Bock provided lawful services requiring the deduction of direct costs of providing lawfully delivered services. ....................................................... 34
4.     Ms. Bock's actual personal proceeds are limited. ................................................ 35
5.     Forfeiture may not duplicate restitution. ............................................................. 36

*E.     Being that the amount of loss cannot be determined properly, the Court must use the amount of "gain" as the alternate vehicle to determine loss.* ............................... 37

*F.     Corrected Guideline Calculation* ................................................................. 38

1.     Charitable or educational misrepresentation (¶ 103): +2 should not apply. ............ 38
2.     Sophisticated Means (¶ 104): +2 should not apply. ............................................. 38
3.     Federal Disaster or Emergency Benefits (¶ 105): +2 should not apply. .................. 39
4.     Role Enhancement (¶ 107): +4 should not apply. ................................................. 40
5.     Obstruction of Justice (¶ 108): +2 should not apply. ........................................... 42
6.     Zero-point offender reduction (¶ 110): -2 should apply. ....................................... 44

IV.     § 3553(a) SENTENCING ARGUMENT ........................................................ 44

*A.     The Nature and Circumstances of the offense.* ............................................. 44
*B.     History and characteristics of the defendant.* .............................................. 45
*C.     The need for the sentence imposed.* ............................................................ 46
*D.     The advisory Guideline range overstates culpability.* .................................... 47
*E.     A below-guideline sentence is sufficient but not greater than necessary.* .......... 48
*F.     Avoiding Unwarranted Disparities (§3553(a)(6))* .......................................... 49

V.    THE ARCHITECT OF THE FOF FRAUD WHO FLED THE UNITED STATES SHEDS LIGHT ON THE FOOD PROGRAM FRAUD. ............................ 54
VI.    THE SPONSOR WHO WAS NEVER CHARGED IN THIS CASE WILL SHOW THE NATURE OF BOCK'S PROSECUTION AND WILL INFORM THE COURT ABOUT THE PROPER SENTENCE FOR AIMEE BOCK. ........................ 58

1.    Roster Fabrication ................................................................................. 59
2.    System Manipulation.............................................................................. 60
3.    Running Known Duplicates ................................................................... 60
4.    Self-Awareness ...................................................................................... 61
5.    The payment chain ................................................................................ 62
6.    The FBI never investigated Ms. Loman because Aimee Bock is who it wanted...... 62

VII.    THE COURT MUST NOT ALLOW THE GOVERNMENT TO TURN MDE'S PROGRAM OVERSIGHT RESPONSIBILITY INTO AIMEE BOCK'S BURDEN. ................................................................................................. 64
   A.    MDE is the agency that approved all meal claims, paid all meal claims, and then blamed the sponsor, Aimee Bock, who complained. ............................................. 65

1.    Ms. Roase's 4.1 Percent in context.......................................................... 70

VIII.    CONCLUSION ...................................................................................... 71

## I.    INTRODUCTION

Defendant Aimee Bock (referred to as "Defendant Bock," "Ms. Bock," or "Aimee Bock") respectfully submits her position regarding sentencing.  Ms. Bock requests that the Court impose a sentence of either time served or no more than 37 months' imprisonment. Ms. Bock further requests that, should the Court order restitution and forfeiture, the amounts be limited to those the United States of America (hereinafter "Government") can reliably prove and that are lawfully attributable to Bock.

This is a case in which the Court must sentence Ms. Bock based on what was proven against her, not on the sheer size of the broader public controversy, not on the conduct of every site operator and vendor who passed through the program, and not on the Government's most maximal framing of aggregate program loss, given that the Government failed to conduct food analysis to determine the fair market value of the loss.

Aimee Bock acknowledges that the jury returned guilty verdicts against her.  But sentencing requires individualized judgment. From the outset of this case, including when the Government executed its search warrant at Aimee Bock's residence on January 20, 2022, Ms. Bock directed Government agents to a red folder and boxes in her office. Inside were records of organizations and individuals that Ms. Bock had terminated or denied participation in the food program for multiple reasons, including fraud. The Government later prosecuted some of those entities. Aimee Bock was not credited for proffering that information to the Government.

1

When the Government and the public labeled Aimee Bock the "mastermind" of the FOF fraud, the Government knew that former FOF employees and consultants, including Aimee Bock's codefendants Hadith Yusuf Ahmed (hereinafter "Hadith Ahmed" or "Ahmed") and Abdikerm Abdelahi Eidleh (hereinafter "Eidleh"), were the recruiters and organizers of the fraud and the "masterminds" of the FOF fraud regimen. Eidleh and Ahmed knew that Bock did not speak Somali. They used Bock's unfamiliarity with Somali to isolate her from uncovering their fraud.

Across the entire COVID-19 food program in Minnesota, Aimee Bock is likely the only person recorded as having terminated or dissociated from people or entities due to concerns about fraud or program integrity. Not other sponsors. Not the Minnesota Department of Education (hereinafter "MDE"), the agency charged by the United States Department of Agriculture (hereinafter "USDA") with implementing and overseeing the food program in the State of Minnesota.

Ms. Bock's Presentencing Investigation Report ("hereinafter "PSR") objections assert that MDE retained approval and oversight authority; that site operators, vendors, and other sponsors were involved in submitting or generating disputed claims; that Ms. Bock did not personally prepare meal counts; and that some suspected fraudulent sites allegedly continued operating elsewhere after FOF sought to terminate or flag them. *See generally* Bock Sent. Ex. 1, pp. 1-6; Bock's PSR Objections and Exhibits.

While this request does not disregard the jury's verdict, it begins where sentencing law requires: the verdict, a correct United States Sentencing Guidelines (hereinafter "USSG" or "Guidelines") analysis, and an individualized application of 18 U.S.C. §

2

3553(a). What loss is properly attributable to Ms. Bock? Which enhancements are proven? What amount is lawfully recoverable through restitution and forfeiture? And what sentence is sufficient but not greater than necessary for Ms. Bock?  This Court exercises broad discretion in the types of evidence it may consider when imposing a sentence.  Therefore, Ms. Bock's life and the characteristics of the offense are relevant information in fashioning an appropriate sentence. *See United States v. Schmidt,* 571 F.3d 743 (8th Cir. 2009).  Here, Ms. Bock's life during her operation of FOF, as well as the nature of the food business during the COVID-19 pandemic, is relevant.

## II.    THE GOVERNMENT'S LOSS CALCULATION IS DEFECTIVE.

The Government bears the burden of proving, by a preponderance of the evidence, the amount of loss attributable to the offense. In USSG § 6A1.3 cmt., the Sentencing Commission found that the preponderance standard "is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case." *Id*. The Court may not engage in "speculation" when establishing loss. *United States v. Chalupnik*, 514 F.3d 748, 754-55 (8th Cir. 2008). Where the Government fails to present sufficient evidence to support a non-speculative, reasonable loss estimate, no loss enhancement should apply. *See United States v. Adejumo*, 848 F.3d 868, 871-72 (8th Cir. 2017)(vacating restitution where the Government failed to prove the victim's ultimate loss).

### A.    *The PSR's loss calculation fails based on multiple independent reasons.*

1.  *The PSR incorrectly used gross reimbursements as loss.*

The PSR relies — directly and indirectly — on the Government's global figure: FOF received $242,807,755 (hereinafter "$243 million") in total program payments from the MDE. *See* PSR ¶¶ 32, 46, 53, 90, 102. This is not a loss figure. It is a gross reimbursement total that encompasses every program, every site, and every year of operation — including periods, sites, and claims that were never alleged to be fraudulent.

The Eighth Circuit Court of Appeals has been clear: loss must be tied to fraudulent conduct, not to total receipts. *United States v. Markert*, 732 F.3d 920, 931 (8th Cir. 2013). Aggregate substitution — using total receipts when the Government has not proven that every dollar was fraudulently obtained — is reversible error. *Id.; Chalupnik*, 514 F.3d at 754-55; *United States v. Frazier*, 651 F.3d 899, 903-05 (8th Cir. 2011); *United States v. Petruk*, 484 F.3d 1035, 1038 (8th Cir. 2007); *United States v. Boccagna*, 450 F.3d 107 (2nd Cir. 2006). The federal food program, through MDE and FOF, reimbursed sites for meals. The Government and the PSR do not attempt to separate valid reimbursements from fraudulent ones. They improperly treat the entire payment stream as a loss. *See* PSR ¶¶ 31-40, 46, 53, 102.

2.  *The Government failed to deduct the fair market value of services provided.*

The Guidelines require that the loss shall be reduced by the fair market value of services rendered to the victim by the defendant or others acting jointly with the defendant before the offense was detected. *See, e.g.,* USSG § 2B1.1 cmt. n.3(E)(ii). The *Markert* court explained that the Guideline's application note codifies the net loss approach developed in case law, recognizing that "the offender who transfers something of value to the victim generally is committing a less serious offense than an offender who

4

does not." *Markert*, 732 F.3d at 932; *see, e.g.*, *United States v. Ruballo*, 833 Fed. Appx. 275 (11th Cir. 2020)(The method for calculating actual loss, as opposed to intended loss, under the Sentencing Guidelines is largely the same as the method for establishing actual loss to identifiable victims under the MVRA).  Critically, the credit is for the fair market value of the services rendered — not the raw cost of ingredients or inputs.

The legal standard asks what the victim received, measured at market rates, not what the defendant spent. In a food-service context, the fair market value of a meal is the price a willing buyer would pay for that meal in the marketplace — not the wholesale cost of the food used to prepare it. This distinction is fundamental. The principle that the fair market value of a meal in a food-service context is determined by the price a willing buyer would pay for the meal in the marketplace, rather than the wholesale cost of the food used to prepare it, is supported by the Eighth Circuit's interpretation of "fair market value" in a wildlife context. In *United States v. Hughes*, 795 F.3d 800 (2015), the court emphasized that when statutory terms are undefined, their ordinary meaning applies. Specifically, the court stated that "fair market value" is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither under compulsion to buy or sell, and both informed of all relevant circumstances. The court further clarified that the "fair-market retail price" is most naturally understood as the price a willing buyer would pay a willing seller for the item in question, which, in this context, would include meals in a food-service setting.

Additionally, in *United States v. Oehlenschlager*, 76 F.3d 227 (8th Cir. 1996), the court noted that when determining market value under the U.S. Sentencing Guidelines,

5

the fair-market retail price should be used when reasonably available. If the retail price is difficult to ascertain, a reasonable estimate based on reliable information may be employed. This reinforces the principle that retail value, rather than wholesale cost, is the appropriate measure of fair market value in contexts where retail pricing is relevant, such as food service.  This principle underscores that valuation is based on market prices rather than the cost of inputs, such as the wholesale cost of food.  Here, the Government failed to deduct the fair market value of services rendered in determining the loss amount.

3.  *Documented food purchases between $28 million and $33.1 million derived from food vendors in the program lend impetus to Ms. Bock's argument about the unreliability of the Government's loss amount.*

The record contains between $28 million and $33.1 million in documented food purchases from vendors, based on 14 subpoenaed vendor records.  The data is obtained from Sysco invoices with delivery dates and driver signatures; Afro Produce invoices with ship-to addresses; Restaurant Depot transaction records; US Halal Foods; Shanghai Wholesale; Costco; Sam's Club; Upper Lakes Foods; Star Distribution; Premium Fresh Produce; and other sources obtained by the Government.  *See* (Food vendor records produced in discovery GJS-00393994-GJS-00950383[1]). The Government's own subpoenas produced much of this evidence. None of it was credited against loss.

The FOF network encompassed over 250 sites. The Government subpoenaed food records from a limited number of vendors and did not conduct a comprehensive accounting of food purchases across the entire network. Many sites purchased food from

---

[1] Records and materials with the "GJS" designation represent Grand Jury Subpoenas.

local vendors, ethnic grocers, wholesale markets, and direct suppliers whose records were never subpoenaed. The $28-$33.1 million represents the captured discoverable record. (Food vendor records produced from discovery GJS-00393994-GJS-00950383 as well as FOF records). The Government failed to conduct any total food expenditure across more than 250 sites during the food program period. It possessed the subpoenaed invoices and receipts. The Government's notion of loss amount is speculative and unreliable.

4. *The fair market value of meals served is a multiple of the raw food cost.*

The $28-$33.1 million figure represents raw food purchases — the cost of ingredients. It does not reflect the fair market value of the meals those ingredients produce. Across the food service industry — from publicly traded restaurant chains to institutional providers to nonprofit school meal programs — raw food costs consistently account for approximately 25–35% of the fair market value of meal service. The remaining 65–75% comprises labor (food preparation, service, supervision), facilities (kitchen equipment, utilities, site costs), transportation (delivery, cold chain), supplies (packaging, disposables, sanitation), and operating margin.

FOF sites were operated primarily by restaurants and community food service organizations — not school districts. These operators had the same cost structure as any commercial food service operation. Publicly available data from the National Restaurant Association, publicly filed annual reports from major restaurant companies for fiscal years 2020 and 2021, and the USDA School Nutrition and Meal Cost Study all confirm that raw food costs account for roughly one-quarter to one-third of the price of a meal in commercial food service and approximately 45% in nonprofit school programs operating

7

at cost with zero margin. *See*, U.S. Department of Agriculture, Food and Nutrition

Service, *School Nutrition and Meal Cost Study,*

https://www.fns.usda.gov/research/school-meals/nutrition-meal-cost-study.



**2020 School Meal Price Allocation (USDA School Nutrition & Meal Cost Study Context)**

**2020 School Meal Cost Allocation**

Illustrative allocation of the total cost of producing a USDA school meal during the COVID-19 period.

Sources: USDA School Nutrition and Meal Cost Study; USDA Food and Nutrition Service; school nutrition operational benchmarks.

**2020 Key Point:** During the pandemic period, labor and operational disruptions significantly increased non-food expenses associated with school meal preparation and distribution.



**2021 School Meal Price Allocation (USDA School Nutrition & Meal Cost Study Context)**

**2021 School Meal Cost Allocation**

Illustrative allocation of total USDA school meal production costs during the 2021 recovery and supply-chain disruption period.

Sources: USDA School Nutrition and Meal Cost Study publications; USDA Food and Nutrition Service; school nutrition financial benchmarks.

**2021 Key Point:** Rising food inflation and supply-chain pressures increased the share attributable to food ingredients in school meal production costs during 2021.

The commercial ratio is the appropriate comparator here. Trial II, Bock Ex. D1-156; *see also* National Restaurant Association (2020); 2020 State of the Restaurant Industry Report, Washington, DC: National Restaurant Association. https://restaurant.org/.



**2020 Restaurant Meal Price Allocation**

**2020 Restaurant Meal Price Allocation**

Estimated allocation of a restaurant meal price during the COVID-19 disruption period in 2020.

Source: National Restaurant Association 2020 State of the Restaurant Industry Report and industry operating benchmarks.

**2020 Key Point:** Raw food ingredients accounted for approximately **30%** of a restaurant meal's menu price, while the remaining costs reflected labor, occupancy, utilities, taxes, insurance, and overhead during the pandemic year.



**2021 Restaurant Meal Price Allocation**

**2021 Restaurant Meal Price Allocation**

Estimated allocation of a restaurant meal price during the restaurant industry's recovery period in 2021.

Source: National Restaurant Association 2021 State of the Restaurant Industry Report and industry food-cost benchmarks.

**2021 Key Point:** Rising supply-chain and inflation pressures increased raw food ingredient costs to roughly **32%** of the average restaurant meal price in many operations during 2021.

9

This comparative structure supports the proposition that: food cost alone does not represent the total value or cost of a meal; operational overhead is the dominant component in both systems; and commercial food-service benchmarks are economically comparable to institutional meal-service models.

If raw food purchases of $28-$33.1 million represent approximately 25–35% of the fair market value of meal service, then the total fair market value of meals produced and distributed through the FOF network ranges from $80 million to $132 million. Even at the most conservative estimate — $28 million in food costs at 35% of fair market value — the credit exceeds $80 million. At the midpoint — $30.5 million at 30% — the credit exceeds $100 million.  Here, the PSR applies none of these credits.

5.  *No attempt was made to value educational and enrichment services.*

In addition to meal service, FOF sites provided educational and enrichment programming — a regulatory prerequisite for at-risk afterschool reimbursement under 7 C.F.R. § 226.17a(b), for example, the prosecution called Mind Foundry a "shell company."  Shell companies don't have attendance sheets, payroll records, employee training materials, or curriculum developed over five years. *See* https://www.mindfoundry.ai/.  The requirement that at-risk afterschool programs provide "educational or enrichment activities" is explicitly supported by USDA regulations and statutory provisions. Specifically, 7 CFR § 226.17a, at-risk afterschool care center provisions, state that to be eligible for reimbursement, an afterschool care program must include "education or enrichment activities" as part of its organized, regularly scheduled activities in a structured and supervised environment.  These services were provided and

10

had measurable market value. The PSR and the Government did not attempt to quantify or credit that value. The amount of service credit should reduce the loss amount.

6. *The mandatory fair market value credit changes the total loss calculation.*

Even if the Court accepted every other aspect of the PSR's methodology, the failure to apply the mandatory fair market value under USSG Application Note 3(E)(ii) independently requires recalculation. An $80 million credit against a claimed loss of $243 million reduces the operative figure by one-third, before addressing any other deficiencies identified in this memorandum. At the $100 million midpoint, the loss is reduced to $143 million. At the upper end, a $132 million credit reduces it to $111 million. Either figure eliminates the 26-point enhancement (threshold: $150 million) and reduces the loss enhancement to +24 ($65 million to $150 million) or lower, depending on which additional deductions apply[2].

In *United States v. Parish*, 565 F.3d 528 (8th Cir. 2009), the court emphasized that in mortgage fraud cases, the loss calculation must account for the fair market value of the collateral at the time of sentencing. Specifically, the court noted that the loss is calculated as the amount of fraudulently obtained loans minus any payments made on the loan principal and the collateral's value at the time of sentencing. This approach aligns with Application Note 3(E)(ii), which requires reducing the loss amount by the fair market value of the collateral.

---

[2] This credit figure due Ms. Bock would grow exponentially and reduce the enhancements, if the Government conducted a food cost analysis for all FOF sites or even all the purchase records that the Government possessed. The Government obtained these records during its investigation of FOF.

11

In *United States v. Rubashkin*, 655 F.3d 849 (8th Cir. 2011), the court reiterated that the loss amount in fraud cases involving loans should be calculated as the unpaid balance on the loan minus the fair market value of any pledged collateral. The court rejected arguments that failed to consider the impact of fraudulent schemes on the collateral's value, affirming that the fair market value of collateral must reflect its actual protective value at the time of loss determination.

In *United States v. Martinez*, 690 F.3d 1083 (8th Cir. 2012), the court addressed situations where the fair market value of collateral could not reasonably be determined. In such cases, the court allowed the use of the defendant's gain as an alternative measure of loss, as permitted under Application Note 3(B). This decision underscores the importance of accurately estimating the fair market value of collateral, when possible, as it directly impacts the loss calculation. In *United States v. Liveoak*, 377 F.3d 859 (8th Cir. 2004), the court clarified that the loss amount must be reduced by the fair market value of property or services returned to the victim before the offense was detected. This reinforces the requirement under Application Note 3(E)(ii) to credit the fair market value of returned property or services against the calculated loss.

In *United States v. Karie*, 976 F.3d 800 (8th Cir. 2020), the court highlighted that the district court must account for the fair market value of legitimate services or property provided by the defendant when calculating loss. This ensures that the loss calculation reflects only the net harm caused by the offense, consistent with Application Note 3(E)(ii).

12

Here, without proper calculation, the amount of loss becomes unreliable, leading to guesswork, given that the Government could have obtained all receipts supporting the meal purchases and delivery. *See, e.g.*, Gov't Trial Ex. X-52, X-55(a), X-60, X-61.

7. *The Government's financial tracing methodology is unreliable.*

The Government appears to have used financial tracing as a proxy for program loss — tracking dollars through bank accounts rather than analyzing whether the meals those dollars paid for were served. That approach is fundamentally unreliable in a food-program case because dollars paid do not map one-to-one to fraudulent meals. A financial tracing model ignores critical program-specific variables: meal composition and compliance with USDA component rules; portion sizes and yield conversions under the USDA Food Buying Guide; differences in menu design and procurement costs across sites; contract pricing and negotiated food costs; waste, spoilage, and shrinkage; legitimate claims that may overlap with questioned periods; and the possibility that some claims at a given site were fully valid even if others were not. *See* (Trial II Tran. Vol. XVII at 3775 line 9; D1-184 p.42-49).

The relevant proof is not simply how much money changed hands, but how much reimbursable food-service output was delivered. The USDA Food Buying Guide converts food items into approximate meal equivalents — that analysis was never performed. Without it, the Government cannot reliably identify actual loss. The Eighth Circuit has rejected restitution calculations grounded in speculation or unsupported assumptions. *Chalupnik*, 514 F.3d at 754-55. A tracing model that measures only expenditures, rather than reimbursable meal production, fails to satisfy that standard. Further, the

13

investigation covered only a portion of the relevant sites. The Government cannot extrapolate from a partial record to a program-wide loss figure unless it proves that the sample is representative and the method reliable. The Mandatory Victims Restitution Act of 1996 (hereinafter "MVRA") does not authorize restitution by guesswork. *See* 18 U.S.C. § 3664(e). The Government bears the burden of demonstrating, by a preponderance of the evidence, the amount of loss sustained by a victim because of the defendant's offense. This principle ensures that restitution is based on actual, provable losses directly caused by the defendant's criminal conduct. *See* 18 U.S.C. § 3664; *United States v. Forrest*, 153 F.4th 671 (8th Cir. 2025); *United States v. Adetiloye*, 716 F.3d 1030 (8th Cir. 2013).  General invoices that purport to indicate the amount of the loss but do not provide further explanation are an insufficient method of proof. *United States v. Haileselassie*, 668 F.3d 1033, 1037 (8th Cir. 2012).

The chart below illustrates one of many steps the Government should have taken to determine the cost of meal portions in accordance with USDA guidelines.  That way, the fair market value would have been discernible.

14



*See https://education.mn.gov/MDE/dse/FNS/SFSP/Claim/PROD083244.* The

investigation methodology report on more than 250 claimed food distribution sites is

instructive. Government agents observed South Cross and one other site, Crystal

Community, three times. Each time, food was being distributed — a refrigerator truck, a

work van, and a line of cars. Then they stopped. It found food, but the Government

refused to obtain the data on food purchased and the analysis. Trial I, Tr. Vol. XXII

5336:21.

8. *Post-notice of fraud payments by MDE breaks the causal chain.*

The MVRA requires more than a but-for causation statement. The offense must

proximately cause the claimed loss. *United States v. DeRosier*, 501 F.3d 888, 896 (8th

Cir. 2007); *United States v. Beston*, 43 F.4th 867 (8th Cir. 2022); *Chalupnik*, 514 F.3d at

753-55. In *United States v. Chaika*, 695 F.3d 741, 748-49 (8th Cir. 2012), the court held

that restitution cannot be awarded for losses caused by factors other than the defendant's offense. It emphasized that restitution must be based on direct and proximate harm and that the court may decline to award restitution if determining causation involves complex factual issues that would unduly burden the sentencing process.

The PSR herein failed to show that Ms. Bock was the proximate cause of the loss amount. Many of the actors were entities outside Ms. Bock's control. MDE was notified of fraud but failed to take independent action to prevent it. Eidleh and Ahmed recruited sites intended to commit fraud, unbeknownst to Ms. Bock. The causal connection to the amount of the fraud cannot be borne by Ms. Bock alone. *See* Bock. Sent. Ex. 1 at 6; Sent. Ex. 2-0058; Ex. 2-0004; Ex. 2-0019.

9. *Being that the Minnesota Department of Education had reports of program integrity concerns about FOF as early as April 2020 and took no appropriate actions, attribution of the $243 million loss amounts to Aimee Bock alone is unfair.*

MDE apparently had concerns about FOF's "program integrity" as early as April 2020 but took no appropriate action. *See* Trial II, Trial Tr. Vol. II 372:13, 403-404; Trial I, Exhibit D1-552. MDE's failure to act despite knowledge of program integrity negates the claim that Aimee Bock bears sole responsibility for the loss amounts. For example, in *Hays v. Hoffman*, 325 F.3d 982 (8th Cir. 2003), the court emphasized the obligations of state agencies administering Medicaid programs under federal law. State agencies must adopt a fraud detection and investigation program that meets strict federal standards. Specifically, the agency must conduct a preliminary investigation upon receiving any complaint about Medicaid fraud or abuse.

16

If the preliminary investigation provides reason to believe that fraud or abuse has occurred, the agency must request a full investigation from the state's Medicaid fraud control unit. The agency must also report its findings to the U.S. Department of Health and Human Services, which may lead to federal or state enforcement actions. *See generally* 42 C.F.R. §§ 455.14, 455.15(a), 42 C.F.R. § 455.17(b); *Hays v. Hoffman*, 325 F.3d 982, 986. *Hays v. Hoffman* underscores the proactive role state agencies must play in maintaining program integrity. *United States v. Sabri*, 326 F.3d 937 (8th Cir. 2003), highlighted Congress's intent to protect the integrity of federal funds by safeguarding the agencies that administer them. The decision noted that maladministration or corruption in one part of an agency could affect the allocation and use of federal funds throughout the agency, given the fungibility of money.

This supports the principle that state agencies have a duty to address fraud or integrity issues to safeguard federal program funds. In *United States v. Pintar*, 630 F.2d 1270 (1980), the court rejected arguments that there was no interference with federal programs despite alleged fraud. It emphasized the Government's interest in ensuring that federally funded projects are administered honestly, efficiently, and free of corruption and waste. This case supports the proposition that state agencies must act to prevent fraud or misuse of federal funds to uphold program integrity.

Here, MDE's own employees, such as Emily Honer and ▮▮▮▮▮▮▮, raised concerns about fraud or program integrity as early as April 2020.  But MDE took no action.  Trial II, Trial Tr. Vol. II at 372:13; Bock Sent. Ex. 1 at 6; *see also,* 'An open secret': New records reveal officials failed to act on fraud warnings, The Minnesota Star

Tribune, May 17, 2026, *https://www.startribune.com/an-open-secret-new-records-reveal-officials-failed-to-act-on-fraud-warnings/601838325*.  MDE was aware of fraud but refused to take appropriate steps to prevent it.  Even though Ms. Bock notified it of the existence of fraud, it did not act as a normal state agency would.  Trial II, Bock Trial Ex. D1-869, D1-606, D1-612, D1-613, D1-620, D1-1008; Bock Sent. Ex. 1 at 53-76.  It is undeniable that MDE contributed to the increase in the loss amount because MDE management directed MDE employees to stop investigating fraud. Bock Sent. Ex. 2-0058-0067.  Fraud was formally reported to the FBI in April 2021; Trial II, Trial Tr. Vol. V 932:10.

The Government now seeks to attribute approximately $100 million, at least $98,257,883.06, representing the loss between April 20, 2020, and January 20, 2022, to Ms. Bock. That loss amount, MDE, could have been prevented but was paid out after the reported program integrity notice. Trial II, Trial Tr. Vol. II at 372:13, 932:10; Trial II, Bock Trial Ex. D1-869, D1-606, D1-612, D1-613, D1-620, D1-1008; Bock Sent. Ex. 1 at p. 6, 53-76; Bock Sent. Ex. 2-0058-0067. Those payments cannot automatically be attributed to Ms. Bock's offense conduct. Once MDE had notice or suspicion of fraud, its decision to continue disbursing funds reflects its own independent administrative choices — including reconfiguring its claims-processing system to bypass its safeguards, auto-processing every claim without human review, and continuing to pay for nine months after the FBI referral without issuing a single deficiency notice. Trial Tr. Vol. IV 905:13; Trial Tr. Vol. III 482:24, 488:10, 499:2-7. The regulatory structure under 7 C.F.R. Part

18

225 places claims approval authority and oversight responsibility with MDE — not with the sponsor alone.

7 C.F.R. § 225.11 — Corrective Action Procedures — governs the Summer Food Service Program (hereinafter "SFSP") and establishes mandatory corrective-action obligations when a state agency identifies "serious deficiencies." The regulation defines serious deficiencies, including submitting false information, failing to maintain adequate records, submitting false claims, and committing operational violations. Once deficiencies are identified, the regulation requires escalation, corrective action, and, potentially, termination and disqualification procedures.

7 C.F.R. Part 225 — Monitoring and Oversight Duties. Part 225 imposes oversight duties on state agencies administering federal nutrition programs. These duties include site and reimbursement approvals, monitoring, corrective action, and enforcement responsibilities. The framework establishes that state agencies are not passive processors of claims but active program-integrity gatekeepers. The burden of oversight and responsibility for loss cannot be borne by Ms. Bock alone.

These requirements are reinforced by case law, which holds state agencies ultimately responsible for ensuring adherence to federal laws and regulations. *See Robertson v. Jackson*, 972 F.2d 529 (4th Cir. 1992); *S.L. v. Whitburn*, 67 F.3d 1299 (7th Cir. 1995); *Bliek v. Palmer*, 102 F.3d 1472 (8th Cir. 1997) (Iowa food stamp program)

10. *The Government's own evidence contradicts its loss figure.*

The Government's forfeiture evidence identifies alleged personal proceeds totaling $5,241,522.79 traceable to Ms. Bock. The defense disputes the $5,241,522.79 figure for

19

reasons outlined in Section II *supra*. But even accepting the Government's number *arguendo*, the gap between $5.2 million (traceable, transaction-based, supported by financial analysis) and $243 million (gross reimbursements, unsupported by program-specific analysis) exposes a fundamental breakdown in the "reasonable estimate" requirement. The PSR ¶32 alleges "more than $242 million" misappropriated — itself internally inconsistent with both the $243 million total reimbursement figure and the $5.2 million forfeiture figure. Ms. Bock is also held responsible for $8.5 million in losses attributable to Partners in Nutrition (hereinafter "PIN"). *See* Bock. Sent. Ex. 1, p. 47.

The PSR does not specify the amount misappropriated by Ms. Bock individually. The conclusions are vague and unsupported by the trial evidence as applied to Ms. Bock. If the Government can trace only $5.2 million in proceeds from a $243 million scheme, the loss figure is not $243 million. The facts show that, based on the Government figure, the amount traceable to Ms. Bock is $678,032, as shown below. This figure does not exclude the disputed amounts of her salary during her participation in the food program, the sale of her childcare facility, and South Cross site rent payments, as shown below. *See* Trial Tr. Vol. XV 3399:10; *see also*, Gov't Trial Ex. X-39, p. 3.

20

Food Program Money Received by Aimee Bock
(4/2/2020 to 1/20/2022)

| | Feeding Our Future Payments to Handy - Helper's LLC | Feeding Our Future Payroll | Cosmopolitan Business Solutions LLC Payment | Food Program Participants | Rent Payments for The Learning Journey (Southcross) | Total Received |
|---|---|---|---|---|---|---|
| Empress M. Watson Jr. | $ 871,513.78 | $ 79,430.26 | | | | $ 950,944.04 |
| Aimee Bock | | $ 257,362.60 | $ 310,000.00 | | $ 110,670.05 | $ 678,032.65 |
| Feeding Our Future [donations] | | | | $ 180,050.00 | | $ 180,050.00 |
| School Age Consultants LLC | | | | $ 103,600.00 | | $ 103,600.00 |
| C. Bock [son] | | $ 2,879.30 | | | | $ 2,879.30 |
| Totals | $ 871,513.78 | $ 339,672.16 | $ 310,000.00 | $ 283,650.00 | $ 110,670.05 | $ 1,915,505.99 |

Feeding Our Future Bank Account Seizure on 1/19/2022  $   3,506,066.80

Total  $   5,421,572.79

## III. WHAT WOULD BE A JUST AND FAIR SENTENCE CONSIDERING THE CONDUCT OF OTHER AGENCIES DURING THE COVID-19 FOOD PROGRAM IN MINNESOTA?

Aimee Bock was convicted at trial on all charged counts. The jury's verdict stands. This memorandum asks a different question — the one the verdict does not answer, but that is important: What sentence would be just and fair, considering other participants? To answer that question, the Court must ask what the $243 million loss represents. How it was calculated, who calculated it, what they understood about the program they were measuring, the conduct of other agencies, and whether the number reflects the harm Aimee Bock caused or something else entirely. The evidence shows the answer is something else entirely.

The staggering loss figure was intended to advance the Government's narrative that Aimee Bock stole from Minnesota's poor children. It is not what she stole. It is what MDE paid to FOF across every program, every site, and every year — the total gross

21

receipts of a nonprofit sponsor organization that, at its peak, operated 384 Child and Adult Care Food Program (hereinafter "CACFP") sites and served as the fiscal conduit for hundreds of community-based food distribution programs during a pandemic that closed every school cafeteria in the state of Minnesota.

Meals were served — Agent Brian Pitzen himself acknowledged at trial that "there's no question that some food was distributed." Trial Tr. Vol XIX 4544:3. Teachers and staff were paid. Rent for facilities where programs were operated, equipment used, and transportation to deliver food to sites across the state were paid. The 10-15% administrative fee that the USDA's own regulations authorize sponsors to retain for managing the program, not as profit but as a cost of doing business, is built into the reimbursement structure by design.  7 CFR 225.6(d)(3).

The fair market value of services rendered "shall be reduced" from the loss total. §2B1.1, App. n.3(E)(ii). The word is "shall." It is not discretionary. *United States v. Luna*, 968 F.3d 922 (8th Cir. 2020); *United States v. Liveoak*, 377 F.3d 859 (8th Cir. 2004).  The Eleventh Circuit vacated a sentence for failure to apply this credit in *United States v. Ruballo*, 833 Fed. Appx. 275 (11th Cir. 2020).  Here, no one — not the Government, not the probation office, not a single witness at either trial — ever calculated the net loss. No one determined how many meals were served across FOF's 384 sites. No one measured the food that was purchased. In *United States v. Hartstein*, 500 F.3d 790, 796 (8th Cir. 2007), when a defendant challenges the loss figure, "the Government must present evidence at the sentencing hearing to prove the existence of the disputed facts."  In *United States v. McKanry,* 628 F.3d 1010, 1019-20 (8th Cir. 2011), the estimate must not

fall outside the realm of permissible computations but must be reasonably foreseeable. $243 million — with no fair market value credit, no separation of legitimate costs, no accounting for the regulatory agency's own role, and no net-loss analysis of any kind — is outside the realm of permissible computations and unforeseeable.

### A. Although the jury convicted Ms. Bock of all charges, the Government's failure to prove the actual loss amount is attributable to the Government witness, who did not know the food program that was the subject of Ms. Bock's prosecution.

The person who calculated that number was FBI Forensic Accountant Pauline Roase. *See United States of America v. Abdiaziz Shafii Farah*, *et al*. Trial Tr. Vol XX, Vol XXI, Vol. XXII, and Vol. XXIII; *United States of America v. Aimee Bock, et al*. Trial Tr. Vol. XV, Vol. XIV; *see also* ECF Doc. 781(Pauline Roase's Forfeiture Declaration) (Bock's loss amount, $246,045,149.65; MDE's Claims for FOF, $246,045,149.65; Bock's Money Judgment ($5,241,522.79)).  Ms. Roase was the Government's primary financial witness at both trials, and she testified for days in each. In Trial II, the jury saw her charts. She presented the entity-level financial summaries, the food expenditure percentages, and the total program payout figures that underpin the $243 million total. In Trial I, she did not understand the program she was analyzing. On cross-examination at Trial I, she was asked directly:

```
Q.   You are not a food expert?

A.   I am not a food expert.

Q.   You are not a nutritionist?

A.   No.

Q.   You are not a food supply chain expert?


A.   No.

Q.   You are not an expert in these food programs?

A.   No.
```

Trial I, Trial Tr. Vol. XXII 5336:37.  On direct examination at Trial II — by her own

counsel — she was even more candid: "I don't have experience in this type of field."

Trial II, Trial Tr. Vol. XIV 3288:23.  She admitted it took her months to understand the

program. When asked on cross-examination:

```
Q.   Okay.  Now, is it fair to say that when you first
     embarked on this venture, you actually didn't understand
     that whole system.  You had to learn as you go.  Correct?
A.   Right, yes.
Q.   Probably took you more than a few days?
A.   Yes.
Q.   More than a few weeks?


A.   More than that.
Q.   Maybe a few months to get your head wrapped around this,
     true?
A.   Yes.
```

Trial I, Trial Tr. Vol. XXII 5461:62. She could not name the five components of a reimbursable meal. When asked — milk, vegetable, fruit, grain, meat alternate — she got four:

```
Q.   What are the five components of a meal?
A.   If you're talking about the food group, it's -- I would
say it's protein, vegetables, fruits, milk, and there's one
more.
Q.   Is there?
A.   There's one more, right?
Q.   What is it?
A.   You tell me.
```

Trial I, Trial Tr. Vol. XXII 5337:8. She had not reviewed the USDA regulations governing the program:

```
Q.   All right.  Did you review USDA regulations about
prepay?

        THE WITNESS:  Not the USDA regulations.
BY MR. UDOIBOK:
Q.   Okay.  Did you review any of the MDE guidance personally
regarding prepay?
A.   No, not personally.
```

Trial II, Trial Tr. Vol. XV 3463:9. She did not apply generally accepted accounting principles. "I was not auditing their company." Trial I, Trial Tr. Vol. XXIII 5495:13. She did not review books and records. She did not calculate EBITDA — and when asked what it stood for, she said: "Oh, my God." Trial I, Trial Tr. Vol. XXIII 5494:23. She did not review tax records. She did not know the cost of basic food items.

25

```
Q.  Well, let's suppose it was.  What's a ten-pound bag of

rice cost?
A.  I don't know.
```

Trial I, Trial Tr. Vol. XXII 5364:25).  When confronted with the SEC's definition of a

"shell company" — a company with no or nominal operations — and asked whether

Bushra Wholesalers (which had employees, a warehouse, and distributed food) fit that

definition, she conceded: "I would not categorize it as a shell company."  Trial II, Trial Tr.

Vol. XXIII at 5493:12.  She had never visited a single site:

```
Q.  So -- and I'm not saying you should have, but since the
spring of 2021 you're investigating the case, but you didn't
go to one site to determine how many meals were actually
delivered, right?
A.  I did not.
```

Trial I, Trial Tr. Vol. XXII 5437:15.  This is the witness whose work product produced the

$243 or $246 million figure the Government uses to seek a life sentence against Aimee

Bock.  It explains the Government's failure to segregate the loss amount properly.  The

government's version of the loss amount remains speculative.

> **B. MDE intentionally misled the Government, as shown by MDE's statements to the Government's investigating agents when compared to MDE's record.  MDE's conduct resulted in the Government's failure to show the accurate loss amount attributable to Aimee Bock.**

FOF was a sponsor of CACFP and SFSP.  Emily Honer was MDE's supervisor for

the CACFP and SFSP, and the programs at the center of this case. She was MDE's

26

primary liaison with the ███████████. In her first interview with ███████████, she established the premise on which the entire financial investigation was built:

> "The money provided for this program is for the reimbursement of food expenses and nothing else."

Bock Sent. Ex. 2-0002.  Her statements became the organizing principle of FBI Forensic Accountant Pauline Roase's actions in the case.  It is why Ms. Roase categorized every non-food expenditure as evidence of fraud. It is why Ms. Roase concluded that Safari Restaurant spent "only 4.1% of its program reimbursements on actual food" — and the reason the prosecution presented that number to the jury as proof that 95.9% of program money was stolen. It is a reason $246 million in gross receipts is called "loss." *See* Doc. 781, p. 3.   There is one problem.  The statement is incorrect.  And MDE's own records prove it.

1.    *What do legitimate programs actually spend on food?*

Every school district in Minnesota files MDE's WebFOCUS Food Service Financial Reports through the same CLiCS system Emily Honer supervised.  Trial II, Trial Tr.  Vol. II 343:12.  The following data is from School Year 2020 — the same year the Government alleges that FOF fraud began: *See* ECF Doc. 1. ¶¶ 29-30 (Indictment). In legitimate child nutrition programs — the programs Honer herself supervised — food accounts for only 25-40% of total costs. The single largest expense category is not food. It is labor: the people who prepare, transport, serve, and clean up after meals. Labor accounts for 43-53% of program spending. Supplies, equipment, transportation, and overhead account for the rest. Under Emily Honer's "food expenses and nothing else"

framework, between 60% and 75% of spending by Minnesota's largest school districts would be classified as misuse of program funds.

If Ms. Roase or the Government had applied her methodology to Minneapolis Public Schools' CACFP operation — the same program type as FOF — she would have concluded that Minneapolis spent "only 37% on food" and that 63% was non-program spending. By the Government's logic, Minneapolis Public Schools are committing CACFP fraud. Legitimate school districts do not just spend money on non-food items. They generate surpluses that ███████████████ was evidence of wrongdoing. Below is the SFSP program for St. Paul, Minneapolis, and Rosemount—the MN Department of Education Data Reports and Analytics Food Service Financial Report: *https://pub.education.mn.gov/MDEAnalytics/DataTopic.jsp?TOPICID=396.*

| District | Program | Revenue | Expense | Surplus | Margin |
|---|---|---|---|---|---|
| St. Paul | SFSP | $16,219,804 | $12,773,044 | $3,446,760 | 21% |
| Minneapolis | SFSP | $7,849,449 | $6,429,523 | $1,419,926 | 18% |
| Rosemount | SFSP | $1,614,229 | $620,777 | $993,452 | 62% |

As shown above, St. Paul Public Schools generated a $3.4 million surplus in its SFSP operations in SY2020. Rosemount retained 62% of its revenue after expenses. MDE accepted these reports without question. If a surplus is evidence of fraud, every school district in this table should be under investigation.

Emily Honer ████████ that "the program was not designed to make a profit." Bock Sent. Ex. 2-0106. She told them: "Uncooked beans and rice are not allowable items

28

and are not reimbursable." That is a fabrication. The USDA's own meal pattern charts list "Cooked dry beans or peas" as an allowable meat alternate and "Cooked cereal or cereal grains" as an allowable grain component. Bock Sent. Ex. 6 p. 20. The USDA does not regulate the form in which food is purchased — it regulates what is served to the child: five components (milk, vegetable, fruit, grain, meat/meat alternate) at minimum serving sizes. Bock Sent. Ex. 7 p. 11. Whether the rice arrives at the kitchen in a fifty-pound bag or a pre-cooked pouch is not a problem. School cafeterias in America buy dry beans and cook them.

Ms. Honer's misunderstanding of the food program persisted throughout both trials. She told the FBI that enrichment activity "was always still required" during the pandemic — contradicting the USDA's "Nationwide Waiver of Activity Requirement in After-School Child Nutrition Programs." Trial I, Tr. Vol. VI 1470-72; *see e.g.,* Trial II, Bock Exhibit D1-164. Even in normal times, the regulation requires enrichment to be "offered," not that children participate in it. *See* 7 CFR 226.17a(b). Ms. Honer described the program as requiring attendance tracking "like the elementary schoolteacher taking attendance every day," Trial II, Trial Tr. Vol. II at 354:10 — then acknowledged that parents could pick up ten days of meals in a single visit. Trial II, Trial Tr. Vol. III 521.

The investigation was built on the program as Emily Honer wished it existed — not the program as the USDA designed it, not the program as MDE's own school districts operated it, and not the program as approximately 120 USDA waivers had transformed it during the worst public health crisis in a century. And every number that flows from that

29

foundation — including $243 million — inherits the error. Trial II, Bock Ex. D1-163-182.

### C. Restitution requires proof of actual or proximate loss caused by the offense conduct, not speculation.

The Mandatory Victims Restitution Act (hereinafter "MVRA") requires proof of actual, proximate loss caused by the offense of conviction. 18 U.S.C. §§ 3663A, 3664(e). The MVRA is compensatory, not punitive. Restitution may not exceed the victim's actual, provable loss, and the Government may not use a defendant's receipts or aggregate reimbursements as a proxy for loss. *Chalupnik*, 514 F.3d at 754-55; *Frazier*, 651 F.3d at 903-05; *Petruk*, 484 F.3d at 1038.

1.    *The same deficiencies apply.*

The loss calculation challenged above is the same as the one underlying the restitution request. For the reasons set forth above — treating gross receipts as a loss, no fair market value credit, an unreliable tracing methodology, including post-notice payments without causation analysis, and internal inconsistency — a preponderance of the evidence does not support the restitution figure. The Court should deny or substantially reduce the requested amount.

2.    *USDA's failure to seek repayment underscores the uncertainty.*

The defense understands that USDA has not requested repayment from MDE despite the public nature of this case. That fact does not preclude restitution, but it underscores the absence of a clear, reliable calculation of loss. The former lead

30

prosecutor, Joseph Thompson, publicly declared that fraud losses in Minnesota were in the tune of $9 billion. *See https://minnesotareformer.com/2025/12/18/u-s-attorney-fraud-likely-exceeds-9-billion-in-minnesota-run-medicaid-services/.* The president of the United States, Donald Trump, when sending federal agents to Minnesota, alleged that the fraud was in the $19 billion range. *https://www.startribune.com/trump-repeats-claim-of-19-billion-in-minnesota-fraud-heres-what-the-numbers-show/601588451.* The Court should require the Government to explain whether the alleged loss belongs to USDA, MDE, or both; whether any offsets, recoveries, or recoupments have been made; and whether the restitution figure duplicates a sum already borne, shifted, or absorbed through administrative channels. The MVRA permits only actual loss, not duplicative recovery. *United States v. Chalupnik*, 514 F.3d 748 (8th Cir. 2008). These findings are required under 18 U.S.C. § 3664(e).

### D. Forfeiture

1.      *This Government's forfeiture theory should not substitute USSG's loss.*

The Government's forfeiture theory further shows why a mechanically extreme sentence would be unsound. The forfeiture motion and Ms. Roase's declaration assert that Ms. Bock's $5,241,522.79 preliminary judgment consists of seven categories: the seized FOF Bank of America balance, the $310,000 Cosmopolitan/Safari payment, deposits from FOF to Ms. Bock's personal accounts, School Age Consultants payments, South Cross rent payments, payments to Handy Helper's LLC, and wages paid to Empress Watson. *See* Gov't Trial Ex. X-39 p.3; ECF Doc. 781 (Roase's Forfeiture Declaration). The Preliminary Order for forfeiture was then adopted as a money judgment in that

31

amount, and specific assets, including bank funds, a Porsche, cash, electronics, jewelry, and other property, were forfeited.  ECF Doc. 784.

Ms. Bock does not ignore that order. But the existence of a preliminary forfeiture order does not answer the Guidelines question, and it certainly does not justify sentencing as though every dollar ever paid through FOF was Ms. Bock's personal theft. For example, there is no scenario in which the $74,108.50 checks Ms. Bock obtained through a personal injury settlement should have been seized or forfeited. *See* Bock Sent. Ex. 3; Trial II, Gov. Ex. S130, p. 1-2, Ex. 8 at p. 35-40. The Government was aware of this because of Ms. Bock's administrative forfeiture notice. *Id*. Furthermore, the Government's own forensic declaration confirms the defense's point: when the analysis shifts from broad-scheme rhetoric to traceable categories, the amount shrinks dramatically. That does not exonerate Ms. Bock from her guilty verdict. It does, however, expose the danger of using the largest available number as a proxy for blame.

Because criminal forfeiture is part of sentencing, not an element of the offense, it is governed by a different inquiry. *Libretti v. United States*, 516 U.S. 29, 38–39 (1995). The forfeiture motion itself argues that gross receipts are forfeitable and that expenses do not offset forfeiture. That position may be the Government's strongest forfeiture argument under Eighth Circuit precedent, but it is not a reason to inflate the prison sentence. If anything, it is a reason for restraint: the Court should recognize that substantial economic punishment has already been or will be imposed through forfeiture and seizure and avoid duplicating that severity by imposing a prison term based on an overstated loss figure.

2.    *Forfeiture is limited to personal proceeds.*

Criminal forfeiture under 18 U.S.C. § 982 requires that the property subject to forfeiture be traceable to the offense. "Proceeds" means the defendant's personal gains from the criminal activity — not the gross revenues of every entity involved in the offense. *United States v. Garbacz*, 33 F.4th 459, 472 (8th Cir. 2022), discusses forfeiture under both criminal and civil forfeiture statutes. The court emphasized that under 18 U.S.C. § 982 (criminal forfeiture), the property must "constitute or be derived from proceeds the person obtained directly or indirectly, as the result of the offense." *Id.* Similarly, under 18 U.S.C. § 981 (civil forfeiture), the property must "constitute or be derived from proceeds traceable to the offense." *United States v. Garbacz*, 33 F.4th 459, 472. The court upheld the forfeiture of two statues purchased by the defendant, finding that they were traceable to proceeds obtained through a wire fraud scheme. The evidence showed that the defendant used stolen funds to pay off credit card debt incurred in purchasing the statues, thereby satisfying the traceability requirement. In *United States v. Hawkey*, 148 F.3d 920 (8th Cir. 1998) elaborates on the concept of property "traceable to" an offense. The court explained that property is traceable to an offense when its acquisition is attributable to the criminal scheme rather than untainted sources. For example, if proceeds from a money laundering scheme are used to purchase a specific item, that item is subject to forfeiture as property traceable to the offense. The court further clarified that proof of the proceeds used to acquire the property is sufficient to establish traceability.

33

Here, the Government's forfeiture figure of $5,241,522.79 aggregates funds that flowed through organizational accounts, not Ms. Bock's personal accounts. The bulk of this amount represents money received by FOF as an organization and disbursed to sites, vendors, and third-party operators whom Ms. Bock did not control.[3]

3.      *FOF and Aimee Bock provided lawful services requiring the deduction of direct costs of providing lawfully delivered services.*

This is not a case in which the defendant fabricated an entirely fictitious enterprise. FOF was a real organization that operated real food distribution sites, purchased real food, employed real staff, and provided real services to real communities — including during a pandemic that shut down school cafeterias across the state. The offense was not the provision of the services. It was the way claims were submitted and reimbursements obtained. When the underlying activity involves the provision of lawful goods and services in an unlawful manner, forfeiture must be calculated on a net basis — deducting the direct costs of providing those services. The operative phrase is traceable to the offense. *United States v. Asomani*, 7 F.4th 749 (8th Cir. 2021). Direct costs in FOF are considerable: Estimate of food purchases by a few sites: $33.1 million documented from subpoenaed vendors; Site operational costs: rent, utilities, and equipment in just a few locations; Labor: staff wages for food preparation, distribution, and enrichment

---

[3] Ms. Bock is entitled to a $74,108.50 refund. This amount was earned through a personal injury settlement, as shown by her attorney's IOTA-drawn check, which is unconnected to the food program fraud at issue. Ms. Bock raised this objection administratively when the government seized the amount. Bock Sent. Ex. 3.

programming; Transportation and logistics: delivery, storage, and cold chain. *See* Section III s*upra; see also*, Trial II, Gov't Trial Ex. X-39 p.3.

The Government did not analyze these costs. It did not separate organizational expenses from personal proceeds. It did not determine what portion of the $5.2 million, if any, represents a net gain to Ms. Bock personally after deducting the costs of operating the program.

4.      *Ms. Bock's actual personal proceeds are limited.*

Trial II, Gov't Trial Ex. X-39, p. 3, establishes the Government's basis for forfeiture of Ms. Bock's assets.  The evidence shows Ms. Bock's personal financial benefit as approximately: Direct payroll: $257,362.60; a single payment from Cosmopolitan Business Solutions for $310,000; and FOF rent payments for the South Cross site totaling $110,670.  After accounting for organizational costs, vendor payments, and third-party disbursements that flowed through FOF but were never retained by Ms. Bock, the net personal proceeds are approximately $678,032.65.  ($257,362.60—2020-2022 salary, $310,000—purchase of childcare, $110,670.05—rent payment for South Cross building; a 2013 Porsche that was valued at $9,000, custom jewelry, etc., now subject to forfeiture. *See* Trial II, Govt. Trial. Ex. X-39.

Considering Ms. Bock's argument, without waiving her objections, Ms. Bock believes that a generous forfeiture should be limited to $413,600.[4]  *See Id*., at p.3.  Ms.

---

[4] Ms. Bock seeks the Court to note that money paid to Mr. Watson was compensation for work he performed for FOF, not Ms. Bock.  Also, donations to FOF remained with FOF even after Ms. Bock's termination.  $257,362.60 represents the entirety of Ms. Bock's compensation for work for FOF, of which she paid appropriate taxes.  There is

Bock is entitled to a refund of the amount she received from a personal injury settlement, in addition to her salary.  Bock Sent. Ex. 3, Personal Injury settlement checks.  That sum of $413,600, which effectively measures her personal benefit from the offense, is orders of magnitude smaller than the $242 million or $44 million figures suggested by the PSR and the Government.

5.      *Forfeiture may not duplicate restitution.*

To the extent the Court imposes both restitution and forfeiture, the awards must not be duplicative. Any forfeiture order should be offset by restitution amounts to avoid an impermissible double recovery. See 18 U.S.C. § 3664(j)(2).  The same core defect infects the PSR's Guidelines loss calculation, the Government's restitution request, and its forfeiture theory: each improperly equates total program reimbursements with fraud proceeds without proving actual loss, crediting the fair market value of meals and services provided, accounting for MDE's independent oversight failures, or distinguishing legitimate claims from illegitimate ones. The Government bears the burden on each issue, and it has not carried that burden.  Accordingly, the Court should recalculate loss based on reliable evidence rather than gross receipts; apply the corrected offense level under the Guidelines; deny or substantially reduce restitution to proven

---

no evidence that her salary was inappropriately high for an organization of FOF's size.  $2,879.30 was paid to Ms. Bock's minor son for assisting in food delivery.  In sum, the only amount the Government could arguably claim is forfeitable is $103,600 that she obtained from contributors to Ms. Bock School Age Consultants, LLC, an entity not involved in the food program, and $310,000 from Cosmopolitan Business Solutions, LLC, for a total of $413,600.

36

actual loss; and limit forfeiture to Ms. Bock's proven net personal proceeds—approximately $413,600—while ordering the return of $74,108.50 to Ms. Bock.

### E. Being that the amount of loss cannot be determined properly, the Court must use the amount of "gain" as the alternate vehicle to determine loss.

Application Note 3(B) of the USSG provides: "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss, but it reasonably cannot be determined." Loss cannot reasonably be determined in this case. The financial analysis was built on a false premise that MDE's own data disproves. No fair market value analysis was ever conducted. MDE's own conduct inflated the loss in ways that cannot be separated from Aimee Bock's. The IRS agent Roase, who prepared the roster analysis, did not review the regulations governing whether rosters were even required. Trial II, Trial Tr. Vol. XV 3463:9.

The Government never measured what was legitimate — it measured gross receipts and labeled them losses. Under these circumstances, the Court should use gain as the basis for determining loss. Ms. Bock's gain was approximately $413,600, without waiving objections, and at most $1.2 million, resulting in a criminal offense level of approximately 19 or 33. With a criminal offense level of 33, 251 fraud defendants were sentenced nationwide over the last decade. The median sentence was eight years' imprisonment. For female defendants with a criminal history category of I, the median was seven years' imprisonment. Even at a criminal offense level of 43 — the Government's position — the median for the closest comparator group, female, criminal

37

history category of 1, and a four-point role enhancement, is 10 years' imprisonment. Not 40 years, not life. Not 20 years. 10 years. *See Supra* IV (f).

### F.      *Corrected Guideline Calculation*

The PSR calculates a total Offense Level of 43 — the maximum — resulting in a Guideline range of life imprisonment. That calculation is the product of six contested enhancements stacked atop a defective loss figure. If the enhancements are evaluated individually against the evidence, the result is fundamentally different. The difference is 19 offense levels, from life imprisonment to 30–37 months.  If the Court agrees with Ms. Bock's calculations, the numbers are remarkably different: (7+12=19)(30-37 months).

1.      *Charitable or educational misrepresentation (¶ 103): +2 should not apply.*

The PSR asserts that Bock misrepresented that she was acting on behalf of a charitable or educational organization. FOF was a registered 501(c)(3) nonprofit. It was approved by MDE as a CACFP sponsor. It operated food distribution sites serving communities during the pandemic. The organization's charitable purpose was real — the fraud was in the claiming, not in the organizational identity. This enhancement is designed for defendants who create fictitious charities.  FOF was a real organization performing real charitable work. The enhancement requires that misrepresentation itself be part of the offense conduct, not merely that a nonprofit was involved.

2.      *Sophisticated Means (¶ 104): +2 should not apply.*

The PSR bases this enhancement on Bock's creation of a GoFundMe account to receive kickback payments and her disbursement of MDE funds to shell entities

controlled by site operators and vendors. The defense contends that a GoFundMe account does not constitute "sophisticated means" within the meaning of §2B1.1(b)(10)(C). The commentary defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." A GoFundMe account is a publicly visible, easily traceable consumer platform — the opposite of concealment. The disbursement of program funds to site operators is how the program was designed to work; the fact that some operators were engaged in fraud does not transform routine fund distribution into sophisticated means.  Besides, the monies raised were not used by Ms. Bock.  If anything, it was used by FOF after Ms. Bock was terminated. *See* ECF Doc. 837, 837-1; *see also,* Trial II, Bock Ex. D1-303, D1-311, D1-322, D1-711-714[5]; *see also*, Govt's Ex. X-39 p.3; S-30 at p.23.

3.      *Federal Disaster or Emergency Benefits (¶ 105): +2 should not apply.*

The PSR applies this enhancement because the offense involved conduct described in 18 U.S.C. § 1040 — fraud in connection with major disaster or emergency benefits. The defense contends that CACFP reimbursements are not "emergency benefits" within the meaning of the statute. CACFP existed before the pandemic, continued during the pandemic under expanded waivers, and continues today. The pandemic waivers broadened eligibility and simplified administration, but the underlying program — reimbursement for meals served to children — is a permanent federal nutrition program,

---

[5] While these exhibits were not admitted at trial, they were disclosed and available to the government before the trial.  It is likely that the probation officer reviewed these records when writing the PSIR.  See e.g., PSIR ¶ 31

39

not an emergency relief program. Applying this enhancement to every CACFP fraud case during 2020-2021 would convert a general nutrition program into an "emergency benefit" program based solely on the timing of the offense. *See* 7 C.F.R. § 226.1.

4.    *Role Enhancement (¶ 107): +4 should not apply.*

The PSR asserts that Bock was an organizer or leader of criminal activity involving five or more participants. The defense contends that Bock's role as the executive director of a nonprofit sponsor does not equate to organizing or leading criminal activity. The evidence at trial established that the fraud was organized by others — primarily Mr. Eidleh and Mr. Ahmed, who recruited 90% of the site operators, created the shell companies, trained the participants, and extracted the kickbacks.  Trial I, Trial Tr. Vol XIII 2976:2 and 3028:13; Trial I, Trial Tr. Vol XXI 5146:25 – 5147:6; Bock Sent. Ex. 2-0115-0135; Ex. 2-0136; Trial II, Trial Tr. Vol XII 2784; Trial II, Trial Tr. Vol XIII 2890, 3077.

Bock's failure to detect or prevent fraud is not the same as organizing it. The § 3B1.1 enhancement requires that the defendant organized or led the criminal activity, not merely that the defendant held an administrative position within an organization where fraud occurred. In *United States v. Adejumo*, 772 F.3d 513 (8th Cir. 2014), the court found the evidence insufficient to support the enhancement because there was no proof that the defendant recruited, planned, or organized others' activities, or exercised decision-making authority over their participation. The court noted that the enhancement requires evidence of directing or procuring the aid of underlings, which was absent in that case. Similarly, the trial record in the case at bar shows no evidence that Ms. Bock recruited, planned, or

organized others' activities, or exercised decision-making authority over their participation in the conspiracy. Rather, Eidleh and Ahmed were the masterminds.

Furthermore, the PSR applies a four-level enhancement under § 3B1.1(a) on the ground that Ms. Bock was an organizer or leader of criminal activity involving five or more participants, or that was otherwise extensive. That conclusion is too broad as written.  There is no dispute that Ms. Bock was the executive director of FOF. But status is not the test. Section 3B1.1 asks whether the defendant organized or led criminal participants. *See* U.S.S.G. § 3B1.1 cmt. n.2. The Eighth Circuit requires specific findings on contested enhancement facts, not a rote adoption of the PSR's narrative. *United States v. Mayer*, 130 F.3d 338 (8th Cir. 1997).

The defense objections properly note that the evidence does not support portraying Ms. Bock as the direct organizer or supervisor of every alleged co-conspirator across the full universe of site operators, vendors, and satellite entities. Even the Government's trial theory, as described in the Court's post-trial order, was that Ms. Bock oversaw the scheme through her role as executive director of FOF.  That is not the same as proving she personally directed each independent operator's criminal conduct, supervised each separate entity, or exercised decision-making authority over all of the actors whose losses are being loaded onto her at sentencing. Besides, the Government knows that the "master minds" were Messrs. Eidleh and Ahmed.

A four-level leader enhancement carries enormous downstream impact in a case already pushed to offense level 43. If the Court finds some aggravating role, it should still distinguish between leadership over FOF's internal operations and leadership over the

41

broader and diffused conduct of outside operators. The present record supports, at most, a narrower finding unless the Government can tie specific outside participants to Ms. Bock's active supervision, direction, recruitment, or control. *See* PSR ¶ 107; *see also* Trial I, Trial Tr. Vol XIII 2976:2 and 3028:13; Trial I, Trial Tr. Vol XXI 5146:25 – 5147:6; Bock Sent. Ex. 2-0115-0135; Ex. 2-0136; Trial II, Trial Tr. Vol XII 2784; Trial II, Trial Tr. Vol XIII 2890, 3077. Messrs. Ahmed and Eidleh were the organizers and recruiters of the fraudulent sites. They deceived Ms. Bock. The Government knew the masterminds of the fraudulent activities. Id.

The internal FOF staffing structure shows that there were other organizers of the fraud program. *See, e.g.,* Gov't Trial Ex. V-1, V-3, and V-15 indicate that Bock did not have complete organizing authority or a leadership role. FOF comprised of other managers, directors, supervisors, employees, and consultants with operational-level authority. *See* Trial II, Trial Tr. X 2190, *see also* Bock Sent. Ex. 2. Even the September 12, 2022, surreptitious recording orchestrated by ███████████████, with Ahmed against ███████████, showed how Eidleh taught Ahmed to commit fraud at FOF. The Government's narrative that Ms. Bock was the mastermind collapses under scrutiny.

5.      *Obstruction of Justice (¶ 108): +2 should not apply.*

The PSR applies a two-level obstruction enhancement under U.S.S.G. § 3C1.1. The addendum identifies two possible theories: first, that civil litigation against MDE delayed scrutiny; second, that the Court may consider whether Ms. Bock committed perjury at trial (PSI ¶¶ 94-95). Neither theory, on the present record, justifies an automatic obstruction finding. That is not how § 3C1.1 works. An enhancement requires

a willful attempt to obstruct or impede the administration of justice, such as refusing to appear, fleeing, or threatening witnesses. Where the defendant objects, the Government must prove actual obstructive conduct with reliable evidence. *United States v. Eagle*, 133 F.3d 608, 611 (8th Cir. 1998). And where the claimed obstruction rests on trial testimony, the court must make the specific findings required by *United States v. Dunnigan*, 507 U.S. 87, 95 (1993), rather than simply inferring obstruction from a guilty verdict.

The defense objections correctly note that the PSR identifies no classic obstructive conduct, such as destruction of records, witness tampering, threats, or materially false statements to federal investigators. Instead, the PSR's principal theory appears to be that FOF's civil litigation against MDE was meritless and delayed the fraud investigation. But invoking the judicial process to challenge state action—even aggressively or unsuccessfully—is not obstruction. Courts should be especially cautious before converting litigation conduct into a sentencing enhancement, particularly when the litigation predated the federal prosecution and involved contested questions about MDE's site approvals, payments, and stop-pay conduct. In any case, FOF and Ms. Bock were successful in state court on the petitions at issue.

In addition, the discrimination lawsuit commenced on June 27, 2021, and was voluntarily dismissed on January 27, 2022, after the Government executed a search warrant at Ms. Bock's residence. The lawsuit had no impact on MDE's approval of claims or sites' submission of meal counts for reimbursement. MDE voluntarily ended the "stop pay" action. *FOF v. MDE* 62-CV-20-5492, Friday, April 30, 2021, Mo. Hr. Tr., D1-780 p. 37; *see also*, Trial II, Trial Ex. D1-796; *see also*, Trial II, Govt. Trial Ex. V-1. p

43

8; *June 2024 Office of the Legislative Auditor Report, MDE Oversight of FOF,*

*www.auditor.leg.state.mn.us/sreview/pdf/2024-mdefof.pdf.*

6.      *Zero-point offender reduction (¶ 110): -2 should apply.*

The PSR denies the two-level reduction under § 4C1.1 because Ms. Bock is

disqualified by an aggravating role adjustment under § 4C1.1(a)(10). If the Court does

not apply the role enhancement as argued above, this disqualification falls away. Ms.

Bock had zero criminal history points. She meets every other criterion for the zero-point

offender reduction. The two-level reduction should apply.

## IV.    § 3553(a) SENTENCING ARGUMENT

The Eighth Circuit has repeatedly recognized that sentencing courts retain broad

discretion to depart downward when the advisory range substantially overstates the

defendant's culpability, history, likelihood of recidivism, or personal gain. *See United

States v. Feemster*, 572 F.3d 455, 461–64 (8th Cir. 2009).

*A.      The Nature and Circumstances of the offense.*

The offense conduct in this case was serious. Ms. Bock does not minimize the

jury's verdict or the public concern generated by the FOF prosecutions. Yet § 3553(a)

requires individualized sentencing, not collective punishment. The Government's own

filings distinguish between the total loss allegedly flowing through the broader sponsor

network and the amount allegedly obtained by Ms. Bock personally. The forfeiture

motion seeks a personal money judgment of approximately $5.24 million, rather than the

hundreds of millions of dollars attributed to the broader scheme. That distinction matters

44

because the Guidelines loss table can dramatically inflate advisory sentencing ranges in large fraud cases. The Eighth Circuit has cautioned that the amount of the loss is not always a reliable proxy for moral culpability. *See United States v. Spencer,* 700 F.3d 317, 327 (8th Cir. 2012).

The record also reflects substantial failures by state oversight authorities during the COVID-era expansion of federal child nutrition programs. MDE approved reimbursement claims, authorized site operations, and permitted continued program participation during the relevant period. The defense presented evidence that MDE officials expressed only limited concerns about fraud during significant portions of that period. Although those failures do not excuse criminal conduct, they materially distinguish this case from traditional fraud schemes driven solely by concealment and sophisticated deception. The program operated amid unprecedented pandemic-era regulatory waivers, reduced in-person oversight, and extraordinary administrative expansion.

## B.    *History and characteristics of the defendant.*

Ms. Bock is a 45-year-old first offender with no prior criminal history or history of violence. Despite her mental health struggles, she earned a bachelor's degree, raised two incredible young men who attend college, maintained stable employment, and spent years working in nonprofit and food distribution efforts before these offenses. Bock Sent. Ex. (Filed under seal). The PSR confirms that she falls within Criminal History Category I. The absence of any prior criminal conduct is highly significant under § 3553(a). *See United States v. Chase*, 560 F.3d 828, 831–32 (8th Cir. 2009).

45

Unlike many defendants who appear before this Court for major fraud offenses, Ms. Bock did not enter the criminal justice system with a history of financial crimes, theft, or recidivism. Her lack of criminal history strongly indicates that she poses a low future danger to the public. *See United States v. Goff*, 20 F.3d 918, 920 (8th Cir. 1994) (recognizing that the lower limit of the range for Criminal History Category I is set for a first offender with the lowest risk of recidivism).

Since her detention following trial, Ms. Bock has reportedly maintained a clean disciplinary record in custody, except for the allegation that she used her son to release protected materials to politicians and the press. She was attempting to expose the excesses of MDE and to challenge her prosecution. She has already endured extraordinary punishment beyond formal sentencing: the destruction of her professional reputation, financial ruin, public humiliation, asset forfeiture proceedings, and the certainty that she will never again hold a comparable professional role. The Eighth Circuit recognizes that collateral consequences may appropriately inform the sentencing analysis under § 3553(a). *See United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008).

## C.    *The need for the sentence imposed.*

General deterrence is an important consideration in white-collar cases. But deterrence does not require a sentence approaching the functional equivalent of life imprisonment for a first offender. The Eighth Circuit has emphasized that district courts possess discretion to conclude that lengthy guideline ranges in economic crime cases may

46

exceed what is necessary to achieve deterrence and respect for law. *See Feemster*, 572 F.3d at 464.

A sentence between time served and 37 months would constitute substantial punishment under the circumstances of this case. Ms. Bock has already spent significant time in custody following the verdict. She faces massive restitution exposure, extensive forfeiture, permanent felony convictions, and lifelong professional consequences. Those sanctions collectively provide meaningful deterrence to others who might contemplate similar conduct.  Specific deterrence and incapacitation concerns are minimal here. Ms. Bock's age, lack of criminal history, public exposure, and complete financial collapse make recidivism highly unlikely. Empirical sentencing data consistently demonstrate that older first-time offenders convicted of nonviolent economic crimes present among the lowest recidivism risks in the federal system.

D.      *The advisory Guideline range overstates culpability.*

The advisory range in this case is driven overwhelmingly by loss calculations and enhancement stacking. In large fraud cases, the Guidelines often yield ranges that are disconnected from individualized culpability. The Eighth Circuit has acknowledged that district courts may vary downward when the advisory range fails to reflect the realities of the defendant's conduct and characteristics. *See United States v. Jimenez-Gutierrez,* 491 F.3d 923 (8th Cir. 2007).

Here, the advisory range substantially overstates Ms. Bock's personal culpability because it attributes to her the full financial scope of a massive, decentralized network involving numerous independent actors, vendors, and site operators. Even accepting the

47

jury's verdict, the sentencing record does not support treating Ms. Bock as personally equivalent to every participant who submitted inflated claims, falsified meal counts, or converted funds for personal luxury spending.

The Court also should consider sentencing parity. Many defendants nationally convicted of serious fraud offenses with offense levels in the highest guideline categories receive sentences measured in years rather than decades. A sentence within the requested range would still represent serious punishment while avoiding unwarranted disparities under § 3553(a)(6).

E.    *A below-guideline sentence is sufficient but not greater than necessary.*

The Supreme Court and the Eighth Circuit both require individualized sentencing grounded in the totality of the circumstances. *See Gall,* 552 U.S. 38, 49–50; *Feemster*, 572 F.3d at 461. This Court need not impose a sentence driven primarily by Guideline mathematics when the resulting range exceeds what is necessary to achieve the purposes of sentencing. Several mitigating considerations justify a substantial downward variance: (1) Ms. Bock's complete lack of prior criminal history; (2) the unprecedented and chaotic regulatory environment during the COVID-era food programs; (3) state oversight failures; (4) the absence of violence, threats, or physical harm; (5) the already extraordinary collateral consequences of conviction; (6) her low likelihood of recidivism; (7) her mental health struggles; and (8) the substantial financial forfeiture and restitution already imposed. For these reasons, the defense respectfully submits that a sentence between time served and 37 months is sufficient to satisfy the purposes of sentencing under § 3553(a).

Such a sentence would promote respect for law, provide just punishment, afford adequate deterrence, and avoid imposing a punishment greater than necessary for a first-time, nonviolent offender whose advisory guideline range materially overstates her actual culpability. The nature of Ms. Bock's prosecution and the conduct of MDE highlight the reason that this Court must watch out for unwarranted disparities in Ms. Bock's sentence.

F.    *Avoiding Unwarranted Disparities (§3553(a)(6))*

Section 3553(a)(6) requires this Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Aimee Bock, through counsel, compiled 10 years of the United States Sentencing Commission's individual offender data — every § 2B1.1 defendant with a Criminal History of 1, from FY2015 through FY2024 — totaling 40,543 cases. Bock Sentencing illustrations below, A through D, present self-evident findings. Among 40,543 defendants, 911 received more than ten years. That is 2.25%. A life sentence for fraud, as Ms. Bock's PSR portends, has never been imposed on the dataset. In the offense level of 43 — the Government's position — all 88 defendants received below-guidelines sentences. *See* Illustration Exhibit A. The median was 12.2 years; one in four received 6 years or less. Where the Guidelines as here recommend life imprisonment, no court has followed such a draconian recommendation.

49



## Sentence Distribution at Offense Level 43

§2B1.1 • Criminal History Category I • U.S. Sentencing Commission FY2015–FY2024

| **88** | **Life** | **12.2** yr | **6** yr | **100%** |
|---|---|---|---|---|
| DEFENDANTS | GUIDELINES RANGE | MEDIAN SENTENCE | 25TH PERCENTILE | BELOW GUIDELINES |

**DISTRIBUTION OF ACTUAL SENTENCES IMPOSED (N = 88)**

Sentence Length (Years)

> The Sentencing Guidelines recommend **Life imprisonment** at Offense Level 43. Over ten years of national data, **every defendant** — all 88 — received a below-guidelines sentence. The median sentence was **12.2 years**. One in four defendants received **6 years or less**.

31 defendants (37.5%) received less than 8 years. 6 defendants received less than 2 years. The distribution ranges from probation to 59 years — reflecting the degree to which courts exercise independent judgment under §3553(a) when the guidelines produce a Life recommendation for fraud offenses.

Source: U.S. Sentencing Commission, Individual Offender Datafiles, FY2015–FY2024. Universe: All defendants sentenced under §2B1.1 with Criminal History Category I and Final Offense Level 43. N = 88. Analysis by JSIN.

At an offense level of 25 — the defense's calculation, as detailed in the PSR addendum — not one of 626 defendants received more than ten years. *See* Illustration Exhibit B.  The median was 42 months. The highest sentence was 119 months, one month below the ten-year mark.



## Sentence Distribution at Offense Level 43

§2B1.1 • Criminal History Category I • U.S. Sentencing Commission FY2015–FY2024

| **88** | **Life** | **12.2** yr | **6** yr | **100%** |
|---|---|---|---|---|
| DEFENDANTS | GUIDELINES RANGE | MEDIAN SENTENCE | 25TH PERCENTILE | BELOW GUIDELINES |

**DISTRIBUTION OF ACTUAL SENTENCES IMPOSED (N = 88)**

Sentence Length (Years)

The Sentencing Guidelines recommend **Life imprisonment** at Offense Level 43. Over ten years of national data, **every defendant** — all 88 — received a below-guidelines sentence. The median sentence was **12.2 years**. One in four defendants received **6 years or less**.

31 defendants (37.5%) received less than 8 years. 6 defendants received less than 2 years. The distribution ranges from probation to 59 years — reflecting the degree to which courts exercise independent judgment under §3553(a) when the guidelines produce a Life recommendation for fraud offenses.

Source: U.S. Sentencing Commission, Individual Offender Datafiles, FY2015–FY2024. Universe: All defendants sentenced under §2B1.1 with Criminal History Category I and Final Offense Level 43. N = 88. Analysis by JSIN.

The amount of the loss does not determine what courts impose. The correlation between loss and sentence is $R^2 = 0.033$ — loss explains 3.3% of sentence variation. As loss increases, courts depart *more*, not less: below-Guidelines rates climb from 48% at the lowest bracket to 90% at $65M–$150M. *See* Illustration below:

51

## Sentencing Outcomes by Loss Amount

§2B1.1 • Criminal History Category I • U.S. Sentencing Commission FY2015–FY2024 • N = 19,829

| LOSS AMOUNT | DEFENDANTS | MEDIAN SENTENCE | MEAN SENTENCE | BELOW GUIDELINES | > 10 YEARS |
|---|---|---|---|---|---|
| < $250K | 7,558 | 10 mo | 13 mo | 48.4% | 0.0% |
| $250K – $1M | 5,325 | 24 mo | 26 mo | 62.6% | 0.4% |
| $1M – $3.5M | 3,983 | 31 mo | 37 mo | 67.7% | 1.7% |
| $3.5M – $9.5M | 1,648 | 46 mo | 54 mo | 73.5% | 6.4% |
| $9.5M – $25M | 829 | 60 mo | 70 mo | 79.0% | 12.2% |
| $25M – $65M | 347 | 65 mo | 82 mo | 87.6% | 20.5% |
| $65M – $150M | 139 | 60 mo | 93 mo | 89.9% | 23.7% |

**BELOW-GUIDELINES RATE BY LOSS BRACKET**



| | |
|---|---|
| < $250K | 48.4% |
| $250K–$1M | 62.6% |
| $1M–$3.5M | 67.7% |
| $3.5M–$9.5M | 73.5% |
| $9.5M–$25M | 79.0% |
| $25M–$65M | 87.6% |
| $65M–$150M | 89.9% |

As loss amounts increase, the below-guidelines rate **climbs** — from 48% at the lowest bracket to **90% at $65M–$150M**. Courts increasingly reject the sentences the loss table produces. The correlation between loss amount and actual sentence is **R² = 0.033** — loss explains only 3.3% of sentence variation nationally.

**Note:** This table excludes losses above $150 million. The USSC's loss variable at that level includes regulatory penalties and restitution figures that do not represent Guidelines loss, producing unreliable data. Exhibit D provides individual defendant data for the $200M–$300M range.

Source: U.S. Sentencing Commission, Individual Offender Datafiles, FY2015–FY2024. Universe: All defendants sentenced under §2B1.1 with Criminal History Category I and documented loss amounts below $150 million. N = 19,829. Analysis by JSIN.

Among the 15 defendants sentenced for $200M–$300M in losses — Ms. Bock's range — sentences range from 3 months to 20 years. The median is 11 years. Eighty

percent received below-Guidelines sentences. *See* Illustration below.

## Defendants Sentenced with $200M–$300M in Loss

§2B1.1 • Criminal History Category I • U.S. Sentencing Commission FY2015–FY2024

| 15 | 11 yr | 10 yr | 80% |
|---|---|---|---|
| DEFENDANTS | MEDIAN SENTENCE | MEAN SENTENCE | BELOW GUIDELINES |

| FY | SENTENCE | LOSS AMOUNT | OFFENSE LEVEL | GUIDELINES RANGE | BELOW RANGE |
|---|---|---|---|---|---|
| 2022 | 240 mo (20.0 yr) | $230M | 38 | 235–293 mo | No |
| 2023 | 240 mo (20.0 yr) | $283M | 43 | Life | Yes |
| 2016 | 220 mo (18.3 yr) | $207M | 37 | 210–262 mo | No |
| 2015 | 144 mo (12.0 yr) | $235M | 41 | 324–405 mo | Yes |
| 2021 | 144 mo (12.0 yr) | $201M | 40 | 292–365 mo | Yes |
| 2021 | 138 mo (11.5 yr) | $286M | 43 | Life | Yes |
| 2016 | 132 mo (11.0 yr) | $224M | 39 | 262–327 mo | Yes |
| 2022 | 132 mo (11.0 yr) | $244M | 32 | 121–151 mo | No |
| 2019 | 120 mo (10.0 yr) | $244M | 40 | 292–365 mo | Yes |
| 2014 | 90 mo (7.5 yr) | $259M | 43 | Life | Yes |
| 2017 | 84 mo (7.0 yr) | $219M | 35 | 168–210 mo | Yes |
| 2023 | 57 mo (4.8 yr) | $285M | 35 | 168–210 mo | Yes |
| — | 42 mo (3.5 yr) | $216M | 32 | 121–151 mo | Yes |
| 2023 | 12 mo (1.0 yr) | $286M | 38 | 235–293 mo | Yes |
| — | 3 mo (0.2 yr) | $286M | 34 | 151–188 mo | Yes |

These are **every defendant** in the USSC database sentenced under §2B1.1 with CHC I and a loss amount between $200 million and $300 million over ten years — the range encompassing the government's loss calculation in this case. Sentences range from **3 months to 20 years**. The median is **11 years**. Twelve of fifteen (80%) received below-guidelines sentences.

Three defendants at OL 43 — the same offense level as Ms. Bock — received 7.5 years, 11.5 years, and 20 years respectively. A defendant with $286 million in loss and OL 38 received **12 months**. Another with $285 million in loss at OL 35 received **57 months**. The same loss amount produces radically different sentences depending on the defendant's individual circumstances — confirming that loss alone does not determine the sentence courts actually impose.

Source: U.S. Sentencing Commission, Individual Offender Datafiles, FY2015–FY2024. Universe: All defendants sentenced under §2B1.1 with Criminal History Category I and loss amount between $200M and $300M. N = 15. Analysis by JSIN.

With Ms. Bock's personal gain of $413,600 or $1.2 million, the USSG's data

speaks clearly. At the Government's own offense level, the national median sentence is

12.2 years, and half of all defendants received less. At the PSR Addendum's offense level, no defendant in a decade received more than ten years. Among defendants at Ms. Bock's loss amount, 80% received below-Guidelines sentences. Even the most severely sentenced CACFP defendants in the country — whose conduct was worse by every measure — did not receive life. Any sentence that materially exceeds the national median at offense level 43 would place Ms. Bock beyond the norm of judicial practice across the country. The Court is respectfully invited to consider what that would say about the proportionality of the sentence to the conduct.

## V.  THE ARCHITECT OF THE FOF FRAUD WHO FLED THE UNITED STATES SHEDS LIGHT ON THE FOOD PROGRAM FRAUD.

On January 20, 2022, ▮▮▮▮▮▮ called Mr. Eidleh to his home in Burnsville, Minnesota. He was not in Burnsville. He was in Somalia. He told the ▮▮▮▮ he had left because of his mother's health. He told them he would come back to cooperate. He said, "looks like I need a lawyer."  Bock Sen. Ex. 2-0136.  He asked what he was being charged with. Then he took down the case agent's contact information, hung up the phone, and never returned.  *Id*.  Before he left, he collected three months of kickback payments in advance from ▮▮▮▮▮▮▮▮ — cash, not checks, so there would be no record. He did not call to explain. He did not say goodbye to the people whose lives he had woven into a fraud so comprehensive that federal agents would need four years, 47 indictments, and the largest pandemic fraud prosecution in American history to begin to untangle it. *See* ECF Doc. 1; *see also Zara Frost, https://feedingourfuture.substack.com.*

54

When Aimee Bock founded FOF in 2019, she hired Mr. Eidleh as an independent contractor. Bock Sent Ex. 2-0121-0135.  Bock brought him on as a translator and recruiter.  What Eidleh built under that title was something else entirely.  He was one of the master minds.  Not Aimee Bock!  According to the ████ own interviews — 47 separate ████ reports mention Mr. Eidleh by name — he recruited ninety percent of the sites that operated under FOF.  He was "the primary point of contact at Feeding Our Future for many of the sites."  He "handled the site applications, gathering the rosters and meal counts from the locations."  These are not the words of defendants seeking leniency.  These are the words of Ahmed, codefendant, Government witness, and Mr. Eidleh's own recruit, speaking under proffer to federal agents. Bock Sent Ex. 2-0121-0130.

Sites did not simply join the food program through FOF.  They joined through Eidleh. ████ described it: "Eidleh was known to be 'the guy' because of his role controlling entry into the food program through FOF."  When ████ tried to bypass Eidleh and go directly to Bock, his application went nowhere. When he returned to Eidleh, the terms were explicit: "Give me 10%, and I'll get you in." Ten thousand dollars up front, plus ten percent of every monthly reimbursement.  Ms. Bock was not aware of Mr. Eidleh's conduct.  Bock Sent. Ex. 2-0091-0104.

This was not a single transaction. It was a system. Eidleh created an archipelago of shell companies — Bridge Consulting and Logistics, Hope Suppliers LLC, Eidleh Inc., Bridge Logistics, Eidleh Relief, Oscar Express, and others — ten active LLCs registered in his name with the Minnesota Secretary of State as of October 2021. Each served the

55

same function: to receive payments from sites that Eidleh had enrolled in, disguised on the memo line as consulting fees or equipment purchases.

He did not merely collect money. He taught people how to commit fraud. He provided pre-filled meal count sheets to Hanna Marekegn at Brava Cafe and instructed her to copy them. He gave her a clicker and told her to keep it on hand in case she was inspected. When she told him the per-meal reimbursement seemed small, he told her: "You get money by increasing the quantity of meals claimed." Trial II Trial Tr. Vol. X 2120:4. He trained Lul Ali at Lido Restaurant to fill out fraudulent sheets and prepare fake invoices. Trial II, Trial Tr. Vol. III 605:13. He told Qamar Hassan at S&S Catering that she was approved for 1,000 meals per day. He showed her what to put on the forms. He told Abdulkadir Awale exactly how much to write on the checks and to whom. Trial II, Trial Tr. Vol VIII 1720:20.

He did not suggest. He directed. He did not enable. He designed.  He embedded family members in FOF management — ██████████████████████ all ██████ — in staff positions that gave them access to documents, monitoring records, and internal operations. ██████████████████████████ filling out fake monitoring sheets without conducting actual site visits. Bock Sent Ex. 2-0025-0234.

The Government interviewed thirteen or more FOF employees. At Trial II, it called one: Genesis Alonso, a junior staffer who started after Eidleh's departure. The ██ reports from the witnesses the Government did not call uniformly describe the same thing: an organization in which Eidleh, not Bock, built and operated the fraud. The Court

56

may consider these reports at sentencing under 18 U.S.C. § 3661 and USSG §6A1.3. Bock Sent. Ex. 2.

When Bock discovered Eidleh was taking kickbacks, she removed him. ("There were rumors that Eidleh had stolen from Bock and was forced to leave." Bock Sent. Ex. 2-0029. When she discovered Hadith Ahmed was stealing, she pushed him out, too. "Bock said Hadith had stolen from FOF." *Id*. FOF's preoperational visit process resulted in the rejection of approximately 80-90 site applications deemed unsuitable. *See* Trial II, Trial Tr. Vol. XVII 3835-36.

None of this undoes the fraud. The jury found Bock bears criminal responsibility, and the Court accepted that finding. But there is a difference. A difference that matters at sentencing. A difference that matters under § 3B1.1 and § 1B1.3 — between the person who designed the fraud and the person who failed to detect it. If Mr. Eidleh independently recruited sites and directed fraud at those sites, the losses from those sites may fall outside the scope of Bock's jointly undertaken criminal activity. *See United States v. Adejumo*, 772 F.3d 513 (8th Cir. 2014). The Government has the burden of proving otherwise.

About forty-seven people have been charged. The man who built the machine is in Somalia. The woman who failed to stop it is before this Court. This Court should sentence Aimee Bock for her actions — not for what Eidleh built. In this instance, a time-served or 37 months' sentence is appropriate.

57

## VI.    THE SPONSOR WHO WAS NEVER CHARGED[6] IN THIS CASE WILL SHOW THE NATURE OF BOCK'S PROSECUTION AND WILL INFORM THE COURT ABOUT THE PROPER SENTENCE FOR AIMEE BOCK.

Ms. Bock acknowledges that the Government has sole discretion in its charging decision. *United States v. Jacobo-Zavala*, 241 F.3d 1009 (8th Cir. 2001). This Court enjoys wide latitude in assigning weight to the relevant § 3553(a) factors, including the nature of the offense. *United States v. Gamar Ahmed*, 103 F.4th 1318 (8th Cir. 2024). The actions of the Government and other parties are essential to this Court when fashioning an appropriate sentence. MDE's conduct regarding Kara Lomen is highly revealing.

When Bock fired Abdiaziz Farah over kickback allegations, someone else took him in. Trial II, Trial Tr. Vol VIII 1720:20. Kara Lomen was the Executive Director of Partners in Nutrition — Minnesota's largest CACFP sponsor, larger than FOF by every metric the state tracks. PIN received $204.7 million in MDE payments between 2020 and 2022 — 46% of the combined FOF and PIN total. PIN had 488 CACFP sites in 2021, compared with FOF's 384. PIN enrolled 681,161 children, compared with FOF's 246,718 — nearly triple. In 2022, PIN had 561 sites, compared with FOF's 312 — nearly double — and 669,139 enrolled children, compared with FOF's 126,978 — more than five times as many.

Ms. Lomen held the identical structural role as Bock: sponsor, Executive Director, CLiCS access, claims submission authority, and MDE contact of record. Ms. Lomen

---

[6] Portions of this material will be redacted in accordance with privacy concerns and subject to this Court's Protective Order.

personally processed CLiCS claims. In her own words: "I ran them myself." After Bock

fired Abdiaziz Farah, Lomen became his primary enabler. The text message records

between them, over 2,000 messages over 17 months.  Trial I, Ex. D1-144.

1.    *Roster Fabrication*

On September 13, 2021, Farah told Lomen he had "mastered the rosters." He had

obtained apartment resident lists from property managers — not lists of children who

attended programming, but lists of every minor living in the building with their dates of

birth:

> "So I have mastered the rosters with all the necessary info you need. Andrew
> pointe / Winfield / Cliff hills / Clifton townhomes."
> "The apartment manager got me all the current residents with all details."
> "All minors with dob."
> "Now that's an intelligent move."

Trial I, Tr. Vol. XIX 4614:15; Trial I Exhibit H-531          Lomen's response was not

to report this to MDE. It was to manage the overlap:

> "Right now, you have a lot of kids that are on both Park View and Cedar Run, so I
> just want you to pick which one you want them on."

She identified children appearing on multiple site rosters simultaneously. Instead of

flagging duplicates as evidence of fraud, she asked Farah which site should get the claim.

Two weeks later, the problem persisted:

> "You have kids that were marked for the same meals on the same day at different
> sites. It won't pay both which site do you want me to pay them through?"

Children simultaneously claimed at multiple sites. Lomen's response: "Pick one."  Trial I,

Tr. Vol. XIX 4616:3.

59

2.    *System Manipulation*

The same night as the roster fabrication exchange, Lomen disabled CLiCS error-checking: "I will turn off the errors so you can enter the meal counts and info but we need to get them in ASAP before anyone notices lol." Trial I, Trial Tr. Ex. H-53l. This is not willful blindness. This is a sponsor executive with administrative access to the state's claims system, deliberately disabling error validation, with full knowledge of what she is doing: "As long as nobody notices but me lol." She coached Farah to prepare for monitoring visits — not to be compliant, but to appear compliant:

> "Then just make sure that sites are doing them at the point of service before monitoring starts lol."

> She found ways to manipulate the approval process: "I will work on it and find a way to sneak it in lol."

Trial I, Tr. Vol. XIX 4618:15.  The Government knew a mastermind but chose Aimee Bock to recoup $243 million.

3.    *Running Known Duplicates*

In January 2022 — six days before the search warrants that would bring the entire scheme to an end — ██████████ were still at it:

> "The mind foundry sites have tons of duplicates do you want me to run them as is or wait for parent forms so I can add kids back in?"

On January 7, 2022, Lome knew the claims contained duplicate names. ██████████ whether to submit them anyway. He told her to run them. She did.

> "I can run them now and run adjustments later."

60

Six days later:

"I did some magic and you are getting lots of adjustments."

On January 13, 2022, ▮▮▮▮▮▮▮▮▮: "You are amazing always!"  The next day — the last day of the scheme, one week before the FBI executed search warrants across the Twin Cities — ▮▮▮▮▮▮▮▮  the results:

> "November, we ran with the duplicates, and they were paid a total of 29041 meals for $122,582.06 they had a check this week."
> "December has not been processed, yet we are waiting to hear if we should run it as is or if they will get forms for the duplicates. They currently have 36390 meals after disallows."

On January 14, 2022, MDE paid $122,582 for a single month at Willmar sites alone. Claims submitted with known duplicate names. Claims that ▮▮▮▮▮▮▮ processed through CLiCS.  Trial I, Exhibit D-64.

4.    *Self-Awareness*

▮▮▮▮▮▮▮▮  knew her operations would not survive scrutiny. When ▮▮▮ told her MDE was cracking down on other programs, her response was not concerned. It was ironic:  "Someone should tip them off to crack down on us too."

On August 15, 202, there was the same exchange:  "The people with us will be protected." ▮▮▮▮▮▮▮  knew it was fraud. She offered protection to participants. She continued for five more months. ▮▮▮▮  credited her directly: "You taught me well."

On November 8, 2021, the Government was aware of this information, yet Ms. Bock was tagged as the mastermind.  The Government produced nothing remotely mirroring ▮▮▮▮▮  when the jury convicted Ms. Bock.

61

5.    *The payment chain*

The ███████████████ text messages confirm how the money flowed. On April 2, 2021, in the earliest WhatsApp message in the thread, ██████████:

"██████ told me she can submit claims, which is good." Trial I, Ex. D1-146, p. 825.  Direct evidence from █████ own words that ████ controlled claims submission. The payment chain ran: ████████████████████████████████ → Family member ████████████████████████ → ████ (vendor payments). ██████ confirmed: "I'm waiting on █████ get checks." ████████████ : "Pick up checks from ██████████ today coz she has more payments for sites."  The scale: $571,105 in October 2021 reimbursement. $609,000 in November. All flowing through ███. All after Bock fired Farah from FOF.

On August 12, 2021, ██████████████ he had money for him and wanted to "chat offline."  In the same exchange:

> Farah: "And you take care of our sister."
> Julius: "Most definitely she's well taken care of lol."

The next day, August 13, they met at a Burnsville address.

6.    *The FBI never investigated ██████████ because Aimee Bock is who it wanted.*

Agent Kary confirmed under oath:

```
Q.  Your understanding is he told somebody in the
United States Government not to talk to Kara Lomen.
A.  Correct.
Q.  And you never have.
A.  I never have.
Q.  All right.  Has she been in front of a grand jury?
A.  She has not.
```

Trial II, Trial Tr., Vol. VIII at 2035:13.  Lomen was named a co-conspirator in the court's Bail findings, Trial I, Trial Tr. Vol. XXVI 6311:11.  The Minnesota Court of Appeals confirmed that MDE relied on affidavits from federal law enforcement connecting Partners in Nutrition to individuals alleged to have diverted food-program funds for their personal use. *See In re Partners in Nutrition*, 995 N.W.2d 631 (Minn. Ct. App. 2023). Lomen's email was never searched. Her phone was never extracted. Her CLiCS access logs were never forensically analyzed.  Yet the full weight of the federal Government was disproportionately placed on Ms. Bock, tagging her as "the mater mind."

Under § 3553(a)(6), the Court must consider "the need to avoid unwarranted sentence disparities."  The disparity between a potential life sentence for the woman who fired Abdiaziz Farah and other fraudulent sites — and nothing for the woman who became his biggest enabler, turned off errors notification in the claims system, ran claims with known duplicate names, acknowledged her own operation wouldn't survive investigation, and was credited by her co-conspirator as his teacher — is not a disparity the statute can justify.

63

## VII.    THE COURT MUST NOT ALLOW THE GOVERNMENT TO TURN MDE'S PROGRAM OVERSIGHT RESPONSIBILITY INTO AIMEE BOCK'S BURDEN.

Ms. Bock does not argue that MDE's failures negate the verdict. But MDE's role remains highly relevant to sentencing attribution, relative blame, and the risk of exaggerating Ms. Bock's personal culpability. The defense's objections note that MDE was also responsible for program oversight, approval, and administration, and that the PSR understates or omits MDE's role. Ms. Bock's objections argue that MDE—not Ms. Bock—had final authority to approve site participation and reimbursement submissions, and that MDE failed to segregate, or halt claims it now characterizes as obviously fraudulent. Even claims that Bock raised concerns were approved. That matters in at least three ways.  First, it weakens any simplistic claim that every dollar reimbursed through FOF should automatically be treated as solely Ms. Bock's personal handiwork.  Second, it supports the defense's argument that the record must distinguish Ms. Bock's conduct from that of many other actors operating within a system that MDE itself approved, paid for, or failed to stop in real time. Third, it bears on parity and fairness. The defense has consistently argued that similar conduct within the PIN sphere did not result in parallel treatment of comparable gatekeepers. Whether or not the Court accepts every aspect of that comparison, caution is warranted before sentencing Ms. Bock, as though she alone personified the entire breakdown of the program.

64

*A.    MDE is the agency that approved all meal claims, paid all meal claims, and then blamed the sponsor, Aimee Bock, who complained.*

This Court must not ignore MDE's conduct in the success of the largest Covid-19 child nutrition fraud in the country. MDE did not merely misinform the FBI. MDE's own institutional conduct — across years of decisions, each documented in the two trial records before this Court — approved, enabled, and sustained the flow of $246 million. Then, in Trial II, MDE asked this Court to attribute it all to Aimee Bock.  MDE physically visited Safari Restaurant in June or July 2020.  Honer confirmed it under oath:

```
Q.  All right.  And in what years did you conduct site
inspection of Safari?

A.  I believe our office conducted a pre-approval site visit
of Safari in June or July of 2020.
```

Trial II, Trial Tr. Vol. III 513:24-514:2.  Then MDE approved the site. Honer admitted she had concerns. She admitted MDE had the authority to deny. She chose not to:

```
Q.  But yet you approved the Safari site, correct?
A.  I conducted our approvals and work within the
regulations in my authority.
Q.  Do you have the authority to deny, though?
A.  If I have reasons to deny, which are spelled out in
regulations, yes.
Q.  But you never did that?
A.  I didn't feel I had the evidence --
```

65

Trial II, Trial Tr., Vol. III at 514:18.  MDE visited. MDE saw. MDE approved. MDE had the authority to deny. MDE chose not to.  Then MDE's human reviewer approved Safari's application for 5,000 meals per day:

```
            What is the request here in the application
regarding breakfast, morning snack?  How many people?
A.  The number entered under morning snack, I'm sorry,
morning snack for total estimated children served is 5,000.
Q.  All right.  And then what about lunch?
A.  It is also 5,000.
Q.  It was approved, wasn't it?
A.  Yes, it was.
Q.  By a human being, correct?
A.  Yes.
```

Trial II, Trial Tr. Vol. III at 506:11.  MDE staff then went further — reconfiguring CLiCS itself to make the approval possible: "In order to bypass claim edits for the COVID-19 waivers of noncongregate and child care, the site was listed as a nonprofit until June 30th, 2020." Trial II, Trial Tr. Vol. III 500:15.  MDE didn't just approve 5,000 meals a day at a single restaurant. It reconfigured its computer system to bypass its safeguards and make that approval work.  When Honer was later asked whether 5,000 meals a day was realistic:

```
Q.  Okay.  Let's say 5,000.  All right?  You say it's
unrealistic, correct?
A.  Yes, I do.
Q.  But it was approved, correct?
A.  Yes, it was.
```

Trial II, Trial Tr. Vol. III at 544:7. MDE approved a capacity that it now calls unrealistic. And then MDE's CLiCS system auto-approved every subsequent claim at that rate — without a single human being ever looking at one:

```
Q.  So is it your testimony that when a claim is made for
money at MDE, a human being does not evaluate it for
approval or denial?
A.  That is correct.
```

Trial II, Trial Tr. Vol. III at 499. $246 million through a computer system with no human checkpoint. That was MDE's design. MDE never issued a serious deficiency notice to Safari. Never issued one to Empire Cuisine. Never issued one to any site, the Government now calls the centerpiece of the fraud. When asked whether MDE's silence communicated compliance, Honer resisted:

```
Q.  MDE's actions were sending the message that Empire was
compliant with program rules at the time; is that fair?
A.  If that's the impression they got, I'm not sure.
```

Trial II, Trial Tr., Vol. VII1 533:16. MDE had the authority to tell sponsors that the numbers seemed unreasonable. MDE had the authority to claw back funds. MDE exercised none of it:

```
briefly, MDE had the authority to, if it had a belief the
numbers were too high, that these claims were not
reimbursable, to tell the sponsor and clawback the money
```

67

```
that was distributed, right?
A.  To tell the sponsor that they seemed unreasonable, yes.
And then we had -- or have the authority under the
regulations to take back funds.
Q.  And MDE did not exercise that option, right?
A.  To this date, no.
```

Trial II, Trial Tr. Vol. VII 1534:23.  MDE referred its concerns to the FBI in spring 2021.

Then it lifted the stop pay on April 29, 2021. Then it continued paying claims —

including claims Honer had concerns about — for eight or nine more months:

```
Q.  And the claims MDE continued to reimburse and pay, those
were -- some of those were claims you had concerns about; is
that right?
A.  I would agree with that.
```

Trial II, Trial Tr. Vol. VII at 1540:2.

```
Q.  So that's about eight or nine months after you first
started providing information to the FBI; is that fair?
A.  I think that's fair.
```

Trial II, Trial Tr. Vol. VII at 1541:6.  MDE management told Honer to stop investigating.

Defense counsel confronted her with her own FBI interview:

```
Q.  Do you remember telling them that upper MDE management,
because they were worried about this lawsuit, told you to
stop looking into some of these things that you were
concerned about?
A.  No, I do not remember that.
```

68

Trial I, Trial Tr. Vol. VI at 1439:13.  Honer's response is a non-denial — "I do not remember" — but the Government's own disclosure from her on a March 2022 FBI interview contradicts her assertions. Bock Sent. Ex. 2-0013. The agency that now asks this Court to attribute $246 million to Aimee Bock directed its own program supervisor to stop looking for fraud.  And while Honer was telling the FBI the claims were fraudulent, MDE's Assistant Commissioner was testifying under oath in a state court:

> Q. Does MDE, to your knowledge, have any reason to suspect there's been intentional acts of fraud with respect to CACFP or SFSP?
> A. No.

Daron Korte Dep., July 29, 2021, 15:24-16:3. Bock. Sent. Ex. 5. The same agency. The same time period. One story for the FBI. A different story under oath.  MDE disclaimed responsibility for site inspections:

> A.  I would say no, we are not responsible for going to do site visits on an application.

Trial II, Trial Tr. Vol. III at 464.  MDE disclaimed authority over fraud:

> A.  MDE does not, to my knowledge, does not have the legal authority to investigate or designate fraud.

Trial II, Trial Tr. Vol. III at 465:20.  MDE admitted it did not conduct monitoring visits at the sites:  "We did not conduct monitoring visits on the sites, no."  Trial I, Trial Tr. Vol. VII 1530:8.  What does this mean for the amount of loss?  The Government's approach to $243 million is simple: take what MDE paid FOF and call it a loss. But MDE's own school district data shows that the correct analytical framework is fundamentally

69

different.  Using the framework below, $182 million represents 75% of the $243 million and falls into cost categories that are legitimate in every school district in Minnesota. The potentially attributable loss is the surplus plus any above-benchmark or diverted spending — not the entire $243 million.  This is not a defense estimate. It is MDE's own cost structure, applied to FOF's revenue. The Government is free to argue that FOF's actual cost structure was different. But it must present evidence to support that argument — not simply assume that every non-food dollar was stolen, as Roase did based on Honer's false premise.

1.      *Ms. Roase's 4.1 Percent in context.*

At trial, Ms. Roase's headline finding was that Safari spent "only 4.1% of its program reimbursements on actual food." Trial II, Trial Tr. Vol. XIV 3288:10.  The prosecution presented this as devastating proof: 95.9% of every dollar was stolen. MDE's own data provides the correct benchmark — and it tells a different story:

| Entity | Food Percentage | Non-Food Percentage | Government theory: "Not Spent on Food." |
|---|---|---|---|
| St. Paul NSLP | 25% | 75% | 75% "diverted." |
| Minneapolis NSLP | 33% | 67% | 67% "diverted." |
| Minneapolis CACFP | 37% | 63% | 63% "diverted." |
| St. Paul SFSP | 40% | 60% | 60% "diverted." |
| Safari (Ms. Roase) | 4.1% | 95.9% | 95.9% "diverted." |

Based on the above, Safari's 4.1% is comparatively low. She excluded food vendors whose invoices she found "not satisfactory" — a subjective standard she never

70

documented. Trial II, Trial Tr. Vol. XV 3366:18. The FBI "didn't need to" search the Bushra food warehouse. Trial I, Trial Tr. Vol. XXIII 5509:14. Had Ms. Roase included the $463,000 in Manmabuyu food invoices, she excluded Trial I Exhibit D5-34, and the food purchases from vendors she chose not to examine, Safari's food percentage would be higher. The exact figure cannot be determined — because the investigation chose not to look.

## VIII.   CONCLUSION

For the foregoing reasons, Ms. Bock respectfully asks the Court to:

1.  Sustain the defense objections to the PSR's overbroad loss attribution.  PSR ¶ 102;

2.  Reject the four-level organizer/leader enhancement or reduce it to the extent the record supports a narrower role finding. PSR ¶ 107;

3.  Zero-point offender reduction should be applied. PSR ¶ 110;

4.  Two points obstruction of justice enhancement should not apply. PSR ¶ 108;

5.  Two points enhancement for federal disaster or emergency benefits should not apply. PSR ¶ 105;

6.  Two points enhancement for sophisticated means should not apply. PSR ¶ 104;

7.   Two points enhancement for charitable or educational misrepresentation should not apply.  PSR ¶ 103;

8.   Limit restitution and forfeiture to amounts lawfully and reliably attributable to Ms. Bock's own conduct; and

9.  Impose a sentence of time served or at the most 37 months, followed by an

    appropriate term of supervised release with mental-health treatment and vocational

    programming conditions.

                                        Respectfully submitted,

                                        **KENNETH UBONG UDOIBOK, P.A.**

May 18, 2026                            /s/*Kenneth U. Udoibok*
                                        Kenneth U. Udoibok (#0262523)
                                        Flour Exchange Building, Suite 5010
                                        310 4th Ave. S. Mpls, MN 55415
                                        Phone: (612) 808-6031
                                        *k@kenulaw.com*
                                        **ATTORNEY FOR DEFENDANT**
                                        **AIMEE MARIE BOCK**